UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20552-CR-Gayles/Torres

**UNITED STATES OF AMERICA**

vs.

**DAVID RIVERA, et al.**
_____/

**GOVERNMENT'S RESPONSE TO DAVID RIVERA'S MOTION
FOR MISCELLANEOUS RELIEF**

The United States of America, by and through the undersigned attorneys, hereby files this response in opposition to David Rivera's ("Rivera") motion for miscellaneous relief in which he seeks an order from the Court requiring the return of his passport so that he can "travel to Venezuela to consult with counsel" who he claims is "advising and assisting" him in the present case as well as in a related civil lawsuit pending in the Southern District of New York (DE #71).

In this instance, however, the purported "counsel" is Raul Gorrin Belisario ("Gorrin"), a wealthy Venezuelan businessman who is (1) a principal participant in the events described in the pending indictment; (2) a Venezuelan attorney not licensed to practice law in the United States; (3) the subject of economic and other sanctions imposed against him by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"); and (4) a fugitive from U.S. justice having been named as a defendant in an indictment pending in the Southern District of Florida that charged him with money laundering and other violations for his role in a massive bribery scheme involving two former Treasurers of the Venezuelan government.

Despite these facts, counsel for Rivera in the pending criminal case asserts – without citation to any judicial or other authority – that Rivera's Sixth Amendment right to counsel requires nothing less than Rivera be allowed to travel to Venezuela in contravention of his conditions of

bond so that he can meet with Gorrin outside the presence of Rivera's current attorneys, all for the purported purpose of receiving legal advice from Gorrin regarding the pending criminal matter.[1]

For the reasons set forth below, Rivera's motion should be denied.

## Background

A.   Indictment Against Rivera

On November 16, 2022, a grand jury sitting in this district returned an indictment charging Rivera and his co-defendant Esther Nuhfer ("Nuhfer") with conspiracy to violate the Foreign Agents Registration Act ("FARA"), in violation of 18 U.S.C. § 371, a substantive FARA count, in violation of 22 U.S.C. § 612(a) and 618(a)(1), money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and five substantive counts of money laundering, in violation of 18 U.S.C. § 1957.

The FARA specific charges in the indictment allege that Rivera and Nuhfer acted as agents of the Government of Venezuela in 2017 and 2018 by engaging in an effort to lobby United States government officials to normalize relations between the United States and Venezuela and to prevent the imposition of additional economic sanctions against Nicolas Maduro, the president of Venezuela, and other members of his regime.

Those efforts, as set forth in the indictment, included, in part, arranging a meeting, with Gorrin's assistance, in April 2017 in New York City between a U.S. Congressman ("U.S. Congressman 1") and the Foreign Minister of Venezuela, Delcy Rodriguez, to discuss a process to normalize relations between the two countries. The indictment alleges that a second meeting

---

[1] For purposes of this motion, the government is accepting the representations of Rivera's attorneys that Gorrin is actually a duly licensed attorney in Venezuela. However, the government has no independent knowledge of that fact.

took place in New York City at which U.S. Congressman 1 was introduced to a member of the Venezuelan National Assembly, which in fact took place Gorrin's apartment. The indictment further alleges that Rivera and others, including Gorrin, arranged two additional meetings in Caracas, Venezuela, in April 2018 involving U.S. Congressman 1 and Venezuelan government officials. The first of these meetings included Rivera, U.S. Congressman 1, President Maduro, other members of the Maduro regime, and Gorrin. The second meeting was held the following morning at Gorrin's home in Caracas. Included in the meeting at Gorrin's home were Rivera, Gorrin, a member of one of the Venezuelan opposition parties, U.S Congressman 1, and several individuals from the U.S. Embassy in Caracas.

To compensate Rivera, PDV USA, Inc., ("PDV USA"), a wholly owned U.S. subsidiary of Petroleos de Venezuela, S.A. ("PDVSA"), the state-owned oil company of Venezuela, entered into a consulting contract with Interamerican Consulting, Inc. ("Interamerican Consulting"), a Florida corporation controlled by Rivera, on March 21, 2017. The signed consulting contract between Interamerican Consulting and PDV USA provided for five installment payments of $5,000,000 each and a final payment of $25,000,000 to be made before June 15, 2017, for a total of $50,000,000. According to the indictment, executives with the CITGO Petroleum Corp. ("CITGO"), PDVSA's primary operating subsidiary in the U.S., were ordered by members of the Venezuelan government to enter into the contract with Rivera's company (effectuated through PDV USA, a non-operating entity).

