UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

No. 22-cr-20552-DAMIAN/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DAVID RIVERA and ESTHER NUHFER,

      Defendants.

_____/

## DEFENDANTS' JOINT RESPONSE IN OPPOSITION
## TO THE GOVERNMENT'S OMNIBUS MOTION *IN LIMINE*

On February 6, 2026, the government filed its Omnibus Motion *in Limine* [ECF No. 341] (the "Gov't MIL"). Defendants David Rivera and Esther Nuhfer therefore file this Joint Response in Opposition, and state as follows:

### INTRODUCTION

The government seeks to bar the defense from presenting any defense evidence—or even a defense at all—while asking this Court to admit anything it thinks will secure a conviction. Defense counsel has never seen a more general motion – lacking identification of specific evidence, statements, summaries, deposition excerpts, or exhibits that it seeks to exclude as if the Court will grant its overbroad, generic requests as a matter of course. Other courts have wholly denied similarly all-encompassing government motions *in limine* as premature, and we ask this Court to do the same here. In *United States v. Markovich*, for example, Judge Dimitrouleas denied one such sprawling motion *in limine* because "[m]otions *in limine* are not designed for a Court to give advisory opinions," and "it is difficult to rule in a vacuum without having the opportunity to

see the proffered evidence or testimony in perspective with other evidence in the trial." No. 21-cr-60020, ECF No. 276, at 2 (S.D. Fla. Aug. 9, 2021). Indeed, concluded Judge Dimitrouleas, "motions in limine are best limited to those issues the mere mention of which would be so prejudicial that it would deprive a party of a fair trial." *Id.*

The government here seeks an exceedingly broad pretrial ruling, which would essentially preclude Defendants from presenting permissible defenses or rebutting government claims. For example, the government contends that some of the evidence described in its Motion would invite jury nullification and would serve no other purpose. Painting with such a broad brush, however, ignores that much of that evidence will be offered for permissible purposes—including to negate an element of the offense, rebut the government's evidence or theory, impeach witnesses, or simply provide background information. That is more than enough for this Court to deny the government's Motion, as such evidence should not be excluded before trial unless it is "*clearly* inadmissible for *any* purpose." *United States v. Hunt*, No. 17-cr-00402, 2019 U.S. Dist. LEXIS 42662, at *3 (M.D. Fla. Mar. 15, 2019).

All relevant evidence is admissible unless the Court finds that its probative value is "substantially outweighed by a danger of . . . unfair prejudice" or other risks. *See* Fed. R. Evid. 403. The fact that a jury might rely on *otherwise relevant* evidence and engage in jury nullification does not constitute unfair prejudice or render the otherwise admissible evidence inadmissible. *See, e.g.*, *United States v. Little*, No. 19-cr-00043, 2020 U.S. Dist. LEXIS 80994, at *8 (S.D. Ga. May 7, 2020) (evidence is admissible unless it is "introduced *solely* to invoke sympathy or to invite jury nullification") (emphasis added); *see also Childs v. DeKalb Cnty. Georgia*, No. 05-cv-02463, 2009 WL 10670880, at *2 (N.D. Ga. Sept. 18, 2009); *United States v. Barrios*, No. 24-cr-20289, 2025 U.S. Dist. LEXIS 162506, at *10–11 (S.D. Fla. Aug. 20, 2025) (noting that "nullification is no

2

basis for admitting *otherwise irrelevant* evidence" (quoting *United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) (emphasis added))).

Finally, the Government sets out *13* categories of evidence to which it objects or seeks to admit. In each of the objections to the defense evidence, however, the evidence at issue either is relevant and admissible or will not be introduced at all. As for the evidence the government seeks to admit, the government is light on specifics and broad in its theories of admissibility. Defendants need to see the evidence and consider the context before being able to fully articulate appropriate objections. Defendants jointly respond to each of these categories in turn.

ARGUMENT

### 1. Statements of participants in the FARA scheme are not admissible under Rule 801(d)(2).

Defendants object to the blanket admission of third-party statements (such as messages or emails by Mr. Hugo Perera, Mr. Raul Gorrin, or other alleged co-conspirators) under Rule 801(d)(2)(E) unless and until the government satisfies the stringent prerequisites for the co-conspirator statement exclusion. Rule 801(d)(2)(E) permits admission of a statement by a co-conspirator of a party only if (i) the statement was made "during and in furtherance of the conspiracy" and (ii) the declarant and the defendant were members of that conspiracy. Before a jury can hear such hearsay, the Court must make a preliminary finding that the foundational requirements of Rule 801(d)(2)(E) are met. In particular, the government must prove, by a preponderance of independent evidence, that:

1. A conspiracy existed;

2. The defendant and the declarant were members of that conspiracy; and

3. The statement was made during the course and in furtherance of the conspiracy (*i.e.*, it was intended to advance the conspiratorial objectives).

3

These requirements are well-established by Eleventh Circuit and Supreme Court precedent. As the Supreme Court explained in *Bourjaily v. United States*, the trial court must be satisfied that a conspiracy involving the declarant and the defendant existed, and that the statement was made during and in furtherance of that conspiracy, before admitting the statement under Rule 801(d)(2)(E). *See* 483 U.S. 171, 175–76 (1987).

Importantly, the proper procedure—often referred to as a *James* hearing (from *United States v. James*, 590 F.2d 575 (5th Cir. 1979)—is for the Court to require the government to establish these prerequisites outside the presence of the jury, before the statements are introduced. The former Fifth Circuit held in *James* that there is a preferred order of proof for co-conspirator hearsay: the prosecution should first produce substantial independent evidence of the alleged conspiracy and each defendant's participation, *and* evidence that the proffered statements were made during and in furtherance of that conspiracy. *See id.* at 581–82. The district court normally should make this threshold determination before the jury hears the statements, in a hearing outside the jury's presence. *See id.* at 582–83. This procedure prevents the jury from hearing potentially inadmissible hearsay on the mere assumption that a conspiracy *might* be proven later. *See id.* If conducting a pretrial hearing proves impractical, the court may conditionally admit the statements subject to the government "connecting them up" with proof of the conspiracy's existence and purpose by the close of evidence. *See id.* at 584. But in *every* case—on appropriate motion—the district court must determine that, by a preponderance of the independent evidence, there was a conspiracy between the defendant and the declarant and the statements were made during and in furtherance of the conspiracy. *See id.*

Here, Defendants respectfully request that the Court hold a *James* hearing (or otherwise require a detailed pretrial proffer) before admitting any statements by alleged co-conspirators in

