INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

WASHINGTON, D.C.

IN THE PROCEEDING BETWEEN

**VENEZUELA HOLDINGS, B.V.
MOBIL CERRO NEGRO HOLDING, LTD.
MOBIL VENEZOLANA DE PETRÓLEOS HOLDINGS, INC.
MOBIL CERRO NEGRO, LTD. AND
MOBIL VENEZOLANA DE PETRÓLEOS, INC.**
(CLAIMANTS)

AND

**THE BOLIVARIAN REPUBLIC OF VENEZUELA**
(RESPONDENT)

**(ICSID CASE NO. ARB/07/27**

---

# AWARD

---

*Members of the Tribunal:*

H.E. Judge Gilbert Guillaume, *President*
Professor Gabrielle Kaufmann-Kohler, *Arbitrator*
Dr. Ahmed Sadek El-Kosheri, *Arbitrator*

*Secretary of the Tribunal:*

Ms. Alicia Martín Blanco

Date of dispatch to the Parties: 9 October 2014



DEFENDANT'S EXHIBIT
**DRX 203**
1:22-cr-20552-MD

DRDP-22-20522-SDFL_000236

DRX203-001

## PARTIES' REPRESENTATIVES

*Representing the Claimants:*

Mr. Thomas L. Cubbage III
Mr. Miguel López Forastier
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, D.C. 20004-2401
USA
 and
Mr. Gaëtan Verhoosel
Three Crowns LLP
1 King Street
London EC2V 8AU
UK
 and
Mr. René J. Mouledoux
Mr. Eugene J. Silva II
Production Company Law Department
Exxon Mobil Corporation
800 Bell Street
Houston, Texas 77002
USA

*Representing the Respondent:*

Dr. Manuel Enrique Galindo Ballesteros
Procuraduría General de la República
Av. Los Ilustres, cruce con calle Francisco
Lazo Martí
Edif. Procuraduría General de la República,
piso 8
Urb. Santa Mónica
Caracas 1040
Venezuela
 and
Mr. George Kahale, III
Mr. Benard V. Preziosi, Jr.
Ms. Miriam K. Harwood
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
USA
 and
Ms. Gabriela Álvarez-Ávila
Curtis, Mallet-Prevost, Colt & Mosle, S.C.
Rubén Darío 281, Pisos 8 & 9
Col. Bosque de Chapultepec
11580 Mexico, D.F.
Mexico

2

DRDP-22-20522-SDFL_000237

DRX203-002

TABLE OF CONTENTS

TABLE OF MAIN ABBREVIATIONS ............................................................................................ 3

I.      PROCEDURAL HISTORY ........................................................................................... 8

II.     THE FACTS ................................................................................................................. 16

    A.   THE PARTIES ..............................................................................................................16
         1.   The Claimants ..........................................................................................................16
         2.   The Respondent ........................................................................................................17
    B.   SUMMARY OF THE MAIN FACTS ...............................................................................18
         1.   Venezuela's Oil Reserves .........................................................................................18
         2.   The Oil Opening .......................................................................................................20
         3.   Mobil Investment ......................................................................................................22
         4.   Cerro Negro Investment ...........................................................................................22
              (a)   Context of the Cerro Negro Investment ..............................................................22
              (b)   Elements of the Cerro Negro Investment ............................................................26
              (c)   Cerro Negro Association Agreement, Reservation and Dedication Agreement and Cerro Negro Royalty
              Reduction Agreement .............................................................................................27
              (d)   Creation of Petrolera Cerro Negro ......................................................................32
              (e)   Chalmette Refining ..............................................................................................33
         5.   La Ceiba Investment .................................................................................................34
              (a)   Context of the La Ceiba Investment ....................................................................34
              (b)   Elements of the La Ceiba Investment ..................................................................36
         6.   Origin of the Present Dispute ..................................................................................38
              (a)   Increase in the Royalty Rate in 2004 and 2005 ..................................................39
              (b)   Creation of the Extraction Tax in 2006 ...............................................................41
              (c)   Increase in the Income Tax Rate Applicable to Participants in Orinoco Oil Belt Ventures ................................42
              (d)   Production and export curtailments on the Cerro Negro Project ........................43
              (e)   Expropriation of the Claimants' Investments in the Cerro Negro and La Ceiba Projects ................................44
    C.   THE ICC ARBITRATION .............................................................................................48

III.    THE PARTIES' SUBMISSIONS ............................................................................... 49

    A.   THE CLAIMANTS' MEMORIAL ..................................................................................49
    B.   THE RESPONDENT'S COUNTER-MEMORIAL .............................................................54
    C.   THE CLAIMANTS' REPLY ..........................................................................................58
    D.   THE RESPONDENT'S REJOINDER ...............................................................................61
    E.   HEARING AND POST-HEARING BRIEFS ......................................................................63

IV.     JURISDICTION ........................................................................................................... 66

V.      EFFECTS OF THE ICC ARBITRATION ................................................................. 76

VI.     APPLICABLE LAW .................................................................................................... 77

VII.    FET AND ARBITRARY OR DISCRIMINATORY MEASURES ................................. 79

    A.   THE EXTRACTION TAX ..............................................................................................80
    B.   THE PRODUCTION AND EXPORT CURTAILMENTS .......................................................86
    C.   THE COERCION AND THE EXPROPRIATION MEASURES ...............................................93
    D.   THE SEVERANCE PAYMENTS .....................................................................................94

VIII.   EXPROPRIATION ...................................................................................................... 94

    A.   EXPROPRIATION OF "DISCRETE RIGHTS" BEFORE JUNE 2007 .....................................95

1

DRDP-22-20522-SDFL_000238

B.   EXPROPRIATION OF THE CERRO NEGRO AND LA CEIBA PROJECTS IN JUNE 2007 ............................................97

C.   QUANTUM OF THE EXPROPRIATION OF THE CERRO NEGRO PROJECT ..........................................................103

    1.   *Net Cash Flow* ...................................................................................................................................*103*

    a)  *Volume of Production* .........................................................................................................................*104*

    b)  *Oil Price* .............................................................................................................................................*108*

    c)  *Future Revenues* ................................................................................................................................*111*

    d)  *Royalties and Extraction Tax* ............................................................................................................*112*

    e)  *Cost of Operation and Capital Investment* .......................................................................................*112*

    f)  *Special Contributions* ........................................................................................................................*116*

    g)  *Income Tax* .........................................................................................................................................*116*

    2.   *Discount Rate* ....................................................................................................................................*119*

    3.   *Price Cap* ...........................................................................................................................................*122*

    4.   *Offset Claim* ......................................................................................................................................*124*

    5.   *Double Recovery* ...............................................................................................................................*125*

D.   QUANTUM OF THE EXPROPRIATION OF THE LA CEIBA PROJECT ...................................................................126

**IX.  TAXES AND INTEREST** ................................................................................................ **127**

A.   PROTECTION AGAINST TAXATION OF THE AWARD .......................................................................................127

B.   INTEREST ..................................................................................................................................................128

**X.  COSTS** ............................................................................................................................. **132**

**XI.  DECISION OF THE TRIBUNAL** .................................................................................. **132**

2

DRDP-22-20522-SDFL_000239

DRX203-004

## TABLE OF MAIN ABBREVIATIONS

| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
|---|---|
| Award | The present Award on the merits of the dispute |
| Treaty or BIT | Agreement on Encouragement and Reciprocal Protection of Investments Between the Kingdom of the Netherlands and the Republic of Venezuela of 22 October 1991 signed on 22 October 1991, which entered into force on 1 November 1993 |
| Cerro Negro Association Agreement or CNAA | Association Agreement Among Lagoven Cerro Negro, S.A., Mobil Producción e Industrialización de Venezuela Inc. and Veba Oel Venezuela Orinoco GmBH dated 28 October 1997 |
| Cerro Negro Royalty Reduction Agreement | Agreement between the Venezuelan Ministry of Energy and Mines and PDVSA Petróleo y Gas, S.A. to calculate the Royalty under Article 41 of the Hydrocarbons Law dated 29 May 1998 |
| Claimants | Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd., Mobil Venezolana de Petróleos, Inc. and Venezuela Holdings, B.V. |
| Cline Report | Expert Report of William B. Cline of Gaffney, Cline & Associates, Inc., "Technical Assessment of the Cerro Negro Contract Area" dated 14 December 2010 |
| C. Mem. J. | The Claimants' Counter-Memorial on Objections to Jurisdiction dated 16 April 2009 |
| C. Mem. M. | The Respondent's Counter-Memorial on the Merits dated 15 June 2011 |
| Congressional Joint Committee Report | Report of the Joint Committee on Energy and Mines of the Venezuelan Congress on the Framework of the Conditions for the Cerro Negro Project dated 10 April 1997 |
| C-PH Brief | The Claimants' Post-Hearing Brief dated 30 April 2012 |
| C-PH Reply | The Claimants' Post-Hearing Reply dated 14 May 2012 |
| CVP | Corporación Venezolana del Petróleo, S.A. |

3

DRDP-22-20522-SDFL_000240

DRX203-005

| Decision on Jurisdiction | The Tribunal's Decision on Jurisdiction dated 10 June 2010 |
|---|---|
| DCF | Discounted Cash Flow |
| Decree-Law 5200 | Decree No. 5200 with Rank, Value and Force of Law on the Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the Risk-and-Shared-Profit Exploration Agreements, Official Gazette No. 38632, published on 26 February 2007 |
| Enabling Law | Law that Authorizes the President of the Republic to Issue Decrees with Rank, Value and Force of Law in Delegated Subject Matters, Official Gazette No. 38617, published on 1 February 2007 |
| Ex. CL- | The Claimants' Legal Authority (legal authorities) |
| Ex. C- | The Claimants' Exhibit (documentary exhibits) |
| Ex. R- | The Respondent's Exhibit (legal authorities and/or documentary exhibits) |
| FET | Fair and equitable treatment |
| First Heads of Agreement | Heads of Agreement among Lagoven, S.A., Mobil Oil Corporation and Mobil Producción e Industrialización de Venezuela dated 17 September 1996 |
| Framework of Conditions for the Cerro Negro Association, Framework of Conditions or FCCNA | Framework of Conditions for an Association Agreement on the exploitation, upgrading and marketing of extra-heavy crude oil to be produced in the Cerro Negro area of the Orinoco Oil Belt to be executed between Lagoven, S.A., Mobil Corporation and Veba Oel AG approved on 24 April 1997 |
| Framework of Conditions for the La Ceiba Project or FCLCP | Framework of Conditions for the Association Agreements for risk-bearing exploration of new areas and hydrocarbon production under the shared-profit scheme |
| Graves ICC Testimony | Transcript of the Hearing on the Merits, 22 September 2010, *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A., PDVSA Cerro Negro, S.A.,* ICC Case No. 15416/JRF, International Court of Arbitration of the International Chamber of Commerce (Graves Cross-Examination, Excerpt) |
| Graves Report | Expert Report of R. Dean Graves of Alvarez & Marsal Dispute Analysis & Forensic Services, LLC dated 13 December 2010 |

4

DRDP-22-20522-SDFL_000241

DRX203-006

| ICC Award | *Mobil Cerro Negro, Ltd. v. Pétroleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. ARB/15416/JRF, Award dated 23 December 2011 |
|---|---|
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of other States |
| ICSID Institution Rules | ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (Institution Rules) |
| Jones ICC Testimony | Transcript of Hearing on the Merits, 21 September 2010, *Mobil Cerro Negro, Ltd. V. Petróleos de Venezuela, S.A., PDVSA Cerro Negro, S.A.,* ICC Case No. 15416/JRF, International Court of Arbitration of the International Chamber of Commerce (Jones Cross-Examination, Excerpt) |
| La Ceiba Association Agreement or LCAA | Association AGreement dated July 10, 1996 between Corporación Venezolana del Petróleo, S.A. and Mobil Venezolana de Petróleos Inc., Veba OEL Venezuela Exploration GmbH and Nippon Oil Exploration (Venezuela) Inc. |
| La Ceiba Evaluation Plan | La Ceiba Area Venezuela Evaluation Plan submitted by Agencia Operadora La Ceiba, C.A. dated 11 December 2011 |
| La Ceiba Royalty Reduction Agreement | Royalty Reduction Agreement for Shared-Risk-and-Profit Projects among the Venezuelan Ministry of Energy and Mines and Corporación Venezolana del Petróleo, S.A. dated 5 December 1995 |
| Law on Effects of the Migration | Law on the Effects of the Process of Migration to Mixed Companies of the Agreements of the Orinoco Oil Belt, as well as of the At-Risk-and-Shared-Profits Exploration Agreements |
| Letter of Intent | Letter of Intent among Lagoven, S.A. and Mobil Oil Corporation dated 20 December 1994 |
| MEM | The Ministry of Energy and Mines, the Ministry of Energy and Petroleum and/or the Ministry of the People's Power for Energy and Petroleum of the Bolivarian Republic of Venezuela. |
| Mem. J. | The Respondent's Memorial on Objections to Jurisdiction dated 15 January 2009 |

5

DRDP-22-20522-SDFL_000242

DRX203-007

| Mem. M. | The Claimants' Memorial on the Merits dated 15 December 2010 |
|---|---|
| MFN | Most favoured nation |
| Mobil | Mobil Corporation |
| Mobil CN | Mobil Cerro Negro, Ltd. |
| Mobil CN Holding | Mobil Cerro Negro Holding, Ltd. |
| Mobil PIV | Mobil Producción e Industrialización de Venezuela, Inc. |
| Mobil Venezolana | Mobil Venezolana de Petróleos, Inc. |
| Mobil Venezolana Holdings | Mobil Venezolana de Petróleos Holdings, Inc. |
| 1975 Nationalization Law | Organic Law that Reserves to the State the Industry and Trade of Hydrocarbons, Decree No. 250, issued on 29 August 1975 |
| Nippon La Ceiba | Nippon Oil Exploration (Venezuela), Inc. |
| October 2006 Production Cut | Order from the Venezuelan Ministry of Energy to Operadora Cerro Negro to reduce extra-heavy oil production for the month of October 2006 by a total of 50,000 barrels |
| Offtake Support Agreement | Offtake Support Agreement for the Cerro Negro Extra Heavy Crude Oil Project among Mobil Cerro Negro, Ltd., PDVSA Cerro Negro S.A., Mobil Sales & Supply Corp. and the Bank of New York dated 18 June 1998 |
| Operadora Cerro Negro or OCN | Operadora Cerro Negro S.A. |
| PDVSA | Petróleos de Venezuela, S.A. |
| 1. Request for Arbitration or RFA | The Claimants' Request for Arbitration against the Bolivarian Republic of Venezuela dated 6 September 2007 |
| Rej. J. | The Claimants' Rejoinder on Objections to Jurisdiction dated 17 August 2009 |

DRDP-22-20522-SDFL_000243

DRX203-008

| Rej. M. | The Respondent's Rejoinder on Merits dated 15 December 2011 |
|---|---|
| Reply Mem. J. | The Respondent's Reply on Objections to Jurisdiction dated 15 June 2009 |
| Reply M. | The Claimants' Reply Memorial on Merits dated 15 September 2011 |
| Reservation and Dedication Agreement | Reservation and Dedication Agreement Among Lagoven, S.A., Lagoven Cerro Negro, S.A., Mobil Producción e Industrialización de Venezuela Inc. and Veba Oel Venezuela Orinoco GmBH dated 28 October 1997 |
| Respondent | The Bolivarian Republic of Venezuela |
| Royalty Procedures Agreement | Agreement on Procedures for the Payment of the Exploitation Tax (Royalty) of the Extra-Heavy Crude Produced and the Sulphur Extracted by Operadora Cerro Negro, S.A. |
| R-PH Brief | The Respondent's Post-Hearing Memorial dated 30 April 2012 |
| R-PH Reply | The Respondent's Post-Hearing Reply Memorial dated 14 May 2012 |
| Tr. M. | Transcript of the hearing on the merits |
| Vienna Convention or VCLT | Vienna Convention on the Law of Treaties, done at Vienna on 23 May 1969 (entered into force on 27 January 1980), United Nations, *Treaty Series*, vol. 1155, p. 331 |
| Veba La Ceiba | Veba Oel Venezuela Exploration GmbH |
| Veba Orinoco | Veba Oel Venezuela Orinoco GmbH |
| Venezuela | The Bolivarian Republic of Venezuela |
| Venezuela Holdings | Venezuela Holdings, B.V. |
| WS | Witness statement |
| 1943 Hydrocarbons Law | Hydrocarbons Law, Official Gazette No. 31, issued on 13 March 1943 |

7

DRDP-22-20522-SDFL_000244

DRX203-009

## I.   PROCEDURAL HISTORY

1.   On 6 September 2007, the International Centre for Settlement of Investment Disputes received a Request for Arbitration against the Bolivarian Republic of Venezuela dated 6 September 2007 from (i) three U.S. (Delaware) companies, *i.e.*, Mobil Corporation, Mobil Cerro Negro Holding, Ltd. and Mobil Venezolana de Petróleos Holdings, Inc., (ii) two Bahamian companies, *i.e.*, Mobil Cerro Negro, Ltd. and Mobil Venezolana de Petróleos, Inc. and (iii) one Dutch company Venezuela Holdings, B.V.

2.   On the same day, the Centre acknowledged receipt of the request for arbitration pursuant to Rule 5 of the ICSID Institution Rules and transmitted a copy to Venezuela and to the Venezuelan Embassy in Washington, D.C.

3.   The Request for Arbitration, as supplemented by the Claimants' letters of 28 September 2007, was registered by the Secretary-General of ICSID on 10 October 2007 pursuant to Article 36(3) of the ICSID Convention.  On the same day, the Secretary-General, in accordance with Rule 7 of the Institution Rules, notified the Parties of the registration and invited them to proceed to constitute a tribunal as soon as possible.

4.   By letter dated 7 January 2008, the Claimants confirmed the Parties' agreement regarding the constitution of the tribunal, according to which the tribunal would be composed of three arbitrators, one appointed by each Party and a third presiding arbitrator appointed by agreement of the Parties with the assistance of the first two appointed arbitrators.

5.   On 7 January 2008, the Claimants appointed Professor Gabrielle Kaufmann-Kohler, a national of the Swiss Confederation, as arbitrator.  On 31 January 2008, the Respondent appointed Dr. Ahmed S. El-Kosheri, a national of the Arab Republic of Egypt, as arbitrator.

8

DRDP-22-20522-SDFL_000245

DRX203-010

6.      In the absence of the Parties' appointment of a presiding arbitrator, the Claimants, by letter dated 16 May 2008, requested the Chairman of the ICSID Administrative Council to appoint the presiding arbitrator pursuant to Article 38 of the ICSID Convention and ICSID Arbitration Rule 4.  On 25 July 2008, the Chairman of the ICSID Administrative Council, in consultation with the Parties, appointed H.E. Judge Gilbert Guillaume, a national of the French Republic, as the presiding arbitrator.

7.      All three arbitrators having accepted their appointments, the Acting Secretary-General of ICSID by letter dated 8 August 2008 informed the Parties that the Tribunal had been constituted and confirmed that the proceeding was deemed to have begun on that day in accordance with Rule 6(1) of the ICSID Arbitration Rules.  The Parties were also informed that Mr. Ucheora Onwuamaegbu, of the ICSID Secretariat, would provisionally serve as Secretary of the Tribunal.

8.      In September 2008, Ms. Katia Yannaca-Small, of the ICSID Secretariat, was designated as the Secretary of the Tribunal, in place of Mr. Onwuamaegbu.

9.      In accordance with the Parties' agreement, the first session of the Tribunal was held at the World Bank's Paris Conference Center on 7 November 2008.  The following individuals were present at the first session:

> Members of the Tribunal:
> H. E. Judge Gilbert Guillaume, President of the Tribunal
> Professor Gabrielle Kaufmann-Kohler, Arbitrator
> Dr. Ahmed Sadek El-Kosheri, Arbitrator
> ICSID Secretariat:
> Ms. Katia Yannaca-Small, Secretary of the Tribunal
> For the Claimants:
> Mr. Oscar M. Garibaldi, Covington & Burling LLP
> Mr. Eugene D. Gulland, Covington & Burling LLP
> Mr. Toni D. Hennike, Law Department, Exxon Mobil Corporation
> Mr. Charles A. Beach, Law Department, Exxon Mobil Corporation

DRDP-22-20522-SDFL_000246

DRX203-011

Mr. Luis Marulanda del Valle, Law Department, Exxon Mobil Corporation

For the Respondent:

Mr. George Kahale, III, Curtis Mallet-Prevost, Colt & Mosle LLP

Ms. Gabriela Álvarez Ávila, Curtis, Mallet-Prevost, Colt & Mosle, S.C

Ms. Miriam K. Harwood, Curtis Mallet-Prevost, Colt & Mosle LLP

Mr. Peter M. Wolrich, Curtis Mallet-Prevost, Colt & Mosle LLP

Dr. Bernard Mommer, Bolivarian Republic of Venezuela

Ms. Hildegard Rondón de Sansó, Bolivarian Republic of Venezuela

Dra. Beatrice Sansó de Ramirez, Bolivarian Republic of Venezuela

Mr. Armando Giraud, Bolivarian Republic of Venezuela

Ms. Moreeliec Peña, Bolivarian Republic of Venezuela

10. The Tribunal determined various procedural issues at the first session, including a schedule for the submission of written pleadings.

11. The Respondent's Memorial on Objections to Jurisdiction was filed on 15 January 2009, followed by the Claimants' Counter-Memorial on Objections to Jurisdiction on 16 April 2009, the Respondent's Reply on Jurisdiction on 15 June 2009 and the Claimants' Rejoinder on Jurisdiction on 17 August 2009.

12. On 9 September 2009, the Tribunal held a procedural conference with the Parties by telephone.

13. The hearing on jurisdiction was held at the offices of the World Bank's Paris Conference Center from 23–24 September 2009. The following individuals were present at the hearing:

Members of the Tribunal:

H.E. Judge Gilbert Guillaume, President of the Tribunal

Professor Gabrielle Kaufmann-Kohler, Arbitrator

Dr. Ahmed Sadek El-Kosheri, Arbitrator

ICSID Secretariat:

Ms. Katia Yannaca-Small, Secretary of the Tribunal

10

DRDP-22-20522-SDFL_000247

DRX203-012

For the Claimants:

Mr. Oscar Garibaldi, Covington & Burling LLP

Mr. Eugene Gulland, Covington & Burling LLP

Mr. Thomas Cubbage, Covington & Burling LLP

Mr. Miguel López Forastier, Covington & Burling LLP

Mr. David Shuford, Covington & Burling LLP

Ms. Luisa Torres, Covington & Burling LLP

Ms. Mary Hernandez, Covington & Burling LLP

Mr. Andres Barrera, Covington & Burling LLP

Mr. Andrés A. Mezgravis, Travieso Evans Arria Rengel & Paz

Mr. Theodore Frois, Exxon Mobil Corporation

Ms. Toni D. Hennike, Exxon Mobil Corporation

Mr. Charles A. Beach, Exxon Mobil Corporation

Mr. Eugene Silva, Exxon Mobil Corporation

Mr. Alberto Ravell, Exxon Mobil Corporation

Mrs. Anna Knull, Exxon Mobil Corporation

Mr. James R. Massey, witness

Professor Allan Brewer-Carías, expert

Professor Christoph Schreuer, expert

For the Respondent:

Mr. George Kahale III, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Mark O'Donoghue, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Miriam Harwood, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Peter Wolrich, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Gloria Díaz, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Christopher Grech, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Joaquín Parra, Bolivarian Republic of Venezuela

Dr. Bernard Mommer, Bolivarian Republic of Venezuela

Mr. Armando Giraud, Bolivarian Republic of Venezuela

Ms. Moreeliec Peña, Bolivarian Republic of Venezuela

14.     Following the hearing, the Members of the Tribunal deliberated by various means of communication, including in a meeting in Paris on 2 December 2009.

11

DRDP-22-20522-SDFL_000248

DRX203-013

15. In its Decision on Jurisdiction dated 10 June 2010, which forms an integral part of this Award and is attached as Annex 2, the Tribunal unanimously decided:

"(a) that it has jurisdiction over the claims presented by Venezuela Holdings (Netherlands), Mobil CN Holding and Mobil Venezolana Holdings (Delaware), Mobil CN and Mobil Venezolana (Bahamas) as far as:

(i) they are based on alleged breaches of the Agreement on Encouragement and Reciprocal Protection of Investments dated 22 October 1991 between the Kingdom of the Netherlands and the Republic of Venezuela;

(ii) they relate to disputes born after 21 February 2006 for the Cerro Negro Project and after 23 November 2006 for the La Ceiba Project and, in particular, as far as they relate to the dispute concerning the nationalization measures taken by the Republic of Venezuela;

(b) that it has  no jurisdiction under Article 22 of the Venezuelan Decree with rank and force of law No. 356 on the protection and promotion of investments of 3 October 1999;

(c) to make the necessary order for the continuation of the procedure pursuant to Arbitration Rule 41(4); and

(d) to reserve all questions concerning the costs and expenses of the Tribunal and the costs of the Parties for subsequent determination." .

16. In September 2010, Ms. Janet Whittaker, of the ICSID Secretariat, was designated as the Secretary of the Tribunal, in place of Ms. Yannaca-Small.

17. On 15 December 2010, the Claimants submitted their Memorial on the Merits.

18. On 9 February 2011, the Respondent submitted its First Request for the Production of Documents.  On 23 February 2011, the Claimants submitted their Objections to the Respondent's First Request for Production of Documents.  On 25 February 2011, the Respondent submitted an Application for an Order Requiring the Production of Documents by the Claimants.  On 14 March 2011, Claimants submitted a Reply to the Respondent's Application for an Order Requiring the

12

DRDP-22-20522-SDFL_000249

DRX203-014

Production of Documents. The Respondent submitted Observations on Claimants' Reply to Respondent's Application for an Order Requiring the Production of Documents on 14 March 2011. On 17 March 2011, the Claimants submitted Comments on Respondent's Observations Regarding its Application for an Order Requiring the Production of Documents. The Tribunal issued a decision on the Respondent's Application for an Order Requiring the Production of Documents on 24 March 2011.

19.    On 15 June 2011, the Respondent submitted its Counter-Memorial on the Merits.

20.    On 15 September 2011, the Claimants submitted their Reply on the Merits.

21.    On 15 December 2011, the Respondent submitted its Rejoinder Memorial on the Merits.

22.    The hearing on the merits was held at the offices of the World Bank's Paris Conference Center from 7 to 16 February 2012. The following individuals were present at the hearing:

> Members of the Tribunal:
> H.E. Judge Gilbert Guillaume, President of the Tribunal
> Professor Gabrielle Kaufmann-Kohler, Arbitrator
> Dr. Ahmed Sadek El-Kosheri, Arbitrator
> ICSID Secretariat:
> Ms. Janet Whittaker, Secretary of the Tribunal
> For the Claimants:
> Mr. Oscar Garibaldi, Covington & Burling LLP
> Mr. Eugene Gulland, Covington & Burling LLP
> Mr. Thomas Cubbage, Covington & Burling LLP
> Mr. Gaëtan Verhoosel, Covington & Burling LLP
> Mr. Miguel López Forastier, Covington & Burling LLP
> Mr. José Arvelo, Covington & Burling LLP
> Mr. Nathaniel Morales, Covington & Burling LLP
> Mr. Philip Scarborough, Covington & Burling LLP
> Mr. Joshua Simmons, Covington & Burling LLP

13

DRDP-22-20522-SDFL_000250

DRX203-015

Mr. Matthew Swinehart, Covington & Burling LLP

Ms. Luisa Torres, Covington & Burling LLP

Mr. Mark Cuevas, Covington & Burling LLP

Ms. Lara Dominguez, Covington & Burling LLP

Mr. William Buck, Exxon Mobil Corporation

Ms. Mary Hernandez, Exxon Mobil Corporation

Mr. Norman Kreutter, Exxon Mobil Corporation

Ms. JoAnne Lee, Exxon Mobil Corporation

Mr. Robert McClure, Exxon Mobil Corporation

Mr. René Mouledoux, Exxon Mobil Corporation

Mr. Eugene Silva, Exxon Mobil Corporation

Mr. Timothy Cutt, witness

Mr. Brian Lawless, witness

Mr. Mark Ward, witness

Mr. Leonard West, witness

Mr. William Cline, Gaffney Cline & Associates

Mr. Neil Earnest, Muse Stancil & Co.

Ms. Sarah Emerson, Energy Security Analysis, Inc.

Mr. R. Dean Graves, Alvarez & Marsal

Mr. Doug Ho, Sproule Unconventional Ltd.

Mr. Keith MacLeod, Sproule Unconventional Ltd.

Mr. Alexis Maniatis, The Brattle Group

Professor Stewart Myers, The Brattle Group

For the Respondent:

Mr. George Kahale III, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Benard Preziosi, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Miriam Harwood, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Borzu Sabahi, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Fernando Tupa, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Justin Jacinto, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Kabir Duggal, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Liliana Dealbert, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Dori Yoldi, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Fuad Zabiyev, Curtis, Mallet-Prevost, Colt & Mosle LLP

14

DRDP-22-20522-SDFL_000251

DRX203-016

Dr. Juan Carlos Boué, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. John Kirtley, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Gloria Díaz, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Bianca Granados, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Elizabeth O'Connell, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Jorge Alcantar, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Chris Gregh, Curtis, Mallet-Prevost, Colt & Mosle LLP

Ms. Noemie Solle, Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Christopher Grech, Curtis, Mallet-Prevost, Colt & Mosle LLP

Dra. Hildegard Rondón de Sansó, Bolivarian Republic of Venezuela

Dra. Beatrice Sansó, Bolivarian Republic of Venezuela

Dr. Álvaro Silva Calderón, Bolivarian Republic of Venezuela

Dr. Joaquín Parra, Bolivarian Republic of Venezuela

Dra. Moreeliec Peña, Bolivarian Republic of Venezuela

Mr. Alvaro Ledo, Bolivarian Republic of Venezuela

Mrs. Irama Mommer, Bolivarian Republic of Venezuela

H.E. Ambassador Jesús Pérez, Embassy of the Bolivarian Republic of Venezuela

Mrs. Zulma Pérez, Embassy of the Bolivarian Republic of Venezuela

Dr. Bernard Mommer, witness

Mr. José Ángel Pereira Ruimwyk, witness

Mr. José Antonio Urbina Herrera, witness

Dr. Vladimir Brailowsky, Economía Aplicada, S.C.

Dr. Daniel Flores, Econ One Research, Inc.

Dr. Anthony Finizza, Econ One Research, Inc.

Ms. Lisa McGuff, Econ One Research, Inc.

Mr. Jesús Rafael Patiño Murillo, ARC Solutions, S.A.

Professor Louis Wells, Harvard Business School

23.     On 30 April 2012, the Parties submitted post-hearing memorials.

24.     On 14 May 2012, the Parties submitted post-hearing reply memorials.

15

DRDP-22-20522-SDFL_000252

DRX203-017

25. In November 2012, Ms. Alicia Martín Blanco, of the ICSID Secretariat, was designated as the Secretary of the Tribunal, in place of Ms. Whittaker.