Ultimately, Rivera, through Interamerican Consulting, received a total of $15,000,000 from PDV USA and an additional payment of $5,000,000 from a PDVSA bank account at Gazprom Bank (a Russian entity) pursuant to the consulting contract. Over time, Rivera distributed these funds between himself and several other individuals involved in their lobbying

efforts including Nuhfer and Gorrin.  In Gorrin's case, Rivera sent the payments to a Miami based company for maintenance and other costs associated with two of Gorrin's luxury yachts.

At no time did Rivera and his associates register with the Attorney General of the United States that they were acting as agents of the Venezuelan government in conducting their lobbying-related activities, nor did they disclose to the U.S. government officials (or anyone else) they interacted with that they were acting to further the interests of the Maduro regime through the consulting contract between Interamerican Consulting with PDV USA.

In support of the conspiracy charge described more generally in the Manner and Means section of the indictment, the indictment also sets forth ninety-two Overt Acts that provide detailed descriptions of various financial transactions, emails, and text messages engaged in or exchanged in furtherance of the scheme.  Many of these Overt Acts directly involve Gorrin (identified in the indictment as "Foreign Individual 1") and reflect the millions of dollars in benefits that Gorrin received as compensation for his involvement in the overall scheme, and describe in detail the substance of the communications involving the various participants, none of which reflect Gorrin providing legal advice to Rivera or the other participants.

B.  The PDV USA Civil Lawsuit Referenced
    In Rivera's Motion

In May 2020, PDV USA filed a civil lawsuit against Interamerican Consulting in the Southern District of New York seeking to recoup the $15,000,000 that it had paid to Interamerican Consulting in 2017.  PDV USA v. Interamerican Consulting, Case No. 20-Cv-03699-JGK (DE#1) (hereinafter, "PDV USA Civil Action").[2]

---

[2] After the filing of PDV USA's lawsuit in May 2020, Rivera gave statements to several news organizations regarding the lawsuit's allegations. The Miami Herald, for instance, reported that Rivera had gone so far as to state that all of the funds Interamerican Consulting received from

It is the government's understanding that the engagement/retainer letter attached to Rivera's present motion first appeared during a discovery dispute in the civil lawsuit. Specifically, Interamerican Consulting had listed a number of text messages and/or emails involving Gorrin on its privilege log based on the assertion that Gorrin had been acting as Rivera's or Interamerican Consulting's attorney in 2017.  There appears to have been some back and forth between the parties in which PDV USA, through its attorneys, was asking for documentation to substantiate the privilege assertion.  After some protracted period of time, Interamerican Consulting apparently produced the engagement letter that PDV USA had been inquiring about for several months.

When asked about the engagement letter by PDV USA's attorney in a deposition in Miami in July 2022, Rivera testified that he had been in communication with Gorrin for some time to obtain a copy of the engagement letter.  Then one day, unannounced, an envelope was lying at or inside his front door when Rivera returned home.  According to Rivera, the envelope was blank and did not have a stamp or mailing address on it.  When Rivera opened the envelope, he found a copy of the purported engagement letter dated March 21, 2017 (the same day the consulting agreement between PDV USA and Interamerican Consulting is dated).  According to Rivera, the letter was then immediately produced to PDV USA.

## Legal Analysis

The Bail Reform Act generally provides that, pending trial, a criminal defendant must be released "on personal recognizance" or "upon execution of an unsecured appearance bond in an

---

PDV USA "went to the opposition for anti-Maduro protests in the summer of 2017.  I never saw a penny of it.  That's all I know."  Miami Herald, Former Congressman Rivera paid millions for consulting by Venezuelan oil firm, suit says (June 22, 2020).

amount specified by the court." 18 U.S.C. § 3142(b). If, however, the Court determines such release "will not reasonably assure the appearance of" the defendant "or will endanger the safety of any other person or the community," the Court can condition the release on the satisfaction of one or more of the conditions listed in § 3142(c)(1). One of these conditions is for the defendant "to avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense." 18 U.S.C. § 3142(c)(1)(B)(v).