4

the so-called "FARA scheme." The government is seeking to introduce a series of text messages, emails, and other out-of-court statements involving multiple participants. The Court should not permit the jury to be exposed to this hearsay evidence unless and until the government demonstrates, with independent evidence, the existence of the specific conspiracy charged and the "in furtherance" nexus for each statement. Conducting a *James* hearing will greatly assist the Court in screening the proffered statements and avoiding unfair prejudice. Otherwise, if the government were allowed to introduce these statements on speculation, the jury might hear inflammatory or irrelevant communications that do not actually meet the Rule 801(d)(2)(E) criteria—and any later curative instruction or belated exclusion would not un-ring the bell. The Eleventh Circuit has recognized that a pretrial *James* hearing is an effective way to reduce the risk that the jury will hear inadmissible evidence, precisely because once such statements are heard, the prejudice cannot readily be undone. *See, e.g.*, *United States v. Magluta*, 418 F.3d 1166, 1177–78 (11th Cir. 2005). In *James*, the court stressed that the jury "is to play no role in determining the admissibility of the statements." 590 F.2d at 583. The preferred course is for the Court to resolve admissibility beforehand, rather than risk a trial tainted by unreliable hearsay.

Moreover, the scope of the alleged conspiracy at issue here counsels in favor of a careful, statement-by-statement review. The indictment charges a specific conspiracy to willfully fail to file a FARA registration, not a broad agreement to lobby or to arrange meetings or to get paid. That distinction matters. Under Rule 801(d)(2)(E), a statement is admissible only if made during the course and in furtherance of the charged conspiracy. It is not enough for the government to show that a statement was made during some meeting or in relation to political activity or in an effort to get paid under the contract; the statement must actually advance the objectives of the charged conspiracy, which is a failure to register under FARA. Statements that merely recount

5

past events, describe political developments, or constitute idle chatter among participants do not qualify. *See United States v. Miles*, 290 F.3d 1341, 1351–52 (11th Cir. 2002) (statements that are "mere narratives" or "idle chatter" are not in furtherance of a conspiracy).

Indeed, it is the position of Defendants that (i) there never was an agreement to violate FARA; (ii) the persons whose otherwise hearsay statements the government will seek to admit were never part of any such conspiracy, and (iii) the government has no witness or evidence, either direct or circumstantial, to prove otherwise. This makes a pretrial *James* hearing even more critical.

At this juncture, the government has not identified the particular statements it intends to offer from the various communications among Mr. Rivera, Ms. Nuhfer, Mr. Perera, Mr. Gorrin, or others. This lack of specificity further justifies a *James* hearing and careful review. Defendants cannot now evaluate each statement for relevance or prejudice without knowing what the statements are. Defendants therefore reserve all objections under Rules 401 and 403 to any specific statement once the government discloses its evidence.

Defendants reserve the right to object under Rule 401 where a statement is not relevant to any material issue in dispute. Similarly, if certain statements have minimal probative value to the charged FARA conspiracy but carry a substantial risk of unfair prejudice, confusion, or waste of time, Defendants will object to their admission under Rule 403. The Court should defer any ruling on the admissibility of particular co-conspirator statements until after the government identifies the statements and the Court conducts the required Rule 104(a) analysis.

For any statements the government seeks to admit under Rule 801(d)(2)(E), the Court should require a *James* hearing and find—based on independent evidence—that a conspiracy existed and that each statement was made in furtherance of the specific FARA-registration

conspiracy alleged before the statement can be admitted. This gatekeeping function is essential to ensure that the jury hears only properly admissible evidence and to avoid unfair prejudice at trial.

    2. **The online news articles that the FARA-scheme participants cited in their written communications are hearsay and should not be admitted wholesale.**

       The articles and videos sent via messaging applications are—as the government admits—hearsay. But furthermore, they also raise substantial problems under Rules 401 and 403. Nevertheless, the government has asked this Court to admit the "online news articles *cited* in Defendants' written communications (and within the communications of other persons in furtherance of the FARA scheme) . . . not for the truth of the matter asserted therein, but to show the chat participant's state of mind at the time, for the news article's effect on the listener, and/or for other permitted purposes." Gov't MIL at 4–5 (emphasis added). The government's request for the wholesale admission of these articles and videos fails for multiple reasons.

       First, the government has made no attempt to specify which articles or videos it would like this Court to admit. Accordingly, this Court cannot make any determination under Rules 401 and 403 as to the admissibility of these items. *See Whidden v. Roberts*, 334 F.R.D. 321, 323 (N.D. Fla. 2020) ("When confronted with a broad motion *in limine*, . . . the 'better practice is to deal with questions of admissibility of evidence as they arise' during the trial." (quoting *Sperberg v. The Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975))); *SEC v. MintBroker Int'l, Ltd.*, No. 21-cv-21079, 2024 U.S. Dist. LEXIS 90624, at *55 (S.D. Fla. May 20, 2024) ("Motions *in limine* that are broad, vague, and include speculative categories of evidence and argument of which the Court cannot predetermine the admissibility are due to be denied[.]").

       Second, the only state of mind that is relevant in this case is that of Mr. Rivera and Ms. Nuhfer.  The state of mind of other "chat participant[s]" is not relevant and therefore under this purported purpose the news articles remain inadmissible hearsay. *See United States v. Davis*, No.

7

23-cr-00034, 2024 U.S. Dist. LEXIS 80878, at *6 (M.D. Fla. May 3, 2024) (finding hearsay statements inadmissible under Rule 803(3) because the declarant's state of mind was not a "relevant issue in this case").

Third, the key word in the government's request is "cited"— that is because these articles and videos were merely "cited" *in the chat* as opposed to having been reproduced in full *in the chat*. In most cases, there is no indication that any of the chat participants did anything more than view whatever thumbnail or title appeared in the chat itself (if they did even that).[1] In other words, articles that were not read and videos that were not watched could not have had *any effect* on the chat participant.

Unsurprisingly, then, the government has cited no caselaw for its flawed proposition that these articles or videos should be wholesale admitted—for state of mind, effect, or some other unknown and unnamed purpose. Judge Ruiz, however, recently adjudicated this exact issue during a hearing in *United States v. Perez-Paris*, No. 24-cr-20155, ECF No. 258 (S.D. Fla. Feb. 28, 2025), and did not permit the government to admit articles based on a link in a chat. Here is the relevant exchange:

> **Defense Counsel:** So the government wants to do two things: introduce those texts, which we will object to, but they also want to introduce the under—like, if you click the link, introduce, like, the DOJ press release or play, for example, the YouTube video of some YouTuber talking about genetic fraud. . . . [I]t's not even clear the defendants clicked on it.
>
> . . .