26. The Members of the Tribunal deliberated by various means of communication, including in meetings in Paris from 20 to 21 November 2012 and on 23 October 2013.

27. The Tribunal declared the proceedings closed on 28 July 2014.

## II. THE FACTS

28. This Chapter summarizes the factual background of this arbitration insofar as is necessary to understand the issues that are raised in this case.

### A. THE PARTIES

#### 1. The Claimants

29. The five Claimants and their investments in Venezuela relevant to the present dispute are as follows[1]:

(a) Venezuela Holdings, B.V. (Venezuela Holdings) is a corporation organized and existing under the laws of the Kingdom of the Netherlands. Venezuela Holdings' address is Graaf Engelbertlaan 75, Breda, 4837 DS, The Netherlands. Venezuela Holdings held, through the other Claimants described below, investments in the Cerro Negro Association and the La Ceiba Association;

---

[1] The term "the Claimants" is used to refer to all of the Claimants collectively, as they remain after the Decision on Jurisdiction. To avoid repeated references to the "Cerro Negro Claimants" or "La Ceiba Claimants", the term "the Claimants" is also used to refer to a subset of the Claimants that have brought a particular claim. Accordingly, when referring to claims related to the Cerro Negro Project, "the Claimants" should be understood to refer to Venezuela Holdings, Mobil Cerro Negro, and Mobil Cerro Negro Holdings (the Cerro Negro Claimants). When referring to claims related to the La Ceiba Project, "Claimants" should be understood to refer to Venezuela Holdings, Mobil Venezolana, and Mobil Venezolana Holding (the La Ceiba Claimants). A graphical representation of each of the Claimants and their respective investments is at Mem. M., Annex A. Pursuant to the Tribunal's Decision on Jurisdiction, Mobil Corporation is no longer a Claimant in this arbitration.

16

DRDP-22-20522-SDFL_000253

DRX203-018

(b) Mobil Cerro Negro Holding, Ltd. (Mobil Cerro Negro Holding) is a corporation organized and existing under the laws of the State of Delaware, United States of America. Mobil Cerro Negro Holding's address is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America. Mobil Cerro Negro Holding is a wholly owned subsidiary of Venezuela Holdings;

(c) Mobil Cerro Negro, Ltd. (Mobil Cerro Negro) is a corporation organized and existing under the laws of the Commonwealth of the Bahamas. Mobil Cerro Negro is a wholly owned subsidiary of Mobil Cerro Negro Holding. Mobil Cerro Negro was a party to the Cerro Negro Association Agreement and owned a 41 2/3% participation in the Cerro Negro Association;

(d) Mobil Venezolana de Petróleos Holdings Inc. (Mobil Venezolana Holdings) is a corporation organized and existing under the laws of the State of Delaware, United States of America. Mobil Venezolana Holdings' address is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, United States of America. Mobil Venezolana Holdings is a wholly owned subsidiary of Venezuela Holdings; and

(e) Mobil Venezolana de Petróleos Inc. (Mobil Venezolana) is a corporation organized and existing under the laws of the Commonwealth of the Bahamas. Mobil Venezolana's address is Shirley House, 50 Shirley St., Nassau, New Providence, Commonwealth of the Bahamas. Mobil Venezolana was a party to the La Ceiba Association Agreement and owned a 50% participation in the La Ceiba Project.

30. The Claimants are represented in this arbitration by Covington & Burling, LLP.

**2. The Respondent**

31. The Respondent is the Bolivarian Republic of Venezuela.

DRDP-22-20522-SDFL_000254

32.     The Respondent is represented in this arbitration by the Procuraduría General de la República and Curtis, Mallet-Prevost, Colt & Mosle, LLP.

## B.     SUMMARY OF THE MAIN FACTS

33.     The following summary is meant to give a general overview of the present dispute. It does not include all factual aspects that may be of relevance, particularly as these emerged from the extensive testimony of witnesses and experts at the hearing on the merits.  Such testimony, insofar as it is relevant, will be discussed in the context of the Tribunal's analysis of the disputed issues.

34.     The facts set forth in this section are those which are alleged by the Parties and that the Tribunal has found to be supported by the evidentiary record, as well as facts alleged by one Party that have not been disputed by the other.  Where a fact is in dispute, the Tribunal has indicated as such.

### 1.  Venezuela's Oil Reserves

35.     Venezuela is one of the world's leading petroleum producing countries[2].  The petroleum industry in Venezuela has always been a strategic sector of vital national importance to the economy[3].

36.     In 1975, the oil industry was nationalized through the Organic Law that Reserves to the State the Industry and Trade of Hydrocarbons ("1975 Nationalization Law")[4]. The Law terminated the oil concessions held by private companies, expropriated their operating assets and generally reserved oil industry activities to the State[5].

37.     Article 5 of the 1975 Nationalization Law provided that activities in the Venezuelan petroleum industry were to be carried out by the State acting through State-owned entities.  A new State-owned entity called Petróleos de Venezuela, S.A. ("PDVSA")

---

[2] Mem. M. ¶ 24.

[3] Mem. J. ¶ 9.

[4] Mem. J. ¶ 10; Mem. M. ¶ 28.

[5] Mem. M. ¶ 28; Mem. J. ¶ 10.

18

DRDP-22-20522-SDFL_000255

DRX203-020

was created to manage the "reserved" activities[6]. The Respondent was, and continues to be, PDVSA's sole shareholder[7]. After the passage of the 1975 Nationalization Law, PDVSA and its subsidiaries carried out activities in the Venezuelan petroleum industry, without the equity participation of private parties, for the following 15 years[8].

38.    By the 1980s, the Respondent wished to explore new fields or to look to the country's vast reserves of extra-heavy oil[9]. These reserves were primarily located in reservoirs in the Orinoco River Basin, in the Orinoco Oil Belt (*la Faja Petrolífera del Orinoco)*, which is a vast area covering approximately 55,000 square kilometres[10]. The Orinoco Oil Belt was divided into four areas, from east to west: Cerro Negro (renamed Carabobo), Hamaca (later renamed Ayacucho), Zuata (later renamed Junín) and Machete (later renamed Boyacá)[11].

39.    To meet these goals, the Respondent adopted a series of measures, collectively known as the *Apertura Petrolera* ("Oil Opening"), which allowed foreign investors to participate in the Venezuelan oil industry. One of the objectives of the Oil Opening was the development of the extra-heavy oil reservoirs in the Orinoco Oil Belt[12].

---

[6] Mem. M. ¶ 28.

[7] Mem. M. ¶ 28.

[8] Mem. J. ¶ 13.

[9] Mem. M. ¶ 25.

[10] Mem. M. ¶ 26; Cline Report at p. 5.

[11] Mem. M. ¶ 26; Cline Report at p. 5.

[12] Mem. M. ¶ 33.

DRDP-22-20522-SDFL_000256

DRX203-021

## 2. The Oil Opening

40.   The Oil Opening was implemented on the basis of Article 5 of the Nationalization Law, which authorized PDVSA to enter into two types of agreements with private companies[13]:

    (i)   operating services agreements – which required private companies to provide specified services to PDVSA in exchange for a fee[14]; and

    (ii)   association agreements – which were contractual joint ventures that PDVSA could form with private companies for a specified term in "special cases […] convenient to the public interest"[15]. These agreements required specific authorization by the Venezuelan Congress[16].

41.   To encourage investment, the Respondent introduced economic incentives. These included:

    (i)   Reduction in the income tax rate

42.   In August 1991, the Respondent amended the Income Tax Law to provide that income arising from new exploitation and refinement of heavy and extra-heavy crude oil under association agreements would be subject to the general corporate rate (then 30%) instead of the rate applicable to other oil activities (then 67.7%)[17]. In 1993, the Respondent enacted Decree No. 188 on Amendment to the Income Tax Law (*Decreto de Reforma de la Ley de Impuesto sobre la Renta*) expressly providing that participants in "vertically integrated projects related to the exploitation, refining, industrialization, emulsification, transport and commercialization of extra-heavy crude oil" would be subject to the general

---

[13] Mem. M. ¶ 34; Bond Offering Memorandum, Cerro Negro Finance Ltd. (11 June 1998) at F-6 (Ex. R-26) ("Offering Memorandum"); see also Mem. J. at ¶¶ 12–15.

[14] Offering Memorandum at F-6 (Ex. R-26).

[15] 1975 Nationalization Law, Article 5 (Ex. C-214).

[16] *Ibid.*

[17] Mem. M. ¶ 49.

DRDP-22-20522-SDFL_000257

corporate rate of 30%, instead of the 67.7% rate otherwise applicable to oil activities[18]. This general corporate rate was later raised to 34%[19].

### (ii) Reduction in the Applicable Royalty

43. The 1943 Hydrocarbons Law then in force empowered the Respondent to reduce the "exploitation tax" (*i.e.*, the royalty payable) in some circumstances. It provides that:

> "All concessionaires referred to in Article 39 shall pay (...)
>
> 1. – The exploitation tax, which will be equal to 16 2/3 percent of the crude oil extracted, measured in the production field in the facilities where the inspection is carried out (...)
>
> Sole Paragraph- For the purpose of extending the economic exploitation of certain concessions, the Federal Executive is hereby authorized to reduce the exploitation tax referred to in this subparagraph in those cases in which it is demonstrated to its satisfaction that the increasing production cost, including tax amounts, has reached the limit which does not permit commercial exploitation. The Federal Executive may also increase again the reduced exploitation tax until restoring it to its original amount, when, in its judgment, the causes which gave rise to the reduction have changed[20]".

44. Exercising the discretion conferred on it by this provision, the Respondent, through the La Ceiba Royalty Reduction Agreement, provided that the applicable royalty would be 16 2/3% during early production and would be reduced, according to a sliding scale, once commercial production was achieved. The sliding scale linked the royalty rate (ranging from 1% to 16 2/3%), to the profitability of the project[21]. Similarly, under the Cerro Negro Royalty Reduction Agreement, the royalty rate

---

[18] Mem. M. ¶ 50.  See also 1993 Law on Partial Amendment to the Income Tax Law (*Ley de Reforma Parcial de la Ley de Impuesto sobre la Renta*) (26 August 1993), Article 1 (Ex. C-58).

[19] Mem. M. ¶ 50.  See also Decree No. 188 on Amendment to the Income Tax Law (*Decreto de Reforma de la Ley de Impuesto sobre la Renta*) (25 May 1994) (Ex. C-59).

[20] 1943 Hydrocarbons Law, Article 41(1) and Sole Paragraph (Ex. Ex. R-30).

[21] Mem. M. ¶ 54.

DRDP-22-20522-SDFL_000258

DRX203-023

was set at 16 2/3% during the early production phase of the Project[22]. Upon achieving commercial production, the rate would be reduced to one percent until such time as the accumulated gross income from the Project exceeded three times the total initial investment, but in no event would the reduction period exceed nine years from the beginning of commercial production. On expiry of the reduction, the royalty rate would revert to 16 2/3%.

### 3. Mobil Investment

45.     In September 1990, PDVSA approached Mobil Corporation[23] to "hear out and react to" PDVSA's "new policy of international cooperation being considered to foster expansion"[24]. Eventually, after studies, discussions and negotiations[25], Mobil participated in two projects that the Respondent offered during the Oil Opening: (i) the Cerro Negro Project – a joint venture to exploit extra-heavy crude in the Orinoco Oil Belt[26]; and (ii) the La Ceiba Project – a joint venture to explore and exploit, on a shared-risk-and-profit basis, an area with light and medium crude potential adjacent to Lake Maracaibo[27].

### 4. Cerro Negro Investment

(a) *Context of the Cerro Negro Investment*

46.     In December 1991, Mobil and Lagoven S.A. ("Lagoven" or "PDVSA P&G")[28] agreed to conduct a joint study to determine the feasibility of producing,

---

[22] Mem. M. ¶ 57.

[23] Mobil Corporation is a corporation organized and existing under the law of the State of Delaware, United States of America. It owns all of the equity of Operadora Cerro Negro, S.A. and Agencia Operadora La Ceiba. Mobil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation. Exxon Corporation and Mobil Corporation merged on 30 November 1999 to form the Exxon Mobil Corporation.

[24] Mem. M. ¶ 44.

[25] Mem. M. ¶ 4.

[26] Cerro Negro Association Agreement (Ex. C-68).

[27] La Ceiba Association Agreement (Ex. C-33).

[28] Along with Corpoven and Maraven, Lagoven was one of the three main operating subsidiaries of PDVSA until 1 January 1998. On 1 January 1998, as part of a corporate reorganization, Lagoven and Maraven were merged into Corpoven. Corpoven was then renamed PDVSA Petróleo y Gas, S.A.

22

DRDP-22-20522-SDFL_000259

DRX203-024

transporting, upgrading and marketing extra-heavy crude oil from the Orinoco Oil Belt[29]. On 20 December 1994, Lagoven and Mobil signed a Letter of Intent agreeing to conduct a joint project study to determine the optimum technical, marketing, economic, financial, legal and fiscal conditions required to develop an extra-heavy oil project[30].

47.     On 17 September 1996, Lagoven, Mobil and Mobil Producción e Industrialización de Venezuela, Inc. ("Mobil PIV")[31] signed a non-binding Heads of Agreement ("First Heads of Agreement")[32] concerning the proposed terms and conditions of: (i) the Cerro Negro synthetic crude oil joint venture ("Cerro Negro Association"); and (ii) a second joint venture that would own and operate the Chalmette Refinery in Louisiana, which would buy synthetic crude oil from the Cerro Negro Association and refine it using specially designated facilities[33]. Lagoven and Mobil would have equal equity participation in each joint venture[34].

48.     The First Heads of Agreement provided that Lagoven would compensate Mobil PIV in the event that certain governmental actions resulted in a "Material Adverse Impact"[35]. Specific limits were placed on the circumstances under which compensation would be granted and the extent of such compensation, as discussed further below[36].

---

[29] RFA ¶ 60.

[30] RFA ¶ 64.

[31] Mobil PIV is a corporation organized and existing under the laws of the State of Delaware, United States of America. Mobil PIV acquired a 41 2/3% interest in the Cerro Negro Association when the association was formed on 28 October 1997. At that time, Mobil PIV was a wholly owned subsidiary of Mobil Corporation. Mobil PIV assigned its interest in the Association Agreement to Mobil Cerro Negro on 29 October 1997.

[32] Heads of Agreement among Lagoven, S.A., Mobil Oil Corporation and Mobil Producción e Industrialización de Venezuela dated 17 September 1996 (hereinafter "First Heads of Agreement") (Ex. C-238).

[33] RFA ¶ 70.

[34] *Ibid.*

[35] C-Mem. M. ¶ 21.

[36] Mem. J. ¶ 24.

DRDP-22-20522-SDFL_000260

DRX203-025

49.     On 1 January 1997, Lagoven, Mobil and Veba Oel[37] signed a Second Heads of Agreement, which superseded certain parts of First Heads of Agreement.  Under the Second Heads of Agreement, Lagoven and Mobil PIV would each own a 41 2/3% interest in the synthetic crude oil joint venture, and Veba Orinoco[38] would own the remaining 16 2/3% interest[39].

50.     Negotiations progressed between the Parties and proved successful.  In order to proceed further, the authorization of the Venezuelan Congress was required pursuant to Article 5 of the 1975 Nationalization Law.  Consequently, on 17 March 1997, the Ministry of Energy and Mines ("MEM")[40] submitted to the Venezuelan Congress, the proposed Framework of Conditions for the Cerro Negro Association (*Marco de Condiciones*)[41].

51.     In the Framework of Conditions for the Cerro Negro Association, the Venezuelan Congress established the general terms of, and conditions for, the Cerro Negro Association and provided for undertakings by the Respondent with respect to certain rights accorded to the participants in the association as follows[42]:

        (1) The Thirteenth Condition provided that any cut in production required by Venezuela's OPEC obligations would be applied proportionately, as follows[43]:

---

[37] Veba Oel is an oil and gas exploration and production company based in Germany.  Veba Oel was acquired by BP Amoco in 2002.

[38] Veba Oel Venezuela Orinoco, GmbH ("Veba Orinoco") is a subsidiary of Veba Oel and participant in the Cerro Negro Association.  Veba Orinoco held a 16 2/3% interest.

[39] RFA ¶ 74.

[40] On 20 January 2005, President Chávez changed the name of the Ministry of Energy and Mines to Ministry of Energy and Petroleum.  On 8 January 2007, President Chávez changed the name again to Ministry of the People's Power for Energy and Petroleum.  Ministry of Energy is a reference to the Ministry of Energy and Mines, the Ministry of Energy and Petroleum and/or the Ministry of the People's Power for Energy and Petroleum.  Mem. M. ¶ 31, fn. 35.

[41] Mem. M. ¶ 59; Framework of Conditions for the Cerro Negro Project (Ex. C-21).

[42] Mem. M. ¶ 60.

[43] Mem. M. ¶ 61.

24

DRDP-22-20522-SDFL_000261

DRX203-026

"If THE PARTIES are required to reduce their production as a result of the international commitments of the Republic of Venezuela, such reduction shall not exceed the reduction percentage generally applicable to the national oil industry as a whole. This percentage shall be calculated based on the available production capacity[44]".

(2) The Fifteenth Condition provided that the participants in the Cerro Negro Project would be subject to the income tax rates applicable to companies in general (as distinguished from the higher rates applicable to other companies in the oil sector), as follows:

"[The activities to be carried out by the Parties under the Association Agreement] shall not be subject to payment of Municipal Taxes (Industry and Commerce Excise) or State taxes; furthermore, pursuant to the second paragraph of article 9 of the Income Tax Law in force, THE PARTIES and each of the Entities shall pay taxes under the ordinary regime established in said law for companies and assimilated entities, for any income obtained in connection with the activities of THE PARTIES (including the Development Production)[45]".

(3) The Eighteenth Condition reserved the rights of Venezuela in the following terms[46]:

"The Association Agreement, and all activities and operations conducted under it, shall not impose any obligation on the Republic of Venezuela nor shall they restrict its sovereign powers, the exercise of which shall not give rise to any claim, regardless of the nature or characteristics of the claim by other states or foreign powers[47]".

---

[44] Framework of Conditions for the Cerro Negro Project, Thirteenth Condition (Ex. C-21).

[45] Framework of Conditions for the Cerro Negro Association, Fifteenth Condition (Ex. C-21).

[46] Reply Mem. J. ¶ 6; C-Mem. M. ¶ 14.

[47] C-Mem. M. ¶ 14.

25

DRDP-22-20522-SDFL_000262

DRX203-027

(4) The Twentieth Condition provided compensation for governmental action having an adverse effect and expressly referred to the limitation of liability, as follows[48]:

"The Association Agreement shall include provisions allowing the renegotiation of the Agreement as necessary to compensate any Party other than LAGOVEN, on equitable terms, for adverse and significant economic consequences arising from the adoption of decisions made by governmental authorities, or changes in legislation, that cause a discriminatory treatment of THE ASSOCIATION, any entity or THE PARTIES in their capacity as participants in THE ASSOCIATION. However, it shall not be considered that a Party has suffered an adverse and significant economic consequence as a result of any of said decisions or changes in legislation, at any time when the Party is receiving income from THE ASSOCIATION equal to a price of crude oil above a maximum price that shall be specified in the Association Agreement[49]".

52.     The Venezuelan Congress approved the proposed Framework of Conditions for the Cerro Negro Association on 24 April 1997[50].

(b) *Elements of the Cerro Negro Investment*

53.     The principal elements of the Cerro Negro investment were[51]: (i) the execution of the Cerro Negro Association Agreement[52], the Reservation and Dedication Agreement (*Convenio de Reserva y Dedicación de Área Designada*)[53] and the Cerro Negro Royalty Reduction Agreement[54]; (ii) the creation of Petrolera Cerro Negro to

---

[48] C-Mem. M. ¶¶ 19–20.

[49] C-Mem. M. ¶ 19.

[50] RFA ¶ 81

[51] RFA ¶ 86.

[52] Cerro Negro Association Agreement (Ex. C-68).

[53] Reservation and Dedication Agreement Among Lagoven, S.A., Lagoven Cerro Negro, S.A., Mobil Producción e Industrialización de Venezuela Inc. and Veba Oel Venezuela Orinoco GmBH, 28 October 1997 (Ex. C-248).

[54] Cerro Negro Royalty Reduction Agreement (Ex. C-336).

26

DRDP-22-20522-SDFL_000263

manage the project (*Convenio de Operaciones Cerro Negro*)[55]; and (iii) the establishment of a joint venture between Mobil and PDVSA to own and operate the Chalmette refinery (*Convenio Modificado y Replanteado de Constitución de Sociedad de Responsabilidad Limitada* )[56].

    (c) *Cerro Negro Association Agreement, Reservation and Dedication Agreement and Cerro Negro Royalty Reduction Agreement*

54.    In June 1997, the proposed Cerro Negro Association Agreement was submitted to the Venezuelan Congress[57]. On 2 October 1997, the Congress determined that the terms and conditions of the Cerro Negro Association Agreement and the Annexes and Exhibits to the agreement complied with the Framework of Conditions for the Cerro Negro Association and formally authorized the execution of those instruments[58].

55.    On 28 October 1997, Lagoven Cerro Negro, S.A ("PDVSA-CN")[59], Veba Orinoco and Mobil PIV entered into the Cerro Negro Association Agreement[60]. On the same day, the Parties entered into the Reservation and Dedication Agreement[61]. Under the provisions thereof, PDVSA P&G conferred exclusive rights to develop and exploit the oil reserves in a designated area of the Cerro Negro region upon PDVSA-CN, Mobil Cerro Negro and Veba Orinoco[62].

---

[55] Cerro Negro Association Agreement, Clause IV and Annex B (Ex. C-68). Cerro Negro Operating Agreement (Ex. C-26).

[56] Amended and Restated Limited Liability Company Agreement of Chalmette Refining, L.L.C., 28 October 1997 (Ex. C-25).

[57] Mem. M. ¶ 65; RFA ¶ 83.

[58] *Ibid.*

[59] Lagoven Cerro Negro, S.A. is a subsidiary of Lagoven and a participant in the Cerro Negro Association. Lagoven Cerro Negro, S.A. acquired a 41 2/3% interest in the Cerro Negro Association when the association was formed in October 1997. On 11 May 1998, Lagoven Cerro Negro, S.A. changed its name to PDVSA Cerro Negro, S.A. (PDVSA-CN).

[60] Mem. M. ¶ 66.

[61] Mem. M. ¶ 74.

[62] *Ibid.*

DRDP-22-20522-SDFL_000264

DRX203-029

56.    On 29 October 1997, Mobil PIV assigned its rights in the Cerro Negro Association Agreement[63] to Mobil Cerro Negro[64]. Until the expropriation described below[65], the percentage interests of the Parties in the Cerro Negro Association were as follows: PDVSA-CN – 41 2/3%; Mobil Cerro Negro – 41 2/3%; and Veba Orinoco – 16 2/3%[66].

57.    The Cerro Negro Association Agreement established an unincorporated joint venture for a term of thirty-five years starting from 30 June 2000[67]. The project contemplated by the Cerro Negro Association Agreement – the Cerro Negro Project – was a set of activities that included[68] (i) exploiting and developing the extra-heavy crude oil fields in the Cerro Negro area; (ii) constructing and operating an upgrader in the Jose Industrial Complex on the Venezuelan coast with the capacity to upgrade approximately 120,000 barrels per day of extra-heavy crude oil to a level of 16.5º API; (iii) laying and operating pipelines between the Cerro Negro area and the Jose Industrial Complex (approximately 315 km); and (iv) selling the resulting products of Mobil Cerro Negro and PDVSA-CN to Chalmette Refining[69]. The Cerro Negro Association Agreement authorized the parties to expand the capacity of the Project to produce extra-heavy crude as well as its capacity to upgrade that crude into synthetic crude oil. An expansion project could be undertaken by unanimous agreement of the participants or, alternatively, under certain conditions, by fewer than all of the participants[70].

---

[63] Mem. M. ¶ 66.

[64] Mobil Cerro Negro is a corporation organized and existing under the laws of the Commonwealth of the Bahamas. Mobil Cerro Negro is a wholly owned subsidiary of Mobil Cerro Negro Holding. Until the expropriation ordered by Decree-Law 5200, Mobil Cerro Negro held a 41 2/3% interest in the Cerro Negro Association.

[65] Mem. M. ¶ 67.

[66] *Ibid.*

[67] *Ibid.*

[68] Mem. M. ¶ 68.

[69] Chalmette Refining LLC is the limited liability company formed by PDV Chalmette, Inc., Mobil and Mobil Pipe Line Company on 28 October 1997. Chalmette Refining is equally owned by PDVSA and Mobil through their respective subsidiaries and it owns and operates the Chalmette Refinery in Louisiana.

[70] Mem. M. ¶ 77.

DRDP-22-20522-SDFL_000265

DRX203-030

58.    The Cerro Negro Association Agreement granted the Parties an undivided interest in the assets and liabilities of the venture in proportion to their respective interests[71]. Title to the oil produced by the Cerro Negro Project vested in the participants at the wellhead, also in proportion to their respective interests[72]. Each party was separately responsible for paying its share of royalties and taxes owed to the Respondent[73]. Further, the Cerro Negro Association Agreement provided that the agreement "... in no event impose[d] any obligation on the Republic of Venezuela or limit[ed] the exercise of its sovereign rights"[74].

59.    Similarly to the previous agreements, the First Heads of Agreement and the Framework of Conditions for the Cerro Negro Association both contemplated compensation to Mobil Cerro Negro in certain circumstances. This compensation structure was also contained in the Cerro Negro Association Agreement[75]. Clause 15 provided that PDVSA-CN would compensate Mobil Cerro Negro and Veba Orinoco for the economic consequences of governmental measures defined as "Discriminatory Measures"[76]. The relevant compensation provisions of the Cerro Negro Association Agreement began with the definition of the term "Discriminatory Measure" as follows[77]:

> "'Discriminatory Measure" shall mean any change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure, which is unjust and is applicable to the Project or any Foreign Party in its capacity as a participant in the Project and is not generally applied to public or private entities engaged in Extra-heavy crude upgrading projects in the Republic of Venezuela; or, with

---

[71] Mem. M. ¶ 69.

[72] *Ibid.*

[73] *Ibid.*

[74] Cerro Negro Association Agreement, ¶ 18.4 (Ex. C-68).

[75] C-Mem. M. ¶ 22.

[76] See Cerro Negro Association Agreement, Article I, Definition of "Discriminatory Measures", Clause 15 and Annex G, Accounting Procedures (Ex. C-68); C-Mem. M. ¶ 22.

[77] See Cerro Negro Association Agreement, Article I, Definition of "Discriminatory Measures" (Ex. C-68), C-Mem. M. ¶ 22.

29

DRDP-22-20522-SDFL_000266

respect to tax rates, foreign exchange controls or the expropriation or seizure ["ocupación"] of assets of the Project or of a Foreign Party's interests in the Project, provided that such change in (or any change in the interpretation or application of) Venezuelan law, or any Governmental Measure is not generally applicable to Companies in the Republic of Venezuela (including the imposition of income tax on the Project or on any Foreign Party in its capacity as a participant in the Project, at a rate that does not correspond with what is set forth in the last sentence of the Fifteenth Condition); or with respect to municipal taxes (license to perform industrial and commercial activities), the imposition of municipal taxes on the Foreign Parties in their capacity as participants in the Association notwithstanding the provision in the Fifteenth Condition, only if the aggregate burden of the municipal taxes on the affected Foreign Party's gross revenue from the Project exceeds by four percent (4%) the affected Foreign Party's gross revenue from the Project in the Fiscal Year at issue, in which event the amount of municipal taxes that exceeds such four percent (4%) shall be a discriminatory measure. A measure that falls within the definition of Discriminatory Measure shall be deemed unjust if it results in a Material Adverse Impact."

60.     Clause 15 of the Cerro Negro Association Agreement then provided substantive provisions for compensation for Discriminatory Measures. These provisions set forth the requirements for obtaining compensation, such as giving immediate notice to PDVSA-CN upon the occurrence of an event that might lead to a "Material Adverse Impact" (as defined in the Agreement), giving another notice immediately to PDVSA-CN upon determination by the party seeking compensation that it actually had suffered a "Material Adverse Impact", and taking all steps to "reverse or obtain relief from" the measure in question[78]. Pursuant to this provision, Mobil Cerro Negro Ltd. initiated arbitration proceedings at the ICC International Court of Arbitration (see below).

---

[78] C-Mem. M. ¶ 24.

DRDP-22-20522-SDFL_000267

DRX203-032

61.    Clause 15 also established the limitation of liability referred to in the Twentieth Condition of the Framework Conditions for the Cerro Negro Association. Specifically, Clause 15.2 provided as follows[79]:

> "15.2 Limitation on Lagoven CN's Obligation. (a) ... after the first period of six (6) consecutive months during which the Price of Brent Crude exceeds the Base Price, Lagoven CN shall not have the obligation to compensate any Foreign Party for Discriminatory Measures with respect to any Fiscal Year in which the average Price of Brent Crude Oil exceeds Base Price, and such Foreign Party receives a Net Cash Flow, after taking into account the effect of the Discriminatory Measure, commensurate with a reference price for the Production produced by the Parties which bears at least a reasonable relationship, adjusted for quality and transportation differences, to the Reference Cash Flow for such Fiscal Year."

62.    On 29 May 1998, the MEM and PDVSA P&G executed a Royalty Reduction Agreement for the Orinoco Oil Belt projects ("Cerro Negro Royalty Reduction Agreement")[80]. The agreement provided for a royalty reduction for Orinoco Oil Belt projects in accordance with the following formula: the applicable royalty would be 16 2/3% (the maximum allowed under the then existing law) during the early production or development phase of the project.  Upon achieving commercial production (defined under the Cerro Negro Association Agreement as the upgrader completion date), the royalty would be reduced to 1% until such time as the accumulated gross income from the project exceeded three times the total investment (from the start of the project until the beginning of commercial production), but in no event would the reduction period exceed nine years from the

---

[79] Cerro Negro Association Agreement, Articles 15.1(a)–(c), 15.2(a) (Ex. C-68); C-Mem. M. ¶ 23.

[80] Mem. M. ¶ 56; Agreement between the Venezuelan Ministry of Energy and Mines and PDVSA Petróleo y Gas, S.A. to calculate the Royalty under Article 41 of the Hydrocarbons Law (Ex. C-336).

31

DRDP-22-20522-SDFL_000268

DRX203-033

beginning of commercial production[81]. This was reaffirmed by the Royalty Procedures Agreement[82].

63. The Cerro Negro Royalty Reduction Agreement provided that companies participating in association agreements (such as Mobil Cerro Negro), by expressing their consent in writing to the MEM, could avail themselves of the Cerro Negro Royalty Reduction Agreement and become Parties to it[83]. Mobil Cerro Negro did so by letter dated 5 November 1998[84].

(d) *Creation of Petrolera Cerro Negro*

64. The Cerro Negro Association Agreement mandated the creation of a company, Petrolera Cerro Negro, S.A. ("Petrolera Cerro Negro"), to direct, coordinate and supervise the activities of the Cerro Negro Project[85]. Parties to the Cerro Negro Association Agreement held shares in Petrolera Cerro Negro in proportion to their respective interests in the Cerro Negro Project[86].