A number of courts have imposed a version of this statutorily enumerated condition of release, including in the Southern District of Florida, with regularity. As the Tenth Circuit noted in upholding a no-contact order prohibiting a defendant charged with drug distribution from contact with his long-term girlfriend, "the no-contact order was necessary to assure the safety of the community because of the potential intimidation of, and collusion with, witnesses, would subvert the judicial process." United States v. Pickel, 500 F.Appx. 771, 772 (10th Cir. 2012).

### Rivera's Bond

Here, Rivera was released pursuant to a $200,000 personal surety bond co-signed by his wife and sister. In addition to the standard conditions of bond imposed in this district (including limiting his travel to the Southern District of Florida), the Court ordered a number of special conditions in order to ensure his appearance at any further proceedings in the matter and trial. These included, in relevant part, that Rivera was to surrender his passport (currently in the possession of pretrial services in Atlanta) and the imposition of a no-contact provision requiring Rivera to "[a]void all contact directly or indirectly with any person who may be a victim or witness in the investigation or prosecution. **Special condition not in effect until a list is provided to the Court and Pretrial Services**." In addition, the special conditions set by the Court allowed Rivera to travel to several other judicial districts in the U.S. to appear in and meet with counsel in relation

6

to other pending litigation, subject to providing pretrial services with 48 hours notice prior to travelling.

Rivera now seeks permission from the Court to travel to Venezuela to meet with Gorrin, who he describes as his attorney since 2017, in order to obtain purported legal assistance with respect to the pending indictment as well as the civil lawsuit filed in New York by PDV USA.

## Argument

A.   Rivera's Sixth Amendment Claims are Without Merit

Rivera's Sixth Amendment Claims are without merit for two reasons.  First, based on the facts and circumstances set forth below and alleged in the pending indictment, Rivera has not come close to establishing a bona fide attorney client relationship with Gorrin.  Second, Rivera's invocation of his Sixth Amendment right to counsel does not support his request for Court authorization to travel to Venezuela to meet with Gorrin outside the presence of his retained counsel.

   1.   Rivera Has Not Proffered Sufficient Facts to Establish
        A Bona Fide Attorney Client Relationship with Gorrin

Rivera primarily asserts in his motion that he needs to travel to Venezuela to meet in person with Gorrin, who he claims has been his attorney since 2017.  Rivera alleges that Gorrin, who he does not attempt to claim is licensed to practice law in the United States, is providing non-specific legal assistance to him concerning both the pending indictment (to which Venezuelan law would appear to have no relevance) and the civil lawsuit filed by PDV USA against Interamerican Consulting.  Yet the only basis Rivera has offered to establish this purported multi-year attorney client relationship with Gorrin are his own self-serving statements to that effect and a retainer agreement of dubious origin.  The government is accordingly skeptical of Rivera's claims in this

regard and Rivera should be required to provide a more substantial showing of the existence of a bona fide attorney client relationship with Gorrin before this Court is asked to authorize his travel to the very country on whose behalf he acted as an undisclosed foreign agent.

As an initial matter, Rivera vastly understates the nature of his relationship with Gorrin, and Gorrin's general role in these matters, when he describes Gorrin in his motion as his attorney since 2017. Gorrin, as described in the pending indictment, played an important and central role in the unlawful lobbying scheme for which Rivera and Nuhfer are charged. A scheme in which Gorrin received millions of dollars to his benefit from the PDV USA consulting contract. Moreover, there is nothing in the voluminous text messages and emails involving Gorrin that the prosecution team has reviewed (a portion of which are described in detail in the pending indictment) that indicate in any way that Gorrin was providing Rivera with legal advice concerning the matters at issue. Accordingly, Gorrin is a potentially significant witness in this case, either for the government or the defendants, should he ever choose to return to the United States to face the criminal charges pending against him or if he is apprehended and extradicted to the U.S. prior to trial in this matter.