---

[1] Nearly everyone who communicates by text message sends and receives links to articles and videos. People do not read every such article or watch every such video, even if they give the link a "thumb's up" to simply acknowledge receipt of the text message/link or make a passing comment on the general subject matter of the link.

**Judge Ruiz:** This happened in a [a prior case]. We had this discussion . . . I certainly did not allow there to be a link clicked on. There's no way—I mean, if I did that, I shouldn't have. I don't think I did that.

. . .

**Judge Ruiz:** You're not going to let a video of a guy getting perp-walked out of a lab and then everyone watching. I'm not doing that.

. . .

**Judge Ruiz:** So I have to wait to see how they play out. I hear you, but I want to make sure that we eliminate the need to start bringing in kind of third-party sources on these emails.

The state of mind can probably be divined from the email, and the concerns are expressed presumably in the text of the emails. But if, for some reason, we can't divine what they're even talking about it, and it's something that we have to open, we'll deal with the press release when we get there. So let's just see how it plays out.

*Id.* at 116:5–119:23. Accordingly, Defendants ask this Court to follow the common-sense approach adopted by Judge Ruiz in *Perez-Paris* and deny the government's request to admit—wholesale and at this premature juncture—linked articles and videos.

### 3. It is premature for this Court to issue an *in limine* ruling admitting all certified domestic records that are self-authenticating.

The government seeks a sweeping pretrial ruling admitting broad categories of records— including email communications and financial records—based solely on anticipated Rule 902 certifications.[2] The request should be denied. Rule 902 addresses authentication only; it does not

---

[2] The government states that the relevant records certifications were produced in discovery. Even so, it must identify the specific materials it seeks to authenticate and promptly provide the corresponding certifications rather than forcing Defendants to search through hundreds of thousands of documents and guess which materials are at issue. Federal Rule of Evidence 902(11) requires advance notice to the adverse party of the intent to offer such records.

establish the admissibility of the *content* of any records or permit wholesale admission of communications or records without a proper foundation. Once again, the government's request is premature, overbroad, and risks admitting evidence that is otherwise inadmissible.

As a threshold matter, the government must identify the specific materials from its 800+ item exhibit list it contends are self-authenticating. Nothing in Rules 902(11) or 902(13) authorizes the categorical admission of the self-authenticating documents the government seeks to admit. Instead, the government "must make the record [s]and certification[s] available for inspection" to allow the defense the opportunity to challenge both. Fed. R. Evid. 902(11). Here, the government has done neither.

This production or identification is necessary, particularly for communications. Emails, even when created in a business context, must be scrutinized to determine whether they satisfy each requirement of the business records exception. *See Parnell*, 2015 WL 3447250, at *9 (noting that "emails should not be treated any differently than any other business record for purposes of Rule 803(6)"); *Cone*, 714 F.3d at 220; *Daneshvar*, 925 F.3d at 777. Emails are not automatically admissible merely because they were created in a business setting. With respect to the emails the government seeks to admit as business records, Mr. Rivera and Ms. Nuhfer must have the opportunity to cross-examine a custodian to determine whether those communications in fact qualify as business records. *See United States v. Butler*, 635 Fed. Appx. 585, 589 (11th Cir. 2015) (stating that the proponent must establish the requirements of Rule 803(6) through the testimony of the custodian or another qualified witness who is knowledgeable about the procedures used to create the alleged business records). Or at least, the government must identify with specificity which records it seeks to admit and provide a certification for each set. Wholesale admission of emails is improper.

#110745581v2

Defendants acknowledge the interest in judicial efficiency and are prepared to work in good faith with the government to enter into authenticity stipulations that would obviate the need to call multiple records custodians, while preserving Defendants' right to raise all evidentiary objections at trial—including foundation, relevance, hearsay, and undue prejudice. However, the government has not even identified a business context for any record its Motion seeks to admit and, frankly, this case largely does not involve business activity as such activity is commonly known. In this sense, the government's undefined motion is a bit baffling.

Second, it is well-established that even if a record or communication can be properly authenticated, the *content* of the record of communication may still not be admissible. *See United States v. Stein*, No. 05-cr-00888, 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007) (holding that an e-mail created within a business entity does not, for that reason alone, satisfy the business records exception to the hearsay rule); *see also United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013) (finding that although properly authenticated e-mails may be admitted under the business records exception, it is insufficient to overcome a hearsay challenge merely to assert that, because a business keeps and receives e-mails, all such e-mails are business records within Rule 803(6)(B)); *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019) (holding that an email is not a business record simply because it was sent between company employees or because employees regularly conduct business by email). Even the case cited by the government, *United States v. Spila*, makes clear that the "self-authentication provision [of Rule 902(11)] does not absolve the proponent of the email *content* from the burden to prove that the statements it contains are admissible. It merely relieves them of the burden to lay the foundation supporting the authenticity of the record." 136 F.4th 1296, 1308 (11th Cir. 2025), *cert. denied*, 146 S. Ct. 250 (2025).

The Court should defer admissibility determinations until trial and resolve admission on a document-by-document basis.

**4. Mr. Rivera's deposition testimony in the S.D.N.Y. civil action between Interamerican Consulting, Inc. and PDV USA, Inc., may be admissible under Rule 801(d)(2)(A), but (i) only against Mr. Rivera and (ii) subject to a Rule 401 and 403 analysis.**

Mr. Rivera's deposition testimony in the Southern District of New York civil action between PDV USA and Interamerican is arguably admissible under Rule 801(d)(2)(A) but (i) only against Mr. Rivera and (ii) subject to a Rule 401 and 403 analysis. As the Eleventh Circuit has stated,

> Under Fed. R. Evid. 801(d)(2)(A), a defendant's own statements are not hearsay and are admissible against him in court. Whether to admit evidence is within the trial judge's discretion. Fed. R. Evid. 104. *So long as the evidence is relevant to the issues at trial and its probative value is not outweighed by the danger of unfair prejudice or confusion, the evidence may be admitted. Id.*, Fed. R. Evid. 403.

*United States v. Killough*, 848 F.2d 1523, 1528 (11th Cir. 1988). (emphasis added).

Much of the government's argument in favor of the admissibility of the civil deposition testimony relies upon, "the government's anticipated evidence at trial." Gov't MIL at 9. The government also seeks to use the civil deposition testimony to establish Mr. Rivera's "consciousness of wrongdoing" and *mens rea*. *Id.* at 11. This desire is both premature and in some respects, cumulative, which should factor into this Court's Rule 403 analysis. The government's 800+ listed exhibits must be taken into account in this analysis.