65. The Cerro Negro Association Agreement charged Petrolera Cerro Negro with appointing a technical operator to run the Cerro Negro Project[87]. On 1 December 1997, Petrolera Cerro Negro, PDVSA-CN, Mobil Cerro Negro and Veba Orinoco signed an Operating Agreement with Operadora Cerro Negro, S.A. ("Operadora Cerro Negro"), a wholly-owned subsidiary of Mobil Corporation[88]. Operadora Cerro Negro became the operator of the Cerro Negro Project, acting as an agent of the parties to the Cerro Negro Project[89].

---

[81] Mem. M. ¶ 57.

[82] *Infra*, ¶ 89.

[83] Mem. M. ¶ 56.

[84] *Ibid.*

[85] Mem. M. ¶ 78.

[86] *Ibid.*

[87] Mem. M. ¶ 79.

[88] *Ibid.*

[89] *Ibid.*

DRDP-22-20522-SDFL_000269

DRX203-034

(e) *Chalmette Refining*

66.     The Cerro Negro Project was a vertically integrated project[90].   To refine the synthetic crude oil and other products of the Cerro Negro Project, Mobil and PDVSA established a related downstream joint venture[91].   Chalmette Refining LLC ("Chalmette Refining") was created to own and operate the Chalmette Refinery[92], which was especially modified to refine diluted crude oil and synthetic crude oil from the Cerro Negro Project into marketable products[93].

67.     On 1 November 1997, Mobil Cerro Negro and PDVSA-CN entered into the Chalmette Offtake Agreement with Chalmette Refining[94].   Under that agreement, Chalmette Refining was required to buy PDVSA-CN's and Mobil Cerro Negro's shares of the diluted crude oil and synthetic crude oil produced by the Cerro Negro Project for the life of the Cerro Negro venture[95].   On 18 June 1998, Mobil Cerro Negro, PDVSA-CN, Mobil Sales & Supply Corporation and the Bank of New York signed the Offtake Support Agreement[96].   Under the Offtake Support Agreement, Mobil Sales & Supply Corporation, a Mobil subsidiary, was required to lift and purchase any PDVSA-CN and Mobil Cerro Negro synthetic crude oil that was not accepted by Chalmette Refining[97].

68.     Commercial production at the Cerro Negro project was achieved in August 2001[98].

69.     In sum, the investment in Cerro Negro involved the construction, operation and management of oil-production and upgrading facilities, and the establishment of a

---

[90] Mem. M. ¶ 81.

[91] *Ibid.*

[92] Mem. M. ¶ 82.

[93] *Ibid.*

[94] Mem. M. ¶ 83.

[95] Association Oil Supply Agreement between Mobil Cerro Negro, Ltd., Lagoven Cerro Negro, S.A. and Chalmette Refining, L.L.C., Article II and Annexes (Ex. C-250).

[96] Mem. M. ¶ 85.

[97] *Ibid.*

[98] Mem. M. ¶ 8.

33

DRDP-22-20522-SDFL_000270

joint venture for the purchase of shares of production[99].  According to the Claimants, from 1997 until June 2007, the three participants invested over U.S. $3.1 billion in the Cerro Negro Project, of which Mobil allegedly invested over U.S.$1.3 billion[100].

### 5.  La Ceiba Investment

70.     The second project in which Mobil participated in Venezuela was the La Ceiba Project – a joint venture to explore and exploit an area with light and medium crude oil potential[101].

(a) *Context of the La Ceiba Investment*

71.     In December 1994, the Respondent submitted to the Venezuelan Congress a proposed Framework of Conditions for At-Risk-and-Shared-Profits Exploration Agreements[102].  On 4 July 1995, the Venezuelan Congress approved the proposal[103].

72.     The Framework of Conditions for At-Risk-and-Shared-Profits Exploration Agreements authorized the MEM to determine the geographic areas to be assigned to a subsidiary of PDVSA for conducting exploration and exploitation activities[104]. The relevant PDVSA subsidiary, in turn, was authorized to select, through a competitive bidding process, the private companies with which it would form association agreements to explore the designated areas[105].

---

[99] Mem. M. ¶ 58.

[100] Mem. M. ¶ 73.

[101] RFA ¶ 59.

[102] Mem. M. ¶ 91.

[103] *Ibid.*

[104] Mem. M. ¶ 93.

[105] *Ibid.*

DRDP-22-20522-SDFL_000271

DRX203-036

73.    One of the geographic areas designated for competitive bidding was La Ceiba, an onshore field adjacent to Lake Maracaibo[106].  The La Ceiba area comprised 15 blocks totaling approximately 1,800 square kilometers[107].

74.    The international tender process contemplated by the Framework of Conditions for At-Risk-and-Shared-Profits Exploration Agreements (also known as the Exploration Bidding Round), took place between July 1995 and January 1996[108].  On 5 December 1995, Corporación Venezolana del Petróleo, S.A. ("CVP")[109] and the MEM entered into a Royalty Reduction Agreement for At-Risk-and-Shared-Profits Exploration Projects (the "La Ceiba Royalty Reduction Agreement")[110].  Under that agreement, the royalty would be 16 2/3% during early production and would be reduced, according to a sliding scale, once commercial production was achieved[111].

75.    Mobil satisfied the financial and technical requirements imposed by the tender rules and was given the highest pre-qualification status and the right to participate in the tender process alone or in a consortium[112].  Mobil Venezolana formed a consortium with Veba Oel Venezuela Exploration GmbH ("Veba La Ceiba") and Nippon Oil Exploration (Venezuela), Inc. ("Nippon La Ceiba") (collectively, "the Mobil Consortium") to bid for the La Ceiba area[113].  Mobil Venezolana held a 50% interest in the Mobil Consortium, Veba La Ceiba held a 30% interest, and Nippon La Ceiba held the remaining 20% interest[114].

---

[106] Mem. M. ¶ 94.

[107] *Ibid.*

[108] Mem. M. ¶ 95.

[109] A PDVSA subsidiary company.

[110] Mem. M. ¶ 54; La Ceiba Royalty Reduction Agreement (Ex. C-32).

[111] Mem. M. ¶ 54.

[112] Mem. M. ¶ 96.

[113] *Ibid.*

[114] Mem. M. ¶ 96, fn. 192.

DRDP-22-20522-SDFL_000272

DRX203-037

76. On 16 January 1996, the Respondent awarded the La Ceiba area to the Mobil Consortium[115]. On 19 June 1996, the Venezuelan Congress determined that the La Ceiba Association Agreement complied with the terms of the Framework of Conditions for At-Risk-and-Shared-Profits Association Agreements and authorized execution of the La Ceiba Association Agreement[116].

(b) *Elements of the La Ceiba Investment*

77. On 10 July 1996, CVP, Mobil Venezolana, Veba La Ceiba and Nippon La Ceiba entered into the La Ceiba Association Agreement to explore, develop and exploit oil fields in the La Ceiba area[117]. The La Ceiba Association Agreement expressly provided that it imposed no limitations on the sovereign rights of the Respondent[118]. The Claimants also accepted the benefits conferred by the La Ceiba Royalty Reduction Agreement by becoming a party to the La Ceiba Association Agreement[119].

78. Petro-Canada International GmbH (Petro-Canada) later acquired the interests of Veba La Ceiba and Nippon La Ceiba in the venture[120]. At the time of the expropriation discussed below, Mobil Venezolana and Petro-Canada were the sole private investors having interests in the La Ceiba Project[121].

79. The La Ceiba Association Agreement provided for the creation of a management company, Administradora La Ceiba, to direct, coordinate and supervise the Project[122]. CVP held a 35% interest in Administradora La Ceiba and Mobil Venezolana and Petro-Canada each held a 32.5% interest[123]. The La Ceiba

---

[115] Mem. M. ¶ 99.

[116] *Ibid.*

[117] Mem. M. ¶ 100.

[118] C-Mem. M. ¶ 47.

[119] Mem. M. ¶ 100.

[120] *Ibid.*

[121] Mem. M. ¶ 100.

[122] Mem. M. ¶ 101.

[123] *Ibid.*

DRDP-22-20522-SDFL_000273

Association Agreement also established a Control Committee, which was responsible for "fundamental decisions of national interest to the Venezuelan State related to the performance" of the agreement[124].

80.  In the event of an oil discovery, the private investors were entitled to submit an Evaluation Plan for assessment of the commercial potential of the discovery to Administradora La Ceiba and the Control Committee[125].  Upon a Declaration of Commerciality (*i.e.*, the notification of an intention to prepare and submit a Development Plan for approval), Mobil Venezolana and Petro-Canada could submit a Development Plan to Administradora La Ceiba and the Control Committee for approval[126].

81.  On 20 August 1996, Agencia Operadora La Ceiba, C.A. ("Operadora La Ceiba", a wholly-owned subsidiary of Mobil), Administradora La Ceiba, CVP, Mobil Venezolana, Veba La Ceiba and Nippon La Ceiba entered into the La Ceiba Operating Agreement[127].  Under that agreement, all activities related to the exploration, development and exploitation of the fields in the La Ceiba area were entrusted to Operadora La Ceiba[128].

82.  Based on those exploration activities, on 11 December 2001, Operadora La Ceiba submitted an Evaluation Plan to Administradora La Ceiba and the Control Committee[129].  Administradora La Ceiba and the Control Committee approved the Evaluation Plan soon after it was submitted[130].

---

[124] *Ibid.*

[125] Mem. M. ¶ 103.

[126] *Ibid.*

[127] Mem. M. ¶

[128] *Ibid.*

[129] Mem. M. ¶ 107; La Ceiba Area Venezuela Evaluation Plan submitted by Operadora La Ceiba ("La Ceiba Evaluation Plan") (Ex. C-263).

[130] Mem. M. ¶ 107.

DRDP-22-20522-SDFL_000274

83. On 30 September 2005, the La Ceiba investors filed a Declaration of Commerciality for Blocks 1, 3, 4 and 7 of the La Ceiba area[131]. On 12 December 2005, Operadora La Ceiba, acting on behalf of Mobil Venezolana and Petro-Canada, submitted to Administradora La Ceiba a detailed Development Plan, which set forth the technical and financial blueprint for exploiting commercial discoveries in the La Ceiba area[132]. The Development Plan called for an investment of U.S.$1.347 billion to produce up to 50,000 barrels of oil per day for an estimated field life of 27 years[133].

84. In the Development Plan, Mobil Venezolana and Petro-Canada expressed their joint intent to proceed to exploit the discoveries[134]. Each of them also agreed to reduce, *pro rata*, its 50% interest in the project once CVP declared its intent to participate in the consortium and designated its percentage interest, up to a limit of 35%[135].

85. The Development Plan was automatically approved by Administradora La Ceiba on 27 January 2007, under the terms of the La Ceiba Association Agreement[136]. The Development Plan should then have been submitted to the Control Committee for final approval. However, as asserted by the Claimant, "the Respondent frustrated that step and soon thereafter expropriated the Claimants' interests in the Project"[137].

### 6. Origin of the Present Dispute

86. The Claimants assert that the alleged wrongful measures at issue in the present case were all taken after Mr. Hugo Chávez Frías was elected President of Venezuela in December 1998[138]. In approximate chronological order, the alleged adverse

---

[131] Mem. M. ¶ 109.

[132] Mem. M. ¶ 109.

[133] Mem. M. ¶ 110.

[134] Mem. M. ¶ 111.

[135] *Ibid.*

[136] Mem. M. ¶ 113. The La Ceiba Association Agreement provides that "any proposal as to which no decision is made within [60 days] shall be deemed approved". See La Ceiba Association Agreement (Ex. C-33) ¶ 5.4.

[137] Mem. M. ¶ 113.

[138] Mem. M. ¶ 122. Mr. Chávez became President of Venezuela in February 1999.

DRDP-22-20522-SDFL_000275

DRX203-040

measures taken by the Respondent for which the Claimant seeks compensation include the following[139]:

1. The unilateral termination of the Cerro Negro Royalty Reduction Agreement and the Cerro Negro Royalty Procedures Agreement;

2. The further increase in the royalty rate through the imposition of the extraction tax;

3. The increase in the income tax rate applicable to participants in Orinoco Oil Belt ventures;

4. The production and export curtailments imposed on the Cerro Negro Project; and

5. The direct expropriation of Mobil Cerro Negro's and Mobil Venezolana's entire interests in the activities of the Cerro Negro Joint Venture and the La Ceiba Joint Venture, as well as the related assets.

87. The facts relevant to these alleged wrongful measures are discussed below.

(a) *Increase in the Royalty Rate in 2004 and 2005*

88. As indicated above, a reduced royalty rate was applicable to the Cerro Negro Investment and the La Ceiba Investment. On 13 November 2001, President Chávez (exercising delegated legislative powers) issued the Organic Law of Hydrocarbons, replacing the 1975 Nationalization Law and the 1943 Hydrocarbons Law[140]. Under the new law, production activities were reserved to the State, and private Parties would be authorized to participate in those activities only through mixed enterprises in which the State owned more than 50% of the shares[141]. Any production from a mixed enterprise would be subject to a royalty of 30% and would have to be sold to PDVSA or another State-owned company[142].

89. According to the Claimants, both before and after the adoption of the 2001 Organic Law of Hydrocarbons, President Chávez's administration reaffirmed its assurances

---

[139] Mem. M. ¶ 124.

[140] Mem. M. ¶ 127; 2001 Organic Law of Hydrocarbons (*Ley Orgánica de Hidrocarburos*) (Ex. C-93).

[141] Mem. M. ¶ 127.

[142] *Ibid.*

DRDP-22-20522-SDFL_000276

that pre-existing contracts (such as the Cerro Negro and La Ceiba Association Agreements) would be respected[143]. Further, on 16 January 2002, the MEM and Operadora Cerro Negro (on behalf of the Cerro Negro Project participants) signed an Agreement on Procedures for the Payment of the Exploitation Tax (Royalty) of the Extra-Heavy Crude Produced and the Sulphur Extracted by Operadora Cerro Negro, S.A. ("Royalty Procedures Agreement")[144]. Although the 2001 Organic Law of Hydrocarbons (which provided for a royalty rate of 30%) was already in effect, the Royalty Procedures Agreement reaffirmed that the royalty for participants in the Cerro Negro Project would remain at the reduced rate of 1% in accordance with the formula set forth in the Cerro Negro Royalty Reduction Agreement and that it would not exceed 16 2/3% during the lifetime of the Project[145].

90.     However, on 19 October 2004, PDVSA served notice on Mr. Mark Ward, President of ExxonMobil de Venezuela S.A. ("ExxonMobil de Venezuela")[146] that, by order of President Chávez, the MEM was "leaving without effect" the 1% royalty rate that had been guaranteed by the Cerro Negro Royalty Reduction Agreement[147]. A royalty rate of 16 2/3% was imposed on the Project starting from 11 October 2004[148].

91.     The Claimants assert that, at the time, neither of the alternative conditions specified in the Cerro Negro Royalty Reduction Agreement for ending the rate reduction had been met. Specifically, (i) the accumulated gross income from the Cerro Negro Project had not reached three times the aggregate investment, and (ii) nine years had not yet elapsed since the beginning of commercial production[149]. This is not

---

[143] Mem. M. ¶ 128.

[144] Mem. M. ¶ 131.

[145] Mem. M. ¶ 131; Royalty Procedures Agreement (Ex. C-30).

[146] An affiliate of Mobil Cerro Negro.

[147] Mem. M. ¶ 134.

[148] *Ibid.*

[149] Mem. M. ¶ 135.

DRDP-22-20522-SDFL_000277

disputed by the Respondent, who emphasizes that it had the discretion under the 1943 Hydrocarbons Law to end the royalty concession[150].

92.     Similarly, on 25 February 2005, CVP informed Mr. Ward that the MEM, by express instructions of President Chávez, was "leav[ing] without effect" the royalty reduction established in the La Ceiba Royalty Reduction Agreement and imposing a royalty rate of 16 2/3% on the La Ceiba Project[151].

93.     In its letter of 8 June 2005 to Mr. Ward, the Ministry of Energy and Mines stated that "[t]he payment of royalties required from companies that process extra-heavy crude in the Orinoco Oil Belt is 30%, as set forth in Article 44 of the Organic Hydrocarbons Law in force"[152].  On 23 June 2005, the Ministry of Energy and Mines informed Mobil Cerro Negro that average monthly production above 120,000 barrels per day would be subject to a royalty rate of 30%[153].

(b) *Creation of the Extraction Tax in 2006*

94.     During the course of 2005 and 2006, the price of crude oil continued to soar, reaching new record highs each year[154].  By May 2006, the price of crude oil had risen to US$69.78 per barrel[155].

95.     On 16 May 2006, the National Assembly enacted a partial amendment to the 2001 Organic Law of Hydrocarbons, which created an additional royalty in the form of an "extraction tax" (*Impuesto de Extracción*)[156].  The new law, which took effect on 29 May 2006, imposed an extraction tax of 33 1/3% on all liquid hydrocarbons

---

[150] C-Mem. M. ¶ 58.

[151] Mem. M. ¶ 136; Letter from PDVSA to Mark Ward, President of ExxonMobil de Venezuela dated 25 February 2005 (Ex. C-39).

[152] Letter dated 8 June 2005 from the Ministry of Energy and Petroleum to Operadora Cerro Negro, S.A. (Ex. C-40). See Reply M. ¶ 46.

[153] Mem. M. ¶ 144.

[154] C-Mem. M. ¶ 64.

[155] C-Mem. M. ¶ 66.

[156] Mem. M. ¶ 149; Law on Partial Amendment to the Organic Law of Hydrocarbons, Article 5.4 (*Ley de reforma Parcial del Decreto 1.510 con Fuerza de Ley Orgánica de Hidrocarburos*) and Organic Law of Hydrocarbons (as amended) (Ex. C-337).

41

DRDP-22-20522-SDFL_000278

DRX203-043

extracted from the ground[157].  Under the new scheme, royalty payments were to be credited to the liability for the extraction tax[158].

96.     Accordingly, Mobil Cerro Negro was liable to pay an additional 16 2/3% as an extraction tax (*i.e.*, 33 1/3% minus 16 2/3% equals 16 2/3%) for its production share[159].  This change increased the royalty rate applicable to the Cerro Negro Project to 33 1/3%[160].

97.     Mobil Cerro Negro paid the increased royalty and the extraction tax under protest and with full reservation of rights[161].  It paid the royalty at the rate of 16 2/3% from 11 October 2004 and the extraction tax at the rate of 16 2/3% from 29 May 2006, in both cases until the investment was expropriated in June 2007[162].

(c) *Increase in the Income Tax Rate Applicable to Participants in Orinoco Oil Belt Ventures*

98.     On 29 August 2006, the National Assembly amended the Income Tax Law to repeal the provision that subjected income from the extra-heavy oil projects in the Orinoco Oil Belt to the general corporate rate, instead of the higher rate applicable to the oil industry[163].  This amendment had the effect of increasing from 34% to 50% the rate applicable to income from those projects, including the Cerro Negro Project[164].  The measure took effect on 1 January 2007[165].

99.     Accordingly, after 1 January 2007, Mobil Cerro Negro was subject to an income tax rate of 50%[166].  Mobil Cerro Negro made two income tax advance payments at the

---

[157] *Ibid.*

[158] Mem. M. ¶ 150.

[159] Mem. M. ¶ 151.

[160] *Ibid.*  See also Transcript of Hugo Chávez, *Aló Presidente* No. 288 (29 July 2007) (Ex. C-415).

[161] Mem. M. ¶ 152.

[162] *Ibid.*

[163] Mem. M. ¶ 153.

[164] *Ibid.*

[165] *Ibid.*

[166] Mem. M. ¶ 154.

DRDP-22-20522-SDFL_000279

DRX203-044

rate of 50% from 1 January 2007 until its investment was expropriated in June 2007[167].

(d) *Production and export curtailments on the Cerro Negro Project*

100.   Under the terms of the Cerro Negro Framework of Conditions and the Cerro Negro Association Agreement, production and export curtailments could be imposed on the Cerro Negro Project provided that they were necessary to comply with the Respondent's international commitments.  They were to be applied on a *pro rata* basis on all oil producers in Venezuela.  From late 2006 through the first part of 2007, the Respondent imposed a series of production and export curtailments on the Cerro Negro Project[168].

101.   On 9 October 2006, the Ministry of Energy ordered Operadora Cerro Negro to reduce extra-heavy oil production for that month by a total of 50,000 barrels ("October 2006 Production Cut")[169].  Shortly thereafter, the Respondent agreed to participate in two OPEC production cuts[170].  The first cut, which was applied between November 2006 and February 2007, reduced Venezuela's oil production by 138,000 barrels per day[171].  The second cut, which took effect on 1 February 2007 and remained in effect in June 2007, reduced oil production by an additional 57,000 barrels per day[172].

102.   Toward the end of 2006, the production cuts imposed by Venezuela were replaced by restrictions on exports in each of November, January, February and March 2007[173].  The export curtailment imposed for March 2007 was to remain in effect until the end of June 2007.

---

[167] Mem. M. ¶ 155.

[168] Mem. M. ¶ 156.

[169] *Ibid.*

[170] Mem. M. ¶ 157.

[171] *Ibid.*

[172] *Ibid.*

[173] RFA ¶ 156; Mem. M. ¶ 159.

DRDP-22-20522-SDFL_000280

103. As a consequence of these production and export cuts, the Cerro Negro Project allegedly produced approximately 560,000 fewer barrels of extra-heavy crude in 2006, as compared with the production target for 2006[174], and exported about 5.5 million fewer barrels of synthetic crude oil by the end of June 2007 than the export target for the first half of 2007[175].

104. Mobil Cerro Negro formally objected to these curtailments as violations of the Cerro Negro Framework of Conditions and the Cerro Negro Association[176].

(e) *Expropriation of the Claimants' Investments in the Cerro Negro and La Ceiba Projects*

105. As described above, pursuant to the 2001 Hydrocarbons Law, operating service agreements were to be reformed as mixed enterprises[177]. The only activities remaining outside of this legal framework were the Orinoco Oil Belt associations (such as the Cerro Negro Project) and the Profit Sharing Agreements (such as the La Ceiba Project)[178].

106. On 8 January 2007, President Chávez announced that all of the projects that had been operating outside of the framework of the 2001 Hydrocarbons Law, including the Cerro Negro Project, would be nationalized[179]. On 1 February 2007, through the Enabling Law (see below), the Respondent made clear that it also intended to nationalize profit-sharing projects such as the La Ceiba Project[180].

107. On 1 February 2007, the National Assembly enacted a law entitled the "Law that Authorizes the President of the Republic to Issue Decrees with Rank, Value and Force of Law in Delegated Subject Matters" ("Enabling Law")[181]. The Enabling

---

[174] Mem. M. ¶ 160.

[175] *Ibid.*

[176] Mem. M. ¶ 162.

[177] Mem. M. ¶ 127.

[178] Mem. J. ¶ 44.

[179] Mem. J. ¶ 45.

[180] C-Mem. J. p.11 at ¶ 19.

[181] Mem. M. ¶ 171; Enabling Law (Ex. C-69).

44

DRDP-22-20522-SDFL_000281

Law authorized President Chávez to take over the Cerro Negro and La Ceiba joint ventures and other similar associations by[182]:

> "[D]ecree[ing] norms allowing the State to assume directly or through corporations of its exclusive property, the control of the activities performed by the associations operating in the Orinoco Oil Belt, including the upgraders and the associations for exploration at risk and shared profits, to regularize and adjust their activities within the legal framework that governs the national oil industry, through the contractual form of mixed enterprises or companies [that are] exclusive property of the State."

108.   On 26 February 2007, President Chávez issued Decree No. 5200 on the "Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as of the At-Risk-and-Shared-Profits Exploration Agreements" ("Decree-Law 5200")[183].   The Decree-Law ordered, *inter alia*, that the associations located in the Orinoco Oil Belt (such as the Cerro Negro Association), and the At-Risk-and-Shared-Profits Associations, (such as the La Ceiba Association), be "migrated" into new mixed companies under the 2001 Organic Law of Hydrocarbons, in which PDVSA or one of its subsidiaries would hold at least a 60% participation interest[184]. This process of transformation from the association form to a mixed company was referred to as "migration"[185].

109.   Decree-Law 5200 provided a roadmap and schedule for the migration of the associations[186].   Article 3 thereof required Operadora Cerro Negro and Operadora La Ceiba, the operators of the Cerro Negro and La Ceiba Projects, to transfer control of all activities and operations related to those projects to Corporación Venezolana del

---

[182] *Ibid.*

[183] Mem. M. ¶ 172; Decree-Law 5200 (Ex. C-339)

[184] *Ibid.*

[185] C-Mem. M. ¶ 81.

[186] C-Mem. M. ¶ 82.

DRDP-22-20522-SDFL_000282

Petróleo, S.A. (or another affiliate of PDVSA) no later than 30 April 2007[187]. Accordingly, on 30 April 2007, Operadora Cerro Negro transferred to PDVSA Petróleo S.A. the operations and control of all activities related to the Cerro Negro Project, with full reservation of rights[188]. On 27 April 2007, Operadora La Ceiba did the same in respect of the La Ceiba Project[189].

110.   Article 4 of Decree-Law 5200 gave Mobil Cerro Negro, Mobil Venezolana and participants in other associations in the Orinoco Oil Belt and in At-Risk-and-Shared-Profits Associations, four months (until 26 June 2007) to agree to participation in the new mixed companies[190]. The mixed companies would be established and would operate under a different statutory framework (the 2001 Organic Law of Hydrocarbons) and under new contractual arrangements that would replace the previous association agreements[191]. Article 5 of Decree-Law 5200 provided that, if no agreement was reached on the establishment and functioning of the new mixed companies by the end of the four-month period, "the Republic, through Petróleos de Venezuela S.A. or any of its affiliates [...] shall directly assume the activities of the associations," namely, the Cerro Negro Association and the La Ceiba Association[192].

111.   Throughout the four-month period specified in Article 4 of Decree-Law 5200, discussions took place between Mobil Cerro Negro and Mobil Venezolana and the Respondent about the potential participation of the Claimants in the new mixed enterprises[193]. By 26 June 2007, no agreement had been reached on such participation[194].

---

[187] Mem. M. ¶ 175.

[188] Mem. M. ¶ 176.

[189] *Ibid.*

[190] Mem. M. ¶ 173.

[191] *Ibid.*

[192] Mem. M. ¶ 174.

[193] Mem. M. ¶ 177.

[194] Mem. M. ¶ 180.

DRDP-22-20522-SDFL_000283

DRX203-048

112.     On 27 June 2007, when the four-month term imposed by Decree-Law 5200 expired, the Respondent seized the investments of Mobil Cerro Negro in the Cerro Negro Project and the investments of Mobil Venezolana in the La Ceiba Project[195]. This is not disputed by the Respondent. The Respondent has admitted that it "nationalized" the Cerro Negro and La Ceiba Projects in 2007[196].

113.     On 5 October 2007, the National Assembly enacted the "Law on the Effects of the Process of Migration to Mixed Companies of the Agreements of the Orinoco Oil Belt, as well as of the At-Risk-and-Shared-Profits Exploration Agreements" ("Law on Effects of the Migration")[197]. The Law ratified the expropriation effected by Decree-Law 5200 and ordered that the interests and assets, formerly belonging to those companies that had not agreed to "migrate", be formally transferred to the new mixed companies by application of the "reversion principle"[198].

114.     Article 1 of the Law on Effects of the Migration provided that association agreements would "be extinguished as of the date of publication in the Official Gazette […] of the decree that transfers the right to exercise primary activities to the mixed enterprises constituted according to what is provided in said Decree-Law [Decree-Law 5200]"[199]. Article 1 also provided a special rule for association agreements in which none of the Parties had agreed to "migrate" to mixed enterprises within the four-month period established in Decree-Law 5200. In such a case, the association agreement would be extinguished as of the date of publication of the Law on Effects of the Migration in the Official Gazette[200].

---

[195] Mem. M. ¶ 181.

[196] Mem. J. ¶ 45.

[197] Mem. M. ¶ 186.

[198] Mem. M. ¶ 187.

[199] Law on Effects of the Migration, Article 1 (Ex. C-313).

[200] *Ibid.*

DRDP-22-20522-SDFL_000284

DRX203-049

115.    By Decree No. 5916, published on 5 March 2008, the Respondent transferred to PetroMonagas, S.A[201]. "[t]he right to develop primary activities of exploration in search of reservoirs of heavy and extra-heavy crude oil, the extraction of such crude oil in its natural state, and its initial production, transport and storage"[202]. Consequently, pursuant to Article 1 of the Law on Effects of the Migration, the Cerro Negro Association Agreement was terminated as of that date.

116.    Neither Mobil Venezolana nor Petro-Canada agreed to "migrate" the La Ceiba Project to a new mixed enterprise[203].   Consequently, the La Ceiba Association Agreement fell under the special rule of Article 1 of the Law on Effects of the Migration.   Accordingly, the La Ceiba Association Agreement was terminated as of 8 October 2007, the date of the publication of the Law on Effects of the Migration.

## C.    THE ICC ARBITRATION

117.    The Tribunal notes that several proceedings have been initiated by the Claimants, including proceedings against PDVSA before courts in London and New York.  The Tribunal will consider the impact of those proceedings, if any, in the course of this Award.

118.    In particular, the Tribunal notes that, in 2008, Mobil Cerro Negro initiated ICC proceedings against PDVSA and PDVSA-CN.   That proceeding was initiated pursuant to Clause 15 of the Association Agreement, which affords Mobil Cerro Negro the right to indemnification by PDVSA-CN in the event of certain governmental measures, but requires Mobil Cerro Negro to initiate a legal action against the Government to enforce that right and sets forth a mechanism to prevent double recovery.

---

[201] A new mixed enterprise created in 2007, owned 83 1/3% by CVP and 16 2/3% by Veba Oil & Gas Cerro Negro GmbH.

[202] Mem. M. ¶ 190; Decree No. 5916 Transferring to Petro Monagas S.A. the Right to Develop Primary Exploration Activities Specified Therein (*Decreto No. 5916, mediante el cual se transfiere a la empresa PetroMonagas, S.A. el derecho a desarrollar actividades primarias de exploración que él se especifican*), Article 1 (Ex. C-316).

[203] Mem. M. ¶ 191.

48

DRDP-22-20522-SDFL_000285

119.   The ICC proceeding has a direct bearing on the present proceeding in as much as the "Discriminatory Measures" at issue in that proceeding are among those before the Tribunal in this case.  Further, in the ICC arbitration Mobil Cerro Negro submitted that: "if MCN receives from the Respondents payment of any damages awarded in this [ICC] Arbitration, and later receives payment of any damages awarded in the ICSID case, MCN will reimburse the Respondents (after deducting legal costs) for the payment they made, to the extent both payments relate to the same Discriminatory Measures"[204].

120.   On 23 December 2011, the award was issued in the ICC proceeding, finding PDVSA and PDVSA-CN jointly and severally liable for the economic consequences of the "Discriminatory Measures".  Setting off the counterclaim, the ICC Tribunal directed the Respondents in the ICC arbitration to pay to Mobil Cerro Negro a sum of US$746,937,958, together with interest thereon.  The implications of the ICC Award on the various issues before this Tribunal (in particular, compensation) are considered in the context of the Tribunal's discussion of those issues.