Moreover, the legal issues Gorrin is facing in the United States are far more significant than the passing reference Rivera makes to Gorrin having been indicted during 2018. As previously noted, Gorrin is a fugitive from U.S. justice who currently lives in Venezuela. He was initially indicted in August 2018 in the Southern District of Florida and charged with conspiracy to violate the Foreign Corrupt Practices Act, conspiracy to commit money laundering, and substantive money laundering, relating to his role in bribing two Treasurers of the Venezuelan Government in order to obtain highly-lucrative foreign exchange contracts awarded by the Venezuelan government. See U.S. v. Raul Gorrin Belisario, 18-80160-Cr-Dimitrouleas.

Alejandro Andrade Cedeno ("Andrade"), one of those former Treasurers, pled guilty to an information filed in December 2017 charging him with conspiracy to commit money laundering in connection with bribe payments he received from Gorrin.  U.S. v. Alejandro Andrade Cedeno, 17-80242-Cr-RLR.  He was initially sentenced to ten years imprisonment before receiving a reduced sentence due to his cooperation with the U.S. government.  The second former Venezuelan Treasurer, Claudia Patricia Diaz Guillen ("Diaz"), and her husband, Adrian Jose Velasquez Figueroa ("Velasquez"), were named as defendants with Gorrin in a superseding indictment returned in December 2020 that charged Diaz and Velazquez with money laundering and conspiracy to commit money laundering.  Diaz and Velazquez were both extradited to the United States from Spain and ultimately convicted by a jury in December 2022 at a trial held in Fort Lauderdale.   In April 2023, the Honorable William P. Dimitrouleas sentenced both Diaz and Velasquez to fifteen years imprisonment for their roles in the multibillion-dollar bribery and money laundering scheme orchestrated by Gorrin.

Despite these convictions, Gorrin to this day denies the allegations against him, claiming in a recent videotaped deposition in civil lawsuit filed in this district that he is the victim of a politically motivated prosecution. See Caballero v. Fuerzas Armadas Revolucionarious de Colombia, 18-Cv-25337-KMM (DE#301-1, pp. 10-11).

Further, in January 2019, the U.S. Department of Treasury placed Gorrin and other members of his family and associates on OFAC's Venezuelan sanctions list due to their involvement in matters relating to the bribery scheme described in Gorrin's indictment. Accordingly, it is the government's understanding that, as a result of Gorrin's designation as a sanctioned individual, U.S. persons such as Rivera are generally prohibited from engaging in transactions with him unless exempt or otherwise authorized by OFAC.

Nonetheless, Rivera subsequently assisted Gorrin in an effort to have Gorrin removed from OFAC's sanctions list for which Rivera received compensation of more than $5,000,000 that was sent to Interamerican Consulting by several Hong Kong shell companies through international wire transfers in the fall of 2019. Rivera had initially intended to receive those funds in an offshore bank account that he attempted to open in Dominica. Although Rivera was unsuccessful in opening the account, as part of the application process, Rivera submitted to the bank fake corporate and personal tax returns that vastly overstated Interamerican Consulting's and Rivera's revenues and income in 2018.[3]

Based on the foregoing, it is simply not reasonable to request that this Court rely solely on Rivera's self-serving statements and a retainer letter of questionable provenance to conclude that Rivera has had a bona fide attorney client relationship with Gorrin for the past six years. At a minimum, Rivera should be required (a) to provide this Court, ex parte if necessary, with additional evidence corroborating his claims and (b) to make a more specific showing regarding the nature and extent of the legal advice Gorrin purportedly has been providing Rivera for the last six years before this Court is asked to find the existence of a bona fide attorney client relationship between them.

---

[3] The government is not alone in its skepticism of Rivera's honesty and his willingness to engage in deceptive conduct. In July 2017, the Federal Election Commission filed a civil complaint against Rivera in the Southern District of Florida, alleging that Rivera had engaged in an illegal campaign contribution scheme relating to the 2012 general election. In granting summary judgment in favor of the FEC, the Honorable Marcia G. Cooke imposed a fine of $456,000 against Rivera, finding that Rivera had, in part, directed others "in how to complete and submit false FEC filings, amongst other actions, demonstrate[ing] Rivera's bad faith." Subsequently, in denying a motion filed by Rivera to dismiss the complaint for lack of jurisdiction, Judge Cooke noted that Rivera's various factual "assertions lack credibility" and the court was left "with the inescapable conclusion that [Rivera was], once again, being less than honest and forthright" in his claims contesting the jurisdiction of the court.