Moreover, Mr. Rivera's deposition testimony is not admissible against Ms. Nuhfer for the reasons she has explained in great detail in her conditional Motion to Sever [ECF No. 343]. The admission of Mr. Rivera's deposition testimony in a joint trial, which is how this case is currently set, certainly tilts the analysis pursuant to Fed. R. Evid. 403 against the government's request for its admission.

#110745581v2

For these reasons, the Court should defer an admissibility determination until it is able to conduct a complete Rule 401 and 403 analysis of the *specific* deposition excerpts that the government intends to introduce as evidence.

### 5. It would be premature for this Court to admit Rule 1006 summaries that have not been produced to Defendants.

The government's request that this Court rule *in limine* to admit "approximately ten exhibits" "of voluminous bank records" under Rule 1006, *see* Gov't MIL at 11, is premature and should therefore be denied, *see Forbo Flooring Inc. v. Falcone Glob. Sols., LLC*, No. 19-cv-02876, 2024 U.S. Dist. LEXIS 22703, at *15–16 (N.D. Ga. Jan. 3, 2024) (finding it "premature to rule on the overall admissibility of [Rule 1006 summaries] prior to trial" given that the Court did not "have sufficient information to establish the[ir] admissibility"). While the government has listed these summaries as Exhibits 1–7 in their Exhibit List, the government has not yet produced the actual summaries to Defendants in accordance with Rule 1006(b), thus Defendants have had no opportunity to review them. Furthermore, that the government intends to make "assumptions" in these summaries, *see* Gov't MIL at 13, means that Defendants must have more than a nominal opportunity to examine these summaries, as any such examination will require an exacting analysis of whether these "assumptions" will be "supported by evidence in the record" and otherwise satisfy the Rules. *United States v. Melgen*, 967 F.3d 1250, 1260 (11th Cir. 2020) (quoting *United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975)). Accordingly, Mr. Rivera and Ms. Nuhfer ask that this Court deny the government's fifth motion *in limine*.

**6. The government cannot ask hypothetical questions in inquiring whether its witnesses (including government officials) would have interacted with Defendants regarding Venezuela matters had they known that Defendants were being compensated by the Venezuelan state oil company and its U.S. affiliates pursuant to an agreement approved by senior Venezuelan officials.**

The government's proposal to allow hypothetical questions assumes contested facts and effectively asks witnesses to assume Defendants' guilt. Eleventh Circuit precedent forbids such "guilt-assuming" hypotheticals. In *United States v. Guzman*, the Eleventh Circuit held that prosecutors may not pose hypothetical questions that assume the defendant is guilty; doing so "strikes at the very heart of the presumption of innocence." 167 F.3d 1350, 1351–52 (11th Cir. 1999). *Guzman* relied on *United States v. Candelaria-Gonzalez*, which emphasized that cross-examining a character witness with questions premised on the charged offense is "prejudicial" and "should not be asked." 547 F.2d 291, 294 (5th Cir. 1977). These rulings stand for the broader principle that no witness—lay or expert—should be asked to speculate on disputed facts as if true. Here, asking witnesses (*e.g.*, government officials) what they would have done "if they had known" that Defendants had a secret $50 million Venezuelan contract or were paid by a foreign oil company would compel these witnesses to accept those allegations as true. That is precisely the type of inquiry *Guzman* forbids. In this context, such questions would improperly invade the jury's role by treating critical disputed facts as settled.

Even aside from the presumption-of-innocence issue, these hypotheticals lack any proper evidentiary foundation. Under Rules 602 and 701, a witness may testify only to matters within personal knowledge or opinions based on their perceptions. A government official who never actually knew of any secret $50 million contract—and who Defendants maintain was dealing only with legitimate U.S. interests (*e.g.*, Citgo/Exxon projects)—cannot properly opine on a hypothetical that assumes that such a contract existed. These questions require the witness to

14

speculate about facts the witness did not perceive. This violates Rule 602 ("personal knowledge" requirement) and Rule 701's mandate that lay opinions be "rationally based on the perception of the witness." In effect, the government would be supplementing its case through the witness's guesswork rather than through admissible evidence. The answers to these hypotheticals would be pure conjecture and would have virtually no independent probative value. By contrast, their prejudicial effect is glaring; they reinforce the prosecution's theory while sidestepping the proof required. Under Rule 403, any marginal probative value is "substantially outweighed by" the risk of unfair prejudice, confusion, and jury misdirection. Such questions will only signal to the jury that the government assumes certain facts – essentially inviting the jury to convict based on those unproven premises.

The cases the government relies on—*Hill*, *Laurienti*, and *Cuti*—do not justify a different outcome. In *United States v. Hill*, lay bank officers were asked whether they would have approved loans if the borrowers' misrepresentations had been known. *See* 643 F.3d 807, 840–41 (11th Cir. 2011). Although *Hill* found no reversible error on those questions, it was because the witnesses were testifying about banking practices grounded in their specialized knowledge and because the government had to prove materiality (an element required in a fraud case). *Hill* held only that Rule 701 does not bar a witness from answering hypotheticals that are "rationally based on particularized knowledge" *Id.* at 841–42.

The *Hill* court also found any error harmless because the district court instructed the jury that the hypotheticals were only proper if the prosecution had proven the facts in the hypothetical and that such a determination was up to the jury. *See id.* at 842. Here, by contrast, the hypothetical facts (*e.g.*, a hidden $50 million Venezuelan contract) are highly contested and not part of any personal knowledge of the witness. No witness here can claim the "particularized knowledge" *Hill*

15

contemplated. Allowing *Hill*'s approach without a foundation would let the prosecutor assume his entire case in front of the jury.

Likewise, *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), and *United States v. Laurienti*, 611 F.3d 530 (9th Cir. 2010)—two securities fraud cases—are far afield. In *Cuti*, for example, accountants and auditors were asked how they would have treated financial transactions "if they had known" certain information—a form of hypothetical useful to reveal the impact of fraud on accounting. *Cuti*, 720 F.3d at 459. *Cuti* found no reversible error for so-called "what-if-you-had-known" questions in fraud cases because it elicited testimony on a scheme's effect. *Id.* But those questions presupposed that the facts (the fraud and the accounting principles) were already proven and well within the experts' domain. Here, we have neither certified facts nor accounting issues. Asking politicians or State Department officials to imagine hidden illicit facts has no analytic merit—it only encourages speculative, prejudicial testimony. In short, none of these authorities suggests that a witness may be forced to answer "would-you-still-have?" about alleged—but hotly contested—crimes, the commission of which are for the jury to decide.