121.   The Tribunal has deliberated and thoroughly considered the Parties' written submissions on the merits and the oral arguments delivered in the course of the evidentiary hearing.

## III.   THE PARTIES' SUBMISSIONS

122.   The following section briefly summarizes the Parties' allegations, which are fully addressed in the Tribunals analysis (see sections IV to XI below).

### A.   THE CLAIMANTS' MEMORIAL

123.   On 15 December 2010, the Claimants submitted their Memorial on the Merits.

124.   The Claimants submit that the Venezuelan Government adopted a series of measures adverse to the Claimants' investments. In particular, the Claimants refer to the following:

---

[204] Claimant's post-hearing brief (25 October 2010) in the ICC Arbitration.

49

DRDP-22-20522-SDFL_000286

DRX203-051

(i)     Breach of the Cerro Negro Royalty Reduction Agreement, the Royalty Procedures Agreement and the La Ceiba Royalty Reduction Agreement;

(ii)     Imposition of increased royalty rates on production above 120,000 barrels per day for the Cerro Negro Project;

(iii)     Unilateral termination of the Cerro Negro Royalty Reduction Agreement and the Cerro Negro Royalty Procedures Agreement;

(iv)     Further increase in the royalty rate through imposition of the extraction tax;

(v)     Increase in the income-tax rate applicable to participants in the Orinoco Oil Belt ventures;

(vi)     Production and export curtailments on the Cerro Negro Project;

(vii)     Direct expropriation of Mobil Cerro Negro's and Mobil Venezolana's entire interests in the activities of the Cerro Negro Joint Venture and the La Ceiba Joint Venture and related assets;

(viii)     Unjustified post-expropriation tax assessments; and

(ix)     Harassment of Claimants' witnesses and Venezuelan counsel[205].

125.     In light of the Tribunal's Decision on Jurisdiction, the Claimants have reshaped their claims as follows:

> "(i) claim arising out of the imposition of the Extraction Tax on the Cerro Negro Project; (ii) claim arising out of the increase in the income-tax rate for the participants in the Cerro Negro Project; (iii) claim arising out of production and export curtailments imposed on the Cerro Negro Project; and (iv) claim arising out of the expropriation of the Claimants' investments in the Cerro Negro Project and the La Ceiba Project… [They] also note that they have sustained and continue to sustain damage from the unconstitutional or otherwise unjustified post-expropriation tax measures… and reserve their right to assert claims arising from those measures depending on the outcome of pending appeals and any further unreasonable delay in the reimbursement of VAT credits"[206].

---

[205] Mem. M. ¶ 124.

[206] Mem. M. ¶ 226.

50

DRDP-22-20522-SDFL_000287

DRX203-052

126.    Regarding the law applicable to the merits, the Claimants submit that "the ICSID Convention and the Treaty determine the rules of law under which the claims asserted in this proceeding must be adjudicated"[207]. In particular, Article 9 (5) of the Treaty enumerates the sources of law upon which an arbitral award under the Treaty must be based[208]. The Claimants acknowledge that Venezuelan law is of some relevance, in particular with respect to the evidence of the Respondent's commitments and conduct. However, they consider that the main source of law must be the Treaty itself given that the claims are for breach of the Treaty[209].

127.    On that basis, the Claimants contend that the Respondent is in breach of the Treaty in several respects.

128.    First, Venezuela violated the Treaty by wrongfully expropriating the Claimants' investments. That expropriation fails to meet at least three of the requirements of Article 6 of the BIT in that it was (i) conducted without due process of law; (ii) contrary to the Respondent's undertakings; and (iii) not taken against any compensation, let alone just compensation[210].

129.    Second, the Claimants contend that Venezuela has violated Article 3 (1) of the BIT by failing to ensure fair and equitable treatment (FET) to its investments. "In brief, the Respondent's measures have frustrated the Claimants' legitimate expectations, which the Respondent itself created by inducing the Claimants to invest on the basis of a specific legal framework that established economic incentives and legal protections for the duration of the investment"[211].

---

[207] Mem. M. ¶ 237.
[208] Mem . M. ¶ 240.
[209] Mem. M. ¶ 241.
[210] Mem. M. ¶ 246.
[211] Mem. M. ¶ 271.

51

DRDP-22-20522-SDFL_000288

DRX203-053

130. Third, the Claimants submit that Venezuela has also violated Article 3 (1) of the BIT by "taking arbitrary and discriminatory measures that impaired the operation, management, use, enjoyment, or disposal of the Claimant's investments"[212].

131. They contend that those "wrongful measures have directly caused severe damage to the Claimants' investments in Venezuela, culminating in the total deprivation, without compensation, of the Claimants' interests in the Cerro Negro and La Ceiba Projects. The Claimants are therefore entitled to reparation in accordance with the standards prescribed by international law for internationally wrongful acts"[213].

132. The Claimants contend that they are entitled to be restored to the position they would occupy without the Respondent's wrongful conduct (*restitutio in integrum*). Since the Treaty permits only monetary compensation, the Claimants request monetary compensation that financially puts them in the same position they would be absent the Respondent's wrongful acts[214].

133. According to the Claimants, their damages relating to the Cerro Negro Project consist of (i) the damages sustained as a consequence of the measures taken before the expropriation; plus (ii) the loss of interests in that project, as a going concern, as a consequence of the expropriation. Given that the value of the lost interest in the Project had increased since the expropriation, the Claimants contend that they are entitled to the current fair market value, which they calculate by means of a discounted cash flow analysis. Assessed as of 30 September 2010, and subject to updating to the date of the Award in this proceeding, the Claimants calculate the *quantum* of damages in respect of the Cerro Negro Project as approximately $14.5 billion[215].

134. Regarding the La Ceiba investment, the Claimants contend that "particular circumstances warrant a different method to determine the *quantum* of

---

[212] Mem. M. p.134.

[213] Mem. M. ¶ 289.

[214] *Ibid.*

[215] Mem. M. ¶ 292.

DRDP-22-20522-SDFL_000289

DRX203-054

compensation needed to provide full reparation"[216]. The Claimants consider that damages in this respect "are properly measured by the value of the Claimant's actual investment in that Project, which amounts to $179 million"[217].

135.   The Claimants add that the Tribunal should also address other aspects of the full reparation required by international law. In particular, the Claimants allege that, insofar as the damages have been determined on an after-tax basis, the Claimants are entitled to protection against potential taxes on the compensation to be awarded. Finally, the Claimants consider that they are also entitled to pre- and post-award compound interest for the relevant periods, and to their costs and attorneys' fees in this proceeding[218].

136.   For these reasons, the Claimants request that the Tribunal render an award in its favor:

"a. Upholding the claims asserted by the Claimants in this proceeding;
 b. Determining that the Respondent has breached the Treaty and applicable principles of customary international law:

By expropriating the Claimants' investments concerning the Cerro Negro Project and the La Ceiba Project without complying with the requirements of the Treaty, including observance of due process of law, respect for undertaking, and payment of compensation as required by the Treaty;
By failing to accord fair and equitable treatment to the Claimant's investments concerning the Cerro Negro and La Ceiba Projects;
By taking arbitrary and/or discriminatory measures that impaired the operation, management, use, enjoyment and/or disposal of the Claimants investments concerning the Cerro Negro and La Ceiba Projects;

---

[216] Mem. M. ¶ 293.
[217] *Ibid.*
[218] Mem. M. ¶ 294.

53

DRDP-22-20522-SDFL_000290

DRX203-055

c. Determining that such a breach has caused damages to the Claimants;

d. Ordering the Respondent to pay to the Claimants compensation, in accordance with the Treaty and customary international law, in an amount sufficient to provide full reparation to the Claimants for the damages incurred as a result of the Respondent's conduct in violation of the Treaty, including:

Compensation for damages sustained by the Claimants in respect of their Cerrro Negro investment as a result of Decree-Law 5200 and the wrongful measures that preceded it;

Compensation for damages sustained by the Claimants in respect of their La Ceiba investment as a result of Decree-Law 5200 and the wrongful measures that preceded it;

Pre-Award compound interest at a normal commercial rate;

Post-Award compound interest at a rate reflecting the yield of the Respondent's sovereign date as of the date of the Award;

e. Determining that the Claimants shall be protected from taxation of such compensation, in the manner specified in this Memorial;

f. Ordering the Respondent to pay all costs and expenses of this arbitration, including the fees and expenses of the tribunal and the cost of legal representation, plus interest thereon in accordance with applicable law; and

g. Such other additional relief as may be appropriate under the applicable law or may otherwise be just and proper"[219].

## B.     THE RESPONDENT'S COUNTER-MEMORIAL

137.     The Respondent submitted its Counter Memorial on 15 June 2011

138.     In its Memorial, the Respondent requests the Tribunal to "confirm its Decision on Jurisdiction and refuse to entertain jurisdiction for any claim based on royalty or tax

---

[219] Mem. M. ¶ 371.

54

DRDP-22-20522-SDFL_000291

DRX203-056

increases" as well as for "any claim based on production in excess of 120.000 barrels per day"[220].

139.	With respect to the applicable law, the Respondent submits that Venezuelan law must be taken into account both under article 42 (1) of the ICSID Convention and under article 9 (5) of the BIT.  This includes "the relevant hydrocarbon legislation and the Cerro Negro Congressional Authorization, as well as the terms and conditions of the special agreement relating to the Cerro Negro Project, particularly the compensation provisions agreed at the outset of the Project in implementation of the Cerro Negro Congressional Authorization"[221].

140.	On the merits, the Respondent contends that the measures adopted did not violate the Treaty.

141.	Regarding the allegations of breach of  FET, the Respondent submits that the FET claims under the Dutch Treaty based on the fiscal measures are untenable for several reasons, each of which would independently require dismissal of these claims: "(i) they are precluded by Article 4 of the Dutch Treaty, the provision expressly dealing with fiscal measures; (ii) they conflict with the Dutch Treaty Protocol, under which non-discriminatory measures that do not violate the minimum standards of international law are beyond the scope of the Dutch Treaty's FET clause, Article 3 (1); (iii) they do not violate even the most expansive notions of FET, based on 'legitimate expectations' at the time of the original investment or Claimants' notion of a 'reasonable stable and predictable environment'; and (iv) Claimants do not even attempt to make their FET argument from the standpoint of Venezuela Holdings at the time of the 'Dutch' acquisition of the investment"[222].

142.	The Respondent observes that in addition to their FET claims based upon tax and royalty measures, the Claimants allege breach of the FET with respect to "(i) the production or export cutbacks, and presumably the production limitation (…) (ii) the

---

[220] C. Mem. M. ¶ 125.
[221] C. Mem. M. ¶ 132.
[222] C. Mem. M. ¶ 211.

DRDP-22-20522-SDFL_000292

DRX203-057

change in operationship, (iii) negotiation under alleged duress, (iv) lack of approval of the La Ceiba development plan and (v) alleged violation of Venezuelan law"[223]. The Respondent contends that all these claims are without merit.

143.     According to the Respondent, the measures that it took were neither arbitrary, nor discriminatory, and therefore did not violate article 3(1) of the BIT.  Like the FET allegations, the claims relating to the fiscal measures would have to be dismissed because they are beyond the scope of Article 4 of the BIT.  In addition, the Respondent considers that there is no basis for claims of arbitrariness or discriminatory treatment as the Government measures do not rise to the established thresholds.[224]

144.     The Respondent submits that this case involves no wrongful or unlawful expropriation.  According to the Respondent, the pre-migration measures do not constitute expropriation.  The Respondent states that the 2007 migration was not a wrongful or unlawful expropriation"[225].  In particular, "the mere lack of agreement on compensation does not render an expropriation unlawful.[226] Therefore, compensation must be calculated in accordance with the BIT and the damage assessed as of 26 June 2007.

145.     The Respondent identifies the following key issues on *quantum* for  the Cerro Negro Project: "(i) the impact of the limitation on the amount of compensation to be granted for adverse governmental action specifically negotiated and agreed at the outset of the Cerro Negro Project as an express condition of the Project's authorization by Congress; (ii) the discount rate to be applied to projected future cash flows; and (iii) the price, cost and volume projection (with the 120,000 barrels per day limit) that are necessary to project cash flows"[227].

---

[223] C. Mem. M.¶ 212.
[224] C. Mem. M.¶¶ 219-226
[225] C. Mem. M. p. 194.
[226] C. Mem. M.¶ 282.
[227] C. Mem. M.¶ 288.

DRDP-22-20522-SDFL_000293

146.    On the first point, the Respondent contends that the price cap set forth in the Cerro Negro Associate Agreement in implementation of the Congressional authorization must be applied in the present case.  Regarding the discount rate, the Respondent submits that the only reasonable proposal is to take the average of appropriate methodologies for an international oil project[228], which leads to a 19.8 %  discount rate to calculate compensation in this case[229].  Finally, regarding future cash flows, the Respondent contends that Claimants seek to inflate compensation by inflating cash flows.  Instead, the Tribunal should apply the price cap resulting from the agreed limitation on compensation and the 19.8% discount rate to the cash flow calculated by Respondent's experts, which yields a value as of June 26, 2007 of US$ $353,542,997[230].

147.    The Respondent submits that the compensation for the La Ceiba Project could be limited to the value of the investment, *i.e.* US$ 75,000,000.

148.    The Respondent adds that the outstanding Cerro Negro debt amounts to US$ 238,139,797.  According to the Respondent, this debt must be taken into account, with the total compensation therefore being limited to US$ 190,403,200.[231]

149.    The Respondent contends that the Claimants' request to increase the amount of the award in this case by taking into account any potential tax consequences must be denied[232], and that simple, post award interest should be applied.  Finally, the Respondent considers that the Claimants should bear all costs.

150.    According to the Respondent, the appropriate amount of compensation for the nationalization is US$ 190,403,200, and all other claims should be dismissed.

---

[228] C. Mem. M.¶ 344.
[229] *Ibid.*
[230] C. Mem. M.¶ 369.
[231] C. Mem. M. ¶ 371.
[232] C. Mem. M.¶ 378.

DRDP-22-20522-SDFL_000294

C.      THE CLAIMANTS' REPLY

151.    In their Reply dated 15 September 2011, the Claimants note that the Respondent does not dispute the core facts of the case, including the expropriation, the Republic's reassurances and inducements to Mobil, the benefits derived from the Claimants' investments and the Cerro Negro annual net income in the years preceding the expropriation.[233]

152.    The Claimants contend that the Respondent's jurisdictional objections have no merit.   They observe that the Tribunal's jurisdiction over the claims for expropriation and for production and export curtailments is uncontested.  According to the Claimants, the Tribunal also has jurisdiction over the claims arising out of the imposition of the extraction tax and of the increase in the income tax rate in the Cerro Negro Project.

153.    The Claimants contend that they had a right to increase production over 120,000 barrels per day.  They recognize that in June 2005, Venezuela imposed a higher royalty over production exceeding that figure.  The Claimants add that they are not pursuing a claim relating to the dispute over such royalty, but stress that they retained the right to increase their production at a higher level, and contend that the "Tribunal has jurisdiction over the claims arising out of the expropriation" of that right[234].

154.    The Claimants agree with the Respondent that Article 9(5) of the Treaty includes, among the sources of applicable law, the law of the Contracting Party and the provisions of special agreements relating to the investments[235].  However, they submit that this does not imply that "Condition Eighteen of the Framework of Conditions excuses non-performance of the Respondent's obligations under the

---

[233] Reply M. ¶ 19.
[234] Reply M. p. 39.
[235] Reply M. ¶ 60.

58

DRDP-22-20522-SDFL_000295

Treaty[236] or that Condition Twentieth of the Cerro Negro Framework of Conditions authorizes incorporation of contractual limitations in a Treaty Dispute[237].

155.     According to the Claimants, "the Respondent concedes the expropriation and its liability for compensation, but mischaracterizes the expropriation process"[238].  The Claimants state that the expropriation was carried out without due process and was contrary to undertakings.  They stress that the Respondent did not pay or even offer to pay compensation in accordance with the Treaty and its compensation standard.  Moreover, the Claimants contend that the Respondent's pre-Decree-Law 5200 measures expropriated discrete rights of the Claimants.

156.     The Claimants reiterate that Venezuela breached the FET standard set forth in Article 3(1) of the BIT and Section 2 of the Protocol.  They contend that, contrary to the Respondent's arguments, fiscal measures are not excluded from the scope of that standard.  In fact, according to the Claimants, the standard contained in those provisions guarantees three different forms of treatment of foreign nationals under international law, only one of which (the floor) is the International Minimum Standards (IMS).

157.     According to the Claimants, Venezuela "breached the FET and the IMS by frustrating the Claimants' legitimate expectations based on specific undertakings"[239].  Furthermore, the Claimants contend that the Respondent "breached Article 3 (1) in subjecting the Claimants to a coercive 'migration process'"[240].

158.     The Claimants reaffirm that the Respondent's conduct was arbitrary and that the production curtailments on the Cerro Negro Project were discriminatory.  Therefore, the Respondent is in breach of Article 3(1) of the BIT.

---

[236] Reply M. p. 46.
[237] Reply M. p. 49.
[238] Reply M. p. 51
[239] Reply M. ¶ 123.
[240] Reply M. ¶ 136.

DRDP-22-20522-SDFL_000296

159. The Claimants note that "the Respondent has conceded that it is liable to pay compensation for the expropriation of the Claimants interest in the Cerro Negro and La Ceiba Projects. Although the Respondent has also (belatedly) conceded that the applicable standard of compensation is fair market value, it admits a *quantum* of compensation which is wholly inadequate (…), based on false factual premises and untenable legal arguments"[241].

160. The Claimants reaffirm that the Respondent owes full reparation under international law for the breach of its obligation under the Treaty. Thus, they must "receive compensation that is *at least* equal to the fair market value of the property at the time of the expropriation"[242]. They add that, if the property has increased in value since that time, further compensation is due for the loss represented by the foregone increase[243]. In the light of these considerations, the Claimants updated their Cerro Negro *quantum* submissions.

161. In this respect, they submit that the Respondent's Cerro Negro compensation analysis is factually and legally flawed. The Claimants contend that the Respondent's *quantum* calculations are debased from the outset by unfounded assertions, and that they are invalidated by other serious errors. According to the Claimants, market transactions discredit the Respondent's valuation for Cerro Negro. Similarly, the Claimants contend that the Respondent's position concerning compensation for La Ceiba is untenable.

162. According to the Claimants, the Respondent's arguments on the remaining *quantum* issues are without merit, whether they concern protection against taxation of the Award, compound interests, costs and expenses of the Award or outstanding Mobil Cerro Negro debts.

163. Concluding on *quantum*, the Claimants assert that they "are entitled to an award of compensation in an amount of not less than $ 16,802.3 million, plus pre-award

---

[241] Reply M. ¶ 161.
[242] *Ibid.*
[243] Reply M. ¶ 185.

DRDP-22-20522-SDFL_000297

DRX203-062

interest and all other relief sought herein"[244].   They finally ask the Tribunal to dismiss "the defenses raised in the Respondent's Counter-Memorial, and render an award in favor of the Claimants in the form requested in the Claimants' Memorial"[245].

### D.   THE RESPONDENT'S REJOINDER

164.   In its Rejoinder dated 15 December 2011, the Respondent reaffirms that the Tribunal does not have jurisdiction over any fiscal claims under the Decision on Jurisdiction because they were part of an already pending dispute at the time of the Dutch restructuring[246].   The Respondent contends that the Tribunal also lacks jurisdiction to entertain a claim for project expansion[247].   In particular, claims based on the imposition of the production limit of 120,000 barrels per day are beyond the scope of the Tribunal's jurisdiction and "cannot be brought into this case under the guise of calculating compensation for the 2007 nationalization"[248].

165.   With respect to the applicable law, the Respondent submits that the Tribunal must take into account Venezuelan law, including the relevant hydrocarbon legislation and the Cerro Negro Congressional Authorization, as well as the terms and conditions of the special agreement relating to the Cerro Negro Project, in accordance with Article 9(5) of the BIT.   This means that both the merits of the claims and the issue of *quantum* must be analyzed in light of the reservation by the Republic in the Eighteenth Condition, and the special compensation provisions of the Twentieth Condition of the Cerro Negro Congressional Authorization (as implemented by the Cerro Negro Association Agreement), which includes a limitation on compensation that is established through the price cap[249].

---

[244] Reply M. ¶ 272.
[245] Reply M. ¶ 275.
[246] Rej. M. ¶ 50.
[247] Rej. M. p. 43
[248] Rej. M. ¶ 76.
[249] Rej. M. ¶ 97.

DRDP-22-20522-SDFL_000298

DRX203-063

166.   The Respondent reaffirms that "apart from the lack of jurisdiction under the Decision on Jurisdiction, there are several grounds for rejecting Claimants' fiscal FET claims"[250], as fiscal measures are not cognizable under Article 3 of the BIT and Claimants make no argument under Article 4. Moreover, according to the Respondent, the record of negotiations "shows that the right of the Government to change law was anticipated, expressly preserved and addressed through the special compensation mechanism Claimants want this Tribunal to ignore. On those facts, no fiscal FET claims could be sustained under any standard".[251]

167.   The Respondent submits that investment treaty cases are unanimous in holding that "non-confiscatory fiscal measures do not constitute an expropriation"[252] and that there can only be an expropriation if there is substantial deprivation of the entire investment[253]. Accordingly, the pre-migration measures could not have constituted an expropriation of "discrete rights"[254].

168.   According to the Respondent, the 2007 Nationalization does not constitute an unlawful expropriation, as it was (i) "carried out pursuant to a law of public policy in an orderly and non-discriminatory manner and for a public purpose, so acknowledged by companies from all over the world; and (ii) serious compensation negotiations took place, but agreement was simply not possible due to Claimants demands"[255]. The Respondent adds that "a nationalization is not rendered unlawful by the mere fact that compensation has not yet been determined or paid so long as the government recognizes its obligation to compensate[256].

169.   With respect to the Cerro Negro Project, the Respondent stresses that compensation must be calculated based on the fiscal regime in place in 2007, and that the proper

---

[250] Rej. M. ¶ 168.
[251] Rej. M. ¶ 168
[252] Rej. M. ¶ 206.
[253] Rej. M. ¶ 213.
[254] Rej. M. p.154.
[255] Rej. M. ¶ 230.
[256] Rej. M. ¶ 249.

DRDP-22-20522-SDFL_000299

DRX203-064

valuation date for the 2007 nationalization is the date of dispossession[257], *i.e.*, 26 June 2007.  The Respondent contends that:  (i) the compensation must be limited as agreed pursuant to the Cerro Negro Congressional Authorization; (ii) the discount rate must be calculated not according to the capital asset pricing model (CAPM), but taking into consideration a number of elements which the Respondent's experts have analyzed when recommending a discount rate of 19.8% and (iii) the projected cash flow must be calculated taking into account "all of the historical data as well as all of the information that would have been available to a buyer as of June 26, 2007"[258].

170.    The Respondent concludes that the Claimants have designed "various maneuvers to justify the exorbitant claims asserted, including ignoring the Decision on Jurisdiction to apply an outdated fiscal regime, postulating a hypothetical new project almost triple the size of the existing one, using unreasonable price scenarios and an indefensible discount rate, and ignoring the carefully tailored compensation provisions and limitations agreed as a fundamental condition to the authorization of the Cerro Negro Project"[259].   It then provides a table showing "how one goes from the exorbitant compensation claimed by the Claimant" (*i.e.*, US$ 16,486 billion) "to the compensation calculated by Respondent's expert even before applying the limitation"[260] (*i.e.*, US$ 844 million).   When applying such limitation, the compensation figure becomes US$ 354 million for the Cerro Negro Project.

171.    The Respondent reaffirms its previous submissions with respect to the "Claimants request for a tax indemnity"[261], pre-award and post-award interest and costs.

## E.       HEARING AND POST-HEARING BRIEFS

172.    At the hearing held from 7 to 16 February 2012, the Parties maintained and developed their arguments.  Five days before the hearing, on 2 February 2012, the

---

[257] Rej. M. p. 208.
[258] Rej. M. ¶ 416.
[259] Rej. M. ¶ 419.
[260] *Ibid.*.
[261] Rej. M. p. 337.

DRDP-22-20522-SDFL_000300

DRX203-065

Tribunal had been informed by the Respondent that a final award had been rendered on 23 December 2011 in the ICC arbitration. The Tribunal requested both Parties to address in their post-hearing briefs the impact, if any, of the ICC award on the award to be rendered in this case.

173.   On 30 April 2012, the Claimants submitted their Post-Hearing Brief. In their brief, the Claimants refer to their statement at the hearing about President Chávez's public declaration that his government would not comply with any decision by Tribunal, and they stress that the Respondent did not comment on that statement at the time.

174.   In response to the Tribunal's question, the Claimants contend that "the ICC award should have no impact on the award to be rendered in this case, either on liability or *quantum*... The ICC award and this case concern the liability of different parties under different normative regimes"[262]. According to the Claimants, the ICC Award does not end the compensation dispute, and the various arguments that the Respondent has offered in that respect are untenable.[263]

175.   Regarding jurisdiction, the Claimants reaffirm that the Tribunal has jurisdiction on all claims that remain at issue. In particular, it has jurisdiction over the disputes arising out of (i) the imposition of the 33 1/3% extraction tax (the extraction tax dispute) and (ii) the repudiation of the guarantee that Mobil CN would be subject to the general corporate income tax rate (the income tax dispute)[264].

176.   The Claimants confirm their interpretation of Conditions 18 and 20 of the Cerro Negro Framework of Conditions and of Articles 3(1), 4 and 6 of the BIT. They stress that the hearing confirmed that, at the time of the investment, they had a legitimate expectation about the fiscal regime that would be applicable to the CN Project[265], and that their investments in the La Ceiba and the Cerro Negro Projects have been unlawfully expropriated. The Claimants contend that they have a right to

---

[262] C-PH Brief ¶ 1.
[263] C-PH Brief ¶ 3
[264] C-PH Brief ¶ 10.
[265] C-PH Brief. p.19.

64

DRDP-22-20522-SDFL_000301

DRX203-066

full compensation of their interests in those projects, which, after a detailed analysis, they evaluate at US$ 16.6 billion in the case of Cerro Negro.

177.  The Claimants consider that the Respondent's sovereign debt yield at the date of the award should be used to determine the rate of interest[266].

178.  In its Post-Hearing Memorial dated 30 April 2012, the Respondent, in response to the Tribunal's question regarding the ICC Award, states that the Cerro Negro claim should be dismissed since compensation has already been paid in accordance with the agreed compensation mechanism[267]. In any case, the Respondent considers that the Cerro Negro result would not change even if the ICC award were to be ignored"[268].

179.  The Respondent reaffirms that the "Tribunal lacks jurisdiction over the royalty and tax claims, which means that valuation of the Cerro Negro Project for purposes of the 2007 nationalization must be made applying the fiscal regime of 2007"[269]. Regarding the production limit claim, the Respondent states that it "had no doubt that production was limited to 120,000 barrels per day from the moment the project was authorized in the 1990s"[270]. "Thus, there is no jurisdictional basis for any claim for a 344,000 barrels per day project"[271].

180.  The Respondent maintains its position with respect to the merits of the Cerro Negro claims. It adds that the hearing confirms the reasonableness of the cash flow projections prepared by its expert for Cerro Negro, on which it comes back with some detail. The Respondent contends that the "344,000 barrels per day" project advanced by the Claimants is based on untenable assumptions.

---

[266] C-PH Brief ¶ 82.
[267] R-PH Brief p. 4.
[268] R-PH Brief p. 8.
[269] R-PH Brief ¶ 16.
[270] R-PH Brief ¶. 18.
[271] R-PH Brief ¶ 19.

65

DRDP-22-20522-SDFL_000302

181. The Respondent further reaffirms that the appropriate compensation for La Ceiba is US$ 75 million, with a simple interest at the same rate specified in the ICC Award or a similar rate.

182. In their Post-Hearing Reply dated 14 May 2012, the Claimants maintain their observations with respect to the impact of the ICC Award on the award to be rendered in this case. They submit that the "Respondent's Post Hearing Memorial adds nothing new on the question of liability"[272]. They summarize their position with respect to the expected cash flow of the Cerro Negro Project (oil price, production, volume and production costs forecasts as well as inflation adjustments) and the discount rate to be applied. The Claimants finally request the Tribunal to award "the amount necessary to provide full reparation, calculated in accord with the Claimants' prior submissions"[273].

183. In its Post-Hearing Reply Memorial dated 14 May 2012, the Respondent reiterates that "the ICC award and its satisfaction should end the compensation controversy with respect to the Cerro Negro Project and the Cerro Negro claims should be dismissed"[274], and that the result would be the same without the ICC Award. The Respondent submits that the Tribunal has no jurisdiction with respect to royalties, taxes and production limit and that the fiscal FET claims have to be dismissed on the merits. The Respondent contends that there has been no expropriation of "discrete rights" and that the 2007 expropriation was not unlawful. The Respondent maintains its position on *quantum (*cash flow, production limits and discount rate).

## IV. JURISDICTION

184. In its Decision on Jurisdiction dated 10 June 2010, the Tribunal decided that "it has no jurisdiction under article 22 of the Venezuelan Decree with rank and force of law N° 356 on the protection and promotion of investments of 3 October 1999".

---

[272] C-PH Reply ¶ 9.

[273] C-PH Reply ¶ 52 and C-PH Brief ¶ 38-41 (Cerro Negro) *and* ¶ 81 (La Ceiba); Reply M. ¶ 206, table 2.

[274] R-PH Reply ¶ 15.

66

DRDP-22-20522-SDFL_000303

DRX203-068

185.   The Tribunal then considered whether or not it had jurisdiction under the BIT. According to the Respondent, the restructuring of the Mobil Corporation through the creation in 2005-2006 of the Dutch holding constituted an abuse of rights, which deprived the Tribunal of jurisdiction under the BIT. According to the Claimants, the Respondent's allegation lacked a legal and factual basis. The Tribunal decided that:

> "204. As stated by the Claimants, the aim of the restructuring of their investments in Venezuela through a Dutch holding was to protect those investments against breaches of their rights by the Venezuelan authorities by gaining access to ICSID arbitration through the BIT. The Tribunal considers that this was a perfectly legitimate goal as far as it concerned future disputes."
>
> 205. With respect to pre-existing disputes, the situation is different and the Tribunal considers that to restructure investments only in order to gain jurisdiction under a BIT for such disputes would constitute, to take the words of the Phoenix Tribunal, "an abusive manipulation of the system of international investment protection under the ICSID Convention and the BITs…"[275]

186.   In light of those considerations, the Tribunal noted that the restructuring of Mobil's investments through a Dutch entity occurred from October 2005 to November 2006, and it went on to decide whether at those dates there were pending disputes between the Claimants and the Respondent. The Tribunal concluded that "complaints had already been lodged by the Claimants at the time of the restructuring"[276].