> 2. Rivera's Assertion that the Sixth Amendment Mandates Allowing Him to Travel to Venezuela to Meet with Gorrin Is Without Merit

Rivera argues that the Sixth Amendment requires that he have the unrestricted ability to travel to Venezuela to meet with Gorrin in person. Rivera, however, cites no authority in support of his claim that his right to counsel extends beyond the attorneys representing him in the present matter.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has observed that the right to counsel "was designed to assure fairness in the adversary criminal process." Wheat v. United States, 108 S.Ct. 1692, 1697 (1988) (further noting that the "appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such."). At its core, "the right to counsel . . . is a trial right, ensuring that the prosecution's case is subjected to the crucible of meaningful adversarial testing." Kansas v. Ventris, 129 S.Ct. 1841, 1845 (2009).

"[A]n element of this right is a right of the defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 126 S.Ct. 2557, 2561 (2006). And although a court "must recognize a presumption in favor of a defendant's counsel of choice," United States v. Schneider, 853 Fed.Appx. 463, 465 (11th Cir. 2021), the right to be represented by counsel of choice is not without limits. For example, the "right to counsel of choice does not extend to defendants who require counsel to be appointed for them." Gonzalez-Lopez at 2565. "Nor may a defendant insist on representation by a person who is not a member of the bar, or demand that a court honor his waiver of conflict-free representation." Id. Indeed, a trial court has "wide latitude in balancing the right to counsel of choice against the needs of

11

fairness" . . . and has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 2656-66.

At first blush, it certainly appears that Rivera's Sixth Amendment right to counsel of choice is satisfied here through his representation in the pending matter by present counsel, all of whom, as members of the Florida Bar, entered temporary appearances in this case with the intention of acting as permanent counsel for Rivera and ultimately representing him at trial. As the Supreme Court has noted, the core of a defendant's Sixth Amendment right is the right to counsel at trial, a right that Gorrin is not able satisfy as he is not a member of the Florida Bar or any other Bar in the U.S. Indeed, the Sixth Amendment issue raised by Rivera seems entirely misplaced because Gorrin is not actually seeking to represent Rivera in the sense that is implicit in the Sixth Amendment case law reviewed by the government—that is, acting as counsel of record in the trial of this matter. Instead, based on Rivera's own description of events, Gorrin is acting as more of a consultant on Venezuelan law – hardly a rare commodity – who ironically also happens to be a potentially significant fact witness in this case. In the end, Rivera fails to cite any judicial or other legal authority – and the government has found none – for this rather expansive reading of the Sixth Amendment right to counsel. Accordingly, Rivera's claim that his right to counsel requires nothing less than the ability to travel Venezuela to meet with Gorrin outside the presence of his counsel of record should be denied.

Finally, to be clear, the government is not in any way seeking to preclude Rivera's attorneys of record in this criminal matter from preparing his defense. If Rivera or his attorneys believe that matters of Venezuelan law are somehow relevant to the pending indictment and the preparation of Rivera's defense, present counsel is certainly free to meet with Gorrin in person in

Venezuela or to communicate with him from the U.S. via telephone or videoconference. Alternatively, Rivera's counsel could engage a Venezuela law expert who is not currently a potential witness in this case and communicate with them with or without Rivera's presence. The government is merely taking the position that in light of Gorrin's status as a potential witness here, the Sixth Amendment does not compel the relief he is seeking in his motion.[4]

B.  Rivera's Interpretation of the No Contact
    Provision Is Too Narrow

First, Rivera appears to suggest that the Court's no contact provision should be read to apply only to victims or witnesses that are believed to be favorable to the government's case at present. Implicit in Rivera's assertion is the belief that the government will never call Gorrin as a witness at trial and therefore Rivera should be allowed to meet with Gorrin outside the presence of his counsel in this matter. Rivera, however, cites no statutory or judicial authority for this position. Instead, he claims that this reading of the no contact provision is implicit in the "witness in the investigation or prosecution" language used by the Court in the no contact clause itself.