The logic of *Guzman* and related cases should prevail. Even if *Cuti* and *Laurienti* allowed certain "if-known" questions under narrow circumstances where materiality was at issue in securities fraud cases, those circumstances are absent here. A question framed "had you known about a $50 million contract with the Venezuelan regime, would you have . . ." assumes the very wrongfulness the jury must decide. Such hypotheticals are uniquely inappropriate because they assume facts that have not been proven to the jury. Putting the witness in this position essentially hands the jury a hypothetical finding of wrongdoing. This is unfair and inconsistent with the presumption of innocence. Furthermore, such questions are extraordinarily prejudicial in the particular context of this case, both because the government intends to inflict maximum unfair

16

prejudice by asking such improper questions of witnesses such as Secretary of State Marco Rubio—who is from, and is very popular in, Miami—and other political figures expected to testify at trial, and because they assume that Defendants were serving as unregistered agents of Nicolas Maduro. *See* Defendants' Joint Motion to Continue [ECF No. 313] (explaining in great detail unique aspects of this case as relating to the alleged charges and the jury's personal and emotional connections to Venezuela).

The Court should therefore disallow the government's proposed hypothetical questions. They are "guilt-assuming" under *Guzman* and beyond the scope of proper lay testimony under the Rules of Evidence.

**7. The government's blanket request to exclude unspecified Rivera and Nuhfer favorable statements is premature and must be denied because the government cannot assert that such statements are inadmissible for all purposes.**

The government seeks to exclude Rivera's and Nuhfer's "self-serving" statements without specifying the statements in question, who made the statements, to whom the statements were made, the context of the statements, the date of the statements, or the format of any statements (oral, written, coded, *etc.*). The government does so under the assumption that "any" such statement is hearsay and should be excluded under Rule 801(d)(2). But to quote the government-cited case *United States v. McDaniel*, "[n]ot all out-of-court statements qualify as hearsay[.]" 398 F.3d 540, 545 (11th Cir. 1999).

The government's request is premature and should be denied. As stated at the beginning of this Response, "it is difficult" for a Court "to rule in a vacuum without having the opportunity to see the proffered evidence or testimony in perspective with other evidence in the trial." *Markovich*, 21-cr-60020, ECF No. 289. This reasoning especially applies here, as the government has not

identified *any statement* it thinks should be excluded, let alone in the "perspective with other evidence in the trial." *Id.*

Moreover, the government—elsewhere in its Motion *in Limine*—concedes that statements, often initially seen as hearsay, can be admitted for other purposes. *See, e.g.*, Gov't MIL at 4–5 (requesting to admit content of news articles "not for the truth of the matter asserted therein, but to show the chat participant's state of mind at the time, for the news article's effect on the listener, and/or for other permitted purposes"). There are a whole host of reasons why statements of a party are perfectly admissible. A statement is not hearsay, of course, if it is not "offer[ed] in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). A statement may instead be used to show the effect on the listener, to establish that the statement was in fact said, or to put other statements in context. Federal Rule of Evidence 106, the rule of completeness, allows a defendant to introduce statements "over a hearsay objection" and for purposes of "fairness" when the government chooses to admit only a portion of a writing or statement. Rule 803 permits the admissions of a defendant's hearsay statement under a plethora of exceptions, including to demonstrate a "declarant's then-existing state of mind." Fed. R. Evid. 803(3). All of these non-hearsay reasons and exceptions will come into play at this trial.

The government's sweeping *in limine* request ignores that much of the evidence it attempts to keep out can (and will) be offered for completely permissible purposes. But that is not how a motion *in limine* works. Again, "motions *in limine* are best limited to those issues the mere mention of which would be so prejudicial that it would deprive a party of a fair trial." *Markovich*, ECF No. 276. The government's blanket petition to ban favorable evidence does not fit this bill and should be denied. *See Stewart v. Hooters of America, Inc.*, 2007 WL 1752873, at *1 (M.D. Fla. Jun. 18,

2007) (emphasis added) (Evidence should not be excluded before trial unless the identifiable evidence is "clearly inadmissible for any purpose.").

**8. The government's request to exclude any evidence from law enforcement interview reports must be denied.**

The government tries to limit the defense's full and fair cross-examination of witnesses by claiming that information or statements obtained from law enforcement reports (*i.e.*, the contents of the reports) are not admissible unless the witness authored the report. Again, this request is not ripe for determination and must be denied.

Without engaging in an unnecessary discussion regarding whether a law enforcement report is or is not *Jencks* material, there is no dispute that the government produced FBI, IRS and HSI interview reports to Mr. Rivera and Ms. Nuhfer in order to disclose the expected testimony of government trial witnesses and for cross-examination purposes. Defendants also expect that the government would admit that the purpose of making such reports is to accurately capture what the witnesses said to the government and its agents.

Nevertheless, the government is fearful that the defense will confront a witness with a (perhaps contradictory, false, or misleading) statement that the witness previously made to a law enforcement official. The government forgets, however, that statements within law enforcement reports may satisfy a hearsay exception, may have been shown to a witness and their counsel for correction, or may be adopted by the witness. A report could also be used to refresh recollection.

Most likely, though, Defendants—when confronting a witness who lies or testifies differently in court from what that person originally said to an agent or officer—are entitled to attack that witness's credibility. Fed. R. Evid. 607. One of the ways this can be done is to reveal that the witness has said something different (or not said something) to an agent when they were asked similar questions before trial. It is not possible under the Federal Rules of Evidence to

19

impeach the witness and to later perfect the impeachment by admitting extrinsic evidence if the content of the report, *i.e.*, the statement made, is not referenced. Indeed, "extrinsic evidence of a witness's prior inconsistent statement may not be admitted until *after the witness is given an opportunity to explain or deny the statement*." Fed. R. Evid. 613(b) (emphasis added). The statement (meaning the content of the report) *must* be revealed and asked about in open court before the jury. Therefore, the government's insistence that "introducing the contents of such reports" is not permitted is flatly incorrect and is entirely inconsistent with standard cross-examination based on statements reportedly made by testifying witnesses during prior interviews under Rule 613(b).  Gov't MIL at 19.

As far as whether the jury may see the piece of paper—the report—itself will depend on the questioning and the testimony of the witness at trial.  The government has not proffered in its Motion that it knows what that testimony will be.  Thus, this Court and the parties must wait and see, and the government's eighth request should be denied.