187.   In this respect, the Tribunal noted the following:

> "200. In two letters dated 2 February 2005, and 18 May 2005, drafted in comparable terms, the Claimants first complained of the increase

---

[275] The Tribunal notes that the ICSID Tribunal in *Pac Rim* recently took a comparable approach. It expressed the view that the dividing line occurs when the relevant party can foresee an actual dispute or a specific future dispute with a very high probability and not merely as a possible controversy. In the Tribunal's view, before that dividing line is reached, there can be no abuse of process; but after that dividing line is passed, there will be. *Pac Rim Cayman Ltd v. Republic of El Salvador* (ICSID Case ARB/09/12) - Decision on the Respondent's Preliminary Objections under CAFTA Articles 10.20.4. and 10.20.5 (2 August 2012) ¶ 2.99.

[276] Decision on Jurisdiction ¶ 199.

DRDP-22-20522-SDFL_000304

DRX203-069

from 1% to 16 2/3% of the royalties decided by Venezuela both for the Cerro Negro and the La Ceiba projects. They requested the Government to designate representatives to meet with them in order to discuss an amicable settlement. They added that 'as you well know, in accordance with Article 22 of the Investment Law, the Bolivarian Republic of Venezuela has consented to submit to arbitration, under the ICSID Convention, investment disputes between the Bolivarian Republic of Venezuela and foreign investors'. They went on, consenting 'to ICSID's jurisdiction for arbitration of the investment dispute, and of any further investment dispute with the Bolivarian Republic of Venezuela, so that, should arbitration become necessary, it can be carried out under the ICSID Convention'. They concluded in requesting 'an early meeting to commence consultation' in order 'to explore an amicable solution of the matter".

188.    Then, on 20 June 2005, Mobil Cerro Negro Holding, Mobil Cerro Negro and Operadora Cerro Negro informed the Venezuelan authorities that the recent ministerial decision to increase the royalties to 30% had "broadened the investment dispute" previously brought to their attention.  They stated that the introduction of a bill that would increase income tax rates from 34% to 50% would further broaden that dispute, and contended that those decisions were "in breach of the obligations" of Venezuela.  They requested consultations "in an effort to reach an amicable resolution of this matter", and added that "[o]ut of an abundance of caution, each of the Mobil Parties hereby confirms its consent to ICSID jurisdiction over the broadened dispute described above and any other investment disputes with the Bolivarian Republic of Venezuela existing at the present time or that may arise in the future, including without limitation any dispute arising out of any expropriation or confiscation of all or part of the investment of the Mobil Parties"[277].

189.    It results from these letters that, in June 2005, there were already pending disputes between the Parties relating to the increase of royalties and income taxes decided by

---

[277] Ex. C-12.

68

Venezuela. The Claimants had even accepted to submit those disputes to ICSID arbitration under Article 22 of the Venezuelan Investment Law and, "[o]ut of an abundance of caution", they had further indicated that, on the same basis, they were also consenting to arbitration for any future dispute, including future disputes arising from expropriation or confiscation.

190.    On this basis, the Tribunal decided as follows:

> "(a) that it has jurisdiction over the claims presented by Venezuela Holdings (Netherlands), Mobil CN Holding and Mobil Venezolana Holding (Delaware), Mobil CN and Mobil Venzolana (Bahamas) as far as:
>
> (i) they are based on alleged breaches of the Agreement on Encouragement and Reciprocal Protection of Investments concluded on 22 October 1991 between the Kingdom of the Netherlands and the Republic of Venezuela;
>
> (ii) they relate to disputes born after 21 February 2006 [i.e. the date of the restructuring] for the Cerro Negro Project and after 23 November 2006 [i.e. the date of the restructuring] for the La Ceiba project and in particular as far as they relate to the dispute concerning the nationalization measures taken by the Republic of Venezuela"[278].

191.    The Parties disagree on the interpretation to be given to the Decision. Specifically, they disagree on which disputes relating to the Cerro Negro Project were born after 21 February 2006 and, as a consequence, they disagree on which claims fall within the jurisdiction of the Tribunal.

192.    The Claimants first state that, as a consequence of the Decision on Jurisdiction, they "are no longer asserting in this proceeding the following claims, which arose before the respective Treaty Application Date: (i) claim arising out of the premature termination of the 1% royalty rate reduction (that is, the royalty-rate increase to 16 1/3%) in breach of the Cerro Negro and La Ceiba Royalty Reduction Agreements

---

[278] Decision on Jurisdiction ¶ 209.

DRDP-22-20522-SDFL_000306

DRX203-071

and the Royalty Procedures Agreement; (ii) claim arising out of the royalty-rate increase to 30% on production over 120,000 bpd; (iii) claim arising out of the imposition of the  extraction tax on the La Ceiba Project; (iv) claim arising out of the frustration of the De-Bottlenecking Project; and (v) claim arising out of the right to early production beyond the evaluation phase of the La Ceiba Project"[279].

193.    The Claimants add that, in accord with the Decision on Jurisdiction, they are now

> "…pursuing only the following four claims:
> (i) claim arising out of the imposition of the extraction tax on the Cerro Negro Project;
> (ii) claim arising out of the increase in the income-tax rate for the participants in the Cerro Negro Project;
> (iii) claim arising out of production and export curtailments imposed on the Cerro Negro Project in 2006 and 2007; and
> (iv) claim arising out of the 27 June 2007 expropriation of the Claimants" investments in the Cerro Negro and La Ceiba Projects"[280].

194.    The Respondent contests jurisdiction over claims (i) and (ii), but concedes that the Tribunal has jurisdiction over claims (iii) and (iv) (with the exception of the increase in production claim).

195.    Therefore, the main question in dispute today is whether the claims relating to the creation of the extraction tax and the increase of the income tax rate fall within the jurisdiction of the Tribunal.

196.    The Respondent denies it.  The Respondent states that the Tribunal had already decided that "there were already pending disputes relating to royalties and income tax" at the time of the Dutch restructuring, and contends that the Claimants themselves recorded those disputes in their letters of 2005, prior to the restructuring. Moreover, according to the Respondent, "In fact, the record is clear that the dispute

---

[279] Mem. M. fn. 501.
[280] Reply M. ¶ 41.

DRDP-22-20522-SDFL_000307

over the right of the government to change the fiscal regime dates back not only to 2005, but actually to 2004, when the first royalty measure was taken"[281].

197.     According to the Respondent, "it makes a mockery of the system of international arbitration to argue that if a government announces a measure on day one and enacts the legislation to implement it on day three, a non-treaty investor can acquire ICSID jurisdiction by transferring its investment to an affiliate in a treaty jurisdiction on day two, particularly after the non-treaty investor has specifically notified the government of an investment dispute. That is the very definition of treaty abuse"[282].

198.     The Claimants acknowledge that the Tribunal's Decision on Jurisdiction is *res judicata*.   However, they submit that the Tribunal has not already declined jurisdiction over any royalty and tax claim"[283].  According to the Claimants:

(a)     The Respondent imposed the extraction tax by a statutory amendment that was adopted on 16 May 2006 and took effect on 25 May 2006.

(b)     The Respondent increased the income tax rate applicable to extra-heavy oil projects by means of a statutory amendment adopted on 29 August 2006 with effect on 1 January 2007.

199.     The Claimants consider that both dates are well after the date of the restructuring for the Cerro Negro Project.

200.     The Claimants further submit that none of the letters cited by the Respondent or sent by the Claimants on 2 February 2005, 18 May 2005 and 20 June 2005 refer to any "extraction tax" or to the effective increase of the royalty to 33 1/3% that resulted from that measure[284].  They add that the letter of 20 June 2005 refers to "a *potential* dispute that would arise *if and when* the increase in the income-tax rate were

---

[281]  R-PH Brief ¶ 15.
[282]  C. -Mem. M. ¶ 119.
[283]  Reply M. ¶ 43.
[284]  Reply M. ¶ 46.

71

DRDP-22-20522-SDFL_000308

DRX203-073

enacted".[285]   This happened only in August 2006.  Therefore, there was no actual dispute and no claim of a Party that was positively opposed by the other.

201.    Finally according to the Claimants, the present case concerns concrete measures, as opposed to "an abstract, single dispute regarding the Respondent's 'right to adopt fiscal measures in the face of changing circumstances in the international oil market'"[286].  The Tribunal has jurisdiction to consider the disputes born from such measures and the corresponding claims.

202.    The Parties refer to various cases[287] in support of their respective positions.

203.    The Tribunal observes that several disputes had arisen between the Claimants and the Respondent with respect to royalties and tax measures taken from October 2004 to June 2007.  All these measures might have been prompted by a single reason: the evolution of the oil market during that period.  However, they were distinct measures taken and contested at different dates, and the Tribunal has to take into account those dates when deciding upon its jurisdiction.

204.    With respect to the extraction tax, the Tribunal recalls that, in its Decision of 20 June 2010, it stated that "in June 2006, there were already pending disputes between the Parties regarding the increase of royalties".  However, it did not specify what those disputes were and it did not mention the extraction tax.

205.    In fact, that tax was established by a statutory amendment adopted on 16 May 2006 with effect on 29 May 2006.  That law imposed a tax of 33.33% on all liquid hydrocarbons extracted from the ground.  Under the new scheme, former royalty

---

[285] Reply M. ¶ 49

[286] C-PH Brief ¶ 13

[287] Both Parties refer to *Mavromatis Palestine Concessions (Greece v. Britain)*, PCIJ, Judgment No. 2 (30 August 1924), (Ex. R-249). They also refer to the decision by the International Court of Justice in the *Headquarters Agreement Case* (26 April 1988) and to the *Gabcíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment (25 September 1977) (Ex. CL-103).  They also refer to several ICSID cases (in particular, *Impregilo S.p.A. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/03/3), *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru* (ICSID Case No. ARB/03/28), *Emilio Agustín Maffezini v. Kingdom of Spain* (ICSID Case No. ARB/97/7) and *Railroad Development Corporation v. Republic of Guatemala* (ICSID Case No. ARB/07/23), (See Mem. M. fn. 504; C-Mem. M ¶ 115; *and* Reply M. fn. 147).

DRDP-22-20522-SDFL_000309

DRX203-074

payments (at the rate of 16 2/3 or 30%) were to be credited to the liability for the extraction tax.

206.    By letter dated 26 May 2006, Cerro Negro protested against the creation of the Tax, "which would have the practical consequence of increasing the royalty applicable to participants in the Cerro Negro Strategic Association to 33.33%"[288] and would thus constitute a breach of the existing agreements.  In the same letter, the Cerro Negro parties reserved their rights to submit that dispute to ICSID Arbitration.

207.    The Tribunal did not find in the record any previous protests by the Claimants relating to the extraction tax.  In particular, the Tribunal notes that the letter of 20 June 2005 referred to in the Tribunal's Decision of 20 June 2010 does not mention that tax.  It merely contests the legality of a previous increase of the royalty tax to 30%.  In fact, the extraction tax was never mentioned in any of the letters exchanged between the Parties in 2005[289].  Accordingly, the Tribunal arrives to the conclusion that the dispute concerning the extraction tax was born after the date limit of 21 February 2006.  Therefore, the Tribunal has jurisdiction over the claim relating to that dispute.

208.    The situation is different with respect to the increase of the income tax.  It appears from press reports that in April 2005, Mr. Rafael Ramírez, Ministry of Energy, told local television that President Chávez had "announced that the Servicio Nacional Integrado de Administración Aduanera y Tributaria (SENIAT) tax agency will reclassify taxes and a company that drills, produces, operates or processes oil must pay income tax of 50%"[290].  Then, on 16 June 2005, according to a LexisNexis report, the Ministry of Energy and Venezuela's tax authority, the SENIAT, were "reportedly in the advanced stages of drafting the legislation that reflects the higher

---

[288] Ex. C-14.

[289] See the Claimants' letters of 2 February 2005 (Ex. C-9), 18 May 2005 (Ex. C-10) and 20 June 2005 (Ex. C-12), and the Respondent's letters of 8 June 2005 (Ex. C-40) and 23 June 2005 (Ex. C-41).

[290] Ex. R-219.

DRDP-22-20522-SDFL_000310

DRX203-075

tax rates".  According to the same source, this move would "increase the tax rate on the four Orinoco heavy oil upgrading projects from 34% to 50%"[291].

209.  As a consequence, in its letter of 20 June 2005, Cerro Negro dealt not only with the increase of the royalty rate to 30%, but also with the increase of the income tax rate to 50%.  On this last point, it noted:

> "As reported by news services, on 15 June 2005, Minister Ramírez announced that the government will introduce a bill in the National Assembly that would increase the income tax rate applicable to the income of participants in Orinoco Oil Belt Project from 34 to 50%.  In 1991, the Venezuelan Congress reduced the income tax rate to 34% as a financial incentive for investors to invest in those projects.  This reduction was an essential inducement to MCN's predecessor to participate in the Cerro Negro project and a key element of the agreement between the participants and the Venezuelan Government."292  The Mobil parties considered that these measures were "in breach of the obligations of the Bolivarian Republic of Venezuela under the Royalty Reduction Agreement, the Procedures Agreement, the [Investment Law] and other applicable provisions of Venezuelan law and international law"293.  As a consequence, the Mobil parties requested consultations with the Government "on the broadened dispute, in an effort to reach an amicable resolution of this matter and avoid dispute resolution proceedings"[294].

210.  Thus, although the increase of the income tax was formally enacted only in August 2006, a dispute relating to the Government's decision to increase the income tax already existed in June 2005, before the date limit fixed in the Tribunal's Decision on Jurisdiction.  This was not a potential dispute relating to a measure to be taken,

---

[291] Ex. R-222.

[292] Ex. C-12.

[293] *Ibid.*

[294] *Ibid.*

DRDP-22-20522-SDFL_000311

DRX203-076

but a real dispute concerning a decision already made, as recognized by the Tribunal in its Decision on Jurisdiction.  That dispute would have been resolved if President Chávez and its Government had abandoned the idea to propose to the Congress the adoption of the increase they had already decided or if the Congress had rejected the bill, but that was not the case.  Accordingly, the Tribunal has no jurisdiction over the claim relating to the increase in the income tax dispute.

211.    A third jurisdictional issue divides the Parties.  It relates to the production volume to be taken into account for the determination of the compensation due for the expropriation of Cerro Negro.  The Respondent contends that production was limited to 120,000 barrels per day before the Dutch restructuring.  Accordingly, a dispute over production volume already existed before the restructuring date, which means that any claim based on this dispute is beyond the Tribunal's jurisdiction and may not be taken into account for the purposes of calculating the compensation due for the expropriation.

212.    The Claimants deny that any such limit existed.  They submit that the dispute that arose before the restructuring date relates to the imposition of a 30% royalty on production above 120,000 barrels per day.  According to the Claimants, this dispute is no longer at issue because they are not contesting the increased royalty, but the expropriation of their right to increase production at the higher royalty[295].  In fact, the Claimants contend that production could go up to 344,000 barrels per day.  Accordingly, the compensation due for the expropriation must be calculated on that basis.

213.    The jurisdictional objection relating to the production increase, as well as the other objections raised by the Respondent in relation to the calculation of the *quantum*, will, if necessary, be examined by the Tribunal at a later stage, when conducting such a calculation (see paragraph 314 below).

214.    The Tribunal will now consider the merits of the claims relating to the alleged breach of FET, arbitrary or discriminatory treatment and expropriation.  However,

---

[295] Reply M, ¶ 57.

75

DRDP-22-20522-SDFL_000312

before doing so, the Tribunal will consider the effects of the ICC Award on the present case and determine the applicable law.

## V.        EFFECTS OF THE ICC ARBITRATION

215.     The Tribunal recalls that, at the Hearing, it specifically requested the Parties to address the question whether the ICC Award should have any impact on the award to be rendered in these proceedings.[296] According to the Claimants, "the ICC Award should have no impact on the award to be rendered in this case, either on liability or quantum, simply because there is no legal basis for any such impact."[297]  By contrast, the Respondent submits that the ICC Award "should end the compensation dispute and effectively put an end to this case".[298]  According to the Respondent, "[the] Claimants have argued from the beginning that this is the proceeding contemplated under the Cerro Negro Association Agreement to mitigate the 'damages payable' as a result of the Government's measures.   Now that the 'damages payable' have been determined by the ICC tribunal and the ICC Award has been paid, there is no point or basis for a continuation of the Cerro Negro compensation controversy."[299]

216.     The Tribunal finds the Respondent's position ill-founded.  The Tribunal recalls that the ICC arbitration was initiated pursuant to Clause 15 of the CNAA[300], which affords Mobil Cerro Negro a right to be indemnified by PDVSA-CN in the event of certain governmental measures, but requires Mobil Cerro Negro to initiate a legal action against the Government to mitigate the damages suffered as a result of those measures.  The parties to the ICC arbitration were Mobil CN, PDVSA and PDVSA-

---

[296] Tr. Day 8 43:12-18.

[297] C-PH Brief. ¶ 2.

[298] R-PH Brief. ¶ 5.

[299] R-PH Brief ¶ 5.

[300] CNAA, Clause 15(1)(a), Ex. C-68: "To the extent any legal recourse is available to reverse or obtain relief from such Discriminatory Measure, [MCN] shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure. [...] Any net benefits received by [MCN] as a result of the pursuit of the aforesaid legal actions (after deduction of the legal costs incurred by [MCN] in connection therewith) shall be (i) applied against any amount ultimately determined to be owed by [PDVSA-CN] pursuant to this Clause or (ii) reimbursed to [PDVSA-CN] if [PDVSA-CN] has previously made payments to [MCN] with respect to the Discriminatory Measure in question."

DRDP-22-20522-SDFL_000313

CN. The ICC Award established the contractual liability of PDVSA and PDVSA-CN to pay the limited indemnity required by the CNAA. It is clear that the ICC Award and the present case concern the liability of different parties under different normative regimes. The State was not a party to the ICC arbitration. Neither are PDVSA and PDVSA-CN parties to this case. These proceedings concern the responsibility of the State for breach of the Treaty and international law, a matter that was not (and could not) have been resolved by the ICC tribunal, which jurisdiction was limited to the contractual dispute.

217.   As a result, the Tribunal finds that the ICC Award does not, as the Respondent contends, put an end to this case. However, it is true that some facts that were relevant in the ICC arbitration are also relevant in the present case, such as the facts underlying the production and export curtailments claim. In its analysis, the Tribunal has thus considered the findings of the ICC tribunal in an attempt to avoid inconsistent outcomes whenever possible.

218.   The Tribunal further notes that the CNAA limits the compensation due by PDVSA, a limitation reflected in the amount awarded by the ICC tribunal. No such limitation applies, however, to the State's responsibility under the BIT. The Government was neither a party to the CNAA nor a third-party beneficiary. Neither has the Respondent advanced any relevant argument that the limitations on PDVSA-CN's contractual liability under Clause 15 should be transmuted into limitations of the State's responsibility under international law.

219.   The Tribunal will assess the effect of the ICC Award on quantum where relevant in section VIII.C.5 below.

## VI.   APPLICABLE LAW

220.   Article 42(1) of the ICSID Convention provides the following:

> "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the

77

DRDP-22-20522-SDFL_000314

DRX203-079

dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable."

221.   In the present case, the Parties have made a choice of law, which is reflected in Article 9(5) of the BIT.  The Respondent consented to this choice of law when ratifying the BIT, and the Claimants have done so when they accepted to arbitrate under the Treaty, or, at the latest, when they filed the request for arbitration with ICSID.

222.   Article 9(5) of the Treaty designates the following sources of law to govern disputes under the Treaty:

> "The arbitral award shall be based on:
> the law of the Contracting Party concerned;
> the provisions of this Agreement and other relevant Agreements between the Contracting Parties;
> the provisions of special agreements relating to the investments;
> the general principles of international law; and
> such rules of law as may be agreed by the parties to the dispute."

223.   Accordingly, the Tribunal will apply the BIT and the other agreed sources of law where appropriate.  Article 9(5) of the Treaty does not allocate matters to any of those laws.  Accordingly, it is for the Tribunal to determine whether an issue is subject to national or international law.  Further, if and when an issue arises, the Tribunal will determine whether the applicable international law should be limited to general principles of international law under Article 9(5) of the BIT or whether it includes customary international law.  Moreover, with respect to the interpretation of the BIT, the Tribunal will resort to the Vienna Convention on the Law of Treaties,[301] which both States have ratified, as a "relevant Agreement between the Contracting Parties".

---

[301] Vienna Convention (Ex. CL-71).

DRDP-22-20522-SDFL_000315

224.   Article 9(5) of the Dutch Treaty quoted above includes "the law of the Contracting Party" and "the provisions of special agreements relating to the investments" among the sources of applicable law.   In reliance on these provisions, the Respondent appears to argue that the Eighteenth and Twentieth Conditions of the Cerro Negro Framework of Conditions (i) relieve the Republic from its obligation to comply with the standards set forth in the Treaty, and/or (ii) import the contractual limitations to PDVSA-CN's indemnity obligations under Clause 15 of the CNAA into the State's responsibility for breach of the Treaty.[302]

225.   The Tribunal disagrees with this position.   The Tribunal recalls that it is a fundamental principle of international law that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."[303] Under this principle, international obligations arising from a treaty cannot be discarded on the grounds of national law.   Among the legal systems on which the Award "shall be based" pursuant to Article 9(5) of the Treaty, the Tribunal has no doubt in concluding that this issue must be governed by international law. Consequently, the Eighteenth and Twentieth Conditions cannot exempt or excuse the Respondent from its obligations under the Treaty or under customary international law.   Bearing this in mind, the Tribunal has considered the effect of the Eighteenth and Twentieth Conditions of the Cerro Negro Framework of Conditions in the section on quantum below.

## VII.   FET AND ARBITRARY OR DISCRIMINATORY MEASURES

226.   The Tribunal will not address the claims over which it has no jurisdiction, namely, the FET and the arbitrary/discriminatory claims concerning the increase in the income tax (see paragraph 210 above).   The Tribunal will successively consider the FET and the arbitrary/discriminatory claims concerning (A) the extraction tax; (B) the production and export curtailments; (C) the coercion and the expropriation measures; and (D) the severance payments.

---

[302] C. Mem. M. ¶ 132.
[303] Vienna Convention, Article 27 (Ex. CL-71).

DRDP-22-20522-SDFL_000316

DRX203-081

**A.**      **THE EXTRACTION TAX**

227.    The Tribunal has found that it has jurisdiction over the extraction tax claim (see paragraph 207 above).  It will thus now consider whether that tax was imposed by the Respondent in violation of the FET and arbitrary or discriminatory treatment standards.

228.    The FET standard is contained in Article 3(1) of the Treaty.  The Respondent submits that Article 4 precludes claims under Article 3(1) "with respect to taxes, fees, charges, and to fiscal deductions and exemptions".[304]  According to the Claimants, there is nothing in Article 4 of the BIT that carves out fiscal measures from the FET standard contained in Article 3(1).[305]  The Tribunal will start by determining whether fiscal measures are covered by the FET standard in Article 3(1) of the Treaty.

229.    The Respondent considers that Article 4 of the Treaty is the only provision addressing fiscal measures in the BIT, and that "it is appropriate to accord priority to the more specific provision, even absent an express carve-out or exception"[306] under the well-established principle of *lex specialis*.

230.    According to the Respondent's interpretation, Article 4 of the BIT sets forth the standard of treatment with respect to fiscal measures.  Since Article 4 only protects investors from discriminatory treatment, the Respondent contends that FET treatment does not apply to fiscal measures.  Once the limited standards of treatment under Article 4 are met, the provision precludes claims under other provisions of the Treaty "with respect to taxes, fees, charges, and to fiscal deductions and exemptions"[307].

231.    The Respondent submits that Article 4 of the Treaty imposes a requirement of non-discriminatory treatment, but it does not contain any references to FET.  Since the

---

[304] C. Mem. M. ¶ 138.
[305] Reply M, ¶ 103.
[306] Rej. M. ¶ 108; see also ¶¶ 101-107.
[307] C. Mem. M. ¶ 138.

DRDP-22-20522-SDFL_000317

Claimants have not alleged that the fiscal measures in question were discriminatory under Article 4, and the FET standard of Article 3(1) does not apply to fiscal measures, the Claimants' claims must be dismissed[308].

232.    In support of its position, the Respondent compares the exemptions from non-discriminatory treatment in Article 4 with those in Article 3(3) of the Treaty. Article 4 provides that a Contracting State's obligation of non-discrimination *inter alia* with regard to taxes, fees, charges and fiscal deductions does not extend to "special fiscal advantages", which it may accord on the basis of reciprocity with a third State or under double taxation treaties. By contrast, Article 3(3) of the Treaty provides that a Contracting State's non-discrimination obligation does not extend to "special advantages" accorded by virtue of agreements establishing customs unions, economic unions, monetary unions, or similar institutions, or on the basis of interim agreements leading to such unions or institutions. It makes no reference to double taxation agreements or to special treatment based on reciprocity. The Respondent considers that "[t]he inclusion of these latter two exemptions in Article 4, and their absence from Article 3, demonstrates that Article 4 was intended as the exclusive provision addressing fiscal measures. If this were not the case, then an investor whose claim for fiscal measures was barred by one of the 'special fiscal advantage' exemptions in Article 4 would be permitted to circumvent the bar by pursuing the claim under Article 3, a result that would make Article 4's exemptions meaningless"[309].

233.    According to the Respondent, accepting the Claimants' submission that "[n]othing in [Article 4] carves out fiscal measures from the FET standard of Article 3(1)", would render Article 4 superfluous. Article 4 does not provide additional requirements to FET. According to the Respondent, Article 4 is more restrictive than Article 3, not more expansive.[310]

---

[308] Rej. M. ¶¶ 20, 99; C. Mem. M. ¶ 135.
[309] C. Mem. M. ¶ 139.
[310] Rej. M. ¶¶ 100-101.

DRDP-22-20522-SDFL_000318

234.    The Respondent considers that "entertaining Claimants' FET claims based on fiscal measures would be tantamount to rewriting the Dutch Treaty to create a new form of claim for non-discriminatory fiscal measures", which would be contrary to the rules established in the Vienna Convention.[311]

235.    The Claimants submit that nothing in Article 4 of the Treaty carves out fiscal measures from the FET standard of Article 3(1).[312]  Just because Article 4 regulates *some* aspects of fiscal measures, it cannot be inferred that Article 4 regulates *all* aspects of fiscal measures.[313]  According to the Claimants, Article 4 does not exclude all other provisions of the Treaty that apply to the State's treatment of investments (such as the FET standard of Article 3(1), the umbrella clause in Article 3(4) and the expropriation standards of Article 6).[314]

236.    It is the Claimants' position that, if Article 4 were to be construed as an exception to Article 3, then it should have included language to that effect.  The Tribunal cannot do violence to the terms of Article 4 and read language into the provision that is not there.  This is all the more so, according to the Claimants, when Article 4 can be given meaning without adding language.

237.    In response to the Respondent's reliance on Article 3(3) of the Treaty, the Claimants submit that "at most, Article 4 of the Treaty provides a special rule that supersedes the more general rule of Article 3(3) in the matter in which both rules overlap, that is, in respect of the State's obligation to afford MFN treatment."[315]  According to the Claimants, the Respondent wrongly extends Article 4 of the Treaty beyond the area of its overlap with Article 3(1).  There is no basis for applying Article 4 to standards (such as FET and expropriation) that are not set forth in Article 3(3), but in other provisions of the Treaty[316].

---

[311] C. Mem. M. ¶ 141.
[312] Reply M. ¶ 103.
[313] *Ibid.*
[314] Reply M. ¶ 104.
[315] *Ibid.*
[316] *Ibid.*

DRDP-22-20522-SDFL_000319

238.   The Claimants submit that, as Article 4 itself requires MFN treatment for taxation measures, "it is absurd to construe Article 4 as (i) excluding taxation measures from most of the substantive standards of the Treaty while (ii) allowing the MFN principle of Article 4 to subject taxation measures to analogous substantive standards incorporated from other treaties made by Venezuela."[317]   The Claimants also contend that the Respondent's reliance on other treaties and on decisions of other arbitral tribunals is misplaced.  In fact, the authorities cited by the Respondent explicitly state that substantive protections do not extend to taxation measures. Since that explicit language is absent in Article 4, the Claimants contend that, by contrast, Article 4 was not intended to carve out taxes from its scope of protection[318].

239.   Before analyzing the Parties' positions on the interaction between Articles 3 and 4 of the Treaty, it is helpful to quote the relevant provisions.  Article 3 of the BIT reads as follows:

> "(1) Each Contracting Party shall ensure fair and equitable treatment of the investments of nationals of the other Contracting Party and shall not impair, by arbitrary or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those nationals.
>
> (2) More particularly, each Contracting Party shall accord to such investments full physical security and protection which in any case shall not be less than that accorded either to investments of its own nationals or to investments of nationals of any third State, whichever is more favourable to the national concerned.
>
> (3) If a Contracting Party has accorded special advantages to nationals of any third State by virtue of agreements establishing customs unions, economic unions, monetary unions or similar institutions, or on the basis of interim agreements leading to such unions or institutions, that

---

[317] C-PH Brief ¶ 26.
[318] Reply M. ¶ 105.

83

DRDP-22-20522-SDFL_000320

DRX203-085

Contracting Party shall not be obliged to accord such advantages to nationals of the other Contracting Party.

(4) Each Contracting Party shall observe any obligation it may have entered into with regard to the treatment of investments of nationals of the other Contracting Party. If the provisions of law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contacting Parties in addition to the present Agreement contain a regulation, whether general or specific, entitling investments by nationals of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such regulation shall to the extent that it is more favourable prevail over the present Agreement."

240.    Article 4 of the BIT provides the following:

"With respect to taxes, fees, charges, and to fiscal deductions and exemptions, each Contracting Party shall accord to nationals of the other Contracting Party with respect to their investments in its territory treatment not less favourable than that accorded to its own nationals or to those of any third State, whichever is more favourable to the nationals concerned. For this purpose, however, there shall not be taken into account any special fiscal advantages accorded by that Party;
(a) Under an agreement for the avoidance of double taxation; or
(b) by virtue of its participation in a customs union, economic union, or similar institutions; or
(c) on the basis of reciprocity with a third State."

241.    The Claimants postulate that nothing in Article 4 carves out fiscal measures from the FET standard of Article 3(1) of the Treaty.  To the contrary, the Respondent contends that Article 4 of the Treaty carves out fiscal measures from the FET standard of Article 3(1).

84

DRDP-22-20522-SDFL_000321

DRX203-086

242.   To resolve this issue, the Tribunal must interpret Articles 3 and 4 of the Treaty, for which it turns to the Vienna Convention.  Article 31(1) of the Vienna Convention requires that a treaty be interpreted "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose".  To confirm the meaning of the provision of a treaty, recourse may be had to supplementary means of interpretation, which include the circumstances of the treaty's conclusion[319].

243.   Broadly put, Article 4 of the Treaty guarantees national and most favored nation treatment to investors with respect to "taxes, fees, charges, and to fiscal deductions and exemptions."  Article 4 is more specific than Article 3, which is generally concerned with the "treatment of investments".  However, Article 4 contains no mention of "fair and equitable treatment".  In addition, the treatment guaranteed by Article 4 is subject to three exceptions, two of which are not included in Article 3(3).  The Tribunal considers that Article 4 comprehensively regulates the standards of treatment with respect to fiscal measures by providing for national and most favored nation treatment, and a list of applicable exceptions.