---

4 Allowing Rivera to communicate directly with Gorrin to obtain legal advice without the presence of his retained counsel would appear to raise additional complexities here. Florida Bar Rule 4-1.7(a)(2) provides that "a lawyer must not represent a client if . . . there is a substantial risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer." Here, Gorrin, a fugitive from justice, was a principal participant in the criminal activity described in the indictment and, as the comments to Rule 4-1.7(a)(2) note, "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." Nor would Gorrin's apparent conflict of interest appear to be waiveable under Rule 4-1.7(b) or otherwise. Rule 4-1.7(b)(2) states that a lawyer may represent a client notwithstanding the existence of a conflict due to a personal interest of the lawyer if "the representation is not prohibited by law." Gorrin, as noted previously, is subject to sanctions imposed against him by OFAC, which raises the spectre that Gorrin's provision of legal advice to Rivera would run afoul of U.S. law. It is the government's present understanding (based, in part, on discussions with the Treasury Department) that Rivera would not be authorized to retain the legal services of Gorrin under the current sanctions program.

The government simply does not read this language to mean only witnesses favorable to the government's case at the present time or that the government presently believes it will call to testify at trial. Indeed, the special condition set by this Court has its statutory basis in 18 U.S.C. § 3142(c)(2)(B)(v), which authorizes the Court, in order to reasonably assure the appearance of the defendant and the safety of any other person and the community, to impose a condition requiring the defendant to "avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense." By its express language, it speaks of "potential witnesses who may testify concerning the offense." It makes no distinction between witnesses who may testify in the government's or the defense's case, but instead focuses on witnesses who may testify as to the offense itself.

Magistrate Judge Louis included a similar no contact provision in the personal surety bond pursuant to which co-defendant Nufher was released pending trial. That provision states that Nuhfer is to "[a]void all contact with victims or witnesses to the crimes charged, except through counsel" and required the government to provide a list of all the witnesses and victims to defense counsel and pretrial services before the no contact provision would take effect. As with the statutory language itself, the focus of the no contact provision is on witnesses to the crime charged. Rivera's no contact provision should be interpreted in a similar manner.[5]

Interpreting the no contact clause in this way makes particular sense given the procedural

---

[5] Rivera faults the government for not providing a no contact list to the Court and defense counsel until June 13, 2023, after Rivera's counsel raised the issue of Rivera travelling to Venezuela to meet with potential witnesses including Gorrin. The Court's conditions of bond, however, did not set a time period in which the government was required to submit a no contact list to the Court and the government's failure to provide one earlier was simply an oversight by the government. The government had, in fact, provided an identical no contact list to pretrial services and counsel for Nuhfer back in December 2022.

14

stage of the pending case. It is much too early in the proceedings to limit the no contact provision to only those individuals the government presently believes it may call to testify when a trial date has not even been set by the court.  A lot can change between now and trial, as anyone familiar with the criminal process understands, and it is therefore premature for Rivera to assert what Gorrin's status will ultimately be in relation to a potential trial at some later date.  Accordingly, it is too early in the criminal proceedings (Rivera has not even been arraigned due to litigation relating to his ability to hire counsel) to limit the reach of the no contact provision to only those witnesses that the government currently believes it may call to testify at trial.

Second, Rivera suggests that the no contact provision exists only to ensure the security of potential prosecution witnesses and asserts that Gorrin has not made any such request for protection.  Once again, Rivera offers no statutory or judicial authority for this assertion.  And, as with Rivera's argument to limit the no contact provision to only prosecution witnesses a trial, there is no basis in the relevant statutory language set forth at § 3142(c)(2)(B)(v) to limit the no contact provisions to situations involving threats to a potential witness's safety.