**9. Defendants do not intend to offer evidence or argument about recent changes to the Justice Department's FARA enforcement priorities unless the government opens the door.**

Attorney General Pamela Bondi issued a department-wide directive on February 5, 2025 (the "Bondi Memo") stating, in relevant part, that "[r]ecourse to criminal charges under [FARA] . . . shall be limited to instances of alleged conduct similar to more traditional espionage by foreign government actors." Bondi Memo at 4. It is undisputed that neither Defendant is alleged to have engaged in conduct resembling traditional espionage. To date, the government has provided no explanation for continuing this prosecution while dismissing materially similar FARA cases. *See, e.g.*, *United States v. Enrique "Henry" Cuellar*, No. 24-cr-00224 [ECF No. 138] (S.D. Tex. Aug. 19, 2025). Although the continued prosecution of this case directly contravenes DOJ policy—and

20

aside from the possibly relevant cross examination of any witness the government offers as a "FARA expert" or any government witness that opens the door regarding DOJ's FARA enforcement priorities—Defendants do not plan to present evidence or argument at trial concerning the Department's FARA enforcement policies unless such evidence becomes relevant.

10. **Defendants do not intend to offer evidence or argument that this prosecution is unwarranted due to the government's unfair or selective enforcement of FARA unless the government opens the door, but Defendants will cross-examine the government's witnesses about bias, motive, credibility, and benefits received from the government.**

Defendants do not intend to present evidence or argument asserting selective prosecution, selective enforcement, or any claim that FARA has been enforced inconsistently or unfairly (unless—again—the government's "FARA expert" or any other government witness opens the door to these topics). Defendants do, however, intend to cross-examine government witnesses regarding bias, motive, and credibility, including any agreements, understandings, or benefits conferred by the government—such as non-prosecution, immunity, and other charging considerations—provided to alleged co-conspirators and scheme participants. Such inquiry is proper and relevant to the witnesses' credibility and potential bias and is distinct from any challenge to the government's prosecutorial discretion. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316–18 (1974) (holding that the right to expose bias through cross-examination is always relevant and a witness's motivation in testifying is an important function of the constitutionally protected right of cross-examination).

A central function of the Sixth Amendment right to cross-examination is to expose the witness' motivation in testifying. *See Jenkins v. Wainwright*, 763 F.2d 1390, 1392 (11th Cir. 1985) *cert. denied*, 476 U.S. 1164 (1986) ("This court has long recognized the particular importance of searching cross-examination of witnesses who have substantial incentive to cooperate with the prosecution."); *see also United States v. Mayer*, 556 F.2d 245, 248–49 (5th Cir. 1977) (holding

that wide latitude in exploring a witness's motivation for testifying is particularly necessary where a prosecution witness has had dealings with the prosecution so that the possibility exists that his testimony was motivated by a desire to please the prosecution in exchange for the prosecutor's actions in having some or all of the charges against the witness dropped or securing immunity against prosecution for the witness). Full cross-examination by defense counsel is especially critical when the witness sought to be questioned is the chief government witness. *See United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir.1992).

The Eleventh Circuit has also long recognized the particular importance of searching cross-examination of witnesses who have substantial incentive to cooperate with the prosecution. *See United States v. Barrington*, 648 F.3d 1178, 1187–88 (11th Cir. 2011). And the importance of such cross-examination is not dependent on whether some deal in fact exists between the witness and the government. *Id.* (citing *Lankford*, 955 F.2d at 1548).

Accordingly, while Defendants will not argue selective prosecution or invite jury nullification, they respectfully submit that the Court should not preclude or limit constitutionally protected cross-examination concerning witness bias, motive, or benefits received from the government relating to alleged co-conspirators or participants in the charged FARA scheme.

**11. Defendants have not violated Fed. R. Crim. P. 16.**

It goes without saying that Defendants have not violated—and have no intention of violating—Fed. R. Crim. P. 16. Indeed, that the government would even advance this argument is strange considering that the government (i) has proposed the admission of an absurdly unrealistic number of exhibits (800+) for its allegedly "streamlined" case and (ii) still has not finished producing those exhibits to Defendants despite the fact that it obtained its documents years ago and the Court ordered the government to produce its exhibits on February 4, 2026. As a result,

Defendants remain engaged in the laborious process of sorting through this mountain of evidence, most of which the government knows that it will not actually attempt to introduce at trial. If the government is going to engage in this kind of evidentiary gamesmanship, it cannot complain about Defendants, *especially when the government already possesses all relevant discovery*.

As to expert witnesses, Defendants will do their best to produce their expert disclosures by February 23, the date proposed by the government. Defendants, however, note that the government has refused to provide *any* detail about what exactly its unnamed "FARA Expert" is going to testify to despite <u>repeated</u> requests, and Defendants ask that this Court ensure only this Court—and not this "FARA Expert"—instruct the jury on the law. To the extent that Defendants need a rebuttal expert to combat the government's expert(s), the retention and identification of the same will necessarily occur after Defendants receive the government's notice.

**12. Mr. Rivera and Ms. Nuhfer are under no obligation to provide advance notice of an entrapment-by-estoppel defense.**

While the Federal Rules of Criminal Procedure require a defendant who intends to assert a "public-authority defense" to "so notify an attorney for the government in writing and . . . file a copy of the notice with the clerk within the time provided for filing a pretrial motion, or at any later time the court sets," (Fed. R. Crim. P. 12.3(a)(1)), there is no such requirement for an entrapment-by-estoppel defense.

The government's attempt to surreptitiously slip entrapment-by-estoppel into Rule 12.3 is a misstatement of the law in this Circuit. *See* Gov't MIL at 27 (interpreting Fed. R. Crim. P. 12.3 to include any "public-authority-*type* defense" (emphasis added)).[3] But nowhere in Rule 12.3 are

---

[3] The government cites *United States v. Alvarado* for this proposition, but—as will be discussed—*Alvarado* does not interpret or explain Fed. R. Crim. P. 12.3; instead, it clearly explains

23

the words "entrapment-by-estoppel" found. And any attempt to shoehorn language into a statute (or—here—a rule) where it does not exist should not be permitted by this Court. *See Ruhlen v. Holiday Haven Homeowners, Inc.*, 28 F.4th 226, 229 (11th Cir. 2022) ("[W]hen interpreting a statute, [a court's] 'inquiry both begins and ends with a careful examination of the statute's language,'" and a court "'must presume that a legislature says in a statute what it means and means in a statute what it says there.'" (first quoting *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021), then quoting *CRI-Leslie, LLC v. Comm'r of Internal Revenue*, 882 F.3d 1026, 1033 (11th Cir. 2018))). In other words, "[i]t is the *text's* meaning, and not the content of anyone's expectations or intentions, that binds us as law." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 398 (2012) (quoting Laurence H. Tribe, "Comment," in Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 65, 66 (1997)).

It makes sense that the Fed. R. Crim. P. 12.3 notice requirement for the public-authority defense does not encompass the entrapment-by-estoppel defense. As the Eleventh Circuit explained in *United States v. Alvarado*,

> In contrast to a public authority defense, which potentially protects a defendant who knowingly engages in acts that he recognizes to be in violation of the law, an entrapment-by-estoppel defense applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law.