244.   If the Claimants' argument were followed, namely that Article 3(1) operates in parallel with Article 4 regarding fiscal measures, the  two exceptions in Article 4 that do not appear in Article 3(3) would be rendered meaningless, as they could be circumvented by relying on the broader provisions of Article 3(1) of the BIT.

245.   Conversely, the one exception covered by both Article 4 and Article 3(3) would be duplicated and therefore redundant.  In particular, Article 3(3) of the BIT contains an exception in respect of "agreements establishing customs unions, economic unions, monetary unions or similar institutions", which is essentially reproduced in Article 4: "participation in a customs union, economic union, or similar institutions."  Thus, the Claimants' interpretation would result in at least one provision being rendered redundant – an outcome that should be avoided in treaty interpretation.

---

[319] Vienna Convention, Article 32 (Ex. CL-71).

DRDP-22-20522-SDFL_000322

DRX203-087

246.	Moreover, if the purpose of the Treaty had been not to carve out fiscal measures from the more general Article 4, then the easiest way to achieve it would have been to incorporate the exceptions contained in Article 4 in Article 3(3) itself. There would have been no need to draft an article dealing with fiscal measures and containing specific exceptions (double-taxation agreements, customs, economic or similar unions and special treatment based on reciprocity with a third State).

247.	For the foregoing reasons, the Tribunal considers that the Claimants' interpretation is not supported by the structure and wording of Articles 3 and 4 of the Treaty, and that the correct interpretation is that Article 3 and Article 4 are distinct provisions, the latter governing fiscal measures exclusively. Therefore, the Tribunal finds that fiscal measures are subject only to the national and most favored nation treatment obligations contained in Article 4 of the Treaty, and are carved out of Article 3(1), which contains the obligation to provide fair and equitable treatment.[320] The Tribunal notes that the claim relating to the extraction tax is based only on Article 3(1) of the Treaty, not on Article 4. Since Article 3(1) does not apply to fiscal measures, the extraction tax claim based on the breach of the FET standard is rejected.

248.	The Tribunal's conclusions regarding FET also apply to arbitrary or discriminatory treatment relating to the extraction tax. The extraction tax claim for arbitrary or discriminatory treatment is made under Article 3(1) of the Treaty, which, for the reasons given, is inapplicable. As a result, the arbitrary or discriminatory claim relating to the extraction tax is equally rejected.

## B.	THE PRODUCTION AND EXPORT CURTAILMENTS

249.	The Claimants submit that the series of production and export curtailments imposed by the Respondent on the Cerro Negro Project from late 2006 through the first part

---

[320] The Tribunal notes that the same conclusion was recently reached in *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and Conoco Phillips Gulf of Paria B.V. v Bolivarian Republic of Veneuzela* (ICSID Case No. ARB/07/30), Decision on Jurisdiction and the Merits of 3 September 2013, ¶¶ 297-317.

DRDP-22-20522-SDFL_000323

of 2007[321] reduced its production by approximately 560,000 barrels of extra-heavy crude in 2006, as compared with the production target for 2006, and reduced its exports by about 5.5 million barrels of synthetic crude oil by the end of June 2007, when compared to the export target for the first half of 2007[322].

250.   The Claimants' contend that these production and export cuts violated both the Framework of Conditions of the Cerro Negro Project and the Association Agreement, which permitted "production cuts only if they were necessary to comply with Venezuela's international commitments, and only if they were applicable on a *pro rata* basis to all producers in Venezuela"[323]. According to the Claimants, the production cut imposed in October 2006 was not required to comply with any international obligation of the Republic, and none of them were applied on a *pro rata* basis to all producers in Venezuela[324]. To the contrary, the Claimants contend that they were in breach of FET as well as arbitrary and discriminatory treatment, and thus violated Article 3(1) of the BIT[325].

251.   The Claimants contend that they have sustained damages amounting to a total of US$ 53.6 million as a result of the curtailments imposed during this period[326].

252.   According to the Respondent, the 2006 curtailments did not meet the *de minimis* exception set forth in the Cerro Negro Association Agreement, and the same would have been true for 2007 had Mobil Cerro Negro remained in the Project[327]. The Respondent contends that the discriminatory treatment claim cannot be sustained given that the export curtailments were not directed at the Cerro Negro Project because of the nationality of Mobil Cerro Negro. In fact, all of the upgrading projects of the Orinoco Oil Belt were curtailed, regardless of nationality. Finally, the Respondent alleges that the differences of the Cerro Negro Project when

---

[321] Mem. M. ¶156.

[322] Mem. M. ¶160.

[323] Mem. M. ¶161.

[324] Mem. M. ¶162. See also Reply M. ¶¶152 to 160.

[325] Mem. M. ¶279 and ¶ 283; Reply M. ¶¶141 and 143.

[326] Mem. M. ¶312; Graves First Expert Report, Section IV.B.

[327] C.Mem. M. ¶ 79.

DRDP-22-20522-SDFL_000324

compared to the other projects in Venezuela render any discrimination claim without merit[328].

253.    The Respondent considers that any adverse impact of the 2007 measures has been grossly inflated by the Claimants[329].

254.    At the outset, the Tribunal would like to point out that it is seized of a treaty claim, which must be carefully distinguished from the contract claims submitted to the ICC tribunal.  Thus, and as explained in paragraph 218 above, the contractual limitation contained in Clause 15 of the Association Agreement concluded between PDVSA and the Claimants and referred to in the ICC arbitration does not apply in the present case,  which concerns Venezuela's responsibility under the Treaty.  The arguments developed by the Respondent to the contrary, as well as those based on the Twentieth Condition of the Cerro Negro Congressional Authorization, cannot be upheld.

255.    The Tribunal has only to consider whether the measures taken by Venezuela regarding production and exports were compatible with the fair and equitable treatment standard and with the prohibition of arbitrary or discriminatory treatment contained in Article 3(1) of the BIT – quoted in paragraph 239 above.

256.    The Tribunal will first consider the alleged breach of the FET standard.  In the Tribunal's opinion, this standard may be breached by frustrating the expectations that the investor may have legitimately taken into account when making the investment.  Legitimate expectations may result from specific formal assurances given by the host state in order to induce investment[330].  The Tribunal will thus consider whether in the present case legitimate expectations could reasonably have been the result of such assurances.

---

[328] C. Mem. M. ¶ 226.

[329] C. Mem. M. fn. 176; Rej. M. ¶ 175.

[330] *Glamis Gold Ltd. v. United States* (NAFTA Ch. 11, 8 June 2009), (Ex. CL-189); *Parkerings-Compagniet AS v. Republic of Lithuania* (ICSID Case No. ARB/05/8), (Ex. R-303); *Continental Casualty Company v. Argentine Republic* (ICSID Case No. ARB/03/9), (Ex. CL-167); *Saluka Investments BV v. Czech Republic* (PCA-UNCITRAL, IIC 210 (2006)), (Ex. CL-123).

DRDP-22-20522-SDFL_000325

257.   In this respect, the Tribunal recalls that the Framework of Conditions of the Association Agreement for the exploitation, upgrading and marketing of extra-heavy crude oil to be produced in the Cerro Negro area of the Orinoco Oil Belt was approved by the Congress of Venezuela on 24 April 1997.

258.   Condition Ninth of the Framework of Conditions specified that "an optimal production level was to be obtained "by the time the upgrading installations start commercial operations". The level of said production would be specified in the Association Agreement. Clause 8 of the Association Agreement fixed that level at 120,000 barrels per day of extra-heavy oil (with the possibility of some increase, which the Tribunal will consider further on (see paragraphs 320 and 321below).

259.   Condition Thirteenth of the Framework of Conditions added that "[i]f the Parties are required to reduce their production as a result of the international commitments of the Republic of Venezuela, such reduction shall not exceed the reduction percentage generally applicable to the national oil industry as a whole. This percentage shall be calculated based on the available production capacity. The Parties shall agree on an appropriate extension of the terms of the Association in the event of a reduction as those indicated herein".

260.   The Tribunal considers that, when making their investment, the Claimants could reasonably and legitimately have expected to produce at least 120,000 barrels per day of extra-heavy crude oil and that their production would not be unilaterally reduced at a lower level except as provided for in Condition Thirteenth of the Framework of Conditions. Accordingly, the Tribunal will now examine whether the measures taken by Venezuela in 2006 and 2007 were contrary to those expectations.

261.   The Tribunal considers that a distinction must be made between the production curtailment decided in October 2006 and the curtailments imposed later.

262.   On 9 October 2006, Venezuela imposed a production cut of natural hydrocarbon to all oil producers, applicable on a *pro rata* basis. It is not contested that this reduction was not the result of an OPEC decision. It was a measure imposed by

DRDP-22-20522-SDFL_000326

DRX203-091

Venezuela in spite of the assurances given in Condition Ninth of the Framework of Conditions, as specified in Clause 8 of the Association Agreement, and it did not fall within the requirements of Condition Thirteenth of the Framework of Conditions.

263.    A new production curtailment was decided on November 2006, followed from January 2007 to March 2007 by export curtailments.   All these curtailments constituted measures adopted as a consequence of OPEC decisions, and in this sense it is not contested that they fall within the requirements of Condition Thirteenth of the Framework of Conditions.   However, these measures only concerned the Orinoco oil producers.   They were not shared on a *pro rata* basis as required by Condition Thirteenth.

264.    It thus appears that the production and export curtailments imposed from November 2006 were incompatible with the Claimants' reasonable and legitimate expectations, and thus breached the FET standard contained in Article 3(1) of the BIT.   The Respondent is responsible for the damage resulting from this breach.

265.    In order to calculate the quantum of the damages suffered as a consequence of this breach, the Claimants produced an Expert Report by Mr. R. Dean Graves evaluating the damages resulting from the production and export curtailments at US$ 53.6 million.

266.    The Expert calculates the volume of extra heavy oil that the Cerro Negro project would have produced between October 2006 and June 2007 had the curtailments not been imposed, and determines the corresponding curtailed SCO sales.  The figure of 41 2/3% reached by Mr. Graves for Mobil Cerro negro must be revised for the following reasons:

(a)    The Respondent draws the Tribunal's attention to the fact that the export curtailments were not a limiting factor on SCO production and sales since April 2007.  Instead, SCO production and sales were constrained because of "repairs to the coker drums that reduced the EHCO feed rates to the upgrader

90

DRDP-22-20522-SDFL_000327

by almost half"[331]. Moreover, according to the Respondent, in 2007 the Project was not in a position to produce at the levels relied on by the Claimants because of the large inventory of inactive wells that existed in the first half of 2007[332]. The Claimants did not persuasively contest these statements either at the hearing or in their post-hearing briefs.

(b)     Mr. Graves bases his calculations on the difference between the sales that would have been achieved if the Project had produced 120,000 barrels per day of EHCO and the sales that were actually made. However, starting in November 2006, the figure must be lowered to reflect the *pro rata* production cut which was legally imposed in accordance with Condition Thirteenth of the Framework of Conditions as a result of the OPEC decision.

267.    Taking these elements into account, the Tribunal evaluates the impact of the curtailments on the Claimants' SCO volume of sales at a total of 815,068 barrels of EHCO.

268.    The Tribunal accepts the oil prices used by the Claimants' Expert, which from October 2006 to March 2007 vary from US$ 39.96 to US$ 44.74 per barrel of SCO. It is on that basis that the Tribunal has calculated the value of the Claimants' curtailed SCO sales at US$ 30,781,144 for the relevant period.

269.    The curtailed co-production sales, amounting to US$ 850,442, must be added to this amount. The balance amount must then be reduced by deducting: (i) production costs, which amount to US$ 2,716,663; (ii) taxes, which amount to US$ 655,195 in science and technology tax, US$ 239,169 in drug and alcohol tax, US$ 31,631 in export registration contribution; (iii) US$ 34,868 in co-production royalties; and (v) US$ 10,667,359 in extraction tax at the rate of 33 1/3% (see paragraph 96 above). It must also be reduced by deducting the income tax at the rate of 34% for 2006 and

---

[331] Rej. M. ¶ 175.
[332] Rej. M. ¶ 175.

DRDP-22-20522-SDFL_000328

DRX203-093

50% for 2007, for a total amount of US$ 8,104,531.  Finally, capital expenses must be deduced, in the amount of US$ 139,688.

270.   On the basis of these calculations, the Tribunal evaluates the damages suffered by the Claimants as a result of the production and export curtailments at US$ 9,042,482.

271.   The ICC tribunal had decided that the export curtailments taken in 2007 constituted discriminatory measures under the Association Agreement and awarded compensation to Cerro Negro Ltd (Bahamas) for the damages suffered as a result of those measures.  It is not contested that these damages have been paid by Lagoven CN, the respondent in the ICC proceeding.  It is also not contested that, under clause 15(1) of the Association Agreement, the Claimants must, upon payment of the compensation awarded in this proceeding for the same measures, reimburse Lagoven CN the sum already recovered as compensation for the prejudice resulting from the 2007 curtailments.  The Claimants have expressly stated that they will make the required reimbursement to PDVSA-CN.  Although this statement is based on a contractual obligation that is foreign to the present case, the Tribunal has no reason to doubt the Claimants' representation.  Double recovery will thus be avoided.

272.   The Claimants add that the Respondent's conduct was not only contrary to the FET standard, but also arbitrary and discriminatory.  On that ground too, the Respondent would be in breach of Article 3(1) of the BIT and therefore responsible for the damage suffered by the Claimants as a result of this breach.

273.   The Tribunal has already decided that the production and export curtailment measures breached the FET standard contained in Article 3(1) of the Treaty (see paragraph 264 above).  The Tribunal does not consider it necessary to separately examine whether the Respondent's conduct was also arbitrary and/or discriminatory.  Indeed, the Claimants would not be entitled to greater relief even if the Tribunal were to establish a breach of these BIT protections.

DRDP-22-20522-SDFL_000329

## C.     THE COERCION AND THE EXPROPRIATION MEASURES

274.     In addition to their expropriation claims under Article 6 of the BIT, the Claimants briefly submit that "each of the Respondent's measures giving rise to claims is in breach of the unqualified Fair and Equitable Treatment standard"[333] and that "the Respondent's measures discussed earlier as violations of the Fair and Equitable Treatment standard were arbitrary"[334]. The inference seems to be that the alleged coertion and expropriation measures are also claimed to breach Article 3(1) of the BIT[335].

275.     In respect of the claims regarding the alleged coercion of the Claimants into migration and the claim relating to the expropriation measures, the Tribunal has found that the expropriation was conducted in accordance with due process (see paragraph 297 below), that it was not carried out contrary to undertakings given to the Claimants in this respect (see paragraph 299 below) and that the Claimant have not established that the offers made by Venezuela were incompatible with the "just" compensation requirement of Article 6(c) of the BIT (see paragraph 305 below). The Tribunal has concluded that the expropriation itself was conducted in a lawful manner (see paragraph 306 below).[336]

276.     On this background, the Tribunal finds no additional elements in the record establishing a violation of FET or the arbitrary or discriminatory treatment standard in respect of these measures. These claims have been too briefly and too unconvincingly developed to enable the decision sought from the Tribunal. Accordingly, these claims are dismissed.

---

[333] Mem. M. ¶ 271.

[334] Mem. M. ¶ 280.

[335] Mem. M. ¶ 284.

[336] The expropriation of the Claimants' "discrete rights" is also claimed to be arbitrary. The measures in question for this claim (reproduced at para. 282 below) are the same as those challenged in this section VII, in which the Tribunal has examined the consistency of the measures with Article 3(1) of the Treaty. Hence, the Tribunal no longer needs to decide this claim.

93

DRDP-22-20522-SDFL_000330

**D.      THE SEVERANCE PAYMENTS**

277.    The Claimants refer to the removal of Operadora Cerro Negro from its role as the operating company for the Cerro Negro Project by Decree-Law 5200, which took effect in April 2007.  They submit that this change was arbitrary and discriminatory and violated the fair and equitable treatment standard contained in Article 3(1) of the BIT.  According to the Claimants, as a consequence of the removal, the company was required to make severance payments to Operadora Cerro Negro's displaced Venezuelan employees.  On the basis of Mr. R. Dean Graves' report, the Claimants contend that the damages resulting from those payments amount to US$ 2.7 million[337], and request the corresponding compensation.  The Respondent contested this claim in its Counter-Memorial on the Merits[338] and the matter was not further addressed in any detail.

278.    Under the circumstances and bearing in mind the findings recalled in paragraph 275 above, the Tribunal is unable on the basis of the record to conclude that the removal of Operadora Cerro Negro from its role as the operating company for the Cerro Negro Project by Decree-Law 5200 constituted a violation of Article 3(1) of the Treaty.  In any case, besides relying on the expert report of Mr. Graves, the Claimants have not furnished any evidence of damage suffered as a consequence of this alleged breach.  Therefore, this claim must be dismissed.

**VIII.   EXPROPRIATION**

279.    The Claimants submit that Venezuela has breached Article 6 of the BIT by wrongfully expropriating its investments in the Cerro Negro and La Ceiba Projects. The Respondent does not dispute that the Claimant's investments were expropriated, but contends that that expropriation was lawful.

280.    Article 6 of the BIT provides the following:

_____

[337] Mem. M. §313
[338] C.Mem M. §215

94

DRDP-22-20522-SDFL_000331

DRX203-096

"Neither Contracting Party shall take measures to expropriate or nationalise investments of nationals of the other Contracting Party or take measures having an effect equivalent to nationalisation or expropriation with regard to such investments, unless the following conditions are complied with:

a) the measures are taken in the public interest and under due process of law;

b) the measures are not discriminatory or contrary to any undertaking which the Contracting Party taking such measures may have given;

c) the measures are taken against just compensation.

Such compensation shall represent the market value of the investments affected immediately before the measures were taken or the impending measures became public knowledge, whichever is earlier; it shall include interest at a normal commercial rate until the date of payment and, shall, in order to be effective for the claimants, be paid and made transferable, without delay, to the country designated by the claimants concerned and in the currency of the country of which the claimants are nationals or in any convertible currency accepted by the claimants."

## A. EXPROPRIATION OF "DISCRETE RIGHTS" BEFORE JUNE 2007

281. The Claimants submit that before "Decree-Law 5200 directly expropriated the Claimants' rights and interests in the Cerro Negro and La Ceiba Projects, they had already been permanently deprived of the benefit of discrete rights pertaining to their investments[339] by measures having an effect equivalent to expropriation[340]. The indirect expropriation of the Claimants' rights was wrongful under the BIT because it was carried out without due process of law, contrary to undertakings and without compensation[341].

282. According to the Claimants, the following measures permanently deprived them of the benefit of their rights:

---

[339] Mem. M, ¶ 255.
[340] Mem. M. ¶ 14.
[341] Mem. M. ¶ 243.

DRDP-22-20522-SDFL_000332

DRX203-097

- Imposing a higher income-tax rate to the participants in extra-heavy oil projects;

- Adopting an extraction tax;

- Imposing unjustified and discriminatory production and export curtailments;

- Appointing a new operator for the Cerro Negro Project by decree (severance payments claim).

283. The Claimants state that each of the expropriated rights falls within the definition of investment given in article 1(a) of the BIT and is separately protected by Article 6 of the BIT[342].

284. The Respondent submits that, in the absence of special circumstances, such as it would be in the case of confiscatory taxes, taxation does not constitute expropriation.[343]   According to the Respondent, the fiscal measures adopted did not prevent the Claimants from enjoying profitable operations in Venezuela due to the unprecedented environment of high oil prices.   Accordingly, the fiscal measures may not be considered "confiscatory" and therefore did not constitute expropriation[344].

285. Regarding the non-fiscal measures, the Respondent considers that they do not satisfy the "substantial deprivation" test for expropriation[345].   Moreover, according to the Respondent, "there is no authority to support the theory of partial expropriation on the basis of a right that is not capable of independent economic exploitation severable from the remainder of the investment"[346].   According to the Respondent, the proper analysis for determining whether an expropriation has occurred is the effect on the investment as a whole[347].

286. The Tribunal has to determine whether the measures referred to by the Claimants had an effect equivalent to expropriation within the meaning of Article 6 of the BIT.

_____

[342] Hearing Tr. Day 1, 102:22-23.

[343] C. Mem. M. ¶ 228.

[344] C. Mem. M. ¶ 239.

[345] C. Mem. M. ¶ 244.

[346] Hearing Tr. Day 2, 156:5-9.

[347] C. Mem. M. ¶ 250.

DRDP-22-20522-SDFL_000333

The Tribunal considers that, under international law, a measure which does not have all the features of a formal expropriation may be equivalent to an expropriation if it gives rise to an effective deprivation of the investment as a whole. Such a deprivation requires either a total loss of the investment's value or a total loss of control by the investor of its investment, both of a permanent nature.

287. It is undisputed that those conditions are not fulfilled in the present case with respect to either the Cerro Negro Project or the La Ceiba Project. Accordingly, the pre-migration measures enumerated by the Claimants cannot be characterized as equivalent to an expropriation of the Claimants' investments.

B.     EXPROPRIATION OF THE CERRO NEGRO AND LA CEIBA PROJECTS IN JUNE 2007

288. The Parties agree that the Claimants' investments were expropriated on 27 June 2007 in implementation of Decree-Law 5200 (see paragraphs 111 to 113 above). The Claimants submit that that expropriation was unlawful and that, as a consequence, the Respondent is under the obligation to make full reparation for the damages caused, in conformity with international law[348]. By contrast, the Respondent contends that the expropriation was lawful and that the indemnity to be paid to the Claimants must represent the market value of the investment in June 2007, as provided for in article 6 of the BIT.[349] The Respondent considers that the same rules would apply even if the expropriation was deemed to have been unlawful[350].

289. The Tribunal will first consider whether the expropriation of the Claimants' investments was carried out lawfully, and then address the compensation claim.

290. The Claimants submit that the measures taken by Venezuela fail to meet at least three of the requirements of Article 6 of the BIT in that: (i) they were taken without due process of law; (ii) they were contrary to the Respondent's undertakings; and

---

[348] Mem. M. ¶¶295 to 304, referring in particular to the *Factory of Chorzow* case (Germany v. Poland, Judgment on the merits, 13 September 1928), (Ex. CL-150) ¶ 47.

[349] C. Mem. M. ¶ 260.

[350] C. Mem. M. ¶ 262.

DRDP-22-20522-SDFL_000334

DRX203-099

(iii) they were not taken against any compensation, let alone just compensation. Non-compliance with any of these requirements would render the expropriation wrongful under the BIT[351].

291.   On the first point, the Claimants submit that the process through which the expropriation was carried out was a coercive process which did not follow any established legal procedure to determine their rights before title of the assets was transferred to a PVDSA subsidiary[352].  On the second point, the Claimants submit that the expropriation was made against specific commitments regarding the legal frameworks applicable to the Cerro Negro and La Ceiba Projects[353].  On the third point, the Claimants contend that the Respondent has not provided any compensation to the Claimants.  Failure to pay compensation itself renders the expropriation wrongful[354].

292.   The Respondent contends that the nationalization was carried out pursuant to a law of public policy, in an orderly and non-discriminatory manner and for a public purpose, in accordance with a process established by duly enacted laws which in fact satisfied most of the oil companies operating in the country[355].  The Respondent denies that specific commitments were made by Venezuela surrendering its sovereign right to regulate or even expropriate interests in the oil sector.  The Respondent further contends that it engaged in bona fide negotiations with the Claimants regarding compensation, but an agreement was not possible due to the Claimants' demands[356].  Failure to agree upon the amount of compensation does not render an expropriation unlawful[357].

293.   The Tribunal recalls that, under the 2001 Hydrocarbon Law, oil production activities were reserved to the State and that private Parties were authorized to participate in

---

[351] Mem. ¶ 257.
[352] Mem. M. ¶¶ 262, 264.
[353] Mem. M. ¶ 265.
[354] Mem. M. ¶ 259.
[355] Rej. M. ¶¶ 230-231.
[356] Rej. M. ¶ 230.
[357] C. Mem. M. ¶ 266.

DRDP-22-20522-SDFL_000335

DRX203-100

those activities only through mixed enterprises in which the State owned more than 50% of the shares. However, the Orinoco Oil Belt Associations (such as the Cerro Negro Project) and the Profit Sharing Agreements (such as the La Ceiba Project) remained outside that legal framework.

294. Six years later, the Venezuelan authorities decided to put an end to this special regime. On 1 February 2007, the National Assembly adopted a law enabling the President to take the measures required to that effect. In implementation of the Enabling Law, Decree-Law 5200 ordered that the Associations located in the Orinoco Oil Belt and the At-Risk-and-Shared-Profits Associations be "migrated" into new mixed companies under the 2001 Hydrocarbon Law. Article 4 of Decree-Law 5200 gave the oil company four months, until 26 June 2007, to agree to participate in the new mixed companies. Article 5 provided that, if no agreement was reached on such a migration by the end of that period, Venezuela would "directly assume the activities of the Associations"[358].

295. Throughout those four months, discussions took place between Mobil Cerro Negro, Mobil Venezolana and the Respondent about the potential participation of the Claimants in the new mixed enterprises. No agreement was reached.

296. As a consequence, on 27 June 2007, the Respondent seized the investments of Mobil Cerro Negro in the Cerro Negro Project and the investments of Mobil Venezolana in the La Ceiba Project. The Law on Effects of the Migration, enacted on 5 October 2007, ratified the expropriation and ordered that the interests and assets formerly belonging to the companies that had not agreed to migrate be formally transferred to the new mixed companies (see paragraphs 113 and 114 above).

297. The Tribunal considers that the expropriation of the Claimants' investments was the result of laws enacted by the National Assembly and of decisions taken by the President of the Republic of Venezuela, the purpose of which was to create new mixed companies in which the State would own more than 50% of the shares.

---

[358] Mem. M. ¶ 174.

DRDP-22-20522-SDFL_000336

DRX203-101

Negotiations with the oil companies were foreseen to that effect for a period of four months, and nationalization was contemplated only in case of failure of those negotiations.  In the present case, the negotiations failed.  In other cases recalled by the Respondent, the negotiations were successful, e.g. with Chevron, Total, Statoil, Sinopec or BP.  The Tribunal considers that this process, which enabled the participating companies to weigh their interests and make decisions during a reasonable period of time, was compatible with the due process obligation of Article 6 of the BIT.

298.    Regarding the Claimants' allegation that specific commitments were made by the Respondent that the 2001 Hydrocarbon Law would not be applied to the existing associations, the Tribunal notes that (i) the Cerro Negro Congressional Authorization specifically indicates that the Association Agreement and all activities and operations conducted under it would not impose any obligations on the Respondent, nor restrict its sovereign powers; and that (ii) the Congressional Authorization covering La Ceiba stated that the Agreement, as well as all activities and operations derived from it, would in no case create liability for the Respondent nor diminish its sovereign rights.

299.    Both Authorizations provided that Venezuelan Law would govern the Agreements. Both Agreements referred to those Authorizations.  In reserving its sovereign rights, the Respondent reserved *inter alia* its right to expropriate the Claimants' investments.  There is no indication that Venezuela later committed not to exercise that right.  Accordingly, the Tribunal concludes that the expropriation was not carried out contrary to undertakings given in this respect to the Claimants.

300.    Regarding the Claimants' allegation that the Respondent "has not determined, has not tendered, and has not paid the compensation required by the Treaty"[359], which is enough to render the expropriation wrongful[360], and the Respondent's counter-argument that it has always been willing to provide compensation and that in any

---

[359] C-PH Brief ¶¶31-32.
[360] C-PH Brief ¶31.

DRDP-22-20522-SDFL_000337

case the mere fact of not having received compensation does not render a nationalization unlawful, the Tribunal observes the following.

301.   It is not disputed that the Claimants did not receive compensation and that Venezuela did not fulfil its obligation to pay compensation in accordance with Article 6(c) of the BIT.  However, the mere fact that an investor has not received compensation does not in itself render an expropriation unlawful.  An offer of compensation may have been made to the investor and, in such a case, the legality of the expropriation will depend on the terms of that offer.  In order to decide whether an expropriation is lawful or not in the absence of payment of compensation, a tribunal must consider the facts of the case.

302.   There are no provisions in Decree-Law 5200 envisaging compensation.  In fact, the Tribunal also notes that the Law on the Effects of Migration contains a reference to a "reversion principle" which could be construed as excluding compensation.  However, it is undisputed that discussions took place in 2007 between the Parties on the compensation that was due to the Claimants on account of the expropriation.

303.   The Tribunal has limited information concerning those discussions[361].  The Claimants largely rely on press reports to substantiate their position[362].  They also rely on a statement made on 14 February 2008 by Minister Ramírez (the Minister of Energy at the time) in the National Assembly stating that the Government would only pay book value for the extra-heavy oil assets in the Orinoco Oil Belt.[363]  But these press reports and public statements do not constitute evidence of what exactly happened during the discussions in 2007.

304.   In this respect, Mr. Cutt (the then President of Mobil Oil Cerro Negro) testified that: "We had several meetings with the Ministry of Energy regarding compensation for the government's taking of our interests in [the Cerro Negro and La Ceiba] ... joint ventures.  We engaged in those meetings with the understanding that the content of

---

[361] For a case in which more information was available, see fn. 320 above.
[362] Ex. C-439.
[363] Ex. C-483.

DRDP-22-20522-SDFL_000338

DRX203-103

those discussions was not going to be used in any contentious proceeding between the Government, including its state-owned entities, and Mobil Cerro Negro".[364] However, at the hearing, the Respondent denied that the Claimants were under any kind of confidentiality obligation[365] and even released them from that commitment should one exist[366]. Despite the Respondent's confirmation, the Claimants have not sought leave to make a late filing of contemporaneous correspondence that would support their position.

305. It was the Claimants' burden to prove their allegations concerning the position taken by Venezuela during the discussions regarding the compensation to be paid. It is not disputed that negotiations too place, and it has been established that Venezuela made proposals during those negotiations. It seems likely that there were discussions at the time on the method of valuation of the expropriated interests, on the relevance of the cap provisions referred to by Venezuela and on the exact amount of the compensation payable to the Claimants.[367] The Tribunal finds that the evidence submitted does not demonstrate that the proposals made by Venezuela were incompatible with the requirement of "just" compensation of Article 6(c) of the BIT. Accordingly, the Claimants have not established the unlawfulness of the expropriation on that ground.

306. In light of the above, the claim that the expropriation was unlawful is rejected. Accordingly, the Tribunal does not need to consider the standard for compensation in case of unlawful expropriation or whether it would differ from the standard for compensation to be paid in case of lawful expropriation. The compensation must be calculated in conformity with the requirements of Article 6(c) of the BIT.[368]

---

[364] Cutt WS ¶ 57.

[365] Hearing Tr. Day 3, 109:14-25.

[366] Hearing Tr. Day 2, 159: 22-24.

[367] On that last point, the Tribunal has been presented with contemporaneous press report indicating that "Exxon has demanded $5 billion in redress of its assets; but PVDSA claims $750 million would be fair compensation" (First Cline Expert Report).