Indeed, various courts have imposed such no contact conditions in situations that do not involve threats of physical harm to potential witnesses.  See, e.g., United States v. Olivarez, 2022 WL 16836338 at **2-3 (S.D. Tex. 2022) (holding that § 3142(c)(1)(B)(v) is not limited to situations involving witness intimidation and upholding a no contact provision against a defendant seeking to the marry the alien she was charged with harboring on the basis of the potential for collusion between them).  Rather, these courts have imposed such conditions on the grounds of the potential for collusion between a defendant and a potential witness that would impede the due administration of justice.  United States v. Cota, 2022 WL 425997 at *2 (D. Kan. 2022) (upholding no contact provision between the defendant and a co-defendant with whom she shared

15

a child "to ensure witness tampering, collusion, or other interference with the prosecution of the case does not occur"); United States v. Blankenship, 2015 WL 1565774 at * (S.D.W.V 2015) (holding that, in part, the defendant's "motive to assert undue influence over potential" witnesses justified an expansive no contact provision where it still allowed contact with any potential witness "through counsel"). Accordingly, there is no basis in the government's view to support Rivera's narrow reading of the no contact provision here.

C. Rivera Should Not Be Allowed to Travel to Venezuela
To Meet With Other Potential Witnesses

Although Rivera's motion is pled in terms of his request to travel to Venezuela to specifically meet with Gorrin, the government opposes his travel to Venezuela for any reason, including meeting with alleged potential witnesses other than Gorrin should Rivera attempt to broaden his request in his reply brief.

This case, by its very nature, involves risks relating to nonappearance should Rivera be allowed to engage in international travel. Rivera is charged after all with being an agent of a foreign government that is on poor terms with the United States and is generally regarded as being run by a corrupt regime. Indeed, Maduro himself is a defendant in an indictment pending in the Southern District of New York and the subject of OFAC sanctions first imposed against him in 2018. Moreover, in addition to the millions of dollars that Rivera received in 2017 at the ultimate direction of members of the Venezuelan government, Rivera received more than $5,000,000 in 2019, as previously described, from various overseas entities to assist Gorrin in obtaining relief from the sanctions imposed on him by OFAC.

That alone should be enough to decline Rivera's request to travel outside the domestic judicial districts he is currently relegated to in his appearance bond. However, Rivera has

16

reported having ownership or control of significant additional offshore assets as recently as June 2022. For example, on June 15, 2022, Rivera filed a Form 6 financial disclosure form with the Florida Division of Elections in a short-lived effort to run for state office in the 2022 general election. On that Form 6, filed under penalty of perjury, Rivera reported a total net worth of $984,137 as of June 15, 2022, including a real estate property in Mexico worth $150,000 and at least three offshore bank/investment accounts in Mexico, Taiwan, and Haiti with a combined balance of $160,000. Rivera also reported $120,000 in income from two companies, including $97,000 from a Mexican company named Xemma Holdings, S.A. de C.V.[6]

Notably, the Form 6 Rivera filed in June 2022 is also false in that it omits to provide a complete description of his financial assets. For example, Rivera lists one bank account at Wells Fargo and a 401(k) account with a combined balance of roughly $359,455. Rivera, however, failed to disclose on the Form 6 additional bank accounts he controlled at two banks located in the U.S. that had a combined balance of approximately $554,346 at the time of filing.

Concededly, Rivera has significant familial and other ties to the U.S. However, for all of the reasons discussed at length in this response, he simply presents too great a risk of nonappearance should he be allowed to travel to Venezuela or elsewhere outside the United States.

                                        Respectfully submitted,

                                        MARKENZY LAPOINTE
                                        UNITED STATES ATTORNEY

By:    /s/ Harold E. Schimkat
        Harold E. Schimkat
        Assistant United States Attorney
        Court ID No. A5500567

---

[6] Rivera declined to provide any financial information to pretrial services in Atlanta before his initial appearance following his arrest in December 2022.

        99 N.E. 4th Street, 4th Floor  
        Miami, Florida 33128  
        Office: (305) 961-9298  
        Cell: (786) 378-4344  
        Harold.schimkat@usdoj.gov  

        &  

        Evan N. Turgeon  
        TRIAL ATTORNEY  
        FOREIGN MALIGN INFLUENCE,  
        COUNTERINTELLIGENCE &  
        EXPORT CONTROL SECTION  
        NATIONAL SECURITY DIVISION  
        U.S. DEPARTMENT OF JUSTICE

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 15, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/
Harold E. Schimkat
Assistant United States Attorney