> [E]ntrapment-by-estoppel creates a narrow exception to the general rule that ignorance of the law is no defense. Like the public authority defense, entrapment-by-estoppel can apply only when the defendant's reliance on an official's reassurance is reasonable.

---

why the public-authority and entrapment-by-estoppel defenses are distinct. *See* 808 F.3d 474, 484–86 (11th Cir. 2015).

Also like the public authority defense, entrapment-by-estoppel requires a showing that a government official affirmatively communicated to the defendant the official's approval of the conduct at issue.

**The entrapment-by-estoppel defense differs from the public authority defense in that the latter requires that the government official who sanctions the illegal activity have actual authority to approve the defendant's criminal activity, whereas the entrapment-by-estoppel defense only requires that the official have apparent authority.** And given the practical difficulty in the mine-run of cases to draw a meaningful distinction between the culpability of a defendant who knows the conduct he has been authorized to commit is illegal (public authority defense) and a defendant who has been assured that the conduct is legal (entrapment-by-estoppel defense), it is the public authority defense's requirement of actual authority that creates the most significant demarcation between the two defenses.

808 F.3d 474, 484 (11th Cir. 2015) (citations omitted and emphasis added). This distinction is highly relevant to the issue of pre-trial notice. Again, the public-authority defense derives from extrinsic sources of authority known to the participants from the outset, such as—for example—the case where a DEA agent authorizes an informant to perform otherwise illegal acts in order to discover and charge other conspirators. Entrapment-by-estoppel, on the other hand, derives from the actions of officials with *apparent*—but not actual—authority, and whether such actions provide legal cover to an accused depends largely on how the evidence develops at trial and is devoid of the independent evidence inherent in the public-authority defense. For this reason, it is impractical—and would make little sense—to require an accused to provide pre-trial notice of an entrapment-by-estoppel defense.

Finally, just as the Eleventh Circuit has not held that Fed. R. Crim. P. 12.3 requires pre-trial disclosure of an entrapment-by-estoppel defense, neither does this district require—through its local rules—that criminal defendants provide advance notice of the intent to present that defense. *See generally* Local Rules for the United States District Court for the Southern District of Florida (nowhere mentioning entrapment by estoppel). Accordingly, Defendants are under no

obligation to decide now—let alone to provide notice to the government of such a decision—whether they will or will not advance an entrapment-by-estoppel defense.

**13. The government's request to exclude any evidence or argument that Defendants' actions were in conformance with U.S. foreign policy must be denied.**

The government seeks to bar the defense from presenting evidence or argument that Defendants' 2017–2018 activities were in furtherance of U.S. policy (*e.g.*, supporting members of the Venezuelan opposition who sought Maduro's removal from power consistent with U.S. foreign policy at the time) on the ground that such evidence would be irrelevant to whether Defendants willfully violated FARA by failing to register. The government's request to exclude such evidence is not supported by any authority and for good reason—it is a recognized and valid defense to FARA charges. For the reasons detailed below, the Court must avoid being seduced by the government's legally incorrect argument into the manifest error of excluding a legally viable defense.

Evidence regarding whether Defendants' activities were in furtherance of U.S. policy is directly relevant to whether Defendants criminally violated FARA. FARA requires an "agent of a foreign principal"—who is not exempt—to file a registration statement with the Attorney General within ten days of becoming a foreign agent. 22 U.S.C. § 612. Section 613 of that statute *exempts* individuals—among other reasons—engaged in "other activities not serving predominantly a foreign interest." 22 U.S.C. § 613(d)(2). Courts have explained that this exemption means that an agent of a foreign principal does not have to register if he or she is acting in the interests of the United States. *See United States v. Sun, et al.*, No. 24-cr-00346, Trial Transcripts (E.D.N.Y. Dec. 10–11, 2025) (**Exhibits 1 and 2**); *United States v. Barrack*, No. 21-cr-00371, Trial Transcript (E.D.N.Y. Nov. 2, 2022) (**Exhibit 3**).

*Sun* is instructive. That case, tried in November and December 2025, ended in a deadlocked jury and a mistrial on all counts. Linda Sun was principally charged with two FARA-related offenses: (1) participating in a conspiracy to violate FARA by acting as an unregistered foreign agent of the Government of the People's Republic of China and the Chinese Communist Party (18 U.S.C. § 371); and (2) failing to register as a foreign agent on behalf of the Government of the People's Republic of China and the Chinese Communist Party (22 U.S.C. §§ 612(a) and 618(a)(1)). *See Sun*, No. 24-cr-00346, ECF No. 184 (Superseding Indictment) (E.D.N.Y. Oct. 2, 2025).

As alleged in the superseding indictment, Ms. Sun held several high-level positions in New York State government during the relevant period. *Id.* at 1–2. While serving as a senior aide to Governors Andrew Cuomo and Kathy Hochul, she allegedly acted secretly—as an unregistered agent for the People's Republic of China ("PRC") and the Chinese Communist Party ("CCP")—in exchange for money and other benefits. The government's central allegation was that—at the direction of these foreign actors—Ms. Sun took steps to advance the PRC's and CCP's interests, including restricting Taiwanese officials' access to New York officials and influencing official state messaging. *Id.* at 5.

At trial, the defense presented Sun as a dedicated public servant acting within the scope of her official duties, emphasizing her role as a liaison to the Asian American community. They emphasized that her guidance to state officials to avoid issues involving Taiwan and mainland China aligned with domestic interests. In closing, Sun's lawyer argued that Sun was not acting as a foreign agent of China and that her actions predominantly served domestic interests—an exemption to registration under FARA. Sun's lawyer urged the jury:

> [A]sk yourself, did you see any evidence that Linda was acting in a way that was contrary to the interests of New Yorkers? Was there any evidence that even if PRC

27

officials might have liked what Linda was doing, that she was doing it predominantly for the PRC and not for New York? Was there any evidence that Linda did what the PRC asked because the PRC asked, rather than because Linda decided to do it on her own? The answer to all those questions is no.

*Sun*, No. 24–cr–00346, Trial Transcript at 3585–86 (E.D.N.Y. Dec. 10, 2025) (**Exhibit 1**).

Indeed, Judge Cogan subsequently instructed the jury as follows:

Now, it is also important to note that FARA has an exception, which provides that registration is not required for a foreign agent engaging only in activities not serving predominantly a foreign interest.

The relevant language from the statute is this: The requirements to register under FARA shall not apply to the following agents of foreign principals. And one of those definitions is any person engaging or agreeing to engage only in other activities not serving predominately a foreign interest.