[368] Neither Party has questioned the Tribunal's jurisdiction to fix the compensation payable to the Claimants in conformity with Article 6 of the BIT.

DRDP-22-20522-SDFL_000339

DRX203-104

C.      QUANTUM OF THE EXPROPRIATION OF THE CERRO NEGRO PROJECT

307.      Article 6 of the BIT requires that "just compensation" be paid to the Claimants. Such compensation must "represent the market value of the investments affected immediately before the measures were taken or the impending measures became public knowledge, whichever is the earlier". In the present case, the market value must be determined immediately after the failure of the negotiations between the Parties and before the expropriation, *i.e.*, on 27 June 2007[369], and it must correspond to the amount that a willing buyer would have been ready to pay to a willing seller at the time in order to acquire the expropriated interests.

308.      With respect to Cerro Negro, the Parties agree that this evaluation must be made in accordance with a discounted cash flow (DCF) analysis for the Claimants' lost interests[370]. Accordingly, the Parties have evaluated the net cash flows that would have been generated by the investment over its remaining life, *i.e.*, until June 2035, and discount them to their present value. However, they diverge in their determination of the net cash flows and the discount rate.

**1. Net Cash Flow**

309.      To calculate the net cash flows, one must forecast the future revenues and expenses of the Cerro Negro Project. In the present case, the revenues forecast is mainly determined by the volume of production of oil and by the oil price level, while the expenses forecast depends on the cost of the operations, the capital investment, if any, and the royalties and taxes to be paid to the Government. On these points, the Parties have developed detailed legal arguments and produced several witness statements and expert reports, which have been most helpful to the Tribunal.

---

[369] See, for instance *Libyan American Oil Company (LIAMCO) v. The Government of the Libyan Arab Republic* (Award, 12 April 1977), (Ex. R-340) p.p. 138-139.

[370] In this respect, the Tribunal notes that the Parties have consistently used the date of 27 June 2007 in their calculations for this purpose. (See, Mem. M. ¶¶ 330-331; Reply M., fn. 642).

103

DRDP-22-20522-SDFL_000340

DRX203-105

### a) Volume of Production

310.    The Parties disagree with respect to the future volume of production to be taken into consideration in order to calculate the compensation. The Claimants submit that: "At the time the Cerro Negro Project was built, the participants and the Venezuelan Congress set an initial production target of 120,000 barrels per day of extra-heavy oil" (EHCO), but they add that that was "without prejudice to the right to expand production later"[371]. Accordingly, the Claimants contend that the initial production facilities were designed to produce 120,000 barrels per day, but they retained the right to expand this amount. They submit that, by applying thermal EOR techniques, improving existing facilities and constructing a second upgrader, they would have produced 344,000 barrels of EHCO per day as soon as 2014[372]. They request compensation on the basis of such volume of production.

311.    By contrast, the Respondent submits that the proper valuation needs to consider a maximum EHCO production of 120,000 barrels per day, not any other increased number[373]. According to the Respondent, a production limit of 120,000 barrels per day was fixed and implemented long before the Dutch restructuring. In fact, a dispute arose between the Parties at that time on the subject. Accordingly, the Tribunal has no jurisdiction to consider that dispute and, as a consequence, it also lacks jurisdiction over any claim for a project expanded beyond 120,000 barrels per day of EHCO. Such a project may not be taken into account for the purposes of determining compensation.

312.    In addition, the Respondent contends that the Claimants would have required the approval of the Venezuelan authorities for the contemplated expansion, and such approval could only have been given in conformity with the 2001 Hydrocarbons Law, under conditions which the Claimants twice found to be unacceptable. Finally, the Respondent adds that the expansion scenario depicted by the Claimants is not technically feasible and relies on unrealistic economic assumptions. As an

---

[371] Mem. M. ¶ 326.
[372] Mem. M. ¶ 327.
[373] Rej. M ¶ 227.

104

DRDP-22-20522-SDFL_000341

DRX203-106

alternative, the Respondent points out that there would be no basis for using the discount cash flow method to assess the value of a new project.

313.     In response to these arguments, the Claimants contend that the Respondent never imposed a production limit to the Project.  According to the Claimants, in 2005 Venezuela imposed a 30% royalty rate on production volumes exceeding a monthly average of 120,000 barrels per day of EHCO.  At the time, the Claimants complained about that new royalty.  However, they retained their right to increase production despite the imposed royalty.  Accordingly, the dispute that existed at the time about the royalty does not affect the Tribunal's jurisdiction to consider the expanded project, which was technically and economically feasible, and to take it into account when determining the amount of compensation.

314.     With respect to jurisdiction, the Tribunal observes that the Claimants' claim is not directed against the measures adopted in 2005 by the Respondent.  It is a claim for compensation for the expropriation done in 2007.  The Tribunal has jurisdiction to consider that claim and to establish the amount of compensation to be paid to the Claimants as a result of that expropriation.  Accordingly, the analysis of the Tribunal must include the volume of production forecasted from 27 June 2007 to 30 September 2035.  In order to determine that volume, the Tribunal must decide whether a willing buyer would have taken into account in June 2007 that the Claimants had the right to increase their production beyond 120,000 barrels per day of EHCO.  The Tribunal has jurisdiction to make this determination.

315.     In this respect, the Tribunal first notes that, under article 5 of the 1975 Nationalization Law, the execution of association agreements such as the Cerro Negro one required the prior authorization of the Congressional Chambers in joint session, within their established conditions and having been duly informed by the National Executive of all the pertinent circumstances[374].

316.     The Cerro Negro Association Agreement, approved by the National Assembly, contemplated a volume of production of 120,000 barrels per day of EHCO.

_____

[374] Ex. C-214.

DRDP-22-20522-SDFL_000342

DRX203-107

However, Article 8(1)(c) did not exclude the possibility to "increase the capacity of the upgrader or the production of Extra-Heavy Oil", and specified that the consequential amendments to the Association Agreement and the other agreements relating to the Project would have to be agreed upon by the parties. No agreement would be required where the increase was carried out by one or more of the parties to the Association Agreement at their own risk and expense and assuming the title of all assets and rights derived from it. While this provision reserved the possibility of increasing the production of EHCO by increasing the capacity of the existing upgrader, it did not contemplate the possibility of building a new upgrader.

317.  In 2004, all the participants to the Association Agreement considered a "de-bottlenecking" project, intended to increase the production from 120,000 to 144,000 barrels per day of EHCO. This increase would have been achieved by enhancing the capacity of components of the Project in order to allow full use of the capacity already available in other components[375]. However in December 2004, PDVSA-CN informed its partners that the agreement of the company and of the Ministry would be subordinated to the payment of a higher royalty, the use of EOR production techniques and the signature of a memorandum of understanding called Cerro Negro II, under which the incremental production would be commercialized by PVDSA. It added that the new 2001 Hydrocarbon Law would apply to the project[376]. In light of these requirements, the project was abandoned.

318.  In 2005, the Venezuelan authorities accused some oil associations of producing more than they had been authorized to produce. The companies were informed that production limits had to be respected and that any excess production would be subject to higher royalties. This was specified in particular in a letter[377] from the Minister of Energy and Mines to the Cerro Negro Association dated 23 June 2005, which stated the following:

---

[375] Mem. M., ¶ 139.
[376] Ex. C-96.
[377] Ex. C-41.

DRDP-22-20522-SDFL_000343

"… the volumes of hydrocarbons that exceed the average monthly production of 120 MBD are subject to the royalty of thirty percent (30%) provided for in Article 44 of the above-mentioned Decree with Force of Organic Law on Hydrocarbons. The same amount of royalty must be paid in cases of volumes related to the mixture of extra-heavy crudes [...]

The payment of the royalty referred to above does not legitimize the over-production indicated above and, consequently, does not imply any authorization of the activies referred to above or of the situations created."

319.   It appears that the Claimants abided by the production limit at all times after that decision was made and notified to the Projects participants[378].

320.   The Tribunal observes that the Project as contemplated today by the Claimants would almost triple the production of oil. This volume of production would require the construction of a new upgrader, at a cost evaluated by the Claimants at US$ 2.3 billion, as well as the extension of the existing facilities and of the maritime terminal at the San José Complex. A project of this magnitude does not fall within the scope of Clause 8(1)(c) of the Association Agreement approved by the Venezuelan legislature. This new project would require the approval of the Venezuelan authorities. In view of the position taken by the Administration in 2004 and 2005, such approval could not have been taken for granted by a prospective buyer in 2007.

321.   In these circumstances, the Tribunal concludes that it cannot use the production volume that would have resulted from the adoption and implementation of this new project. The net cash flows must be calculated on the basis of an average monthly production of 120,000 barrels per day of EHCO. Based on the past experience analyzed in the experts' reports, this volume of production would, in the opinion of

_____

[378] Mommer Supplemental WS ¶ 12.

107

DRDP-22-20522-SDFL_000344

DRX203-109

the Tribunal, allow for an average monthly production of 108,000 barrels per day of synthetic crude oil (SCO)[379].

322.   The experts agree that it would not be possible to achieve such a level at all times. Prof. Myers, the expert appointed by the Claimants, calculated the impact on production of risks such as "episodes of civil unrest", "major unplanned outrages due to accidents or equipment failures" and the possibility of OPEC curtailments. On these grounds, he proposes to reduce the expected production by 3.2%[380]. Prof. Myers specifies that this percentage does not take into account "operational down time, typical failures and maintenance"[381]. Mr. Brailovsky and Prof. Wells, the experts appointed by the Respondent, consider that the reductions made by Prof. Myers understate the effects of the events they address. Mr. Brailovsky and Prof. Wells stress that certain types of minor incidents and turn around factors must also be taken into account, and propose a reduction of approximately 5%.

323.   The Tribunal has carefully considered this question in light of the expert reports. The Tribunal concludes that the future average planned production must in the long run be reduced by approximately 4%, and that it could accordingly be fixed at 104,300 barrels per day of SCO. The corresponding production, year by year, appears in column 2 of the table annexed to this Award[382].

### b)  Oil Price

324.   The Parties have produced detailed expert reports containing price forecasts for the Cerro Negro Synthetic Crude Oil (CN - SCO). These reports forecast SCO prices by benchmarking SCO to other price series for which there is more forecast information. In this respect, the experts (i) refer first to the price to be paid for West Texas Intermediate light sweet crude oil (WTI); and then (ii) derive the CN - SCO price from WTI in two steps, using a Mexican heavy sour crude oil called Maya as

---

[379] C. Mem. M ¶ 354, fn. 689.
[380] Myers Second Expert Report, Exhibit 59, table 6, p. 3.
[381] Myers First Expert Report, Appendix D.
[382] Calculations made on the basis of 188 days for 2007 and 273 days for 2035.

DRDP-22-20522-SDFL_000345

DRX203-110

an intermediary.   The experts differ on their forecast of WTI prices and on the discount to be applied from the benchmark WTI price to the SCO price.

325.   In her second report, Ms. Sarah Emerson, of Energy Security Analysis (ESAI), expert for the Claimants, forecasts WTI prices as of 27 June 2007 on the basis of market analyses made by ESAI in 2007 and, in particular, on the basis of a report of that firm entitled "Atlantic Basin Stockwatch", published on 16 July 2007.   Ms. Emerson anticipates a price of US$ 72.91 per barrel of WTI in the second half of 2007,[383] decreasing to US$ 67.60 in 2013, then going up to US$ 105.52 in 2035[384].

326.   The three experts of Econ One Research, appointed by the Respondent, analyzed this differently.   They collected twenty-three publicly available WTI price forecasts "representing a view of the market formed during the first half of 2007"[385].   They then chose the average WTI price forecast for each future year, and forecast a WTI price of US$ 67.97 per barrel in 2007, decreasing to US$ 59.69 in 2013, and finally increasing to US$ 92.78 in 2035.

327.   The Tribunal has carefully considered these reports.   It first notes that from 2003 to 2006, WTI oil prices rose significantly above the US$ 20 / US$ 30 range of the late 1980s and 1990s.   It peaked in the summer of 2006, reaching the US$ 70 range, but started to fall in autumn that year.   In October 2006, OPEC decided to cut production in order to protect prices around US$55 / US$ 60.   There was then some expectation of an increased production from non-OPEC countries, and analysts considered that the price could stay in the US$ 55/ US$ 65 range.   However, there was no such increase, and the International Energy Agency tried in April and May 2007 to obtain an increase of production from OPEC in order to avoid running out of oil in 2007[386].   On 18 June 2007, OPEC formally rejected this option[387].   It then became clear that oil prices would rise again.

---

[383] Hearing Tr. Day 6, p.50

[384] This calculation is made in nominal US$ ("actual dollars in the day", Hearing Tr. Day 6, 29).

[385] Econ One First Expert Report ¶ 39.

[386] Hearing Tr. Day 6, pp. 78- 81.

DRDP-22-20522-SDFL_000346

328.    It appears to the Tribunal that the forecast of WTI prices made by the Econ One experts is based on data which, to some extent, no longer correspond to the situation as it was at the end of June 2007.  By contrast, the forecast made by Ms. Emerson took those circumstances into account.  Accordingly, the Tribunal has decided to use Ms. Emerson's forecast.

329.    To determine the discount to be applied from WTI prices to SCO prices, Ms. Emerson first observed that the spread between ultra-low-sulfur diesel and high sulfur fuel oil constitutes a fairly good comparison of the spread between WTI and Maya prices.  She then forecasted that spread, taking into account the foreseen evolution of the markets.  In this respect, Ms. Emerson noted that OPEC intervention supported heavy sour crude[388], that complex refiners sought heavy crude when crude quality differentials widened[389] and that European diesel demand had grown[390].  On those grounds, she forecasted that the WTI-Maya spread would be reduced in the future.  Then, Ms. Emerson used the SCO price formula contained in the Association Agreement to forecast the price of CN - SCO, and finally evaluated the spread WTI/SCO at around 22% for the second half of 2007, decreasing later to 19%.

330.    The Econ One experts analyzed the past relationship between WTI, Maya and SCO prices.  From that analysis, they derived equations, which they used for their forecasts.  On those grounds, they concluded that, as of mid-2007, Maya prices would fall 21% below WTI prices, while SCO prices would fall 7% below Maya prices.

331.    The Tribunal notes that, under the method used by the experts of Econ One, the spread between WTI, Maya and SCO prices will essentially remain unchanged in percentage in the future.  The Tribunal considers that their method does not take into

---

[387] *Ibid.*

[388] Emerson Expert Report, p. 15.

[389] Emerson Reply, p. 17.

[390] Emerson Reply, p. 16.

DRDP-22-20522-SDFL_000347

account the changes that could be foreseen in the market of oil products, or their consequences on the price of the different types of oil.  Ms. Emerson's approach takes these elements into account, and therefore her method seems preferable to the Tribunal.  Accordingly, the Tribunal will adopt Ms. Emerson's approach.

### c)  Future Revenues

332.  In her second report, Ms. Emerson produced a table indicating the CN - SCO prices forecasts from 2007 to 2035[391].  For the reasons mentioned above, the Tribunal will use Ms. Emerson's price forecasts (see Annex 1, column 3), and multiply them for each year by the annual SCO production on the basis of the figures referred to in paragraph 323 above.  As a result of this calculation, the Tribunal obtains the SCO revenue forecast for the period that amounts to US$ 69,515.5 million (see Annex 1, column 4).

333.  This figure must be increased by adding the revenues from products other than SCO, such as petroleum coke, sulfur and natural gas.  Prof. Myers considered that there could be some variations from year to year of the gross revenue resulting from the sale of those by-products.  It results from these calculations that the revenue would generally amount to 2.20% to 2.70% of the gross revenue resulting from the synthetic crude oil sale[392].  The Respondent's experts evaluated them at 2.15%. Having carefully examined these reports in light of past experience and market forecasts in June 2007 (in particular for natural gas), the Tribunal has decided to fix that percentage at 2.50%.  Accordingly, the by-products revenue forecast from 2007 to 2035 is calculated at US$ 1,737.9 million (see Annex 1 column 5).

334.  The tribunal concludes that, on 27 June 2007, the future revenues of the Cerro Negro Project could be forecasted at US$ 71,253.4 million (see Annex 1, column 6).

---

[391] See p. 11, table A, second column.
[392] Myers First Expert Report, table 2.

DRDP-22-20522-SDFL_000348

### d) Royalties and Extraction Tax

335.    In order to obtain the net cash flow, this figure must be reduced by deducting the royalties and the extraction tax to be paid to Venezuela on oil production at the rate of 33 1/3% under the regime in effect at the date of the expropriation (see para 96 above).   Since the royalties and the extraction tax are applied to the value attributable to EHCO, the amount to be paid must be calculated by converting the SCO prices and volumes into EHCO prices and volumes.   The Tribunal used 94.09%[393] for SCO and 110% for EHCO, and arrived to the conclusion that the deduction to be made for the royalties and the extraction tax amounts to US$ 23,982.6 million (see Annex 1, column 7).

336.    The royalties and the extraction tax are also applicable to the by-products referred to in paragraph 333 above.   Applying a rate of 16 2/3%, the royalties and extraction tax deduction applicable to by-products amounts to US$ 289.6 million (see Annex 1, column 8).

337.    Therefore, the total amount to be deducted from the gross revenue in application of the royalties and the extraction tax amounts to US$ 24,272.3 million (see Annex 1, column 9).

### e) Cost of Operation and Capital Investment

338.    The second type of deduction to be made concerns the Project's costs of operation and the disbursements necessary to maintain oil production at the required level.

339.    The Claimants produced detailed reports from Muse Stancil, which evaluate the cost of maintaining and improving upstream and downstream Cerro Negro installations in order to achieve a production of 344,000 barrels per day.   In turn, Prof.  Myers

---

[393] The 94.09% had been agreed by the parties to the ICC arbitration (Econ One First Report ¶12).

DRDP-22-20522-SDFL_000349

analyzed the risks that could affect those forecasts and made upward adjustments to account for inflation and uncertainty in currency exchange rates[394] .

340.    The Respondent's expert, Econ One, started the evaluation of costs with the 2007 budget of the Cerro Negro Project.  Econ One considers that this budget substantially underestimated inflation, did not take into account additional labor costs and did not include sufficient funds for repairs to the coker drums.  It states that, "in light of the low level of production capacity and the 11% rate of natural field decline, the Cerro Negro Project would have been required to undertake an immediate aggressive program both to repair inactive wells and to drill additional wells"[395].  Accordingly, Econ One calculates the costs of such a program and adds the costs for well repairs and major maintenance of the upgrader, plus inflation in US dollars and overvaluation of the Bolivar[396].

341.    The Claimants contend that Econ One's cash-flow analysis exaggerates production costs.  According to the Claimants, "Econ One has assumed that capital expenditures would be incurred between 2008 and 2034 to prepare every well for EOR even though the Project would not use EOR"[397].  They add that the Respondent's experts have also overestimated the capital cost of the well pads and the cost of major maintenance campaigns, and made unjustifiable adjustments to the amounts budgeted in 2007 because of local inflation[398].

342.    With respect to the costs of operation, the Tribunal recalls that, on 2 November 2006, a business plan prepared by OCN was presented to the Cerro Negro Board of Directors.  This plan budgeted US$ 145.1 million in operating expenses for the whole year 2007, and the Tribunal regards it as the best indicator of what the Project participants expected to happen in the future in the absence of any adverse measures

---

[394] Mem. M. ¶ 337.
[395] C. Mem. M. ¶ 362.
[396] C. Mem.M. ¶ 368.
[397] Reply M. ¶ 230.
[398] Reply M. ¶¶232-234.

DRDP-22-20522-SDFL_000350

taken by the Venezuelan authorities[399]. The plan would have been available to any prospective buyer, and the Tribunal considers that such a buyer would have relied on it when forecasting the Project's operational costs for a production of 120,000 barrels per day. Accordingly, the Tribunal will also use it.

343. The Respondent considers that the 2007 budget requires various adjustments in order to develop the operating costs projections. It contends that the Cerro Negro Project had a serious labor issue due to OCN's failure to pay a large number of workers the entire amount that was due to them regarding overtime[400]. According to Venezuela, the future operating costs must for that reason be annually increased by US$ 6.3 million, as calculated by Econ One on the basis of the testimony of Mr. Pereira[401]. By contrast, one of the Claimants' witnesses, Mr. Lawless, testified that, during the time when OCN operated the Cerro Negro Project, workers were paid in accordance with the provisions of the labor law then in effect. He added that he was "not aware of any outstanding grievances relating to unpaid compensation of any sort that had been made against OCN through the time of the expropriation in June 2007"[402].

344. The Tribunal has been presented with a labor liability agreement signed on 30 October 2007 between the Sindicato de Trabajadores de la Empresa Operadora Cerro Negro and PDVSA, granting various indemnities to certain categories of workers[403]. However, the Tribunal has no evidence relating to the costs of that agreement. Moreover, the Tribunal considers that a prospective buyer could not have foreseen in June 2007 that such an agreement would be signed several months later. Accordingly, the Tribunal will not take into account the alleged increased labor costs in its calculation.

---

[399] ICC Award ¶ 677.

[400] C. Mem. M. ¶ 358

[401] Econ One First Report ¶ 16

[402] Lawless WS ¶ 15.

[403] Labor Liability Agreement, Pereira Second Supplementary WS, Appendix 26.

114

DRDP-22-20522-SDFL_000351

DRX203-116

345.  On the other hand, the Tribunal considers that every five years extra expenses must be added to the budget to account for the maintenance of the upgrader and the CPF turnaround. In light of the expert reports, the Tribunal considers that the cost of each turnaround should be fixed at US$ 32.6 million for the upgrader and at US$ 0.5 million for the CPF turnaround. In addition, when projecting annual expenses after 2007, the figures must be corrected by applying an inflation factor of 2% per year and increasing costs by 6% to take into account the overvaluation of the Bolivar[404]. On these bases, the Tribunal considers that the total operating costs amount to US$ 6,056.7 million (see Annex 1, column 10).

346.  With respect to investments to be made, the Tribunal notes that the experts of both Parties are roughly in agreement about the number of wells to be drilled, and that they have limited divergences on the cost and timing of the work to be done in order to maintain production at the appropriate level with the existing technique[405].

347.  In addition, the Respondent contends that the Claimants were under an obligation to make further investments in order to prepare every well for EOR. The Tribunal is not aware of the existence of any legal or contractual obligation of that kind and will not take the proposed EOR investments into account. Accordingly, the Tribunal will determine the deduction corresponding to the investments to be made in accordance with the proposal made by Mr. Cline, expert for the Claimants, in table 5 of exhibit 1 to his first report. When projecting the deduction by year, the Tribunal has applied an inflation rate of 2% per year and increased costs by 6% to take into account the overvaluation of the Bolivar. On these bases, the reduction corresponding to the investments to be made amounts to US$ 1,779.9 million (see Annex 1, column 11).

---

[404] Econ One First Report ¶22; Appendix 5, table 3.
[405] Hearing Tr. Day 5, p.124 to 128.

DRDP-22-20522-SDFL_000352

DRX203-117

### f)  Special Contributions

348.    It is not disputed that the Cerro Negro Project had to pay special contributions, which must be deducted from the cash flows before applying the income tax.  These special contributions are: (i) a contribution to science and technology of 2% of the gross revenue two years prior; (ii) an anti-drug enforcement contribution of 1% of the prior year's taxable income; and (iii) an export registration tax of 0.1% of the value of the exported hydrocarbons.

349.    The Tribunal has evaluated these contributions in accordance with the method used by the Econ One experts in their first report, and arrived to the conclusion that the sums to be paid on account of special contributions amount to (i) US$ 1,382.8 million for science and technology; (ii) US$ 387.6 million for anti-drug enforcement; and (iii) US$ 69.5 million for export registration (see Annex 1, columns 12, 13 and 14).

### g)  Income Tax

350.    Under the applicable Income Tax Law at the date of the expropriation, income tax is to be paid on the taxable income at a rate of 50% (see paragraph 99 above).  The taxable income corresponds to the gross revenue less the OPEX, extraction taxes and other contributions, and it has been established at US$ 39,084.6 million (see Annex 1, column 15).

351.    According to the Respondent, the Claimants have failed to take into account the full impact of income tax regulations in Venezuela.[406]  In particular, the Parties disagree on the consequences to be drawn from Venezuela's inflation.  The Claimants' expert, Prof. Myers, recalls that depreciation "is a tax deductible expense" and adds that "depreciation is determined by Venezuelan tax accounting rules, which are

---

[406] Rej. M. ¶ 408

DRDP-22-20522-SDFL_000353

DRX203-118

based on the inflation adjusted cost of capital investment"[407].  As a consequence, he computed future depreciation expenses and deducted them from the taxable income.

352.   The Respondent's expert, Econ One, recognizes that inflation increases depreciation deductions over time.  However, Econ One stresses that inflation also drives up the value of the assets.  Therefore, it concludes that the income tax effects of inflation "reflect the combined result of the additional tax owed on the appreciation less the reduction associated with the (...) added depreciation"[408].  As a result, the effects of inflation on depreciation would increase, while the asset appreciation effects would diminish over the remaining life of the asset[409].

353.   The Claimants do not contest that inflation will create appreciation of taxable assets, but contend that Econ One has ignored other offsetting inflation adjustments to the taxable income[410].  In particular, the Claimants refer to Articles 179 and 184 of the Venezuelan Income Tax Law and submit that, "[b]y considering only the inflation adjustment for non-monetary assets and liabilities, but disregarding the corresponding adjustment to equity, Econ One has substantially overstated tax expenses in its forecasted flows"[411].

354.   The Respondent contends that Venezuela's Income Tax Law requires that a second set of accounts, independent from those used for financial reporting, be maintained for tax purposes.  In these accounts, the appreciation of assets that has been caused by inflation is counter-balanced by an account called "Readjustment for inflation", not by an increase to equity.  According to the Respondent, "[i]n the end, the increase depreciation allowance (a tax benefit) will equal the increased asset value (a tax liability)"[412].

---

[407] Myers Expert Report,  p. 49 and table 2. See also Graves Expert Report, p. 13.
[408] Econ One First Report ¶ 26.
[409] *Ibid.*
[410] Reply. M. ¶ 235.
[411] *Ibid.*
[412] Rej. M. ¶ 409.

DRDP-22-20522-SDFL_000354

DRX203-119

355.   The Tribunal observes that the Claimants have calculated the taxable income by deducting only the future depreciation expenses from the income.  They agree with the Respondent that non-monetary assets and liabilities must also be re-evaluated, as provided for in Article 179 of the Income Tax Law, but add that this is also the case for equity under Article 184.  According to the Claimants, in the past "Mobil-CN's net equity balance exceeded its net non-monetary assets and liabilities balance, resulting in a net inflation readjustment that reduced Mobil-CN's taxable income".[413] The Claimants consider that this would be the situation in the future, and explain that, in order to avoid complex calculation which in any case would have been in their favor, they have limited their claim to the deduction of the future depreciation expenses[414].  The Respondent contests both the application of Article 184 and the result of this calculation.

356.   The Tribunal notes that both Parties have offered a rather simplified view of the readjustments to be made under Venezuela's Income Tax Law in case of inflation. The Claimants' expert, Mr. Graves, recognized at the hearing that "[t]he tax return includes not just 179 and 184; it includes a whole of inflation adjustments"[415].  The Respondent's expert, Econ One, specified that :"[a] complete application of the 21 articles in the Income Tax Law and the 34 articles in the  rules of the Income Tax Law dealing with inflation readjustments would require, among other things, evaluating which assets and liabilities are to be treated as monetary and non-monetary, and considering whether and how the law requires readjustments for inflation on inventories (…) retained earnings and assets outside of Venezuela, among other issues"[416].

357.   The Tribunal considers that, for the purposes of this calculation, it cannot take into account some of the provisions of Venezuelan tax law relating to the consequences of inflation on the taxable income and ignore other provisions.  Accordingly, it cannot proceed to a readjustment of the depreciation expenses without considering

---

[413] Reply M. ¶ 235.
[414] Hearing, Day 5, p. 164.
[415] Hearing, Day 5, p.159:24-25
[416] Econ One Reply Report, fn. 130.

DRDP-22-20522-SDFL_000355

the other legally required readjustments.  The Tribunal notes that it has not been provided with the relevant information for this purpose.  Accordingly, the Tribunal concludes that it cannot uphold the Claimants' submissions on this point.

358.  The Tribunal concludes that the income tax to be paid on oil and by-products amounts to US$ 19,542.3 million (see Annex 1, column 16).  After payment of the tax, the balance amounts to US$ 19,542.3 million.

359.  In order to obtain the net cash flow amount, the balance (US$ 19,542.3 million) must be reduced by deducting the CAPEX (US$ 1,779.9 million).  As a consequence, the forecasted net cash flow of the Cerro Negro Project from 2007 to 2035 is US$ 17,762.4 million.  It is not disputed that the Claimants own 41 2/3% of Cerro Negro.  Accordingly, the net cash flow of the Cerro Negro Project from 2007 to 2035 corresponding to the Claimants amounts to US$ 7,399.8 million (see Annex 1, columns 17 and 18).

## 2.  Discount Rate

360.  Having established the net cash flow amount, the Tribunal still has to determine how that cash flow should be discounted to its value in June 2007.

361.  Prof. Myers submits that the appropriate discount rate for a project's cash flow is the cost of capital.  The cost of capital is defined as the expected rate of return offered by other investments with the same risk as the project[417], and it is determined by using the capital asset pricing model (CAPM), which depends upon three components: the ratio of return for risk free investments, the market risk premium that is generally expected by investors and a measure of a particular investment's contribution to the risk of a diversified portfolio, which is known as the beta value[418].  Professor Myers made the corresponding assessments and calculations,

---

[417] Myers Reply Expert Report, Appendix A, p. 1.
[418] Myers Expert Report, p. 22.

DRDP-22-20522-SDFL_000356

DRX203-121

and arrived to the conclusion that the discount rate in June 2007 could be fixed at 8.7%.

362.    The Respondent contends that the CAPM methodology is of little relevance in determining the value of an international oil project[419] because it does not take into consideration the country risk.  According to the Respondent, Prof. Myers has relied on a single, inappropriate method, whereas Respondent's experts have used four separate methods, ICAPM and country risk survey ("market acquisition approach"), and backward- and forward-looking data ("make-whole approach")[420].  These four methods resulted in discount rates "within a relatively narrow range", which the Respondent's experts averaged, yielding a discount rate of 19.8%[421].

363.    The Claimants contend that the country risk is largely composed of the risk of uncompensated expropriation, which cannot be taken into consideration in order to valuate such an expropriation.  Similarly, the Claimants consider the "make-whole approach" to be incompatible with article 6 of the BIT and the principle of full reparation[422].  According to the Claimants, the methods used by the Respondent's expert indicate a wide range of discount rates that have been "de-emphasized by the liberal use of averaging"[423].

364.    The Tribunal observes that the basic divergence between the Parties concerns the question of what they refer to as the "confiscation risk"[424], or more specifically, whether the risk of confiscation should be taken into account when calculating the discount rate applicable to the compensation due for an expropriation.  The Claimants submit that under Article 6(c) of the BIT, "a valuation of the expropriated property that complies with the Treaty cannot include the risk that the property might be expropriated later without the compensation required by the Treaty"[425].  In

---

[419] C. Mem. M. ¶ 304.
[420] C. Mem. M. ¶ 321.
[421] C. Mem. M. ¶¶321, 344.
[422] Reply M. ¶ 247.
[423] Reply M. ¶ 243.
[424] C-PH Brief ¶ 48.
[425] C-PH Brief ¶ 49.