Thus, it's not enough that you find the evidence proves that Ms. Sun was an agent of a foreign principal. **If you find that Ms. Sun engaged or agreed to engage in only activity that did not predominately serve a foreign interest, meaning that those activities were either equally or predominately serving a domestic interest, that is, the interests of the United States or the State of New York, then her conduct wouldn't violate FARA.**

*Sun*, No. 24–cr–00346, Trial Transcript at 3777 (E.D.N.Y. Dec. 11, 2025) (emphasis added)

(**Exhibit 2**).

*Sun* involved the same FARA charges now before this Court and—if Defendants decide to present a similar defense—Defendants must be permitted to do so. In other words, if Rivera's and Nuhfer's actions "equally or predominantly serv[ed] a domestic interest," then their conduct would not violate FARA. *Id.*

A different prosecution, *United States v. Barrack*, which resulted in a full acquittal of both defendants, is also fatal to the government's motion to exclude this defense. The defendants in *Barrack* were charged, in part, with acting as agents of the government of the United Arab Emirates without prior notice to the Attorney General in violation of 18 U.S.C. § 951(a), along with

conspiring to violate that statute in violation of 18 U.S.C. § 371. *See United States v. Barrack*, No. 21-cr-00371, ECF No. 105 (Superseding Indictment) (E.D.N.Y. May 16, 2022).

There, Mr. Barrack was accused of using his connections to the Trump administration to influence U.S. foreign policy on behalf of the United Arab Emirates ("UAE"). Along with his co-conspirators, Barrack allegedly communicated with UAE national security officials and, at their direction, attempted to shape U.S. public opinion and foreign policy during the 2016 presidential campaign and afterward. *Id.* Although Barrack involved a different (but closely related) statute—Section 951—the government argued that the defendants' conduct was nevertheless illegal under Section 951 because it was prohibited by FARA (in violation of 22 U.S.C. §§ 612(a) and 618(a)(1)).

As such, the *Barrack* jury was also instructed regarding FARA's requirements and exemptions. Specifically, the jury was instructed that "FARA has [an] exemption which provides that any person engaging in or agreeing to engage only in activities not serving predominantly a foreign interest is not required to register under FARA." *Barrack*, No. 21-cr-00371, Trial Transcript at 5287 (E.D.N.Y. Nov. 2, 2022) (**Exhibit 3**). The jury was further instructed "If you find that a defendant . . . only engaged or agreed to engage in activity that [did not] predominantly serve a foreign interest, that defendant's conduct would be legal under FARA." *Id.* at 5288.

Just like the defendants in *Barrack* and *Sun*, Mr. Rivera and Ms. Nuhfer are equally entitled to present an appropriate defense and request this jury instruction if applicable. The critical point is that evidence showing whether Defendants' actions predominantly or equally served a domestic interest—rather than a foreign one—bears directly on whether their conduct violated FARA. *See* 22 U.S.C. § 613(d)(2) (section 613 exempts individuals from registering under FARA if they are engaged in "other activities not serving predominantly a foreign interest.").

Separately, the government must prove that Mr. Rivera and Ms. Nuhfer agreed to act in the United States as representatives of Maduro's government, subject to its direction or control, and for *predominantly* that reason. The overwhelming evidence at trial, however, will show that Defendants acted on their own convictions—not at Maduro's direction or pursuant to the so-called consulting agreement—and thus the government cannot carry its burden of proving agency under FARA. *See* Scope of Agency, DEP'T OF JUSTICE (May 2020) ("DOJ Guidance"), at 3, available at https://www.justice.gov/nsd-fara/page/file/1279836/dl (last accessed Feb. 13, 2026). Even DOJ Guidance permits such a defense: "The ultimate test for agency under FARA is whether it is fair to draw the conclusion that an individual is not acting independently, is not simply stating his or her own views, but is acting as an agent or alter ego of the foreign principal." *Id.* at 3 (citing Philip B. Heymann Testimony in Hearings Before the Subcomm. to Investigate the Activities of Foreign Governments of the Senate Comm. on the Judiciary, 96th Cong., 2d Sess., vol. 2, 700, 701 (1980)) (internal quotations omitted).

Mr. Rivera and Ms. Nuhfer are American citizens who enjoy First Amendment freedoms to express their political views.[4] FARA only applies to statements and activities of persons acting in their capacity as "agents" of a foreign principal within the meaning of the statute. *Id.* at 1–3 (recognizing that under FARA, the definition of an "agent" is critical). Accordingly, it is for the jury to decide whether Defendants were acting at the direction and control of Maduro's

---

[4] DOJ acknowledges that because FARA regulates expressive activities by U.S. persons that implicate rights protected under the First Amendment, it is important that the standards governing FARA's application are clear. DOJ Guidance at 1 (citing *Buckley v. Valeo*, 424 U.S. 1, 76–77 (1976) (recognizing that federal statutes regulating expressive activities must be clear, particularly where "the violation of its terms carries criminal penalties and fear of incurring those sanctions may deter those who seek to exercise protected First Amendment rights.")).

government, or whether they were simply expressing their own views and acting in what they believed to be the best interests of the United States in a free Venezuela.

For these reasons, government request number 13 should be denied.

* * *

WHEREFORE, Defendants David Rivera and Esther Nuhfer respectfully ask that Court deny the government's Omnibus Motion *in limine* [ECF No. 341].

**Respectfully submitted on February 17, 2026,**

| | |
|---|---|
| **JONES WALKER LLP**<br>201 S. Biscayne Blvd., Suite 3000<br>Miami, FL 33131<br>Tel: (305) 679-5700<br>By:    */s/David S. Weinstein*<br>       **David S. Weinstein**<br>       Florida Bar No. 749214<br>       dweinstein@joneswalker.com<br>       **Edward R. Shohat**<br>       Florida Bar No. 152634<br>       eshohat@joneswalker.com<br>       **Thomas P. Bardenwerper**<br>       Florida Bar No. 1044458<br>       tbardenwerper@joneswalker.com<br><br>*Counsel for David Rivera* | **MARKUS/MOSS PLLC**<br>40 N.W. Third Street, PH1<br>Miami, FL 33128<br>Tel: (305) 379-6667<br>By:    */s/ David Oscar Markus*<br>       **David Oscar Markus**<br>       Florida Bar No. 119318<br>       dmarkus@markuslaw.com<br>       **A. Margot Moss**<br>       Florida Bar No. 91870<br>       mmoss@markuslaw.com<br>       **Melissa Madrigal**<br>       Florida Bar No. 93241<br>       mmadrigal@markuslaw.com<br><br>*Counsel for Esther Nuhfer* |

#110745581v2