DRDP-22-20522-SDFL_000357

their opinion, the discount rate can take into consideration country risks such as those resulting from a volatile economy or civil disorder, but not the confiscation risk. The Respondent does not share that interpretation of article 6(c) and contends that elements such as the risk of taxation, regulation and expropriation are essential to the country risk[426] and must be taken into consideration in the determination of the discount rate.

365.   Article 6(c) of the BIT requires that the compensation due in case of expropriation represent "the market value of the investments affected before the measures are taken or the impending measures became public knowledge, whichever is earlier". This means that the compensation must correspond to the amount that a willing buyer would have been ready to pay to a willing seller in order to acquire his interests but for the expropriation, that is, at a time before the expropriation had occurred or before it had become public that it would occur. The Tribunal finds that, it is precisely at the time before an expropriation (or the public knowledge of an impending expropriation) that the risk of a potential expropriation would exist, and this hypothetical buyer would take it into account when determining the amount he would be willing to pay in that moment. The Tribunal considers that the confiscation risk remains part of the country risk and must be taken into account in the determination of the discount rate. Accordingly, the Tribunal is unable to adopt the approach used by the Claimants' expert, which does not take this risk into account.

366.   The Tribunal observes that the Respondent's experts have used different methods to calculate the discount rate, which take into account the confiscation risk and a number of other relevant elements. On these bases they arrive to discount rates ranging from 18.5% to 23.9%.

---

[426] C-PH Reply ¶ 46.

DRDP-22-20522-SDFL_000358

DRX203-123

367.    Other arbitral tribunals have adopted discount rates in circumstances comparable to the present case.  In those cases, they have used rates ranging from 18.5% to 21%[427]. The Tribunal in the ICC Award applied a discount rate of 18%[428].

368.    In the Tribunal's view, that 18% discount rate appropriately reflects the existing risks in the present case.  Accordingly, the Tribunal has decided to adopt it, and arrived to a discounted net cash flow of US$ 1,411.7 million (see Annex 1, column 19).

### 3.  Price Cap

369.    The Respondent considers that the price cap set forth in the Cerro Negro Association Agreement in implementation of the Twentieth Condition of the Cerro Negro Congressional Authorization is applicable in this case.  The Eighteenth Condition of the Association Agreement establishes that "it shall not be considered that a Party has suffered an adverse and significant economic consequence as a result of any said decisions or changes in legislation, at any time when the Party is receiving income from THE ASSOCIATION equal to a price of crude oil above a maximum price that shall be specified in the Association Agreement"[429].  According to the Respondent, that limitation was embodied in Clause 15(2)(a) of the Agreement, which establishes that, under certain conditions, "compensation would not be granted for any fiscal year if the price of the benchmark crude oil (Brent) has exceeded US$ 27 per barrel in 1996 dollars"[430] (corresponding to  US$ 25.07 in 2007 dollars).  According to the Respondent, compensation must be limited in accordance with this price cap.

---

[427] *Himpurna California Energy Ltd v. PT (Persero) Perusahaan Listruik Negara* (Award, 4 May 1999), (Ex. R-354)*; Patuha Power Ltd (Bermuda) v PT (Persero) Perusahaan Listruik Negara* (Award, 4 May 1999), (Ex. R-473); *Joseph Charles Lemire v. Ukraine,* ICSID Case No. ARB/06/18 (Ex. R-474); *Phillips Petroleum Company Iran v. The Islamic Republic of Iran, The National Iranian Oil Company,* Iran-U.S. Claims Tribunal (CL-152).

[428] ICC Award ¶¶ 768, 777.

[429] C. Mem. M. ¶ 289 and following ¶¶; Reply M. ¶ 224 and following ¶¶.

[430] C. Mem. M. ¶298.

DRDP-22-20522-SDFL_000359

370.    The Claimants submit that the Respondent was not a party to the Cerro Negro Association Agreement and that this case does not involve a claim under Clause 15[431]. Therefore, the price cap provided for in the Agreement is not applicable. The Respondent considers that the Claimants' argument does not address the issue, since "[t]his is not a matter of enforcing a contract; it is a question of respecting the terms and conditions under which the Project was authorized (…)"[432]. According to the Respondent, any prospective buyer would have taken this price cap into consideration when evaluating Mobil Cerro Negro's interests.[433]

371.    The Tribunal observes that the Twentieth Condition of the Congressional Authorization refers to the income to be provided to the parties by the association, and to a price cap to be established in the association agreement. In the present case, Clause 15(1) of the Association Agreement provides for the consequences of Governmental actions, covering discriminatory measures taken by the Government that result in a materially adverse effect for the foreign party to the Agreement, and allowing that foreign party to initiate arbitration proceedings against Lagoven (a subsidiary of PDVSA) in order to obtain compensation for the economic consequences of those measures.

372.    In accordance with the Twentieth Condition of the Congressional Authorization, Clause 15(2)(a) of the Agreement fixes a price cap for the compensation. Clause 15(1) establishes that: "[t]o the extent any legal recourse is available to reverse or obtain relief from such Discriminatory Measure, the Foreign Party shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure ", and adds that any net benefit received as a result of these legal actions "shall be (i) applied against any amount ultimately determined to be owed by Lagoven CN pursuant to this Article; or (ii) reimbursed to Lagoven CN if Lagoven CN previously has made payments to the Foreign Party with respect to the Discriminatory Measure in question".

---

[431] Reply M. ¶ 66.
[432] Rej. M. ¶ 314.
[433] C. Mem. M. ¶ 297.

DRDP-22-20522-SDFL_000360

DRX203-125

373. The Tribunal notes that the Twentieth condition of the Congressional Authorization does not impose a specific price cap, but provides for a price cap to be established in the Association Agreement.  In the present case, Clause 15(1) of the Association Agreement makes a clear distinction between the action that the Foreign Party may initiate against Lagoven CN on the one hand, and the action that it may initiate against the Government on the other.  The price cap contained in Clause 15(2)(a) is applicable only to the compensation payable by Lagoven CN.  Since the Respondent in this proceeding is the Bolivarian Republic of Venezuela, not Lagoven CN, the Tribunal concludes that it may not oppose this price cap to the Claimants.

374. As a consequence, the compensation to be paid by the Respondent for the expropriation of the Cerro Negro Project remains in the amount of US$ 1,411.7 million (see para 368 above).

## 4.  Offset Claim

375. In its analysis of the compensation due to the Claimants, the Respondent has included an offset request in the amount of US$ 238,139,797.  According to the Respondent, this figure representas the amount of debt relating to the Cerro Negro Project that was paid on behalf of the Claimants[434].

376. The Claimants contend that the Respondent has failed to explain why it is entitled to an offset for purported debts to PDVSA, which is not a party to these proceedings. In any case, the Claimants note that the Respondent has not brought or substantiated any counterclaim based on this alleged debt.  The Claimants consider that this alleged obligation to PDVSA is irrelevant and outside the jurisdiction of the Tribunal[435].

377. The Tribunal notes that this offset request has been enunciated and contested without any elaboration or substantiation.  The Tribunal has not been provided with the grounds or with cogent evidence to decide this request, including convincing

---

[434] C. Mem. M. ¶ 371, fn. 737.
[435] Reply M. ¶ 268-269.

DRDP-22-20522-SDFL_000361

reasons why it should have or lack jurisdiction over a request involving a third party. Accordingly, to the extent that the Tribunal has jurisdiction, the offset request must be dismissed in any case.

## 5. Double Recovery

378. The prohibition of double recovery for the same loss is a well-established principle, also referred to as *enrichessement sans cause*. The issue has arisen in a number of ICSID cases[436], and should be assessed on a case-by-case basis.

379. In the parallel ICC case, the tribunal decided that the expropriation caused by Decree-Law 5200 constituted a discriminatory measure in the sense of the Association Agreement, and awarded Mobil Cerro Negro Ltd (Bahamas), one of the Claimants in this proceeding, compensation covering the damage suffered as a result of that measure. It is not contested that the compensation awarded by the ICC tribunal has been paid[437]. Although the dispute before the ICC Tribunal and the dispute before this Tribunal are different, the measure that gave rise to the dispute before the ICC Tribunal is also a measure at issue in this proceeding, and one of the Claimants in the present case has already been compensated for the loss incurred as a consequence of that measure. Therefore, there is a risk of double recovery in the present case for the Cerro Negro Project.

380. Clause 15(1) of the Association Agreement requires the "Foreign Party" to pursue legal action which is available to it in order to mitigate any damages it may have suffered as a result of the alleged discriminatory measures. In addition, Clause 15(1) establishes that any net benefits received by the "Foreign Party" as a result of such legal action, (and after deduction of the legal costs incurred by the "Foreign Party" in this connection) shall be reimbursed to Lagoven CN if Lagoven CN had

---

[436] *Pan American Energy LLC and BP Argentina Exploration Company v. Argentina* (ICSID Case No. ARB/03/13), (CL-176) ¶ 219. See also *Railroad Development Corporation v. Republic of Guatemala* (ICSID Case No. ARB/07/23) ¶265; and *Daimler Financial Services AG v. Argentine Republic* (ICSID Case No. ARB/05/1) ¶ 155.

[437] Hearing Tr. Day 8 24:19-23.

DRDP-22-20522-SDFL_000362

DRX203-127

previously made payment to the "Foreign Party" with respect to the discriminatory measures in question. The Claimants have expressly stated that "in the event of an award in this case in favor of the Claimants, the Claimants are willing to make the required reimbursement to PDVSA"[438]. The Tribunal has no reason to doubt the Claimants' representation.

381. Effectively, the total compensation payable to the Claimants is the amount specified in paragraph 374 above, less the amount already received by the Claimants under the ICC Award for the same damage. Double recovery will thus be avoided.

## D. QUANTUM OF THE EXPROPRIATION OF THE LA CEIBA PROJECT

382. It is not disputed that, at the time of the expropriation, the La Ceiba Project was in a phase of development, which excludes the application of the DCF method in order to evaluate the market value of the Claimants' interests in accordance with Article 6 of the BIT.

383. The Claimants submit that, under the circumstances, the more appropriate form of reparation would be compensation measured by the Claimants' actual investment in the Project[439]. On that basis, they ask for US$ 179.3 million.

384. The Respondent observes that the Claimants had a 50% interest in the La Ceiba Project. The other 50% was the property of Petro Canada, which accepted the sum of US$ 75 million as compensation for the expropriation of its interests in the Project. According to the Respondent, that sum corresponds to the value of the Claimants' investment in June 2007.

385. The Tribunal recalls that the market value under Article 6 of the BIT must correspond to the sum that a willing buyer would have been ready to pay to a willing seller at the time of the expropriation, none of them being under pressure to buy or to sell. This was not the situation of Petro Canada when it accepted to sell its

---

[438] C-PH Brief ¶ 9.
[439] Mem. M. ¶ 350.

126

DRDP-22-20522-SDFL_000363

interests in the La Ceiba Project for US$ 75 million, one day before the expiry date established by Decree-Law 5200.  Accordingly, the Tribunal considers that it cannot rely on the figure proposed by the Respondent, and that the market value of the Claimants' interests in the La Ceiba Project must be established at the total of their investment in that Project, *i.e.*, US$ 179.3 million.

## IX.   TAXES AND INTEREST

### A.   PROTECTION AGAINST TAXATION OF THE AWARD

386.   The Claimants contend that compensation should be calculated and payable in an amount net of any taxes, domestic or foreign.  Accordingly, they request that compensation be calculated on an after-tax basis and that the quantum of the compensation be increased to include the amount of any tax levied by the Respondent and the amount of any tax liability that may be incurred as a result of the Award and as a consequence of the Respondent's wrongful measures[440].  The Claimants consider that, "at the very least", the Tribunal should specify that the compensation established in the Award "is net of taxes and shall be automatically grossed up to offset any Venezuelan tax liability that may be imposed or purportedly may arise from that compensation"[441].

387.   The Respondent contends that there should be no increase in the amount of the compensation to account for the hypothetical tax consequences of the Award, since this claim is speculative, contingent and uncertain[442] .

388.   Regarding foreign taxation, the Claimants contend that there is a risk that other jurisdictions will seek to impose taxes that would have been prevented in the absence of the expropriation.  According to the Claimants, such taxation would

---

[440] Mem. M. ¶ 358.

[441] Reply M.  ¶ 264.

[442] C. Mem. M. ¶ 374.

127

DRDP-22-20522-SDFL_000364

constitute additional consequential damages[443].   The Tribunal considers that this claim is speculative and uncertain.  Accordingly, the claim is dismissed.

389.   Regarding taxation by Venezuela, the Tribunal recalls that the compensation awarded to the Claimants has been calculated taking into account all taxes to be paid to the Venezuelan authorities.  As a consequence, that compensation should be paid net of any Venezuelan tax[444].

## B.   INTEREST

390.   The Claimants submit that Article 6(c) of the BIT requires that pre-award interest be paid at a normal commercial rate.  The Claimants consider that a normal commercial rate includes compounding of interest, and therefore claim compound pre- and post-award interest for both the Cerro Negro and La Ceiba Projects.

391.   Regarding accrual of pre-award interest for the Cerro Negro Project, the Claimants consider that, (i) for the first tranche, between 29 May 2006 and 26 June 2007, pre-award interest should accrue at the times when those damages occurred as a result of the extraction tax, curtailments of production and exports and severance payments[445]; (ii) for the second tranche, representing net cash flows that would have been received between 27 June 2007 and 30 September 2010 (as a placeholder for the date of the Award), pre-award interests must be calculated from the times when the lost net cash flows would have been received during that period[446]; and (iii) for the third tranche, measured by the fair market value of the lost interests in the Cerro Negro Project, pre-award interests should begin to accrue on the final valuation date which is used[447].

---

[443] Mem. M. ¶ 357.

[444] See *Siemens A.G. v. Argentine Republic* (ICSID Case No. ARB/02/8), Award of 6 February 2007 (CL-112) ¶ 403.

[445] Mem. M. ¶ 364.

[446] Mem. M. ¶ 365 and Reply M. ¶ 13.

[447] Mem. M. ¶ 366.

DRDP-22-20522-SDFL_000365

392. Regarding accrual of pre-award interest for the La Ceiba Project, the Claimants contend that pre-award compound interests should accrue from 27 June 2007, *i.e.*, the date of the expropriation.

393. The Claimants contend that post-award compound interest should be paid on the quantum of compensation from the date of the Award until payment in full "at the rate reflected by the yield for the Respondent's sovereign debt as of the date of the Award"[448]. This rate could also be used for pre-award interest[449]. In the alternative, the Claimants refer to a prime lending rate, to be increased by an additional 3.1 percentage points "to encompass the 'sovereign spread' that the market demands to account for the Respondent's risk of default"[450].

394. The Respondent submits that the Claimants should be granted no pre-award interest "given their choice of pursuing worldwide litigation rather than negotiating reasonable compensation"[451]. In the alternative, simple pre- and post- award interest should apply[452]. According to the Respondent, there is no reason to depart from international law, which does not require compound interest, and Venezuelan law, which does not provide for compound interest[453]. With respect to the interest rate, the Respondent contends that the LIBOR or US Treasury rate should be used.

395. The Tribunal will address first the applicable rate of interest, then turn to the question of the date from which interest should accrue and finally decide whether interest should be simple or compound.

396. Article 6 of the BIT requires that the compensation to be paid in case of expropriation "include interest at a normal commercial rate". Accordingly, the Tribunal rejects the Claimants' request to apply the rate reflected by the yield for the Respondent's sovereign debt. Considering the circumstances of the case, the parties

---

[448] Mem. M. ¶ 369.
[449] C-PH Brief ¶ 82.
[450] *Ibid.*
[451] C. Mem. M. ¶ 379.
[452] Rej. M. ¶ 427.
[453] C. Mem. M. ¶ 382.

DRDP-22-20522-SDFL_000366

involved and the fact that the compensation is to be awarded in United States dollars, the Tribunal considers that the current US prime rate of 3.25% is the appropriate rate for the whole period.

397.    The Tribunal observes that the practice of awarding pre-award interest is common in cases of expropriation and that, in order to ensure full compensation, such interest generally accrues from the date of the expropriation. In the present case, the Tribunal considers that the valuation date under Article 6 of the BIT should be the date of the expropriation. Accordingly, accrual of pre-award interest would start on 27 June 2007 and continue until the date of the Award. Post-award interest will accrue from the date of the Award and until compensation has been paid in full.

398.    The production and export curtailments have also been found to breach the Treaty (see paragraph 264 above). Interest is payable in respect of this breach as well. The Tribunal notes that the last measure regarding this breach occurred in April 2007, less than three months prior to the starting date from which interest is payable for the expropriation of the Claimants' investments. For the sake of convenience, the Tribunal decides that the interest payable on account of the production and export curtailments shall also be calculated from 27 June 2007.

399.    According to the Respondent, Venezuelan law provides for simple rather than compound interest. However, the compensation due to the Claimants has been determined under the BIT and not under Venezuelan law. Accordingly, the Tribunal must decide in accordance with Article 6 of the BIT, which provides for a "normal commercial rate". The Tribunal considers that a normal commercial rate generally includes compounding of interest, and notes that there is a growing tendency of international tribunals to award such interest in order to ensure full compensation of the damage. Therefore, the Tribunal decides that interest shall be compound and that, in the present case, compounding of interest shall be done annually. For any period less than a full year, interest shall be calculated on a prorated basis.

130

DRDP-22-20522-SDFL_000367

400.    The Tribunal concludes that the interest due on the sum to be paid in implementation of paragraph 385 above (La Ceiba *quantum*) shall be calculated from the same date and in the in the same manner.

131

DRDP-22-20522-SDFL_000368

DRX203-133

## X.    COSTS

401.    The Claimants submit that "the Tribunal should assess all costs against the Respondent, because it violated the Treaty, erroneously contended that this Tribunal lacked competence over *any* claims, and advocated amounts of *quantum* that utterly disregard the standard of compensation required by the Treaty"[454].

402.    By contrast, the Respondent submits that the costs of the proceeding should be assessed against the Claimants because of the abusive manner in which they have pursued compensation in national courts and presented exorbitant compensation claims in the present case, as well as their insistence on relitigating claims that are manifestly beyond the jurisdiction of this Tribunal[455].

403.    Taking into account the conduct of both Parties, the Tribunal decides that each of them shall bear its own costs and counsel fees, and that the fees and expenses of the Tribunal, as well as the costs of the ICSID Secretariat, shall be equally shared between them.

## XI.    DECISION OF THE TRIBUNAL

404.    For the foregoing reasons, The Tribunal unanimously decides as follows:

(a)    the Tribunal has no jurisdiction over the claim arising out of the increase in the income tax rate for the participants to the Cerro Negro Project;

(b)    the Tribunal has jurisdiction over the remaining claims, *i.e.*:

a.    the claim arising out of the imposition of the extraction tax on the Cerro Negro Project;

b.    the claim arising out of the production and export curtailments imposed on the Cerro Negro Project in 2006 and 2007; and

---

[454] C-PH Reply ¶ 51.
[455] R-PH Brief ¶ 87.

132

DRDP-22-20522-SDFL_000369

DRX203-134

       c.   the claim arising out of the expropriation of the Claimants' investments in the Cerro Negro and La Ceiba Projects;

(c)    the Respondent shall pay to the Claimants the sum of US$ 9,042,482 (nine million, forty two thousand, four hundred and eighty two United States dollars) in compensation for the production and export curtailments imposed on the Cerro Negro project in 2006 and 2007;

(d)    the Respondent shall pay to the Claimants the sum of US$ 1,411.7 million (one thousand, four hundred and eleven million, seven hundred thousand United States dollars) in compensation for the expropriation of their investments in the Cerro Negro Project;

(e)    the Tribunal takes note in both cases of the Claimants' representation that, in the event of favourable award, the Claimants are willing to make the required reimbursements to PDVSA.  Double recovery will thus be avoided;

(f)    the Respondent shall pay to the Claimants the sum of US$ 179.3 million (one hundred seventy nine million, three hundred thousand United States dollars) in compensation for the expropriation of their investments in the La Ceiba Project;

(g)    these sums shall be paid to the Claimants net of any Venezuelan tax;

(h)    these sums shall be increased by annual compound interest on their amount at the rate of 3.25% from 27 June 2007 up to the date when payment of this sums has been made in full;

(i)    each Party shall bear its own costs and counsel fees;

(j)    the Parties shall equally share the fees and expenses of the Tribunal and the costs of the ICSID Secretariat; and

(k)    all other claims are rejected.

133

DRDP-22-20522-SDFL_000370

DRX203-135

[Signed]                                              [Signed]

_____            _____
Prof. Gabrielle Kaufmann-Kohler             Dr. Ahmed Sadek El-Kosheri
          Arbitrator                                  Arbitrator
     24 September 2014                           16 September 2014




                        [Signed]

            _____
               Judge Gilbert Guillaume
                      President
                 30 September 2014

DRDP-22-20522-SDFL_000371

DRX203-136

---

**ANNEX 1**

---

DRDP-22-20522-SDFL_000372

| Period | Daily SCO Volumes (MBD) | Total SCO Volumes (MB) | SCO Price | SCO Revenue (B$) | Joint Revenues (B$) | Total Revenues (B$) | Extraction Tax on EHO | Extraction Tax on Joint Revenues (B$) | Total Extraction Tax | OPEX | CAPEX | Contribution for Science and Technology | Anti-drug Contribution | Export Contribution | Taxable Income | Income Tax | Project Cash Flow | 41 2/3 % Share Cash Flows | Discounted Cash Flows 18% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 104.3 | 19,600 | 56.52 | 1,107.8 | 27.7 | 1,135.5 | 382.2 | 4.6 | 386.8 | 74.7 | 4.5 | 16.6 | 5.6 | 1.1 | 650.6 | 325.3 | 320.8 | 133.7 | 128.1 |
| 2008 | 104.3 | 38,158 | 55.22 | 2,107.1 | 52.7 | 2,159.7 | 726.9 | 8.8 | 735.7 | 156.9 | 10.5 | 36.6 | 11.2 | 2.1 | 1,217.2 | 608.6 | 598.1 | 249.2 | 211.2 |
| 2009 | 104.3 | 38,053 | 53.73 | 2,044.6 | 51.1 | 2,095.7 | 705.4 | 8.5 | 713.9 | 160.0 | 42.3 | 41.7 | 12.2 | 2.0 | 1,165.9 | 583.0 | 540.6 | 225.2 | 161.8 |
| 2010 | 104.3 | 38,053 | 53.56 | 2,038.1 | 51.0 | 2,089.1 | 703.2 | 8.5 | 711.6 | 163.0 | 44.0 | 43.2 | 11.7 | 2.0 | 1,157.5 | 578.8 | 534.7 | 222.8 | 135.6 |
| 2011 | 104.3 | 38,053 | 53.89 | 2,050.7 | 51.3 | 2,102.0 | 707.5 | 8.5 | 716.0 | 204.0 | 35.7 | 41.9 | 11.6 | 2.1 | 1,126.4 | 563.2 | 527.5 | 219.7 | 113.3 |
| 2012 | 104.3 | 38,158 | 54.08 | 2,063.6 | 51.6 | 2,115.2 | 711.9 | 8.6 | 720.5 | 169.2 | 54.2 | 41.8 | 11.3 | 2.1 | 1,170.3 | 585.2 | 531.0 | 221.2 | 96.7 |
| 2013 | 104.3 | 38,053 | 54.54 | 2,075.4 | 51.9 | 2,127.3 | 716.0 | 8.6 | 724.7 | 173.8 | 55.7 | 42.0 | 11.7 | 2.1 | 1,173.0 | 586.5 | 530.8 | 221.1 | 81.9 |
| 2014 | 104.3 | 38,053 | 55.00 | 2,092.9 | 52.3 | 2,145.3 | 722.1 | 8.7 | 730.8 | 176.9 | 71.3 | 42.3 | 11.7 | 2.1 | 1,181.5 | 590.7 | 519.4 | 216.4 | 67.9 |
| 2015 | 104.3 | 38,053 | 55.45 | 2,110.1 | 52.8 | 2,162.8 | 728.0 | 8.8 | 736.8 | 180.0 | 54.7 | 42.5 | 11.8 | 2.1 | 1,189.6 | 594.8 | 540.1 | 225.0 | 59.9 |
| 2016 | 104.3 | 38,158 | 56.60 | 2,159.7 | 54.0 | 2,213.7 | 745.1 | 9.0 | 754.1 | 226.7 | 50.8 | 42.9 | 11.9 | 2.2 | 1,176.0 | 588.0 | 537.2 | 223.8 | 50.5 |
| 2017 | 104.3 | 38,053 | 57.74 | 2,197.2 | 54.9 | 2,252.1 | 758.0 | 9.2 | 767.2 | 187.6 | 61.8 | 43.3 | 11.8 | 2.2 | 1,240.1 | 620.0 | 558.2 | 232.6 | 44.4 |
| 2018 | 104.3 | 38,053 | 58.87 | 2,240.2 | 56.0 | 2,296.2 | 772.9 | 9.3 | 782.2 | 190.7 | 67.2 | 44.3 | 12.4 | 2.2 | 1,264.4 | 632.2 | 565.0 | 235.4 | 38.1 |
| 2019 | 104.3 | 38,053 | 60.00 | 2,283.2 | 57.1 | 2,340.3 | 787.7 | 9.5 | 797.2 | 195.3 | 59.4 | 45.0 | 12.6 | 2.3 | 1,287.8 | 643.9 | 584.5 | 243.5 | 33.4 |
| 2020 | 104.3 | 38,158 | 61.26 | 2,337.5 | 58.4 | 2,396.0 | 806.4 | 9.7 | 816.2 | 198.4 | 68.0 | 45.9 | 12.9 | 2.3 | 1,320.2 | 660.1 | 592.2 | 246.7 | 28.7 |
| 2021 | 104.3 | 38,053 | 62.52 | 2,379.1 | 59.5 | 2,438.6 | 820.8 | 9.9 | 830.7 | 249.3 | 46.6 | 46.8 | 13.2 | 2.4 | 1,296.2 | 648.1 | 601.5 | 250.6 | 24.7 |
| 2022 | 104.3 | 38,053 | 63.76 | 2,426.3 | 60.7 | 2,486.9 | 837.1 | 10.1 | 847.2 | 207.6 | 75.1 | 47.9 | 13.0 | 2.4 | 1,368.8 | 684.4 | 609.3 | 253.8 | 21.2 |
| 2023 | 104.3 | 38,053 | 65.00 | 2,473.5 | 61.8 | 2,535.3 | 853.3 | 10.3 | 863.6 | 210.7 | 72.2 | 48.8 | 13.7 | 2.5 | 1,396.6 | 698.0 | 625.8 | 260.7 | 18.5 |
| 2024 | 104.3 | 38,158 | 66.23 | 2,527.2 | 63.2 | 2,590.4 | 871.9 | 10.5 | 882.4 | 215.3 | 77.9 | 49.7 | 14.0 | 2.5 | 1,426.4 | 713.2 | 635.3 | 264.7 | 15.9 |
| 2025 | 104.3 | 38,053 | 67.60 | 2,572.4 | 64.3 | 2,636.7 | 887.5 | 10.7 | 898.2 | 219.9 | 75.3 | 50.7 | 14.3 | 2.6 | 1,451.0 | 725.5 | 650.2 | 270.9 | 13.8 |
| 2026 | 104.3 | 38,053 | 68.95 | 2,623.8 | 65.6 | 2,689.4 | 905.2 | 10.9 | 916.1 | 275.8 | 71.0 | 51.8 | 14.5 | 2.6 | 1,428.5 | 714.3 | 643.2 | 268.0 | 11.5 |
| 2027 | 104.3 | 38,053 | 70.30 | 2,675.2 | 66.9 | 2,742.0 | 922.9 | 11.1 | 934.1 | 229.2 | 78.5 | 52.7 | 14.3 | 2.7 | 1,509.1 | 754.6 | 676.1 | 281.6 | 10.3 |
| 2028 | 104.3 | 38,158 | 71.63 | 2,733.2 | 68.3 | 2,801.6 | 943.0 | 11.4 | 954.3 | 233.8 | 89.9 | 53.8 | 15.1 | 2.7 | 1,541.8 | 770.9 | 681.0 | 283.7 | 8.8 |
| 2029 | 104.3 | 38,053 | 73.10 | 2,781.7 | 69.5 | 2,851.2 | 959.7 | 11.6 | 971.3 | 238.4 | 81.7 | 54.8 | 15.4 | 2.8 | 1,568.5 | 784.3 | 702.6 | 292.7 | 7.7 |
| 2030 | 104.3 | 38,053 | 74.56 | 2,837.3 | 70.9 | 2,908.2 | 978.8 | 11.8 | 990.7 | 243.0 | 169.3 | 56.0 | 15.7 | 2.8 | 1,600.0 | 800.0 | 630.7 | 262.7 | 5.8 |
| 2031 | 104.3 | 38,053 | 76.59 | 2,914.5 | 72.9 | 2,987.4 | 1,005.5 | 12.1 | 1,017.6 | 304.1 | 107.2 | 57.0 | 16.0 | 2.9 | 1,589.7 | 794.8 | 687.7 | 286.5 | 5.4 |
| 2032 | 104.3 | 38,158 | 78.68 | 3,002.2 | 75.1 | 3,077.3 | 1,035.8 | 12.5 | 1,048.3 | 252.2 | 108.3 | 58.2 | 15.9 | 3.0 | 1,699.7 | 849.9 | 741.6 | 308.9 | 4.9 |
| 2033 | 104.3 | 38,053 | 80.82 | 3,075.5 | 76.9 | 3,152.4 | 1,061.0 | 12.8 | 1,073.8 | 256.9 | 18.4 | 59.7 | 17.0 | 3.1 | 1,741.8 | 870.9 | 852.5 | 355.2 | 4.8 |
| 2034 | 104.3 | 38,053 | 83.01 | 3,158.8 | 79.0 | 3,237.8 | 1,089.8 | 13.2 | 1,102.9 | 263.0 | 18.9 | 61.5 | 17.4 | 3.2 | 1,789.7 | 894.9 | 876.0 | 364.9 | 4.2 |
| 2035 | 104.3 | 28,462 | 85.26 | 2,426.7 | 60.7 | 2,487.3 | 837.2 | 10.1 | 847.3 | 200.2 | 9.6 | 63.0 | 17.9 | 2.4 | 1,356.5 | 678.2 | 668.7 | 278.6 | 2.8 |
| **TOTAL** | | **1,076,234.7** | | **69,515.5** | **1,737.9** | **71,253.4** | **23,982.6** | **289.6** | **24,272.3** | **6,056.7** | **1,779.9** | **1,382.8** | **387.6** | **69.5** | **39,084.6** | **19,542.3** | **17,762.4** | **7,399.8** | **1411.7** |

DRDP-22-20522-SDFL_000373

DRX203-138