UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

No. 22-cr-20552-DAMIAN/Torres

UNITED STATES OF AMERICA,

       Plaintiff,

v.

DAVID RIVERA and ESTHER NUHFER,

       Defendants.

_____/

**<u>DAVID RIVERA'S MOTION FOR NEW TRIAL</u>**
**<u>AND FOR JUDGMENT OF ACQUITTAL</u>**

David Rivera, through counsel and pursuant to Federal Rule of Criminal Procedure 33(a), respectfully moves for a new trial, and pursuant to Federal Rule of Criminal Procedure 29(c), moves for acquittal on all counts, and in support thereof states as follows:

### INTRODUCTION

In 54 years of trying federal criminal cases, the undersigned has never encountered a case even close to this one. Rivera was indicted on the premise that he sold out to the Maduro government to help "normalize" its relations with the United States. Superseding Indictment at pp-5-6. The indictment also actually alleged that Rivera acted to "prevent[][sic] the United States from imposing additional economic sanctions against President Maduro and other members of his regime."*Id.*, p. 6.   At the very beginning of their opening statement, the government told the jury that, "these two defendants made a pact to secretly work for and lobby for the government of Venezuela to work for Nicolas Maduro, the communist dictator, and his second in command, Delcy Rodriguez[.] [T]hese two defendants engaged in representing the government of Venezuela. They orchestrated a secret political influence campaign for $50 million. They sold their loyalty to the president and the foreign minister." (Excerpt of Government's Opening Statement at p. 3.).[1]

The government's closing argument that the defendants' public anti-Maduro stance was a "façade," that they were "pretending to do good" while being paid by Maduro to represent his interests in Washington, D.C, was wrong.  The evidence at trial was overwhelmingly the polar opposite.  With the one unsupported exception addressed below, every witness who knew of Rivera's efforts, Marco Rubio, Julio Borges, Brian Ballard and Pete Sessions, testified to Rivera's consistent opposition to Maduro at all times, especially in the 2017–2018 time frame of the case. Communications between Rivera, Rubio and others proved Rivera's ongoing efforts to *impose* – not to remove – economic sanctions against Maduro regime members.[2] Not a single piece of

---

[1] Rivera moved for and received a ten-day extension for filing this motion partly to await filing of the complete opening statement and closing argument transcripts. Although the transcripts are not yet available, given the time frames involved, we are filing this motion now without some of the record we expect to  reference upon becoming available.

[2] Even the late 2017 effort to locate a lawyer for Eric Malpica to apply for his removal from the OFAC list was shown by the evidence to be an Opposition supported enterprise.

#111725254v2
#111790270v1
#111790270v2

evidence supported the claim that Rivera ever tried to help the Maduro government "in Washington, DC."

Importantly, the contemporaneous communication exhibits introduced into evidence at trial including GX 15 (excerpts from the Mia Chat Group made up of Rivera, Nuhfer, Perera and Gorrin),[3] GX 20 (La Luz Chat Group made up of Rivera, Nuhfer and Perera),  and GX 22 (Rivera and Gorrin bi-lateral chat), along with all other chats and text messages introduced into evidence, normally the most powerfully incriminating evidence available, without exception, contained not a single conversation in support of Maduro. On the contrary, aside from conversations in the La Luz Chat establishing that Exxon was the focus of the Consulting Agreement (consonant with Rivera's defense), the chats and texts were, in material part, entirely about supporting the opposition efforts to remove Maduro. In the face of the indicted allegations and the government's theory of the case stated to the jury, this evidentiary anomaly is truly extraordinary, unheard of even!  It is the chat equivalent of months of wiretap tapes fully exculpating the targets of an investigation. Has anyone *ever* heard of such a thing?

Even the government's key witness, Hugo Perera, could not and did not identify a single statement or conversation of support for Maduro in the months long chats in a direct challenge on cross-examination to his testimony about trying to "normalize relations."  Despite having told the Court during pre-trial proceedings that they literally had "tens of thousands" of Rivera's text messages,[4] on redirect of Perera and in closing argument, the government could not and did not point the jury to a single Rivera communication showing support for the Maduro government.[5]

---

[3] DRX 223 and 776 in evidence contained the entire MIA Chat.

[4] Transcript of Status Hearing on February 27, 2026, page 8, lines 5-8.

[5] In the entire case, the government could point to only a single exhibit which even arguably supported its "normalize relations" theory and even there, they failed to tell the jury the truth about it. During its rebuttal close, when a response from the defense was foreclosed, the prosecutor told the jury "to take the defendants' own words for it" and pointed the jury to drafts of a text by Rivera intended for Raul Gorrin and sent to Perera and Nuhfer on May 29, 2017, explaining why the Exxon effort had fallen apart. The actual text is referenced in Overt Act 41 which ends, in material part, with "…we return the last payment and either terminate our efforts or return our focus to the original intent which was to normalize relations." The drafts of this text had the words "of the contract" after the word "intent" and before the word "which." However, as OA 41 sets out, the actual communication did not contain those words reflecting the intentional removal of the words "of the contract" which supported the defense view, established on cross examination of Perera,

3

Bottom line, the overwhelming weight of the evidence supports the defense position that Rivera [and Nuhfer] never acted as Maduro agents to help improve Maduro's relations with the United States. This is a failure of proof of monumental proportion in this case. This failure of proof is further supported by the fact that, with zero mention of such a theory in its opening statement to the jury and despite its protestations to the contrary, the government's theory of the case was literally forced by the weight of the testimony and evidence to morph from normalizing relations to the patently absurd claim that then Foreign Minister Delcy Rodriguez agreed and the PDVSA Board resolved to pay Rivera's company $50,000,000 over just three short months starting in March 2017 to help remove Maduro and provide him a "soft landing" somewhere.[6] This the prosecutors argued with a straight face despite hard evidence that Maduro repeatedly and emphatically rejected any such suggestion.[7]

Justice precludes discounting the truth of the evidence in the case. Fundamental fairness and the very purpose and language of Rule 33's command that the Court undertake an overall evaluation of the actual weight of the evidence in resolving a new trial motion, as distinguished from Rule 29's sufficiency standard, require a fresh look at what occurred at the trial. Because of page limitations, Rivera will rely on the legal principles and caselaw set out in Esther Nuhfer's Motion for New Trial at Dkt 531, pages 2-4, as to the review standards under Rules 29 and 33. These authorities apply with equal force for resolution of Rivera's new trial motion and renewal in this filing of his motion for judgment of acquittal under Fed. R. Crim. P. 29(c). As to Rule 29, we argued at trial, and renew here, that the government failed to prove each element of each of the charged offenses, and we discuss in this motion, by way solely of highlighting, issues of particular application to this case given the instructions and theory presented by the government.

---

that the phrase "normalize relations" referenced an intention to *remove* Maduro and *then* normalize relations which was established during pre-contract meetings with the opposition in the Dominican Republic. (TT excerpt from April 13, 2026 at pp 39-42) (DRX 776 pp. 10-11). Crucially, removal of the language "of the contract" was not referenced by the prosecutor in his rebuttal close.

[6] GX 131A/131AT was the March 8, 2017 Resolution of the PDVSA board approving the Consulting Agreement.

[7] *See* chat message from Raul Gorrin in August 2017 saying that, "they told me to f--k off" when he proposed free and fair elections followed by a soft landing to Maduro. (GX 22 at p. 24).

#111725254v2
#111790270v1
#111790270v2

However, the focus of this motion is the Rule 33 request for a new trial, and we do want to pause for a moment on the following passage from Nuhfer's motion, Dkt 531, at page 4:

"A new trial is likewise appropriate where unfairly prejudicial evidence may have induced the jury to decide the case on an improper basis. *See United States v. Thomas*, 321 F.3d 627, 636–37 (7th Cir. 2003) (ordering new trial where propensity-laden evidence was not harmless in a case otherwise dependent on inference); *United States v. Elizondo*, 277 F.Supp.2d 691, 703–04 (S.D. Tex. 2002) (granting new trial where erroneous admission of highly prejudicial evidence was not harmless)."

Here, we refer to the government's featuring, at several points during trial, what we refer to as the *tira flechas* text messages in which Rivera allegedly referred to Venezuelans in Miami as "savages." Beyond doubt, this was an effort to make Rivera appear racist against Venezuelans.

We understand that the Court disagrees with Rivera's objections to the use of this poisonous and seemingly racist aspersion. However, we expect that this issue will be raised prominently in Rivera's appeal, and we now ask the Court to consider both how the prosecutors took advantage of the Court's permission on this issue, repeatedly slamming Rivera's character, including in closing arguments, and the inevitable effect upon the jury – not only members of which were or had ties to Venezuela and Venezuelans, but those who befriended their Venezuelan jury mates during the bonding experience of trial. This extraordinary, indeed in combination unprecedentedly prejudicial, use of a government character attack affects the Rule 33 analysis. Beyond doubt, "unfairly prejudicial evidence *may* have induced the jury to decide the case on an improper basis." *Thomas, supra* (italics supplied). Any arguable relevance of the text was grossly outweighed by the danger, neigh the reality, of unfair prejudice under Rule 403.

Having fully preserved a number of evidentiary and other issues for appeal (which are herein renewed), what follows is an identification of just some of the issues which, in addition to the foregoing, beg the Court's ruling now that a new trial is required:

1. The Court's denial of a statute-of-limitations jury instruction was erroneous, given the evidence that had been admitted to support such a defense;

2. The overruling of defendants' Motion in Limine on use of guilt-assuming hypothetical questions, and denial of a limiting instruction, with these becoming a feature of the government's case that denied Rivera a fair trial.

5

3. The admission of the "*tira flechas*" text messages between Rivera and Perera—during Perera's testimony and throughout the case—unfairly attacked Rivera's character and prejudiced him in violation of Fed. R. Evid. 403;

4. AUSA Cruz's repeated objections and the Court's related commentary during Attorney Shohat's closing argument for Rivera effected impermissible disparagement of the merits of Mr. Shohat's arguments before the jury.

## THE LAW

Rule 33 "permits the court to grant a new trial 'in the interests of justice.'" *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). Courts are to grant such motions "sparingly and with caution, doing so only in those 'really exceptional cases.'" *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). Mr. Rivera submits that this is such an exceptional case. Rule 29(c) compels a judgment of acquittal where the government fails to prove, by substantial evidence, any essential element of a count of conviction. *See*, *e.g.*, *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) (reversing false statement conviction where regulations and administrative authority did not "clearly answer" dispositive elemental question).

## ARGUMENT

I. **This Court's denial of a statute-of-limitations jury instruction was improper under legal precedent and because evidence had been admitted to support such a defense.**

i. *This Court erred in rejecting the D.C. Circuit's holding that the five-year statute of* limitations for FARA violations commences when the alleged agency conduct terminates.

In denying a statute of limitations instruction the Court rendered FARA's five-year statute of limitations a nullity. *See* 18 U.S.C. § 3282 ("Except as otherwise *expressly* provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.") (emphasis added). As we explain, that five-year statute can only meaningfully be effectuated if it runs from when the agency action or relationship ends. Nowhere is a different result "*expressly*" provided for.  Indeed, the government failed to offer any competing factual theory for  permanently pausing the running of the statute.

The government has taken a position at odds with that *it* provided to Congress upon drafting relevant portions of FARA.  The government originally did not argue, as it has to this Court, that

#111725254v2
#111790270v1
#111790270v2

the statute-of-limitations does not begin to run until a non-filer files a FARA. In fact, the Department of Justice proposed the legislation establishing that the end of the agency starts the running of the statute. In a transmittal letter to Congress during the debate surrounding the legislation, the Attorney General's Office described the proposed amendment to 22 USC §612(a). "..as the section presently reads there is room for doubt as to whether the statute of limitations against prosecution of an agent for failure to comply with the registration provisions of the act commences to run from the date on which he was first required to register or from the last day on which such unregistered agent has acted. Doubt has also arisen as to the liability of an agent to file a registration statement *for the period during which he was acting as an agent* of a foreign principal if he has since ceased such activity.." *United States v. McGoff*, 831 F.2d 1071, 1086 (D.C. Cir. 1987) (quoting Letter from [Assistant Attorney General] Peyton Ford to The Speaker, House of Representatives (Apr. 12, 1949), reprinted in H.R.Rep. No. 1775, 81st Cong., 2d Sess. 3 (1950)).[8]

Moreover, the court in *McGoff* further pointed out that, "It is significant that the Government's current position – that the statute of limitations trigger-point commences on the first day that a formerly unregistered agent actually registers – was not even mentioned as a possible interpretation by the Justice Department in the 1950 transmittal letter authored by Peyton Ford. ***Since the provisions of the statute at issue originated with, and were drafted by, the 1950 Justice Department, Mr. Ford's expression of the provision's intent is entitled to weight as a probative piece of legislative history.***" *Id.* (emphasis added). In this case, the government has contradicted itself and has led the Court astray.

*McGoff* was the first case to tackle this issue. McGoff was accused of being an unregistered agent for South Africa. *See id.* at 1072. McGoff had last acted as such an agent in 1979, yet the government did not bring criminal FARA charges against him until 1986. *See id.* McGoff therefore moved to dismiss the indictment on the grounds that the FARA charges had been brought too late. The D.C. District Court agreed, finding that the FARA statute of limitations begins to run on "the last day that an unregistered foreign agent acts on behalf of a foreign principal" as opposed to "the first day that a formerly unregistered agent actually registers." *Id.* at 1071. The D.C. Circuit affirmed (over a dissent by Judge Robert Bork).

The D.C. Circuit began its analysis with 22 U.S.C. § 618(e), which states as follows:

---

[8] The House Report is Exhibit "A" hereto. The DOJ transmittal letter is on page 3.

#111725254v2
#111790270v1
#111790270v2

"Failure to file any such registration statement or supplements thereto as is required by either section 612(a) or section 612(b) . . . shall be considered a continuing offense for as long as such failure exists, notwithstanding any statute of limitations or other statute to the contrary."

*Id.* at 1077–78 (quoting 22 U.S.C. § 618(e)). The D.C. Circuit explained that "the statute of limitations as to prosecutions for continuing offenses runs from the last day of the continuing offense"; "continuing offenses do not, in general, continue indefinitely"; and "the express language of section 618(e) makes clear that the continuing offense created here is no exception." *Id.* at 1079.

The D.C. Circuit then turned to § 612(a), for the statue-of-limitations question because it, "turns on the duration of the registration obligation of section 612(a)." *Id.* at 1082. Under § 612(a),

"The obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming such agent, continue from day to day, and *termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal.*"

*Id.* (quoting 22 U.S.C. § 612(a) (emphasis in original)).

The dismissal issue focused on the italicized portion of the statute—specifically, does the underlined language modify to file or statement? According to the government, the *underlined language* modified statement such that "the statutory obligation is to file a registration statement describing 'the period during which' the person acted as an agent." *Id.* at 1083. But according to the defendant, "the phrase modifies the obligation temporally, or more precisely, modifies the words 'to file.' That is, an agent is required 'to file' only 'for the period during which he was an agent of a foreign principal.' Read in this fashion, the function of the italicized language . . . is to ensure that termination of the agency does not provide an affirmative defense for failure to file during the period that one is an agent." *Id.*

Although "neither of these possible readings can confidently be embraced on the basis of grammatical structure alone," *id.,* the D.C. Circuit  endorsed the defendant's interpretation. First, "once an individual has ceased his activities, he is no longer an 'agent of a foreign principal' within the meaning of FARA. The reason is that the section defining 'agent of a foreign principal' focuses solely on the agent who is acting, rather than the agent who has previously acted. Nothing in the definition indicates that it operates counterintuitively to label forever someone as an 'agent of a foreign principal' because that individual once acted in such a capacity." *Id.* at 1082.

#111725254v2
#111790270v1
#111790270v2

Second, the D.C. Circuit concluded that the government's interpretation would effectively "eliminate the statute of limitations for failure to file under FARA." *Id.* at 1093. "Under the government's construction, an individual is forever subject to prosecution and stiff criminal penalties . . . for an omission in the form of a failure to provide information required by what is, at bottom, a disclosure statute." *Id.* And third, concluded the D.C. Circuit, "our holding finds solid support in the well-established principle of interpretation of criminal statutes known as the rule of lenity." *Id.* at 1095. Accordingly, the D.C. Circuit affirmed dismissal of the indictment.

Three decades later, the D.C. Circuit confronted the same issue in another matter. *Attorney General v. Wynn,* 636 F. Supp. 3d 96, 101 (D.D.C. 2022), involved a defendant who allegedly lobbied on behalf of the People's Republic of China. The government—instead of bringing criminal charges—sued Wynn civilly under FARA to force him to register. *See id.* at 100. Wynn moved to dismiss the complaint on the basis that even if he had so lobbied, his lobbying had long since ceased such that he could not be forced to register *retroactively. See id.* at 101.

Wynn relied on *McGoff* for the proposition that the D.C. Circuit previously "interpreted FARA's § 612(a) registration obligation to expire upon the termination of the agency relationship," and thus he could "no longer be required to file a registration statement." *Id.* The district court agreed, although it admitted that "the issue [was] close." *See id.* at 102–04. Accordingly, the district court found that "Wynn's obligation to file a registration statement has years since passed, and the government cannot now compel him to register[.]" *Id.* at 104. The government appealed.

According to the D.C. Circuit, "[t]he central question in this case is whether Wynn has a continuing obligation to register under FARA even if he ceased his representation of a foreign principal nearly seven years ago. Under *McGoff*, which binds this panel, the answer is plainly 'no.'" *Att'y Gen. v. Wynn,* 104 F.4th 348, 351 (D.C. Cir. 2024). "*McGoff*," after all, "was explicit that, under Section 612, 'the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal.'" *Id.* at 353 (quoting *McGoff*, 831 F.2d at 1082). "Because," concluded the D.C. Circuit, "Wynn's duty to register ended almost seven years ago, *McGoff* dictates that there is no legal basis for the government to compel him to register now, and the district court properly dismissed the case." *Id.* Indeed, stated the D.C. Circuit, "the government's interpretation would make Section 612(a)'s registration obligation perpetual, which is a proposition that *McGoff,* explicitly rejected." *Id.* at 355.

9

#111725254v2
#111790270v1
#111790270v2

The takeaways from *McGoff* and *Wynn* are straightforward. The obligation to register under FARA ceases when the agency in question ceases. And it is at that moment that the five-year statute of limitations begins to run. To prosecute someone for an alleged violation of FARA, then, a grand jury must return an indictment within five years of the termination of the agency relationship. Here, that did not happen.

Judge Bork's dissenting approach is not supported by any caselaw and would lead to absurd results. Under Judge Bork's approach, at least as employed by the government in this case, a FARA violation would have no statute of limitations. If the alleged foreign agent never registers, that alleged foreign agent could be charged with a FARA violation decades after the alleged agency relationship terminates. This cannot be, and as Judge Boasberg noted, "Neither reading is entirely satisfactory, and both create undesirable issues of surplusage and ambiguity that cannot be fully resolved on the text alone." *Wynn*, 636 F. Supp. 3d at 102.

ii.  *Having advocated for the D.C. Circuit's approach, the defense asked this Court to include a statute-of-limitations jury instruction; this request was erroneously denied.*

Given the caselaw supporting the proposition that the five-year statute of limitations began when the alleged agency relationship terminated—and the dearth of caselaw in the alternative— as well as the substantial evidence of record at trial that the alleged agency relationship in this case terminated no later (and probably even before) than when the Consulting Agreement expired on or before June 21, 2017,[9] the defense asked this Court to include a statute-of-limitations defense that included recognition that "[t]he defendants have raised a statute of limitations defense," that the limitations period is five years, that "in order to determine whether the charges were brought within the statute" the jury "must determine when the defendant's obligation to register, if any, ended," and that only if "the defendants' obligation to register ended on or after November 16, 2017, then the prosecution was brought within the statute of limitations."  The defense contention that the testimony of government witnesses Gina Coon and Arnaldo Arcay that the contract was terminated and IAC was fired at the end of May 2017, and that other evidence shows that nothing after that was FARA activity, mandated the jury instruction in the case. *United States v. Arias*, 431 F.3d 1327, 1340 (11th Cir. 2005) (vacating conviction; communicated termination of criminal

---

[9] *See* Defendants' Motion for Judgment of Acquittal as Related to the Statute of Limitations [ECF No. 465] at 7–9 (explaining why this is so).

#111725254v2
#111790270v1
#111790270v2

conduct began running of statute; "If the proposed instruction presents a valid defense and there has been 'some evidence' adduced at trial to support the defense, a trial court may not refuse to charge the jury on that defense. The burden of presenting evidence sufficient to support a jury instruction on a theory of defense is 'extremely low.'") (quoting *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir.1995)).

Tthe government's continuing-offense theory is wrong—in light of *McGoff*, the express language of the statute and the indictment, the legislative history, and the due process principles of fair notice.  Without any statute of limitations instruction, the jury was permitted to convict based on post-agency inaction (failure to file a FARA) for which there was neither a showing, nor a required linkage, of willfulness in the post-agency period. In  fact, Rivera's defense expressly argued that all post Consulting Agreement conduct was non  FARA conduct.[10]  Absent an instruction that the government, to the extent it relied on post-agency inaction as a theory for conviction, was required to prove that the defendant knew that the law still required him to register even years after any agency ended (a knowledge proposition the *McGoff* court found inherently absurd in rejecting the continuing-offense statutory interpretation), the no-limit theory permitted conviction on an invalid basis.  Lacking an instructional linkage between post-agency inaction and willfulness—of which, in any event, there was no evidence—there could be no extension of the statute even if *McGoff* were not the law.

The willfulness instruction focused on knowledge of a requirement to register if acting as a foreign agent, not knowledge of the Bork dissent.  The instructions focused on what constituted willfully acting as an agent, and relatedly the exemptions only for certain types of commercial or non-foreign interest actions (as to which the Court, over defense objection that we renew as part of this motion, instructed remained the proof burden of the defense).  In this case, the jury was led to believe that if the defendant willfully failed to file a registration form while acting as an agent, *there was no statute of limitations on that willful action*.  The manifestly erroneous continuing offense concept adopted by the Court precluded the jury from even considering any limitation on the prosecution of post agency inaction. . Denial of any component of the statute of the limitations defense instruction request permitted the jury to convict based on

---

[10] Consisting of the July 2017 meetings in DC with Rubio, the effort to find an OFAC lawyer for Eric Malpika and the April 2018 Maduro meeting.

#111725254v2
#111790270v1
#111790270v2

willfulness and conspiratorial agreement during the agency period combined with strict liability as to a post-agency failure to register.  That reading of the statute contravenes not only *McGoff* but also due process.

The impact of precluding reliance on the statute of limitations meant that the jury was invited to convict on a theory not supported by the law, undermining both the FARA convictions and the convictions as to monetary transactions under 18 U.S.C. § 1957 which flowed only from the FARA convictions.  The jury instructions permitted a jury finding of a non-proceeds-producing FARA crime as the illegal conduct constituting specified unlawful activity for the § 1957 charges, which is an invalid theory of conviction.  Denial of the defense statute of limitations request permitted the jury to find the commission of a FARA crime long after any gross receipts were obtained and thus permitted conviction on a money laundering theory of proceeds that founders on the stark temporal mismatch of proceeds-producing events and the underlying criminal conduct the jury was invited to find.  Barring the statute of limitations defense permitted the jury to convict under an invalid theory lacking the requisite connection between any agency action that produced the proceeds and the post-agency registration violation that the jury was invited to find as the actual FARA crime.

iii.     The Court's Denial of the Statute-of-Limitations Instruction Independently Requires a New Trial on the Money Laundering Counts Because the Jury Was Permitted to Convict Under a Legally Invalid Proceeds Theory.

The government's post-agency offense theory, unlimited by time and status, also allowed the jury to find that a FARA crime was committed even at a time at which knowledge of the requirement to register—which under published precedent had extended only to the time of agency relationship—was lacking given the government's insistence that failure to file for *past* agency action was sufficient to constitute an actionable FARA crime.  Notably, the government's case offered no linkage at all between post-agency registration inaction and any prior receipt of funds for agency action in violation of the law, much less an adequate explanation of a proceeds theory connecting post-agency criminal conduct with criminal receipts.  At a minimum, even if proceeds from a contract that did not pay for non-registration or contemplate it at all were to be deemed criminal property under § 1957 (and we maintain our position that it was not), once the contracted-for money stopped, any agency proceeds relationship necessarily also stopped.

A temporally distinct crime that covers up a proceeds-producing crime is insufficient to constitute the proceeds-producing crime itself. *See*, *e.g.*, Nuhfer Post-trial Motion at 9 (explaining binding precedent of temporal-causational requisite for proceeds; citing *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997); *United States v. Kramer*, 73 F.3d 1067, 1076 (11th Cir. 1996)). Under the definition provided in the relevant statute, in order to be the subject of a monetary-transaction prosecution, the criminally derived property must have been "obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). But at the time of the post-agency registration inaction that the government asserted fell within the allegations of the indictment, the funds at issue had long previously been obtained under a terminated contract (compliance with which did not include failing to register in any event).

Justice Stevens' decisive concurring opinion in *United States v. Santos*, 553 U.S. 507, 524 (2008), recognizes the ambiguity of the term "proceeds," concluding that it was up to Congress to make its reach include even gross receipts of a crime (a matter later resolved by statutory amendment). Here, however, there was insufficient evidence that any proceeds were obtained from post-agency inaction, particularly when knowledge of any registration obligation would be speculative at best. More generally, the Supreme Court has unambiguously held that acts of concealment are not part of the original conspiracy. *See Grunewald v. United States*, 353 U.S. 391, 403–04 (1957) (rejecting government argument "that a continuing agreement to conceal should be implied out of the mere fact of conspiracy, and that acts of concealment should be taken as overt acts in furtherance of that implied agreement to conceal") (citing *Krulewitch v. United States*, 336 U.S. 440 (1949)).

The government's pursuit of a FARA theory that rested on post-proceeds events requires, in light of denial of the statute of limitations defense theory instruction, a new trial on all counts.

**II.     The Court erred in permitting, over defense objection, the government to ask several witnesses the guilt-assuming hypothetical question as to how they would have reacted to knowledge of the Rivera contract allegedly with the Venezuelan government of Nicholas Maduro when the nature of such contract and the actual parties to it was a central issue in the case for the jury to decide.**

The Court permitted the government to ask hypothetical questions which assumed contested facts and effectively asked the witnesses to assume the Defendants' guilt. Eleventh Circuit precedent forbids such "guilt-assuming" hypotheticals. In *United States v. Guzman*, 167 F.3d 1350 (11th Cir. 1999), the Eleventh Circuit held that prosecutors may not pose hypothetical

13

questions that assume the defendant is guilty; doing so "strikes at the very heart of the presumption of innocence." *Id* at 1351–52. *Guzman* relied on *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977), which emphasized that cross-examining a character witness with questions premised on the charged offense is "prejudicial" and "should not be asked." *Id* at 294. These rulings stand for the broader principle that no witness—lay or expert—should be asked to speculate on disputed facts as if true.

Even aside from the presumption-of-innocence issue, these hypotheticals lack any proper evidentiary foundation. Under Rules 602 and 701, a witness may testify only to matters within personal knowledge or opinions based on their perceptions. A government official who never actually knew of any secret $50 million contract—and who Defendants maintain was dealing only with legitimate U.S. interests (*e.g.*, Citgo/Exxon projects)—cannot properly opine on a hypothetical that assumes that such a contract existed. These questions require the witness to speculate about facts the witness did not perceive. This violates Rule 602 ("personal knowledge" requirement) and Rule 701's mandate that lay opinions be "rationally based on the perception of the witness." This allowed the government to supplement its case through the witness's guesswork rather than through admissible evidence. The answers to these hypotheticals were pure conjecture and had virtually no independent probative value. By contrast, their prejudicial effect is glaring; they reinforce the prosecution's theory while sidestepping the proof required. Under Rule 403, any marginal probative value is "substantially outweighed by" the risk of unfair prejudice, confusion, and jury misdirection. Such questions only signaled to the jury that the government assumes certain facts – essentially inviting the jury to convict based on those unproven premises.

The cases that the government relied on, and upon which the Court allowed the hypothetical questions, *United States v Hill*, 643 F.3d 807 (11th Cir. 2011), *United States v. Cuti, 720 F.3d 453 (2d Cir. 2013), and United States v. Laurienti, 611 F.3d 530 (9th Cir. 2010)* did not justify a different outcome.

The logic of *Guzman* and related cases should have prevailed. Even if *Cuti* and *Laurienti* allowed certain "if-known" questions under narrow circumstances where materiality was at issue in securities fraud cases, those circumstances were absent here. A question framed "had you known about a $50 million contract with the Venezuelan regime, would you have . . ." assumes the very wrongfulness the jury must decide and effectively decides for the jury hotly contested issues about the nature and parties to the contract. Putting the witness in this position essentially hands the jury

14

a hypothetical finding of wrongdoing. This is unfair and inconsistent with the presumption of innocence. Furthermore, these questions were extraordinarily prejudicial in the particular context of this case.

Asking these witnesses, what they would have done "if they had known" that Rivera had a secret $50 million Venezuelan contract, or were paid by a foreign oil company, compelled these witnesses to accept those allegations as true when the nature and meaning of such contract was a hotly contested issue.  That is precisely the type of inquiry *Guzman* forbids. In this context, these questions improperly invaded the jury's role by treating critical disputed facts as settled. Permitting the Secretary of State to tell the jury, as he did, "It would have been shocking to me"[11] to learn of such a contract as the very last question on his redirect examination, standing alone, deprived Rivera of a fair trial.

The Court should therefore have disallowed the government's proposed hypothetical questions. They are "guilt-assuming" under *Guzman* and beyond the scope of proper lay testimony under the Rules of Evidence.

### III.    By denying the use of a limiting instruction as related to the government's use of guilt-assuming hypotheticals, this Court—and not the jury—effectively made critical factual determinations.

The guilt assuming hypothetical question came as no surprise, as the parties had argued over the propriety of such "guilt-assuming hypotheticals" in the leadup to trial. *See* Government's Motion in Limine [ECF No. 341] at 15–18; Defendants' Joint Response in Opposition to the Government's Motion in Limine [ECF No. 353] at 14–17; Government's Reply in Support of its Motion in Limine [ECF No. 363] at 7–8.

In light of the Court's ruling allowing the use of the hypothetical, and hoping to lessen the prejudicial effect, Rivera moved this Court on March 24, 2026, to issue the following limiting instruction to the jury at the close of Secretary Rubio's testimony:

> Ladies and gentlemen, you are instructed that with regard to any hypothetical question of any witness whether they would have met or spoken with Mr. Rivera had they known about the Consulting Agreement (GX 133), that it is, for you the jury to determine if that agreement had anything to do with any such meeting or conversation. The hypothetical question itself does not establish

---

[11] March 24, 2026, Trial Transcript at 133:4–18.

#111725254v2
#111790270v1
#111790270v2

such fact which is only for you, the jury to determine.

This Court denied that request as well.[12] The Eleventh has held that, "this type of limiting instruction can reduce the risk of undue prejudice. *United States* v. *Ramirez*, 426 F.3d at 1354; *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993) (finding where the district court issued a limiting instruction, "any unfair prejudice possibly caused by its introduction was mitigated"). *United States v. Davis*, No. 24-12274, 2025 LX 284331, at \*26 (11th Cir. July 17, 2025).

Although Secretary Rubio was technically a fact witness, he came very close to being a character witness. Indeed, the bulk of his direct and cross-exams were about how well he knew Mr. Rivera, their common history, and Mr. Rivera's important efforts while in the State Legislature and his long-held anti-socialist views and efforts along with Rubio's numerous favorable remarks about Rivera over time and in his memoir By asking the above-mentioned hypothetical, the government was doing exactly what is forbidden with character witnesses—*i.e.*, "You have testified that Rivera was anti-socialist, but if you had been aware that he was working for Maduro, that would have changed your opinion?" Had the court given a limiting instruction, it could have reduced the risk of undue prejudice. The failure to do was error and should result in a new trial.

**IV.** **The Court erred by limiting the defense's use of the Schuster proffer and the Perera changes to the 302s effectively preventing the defense of introducing strong evidence of Perera's bias in favor of the government.**

There is no dispute that the government produced FBI, IRS and HSI interview reports to Mr. Rivera and Ms. Nuhfer in order to disclose the expected testimony of government trial witnesses, any potential *Brady* material in the reports and for cross-examination purposes.

However, it is not possible under the Federal Rules of Evidence to impeach the witness and to later perfect the impeachment by admitting extrinsic evidence if the content of the report, *i.e.*, the statement made, is not referenced. Indeed, "extrinsic evidence of a witness's prior inconsistent statement may not be admitted until *after the witness is given an opportunity to explain or deny the statement*." Fed. R. Evid. 613(b) (emphasis added). The statement (meaning the content of the report) *must* be revealed and asked about in open court before the jury. Therefore, the

---

[12] The Court's denial of the proposed limiting instruction was not about its wording which was never raised as an issue. Id.

16

government's insistence and the Court's agreement that "introducing the contents of such reports" is not permitted is flatly incorrect and is entirely inconsistent with standard cross-examination based on statements reportedly made by testifying witnesses during prior interviews under Rule 613(b).

The Court entered pre-trial and an in-trial rulings limiting the defense from using Hugo Perera's 82 specific changes to the written FBI reports ("302s") from his prior interviews as evidence of his bias in favor of the government. The Court also precluded use of the reported statements in the reports. The changes almost uniformly sought to comport with the government's theory of the case which, after so many interviews, Mr. Perera clearly knew would be the case. He knew that after his first interview, which was reflected in the letter from him which his lawyer, Neal Schuster read to the agents and prosecutors at the inception of Perera second interview. The Court also limited the defense's use of the letter itself, saying that it was Mr. Schuster, not Mr. Perera who was making the statements contained in the letter.

This is contrary to longstanding principals of cross-examination from interview reports and, very recently, what the Eighth Circuit y held in *United States v. Agbaje*, No. 24-2944, 2026 LX 283302 (8th Cir. May 13, 2026). "[E]vidence tending to show a substantial reason for bias or interest in an important witness is never collateral or irrelevant." *United States v. Peltier*, 585 F.2d 314, 332 (8th Cir. 1978) (quoting *Barnard v. United States*, 342 F.2d 309, 317 (9th Cir. 1965)). As a result, bias may be proven by extrinsic evidence. *Johnson v. Brewer*, 521 F.2d 556, 561-62, 562 n.13 (8th Cir. 1975). And "[b]ecause impeachment evidence is not offered for the truth of the matter asserted, it is not hearsay." *Limbeya v. Holder*, 764 F.3d 894, 898 (8th Cir. 2014) (citing Fed. R. Evid. 801(c)). This means "[e]vidence showing a witness's bias is almost always admissible." *United States v. Chambers*, 133 F.4th 812, 816 (8th Cir. 2025) (quoting *United States v. Harris*, 956 F.2d 177, 181 (8th Cir. 1992)). *Id* at *6-7 (8th Cir. May 13, 2026).

This is precisely how the Court erred when the Court precluded defense counsel from using Perera's 82 specific changes to the written FBI reports ("302s") from his prior interviews.

V.   **This Court's admission of the *"tira flechas"* text messages violated Federal Rule of Evidence 403.**

During AUSA Roger Cruz's direct examination of Hugo Perera—the Court allowed the admission into evidence of page 16 of GX-23, a bilateral WhatsApp conversation between Mr. Rivera and Mr. Perera. In this exchange, Mr. Rivera and Mr. Perera argue about the political

17

inclinations of Venezuelan-Americans. At one point, Mr. Rivera describes some of these individuals as "*tira flechas*," which the government's translation equated to "savages."[13] The defense moved multiple times to preclude the admission of this conversation under Federal Rule of Evidence 403 on the grounds that it was extremely and unfairly prejudicial to Mr. Rivera and of little to no probative value of any material fact at issue. (*See* TT excerpt from April 8, 2026, at pp 130-133). The Court rejected those objections, finding—wrongfully—that this conversation undercut Mr. Rivera's defense that his actions underlying this prosecution were taken in support of the Venezuela opposition. This was a flawed decision, and it destroyed whatever chance Mr. Rivera had at receiving a fair trial from the jury, a jury that included both Venezuelan-Americans and persons with family and other connections to Venezuela. Indeed, the government trotted out this extremely damaging exhibit *twice more* during trial—once during its cross-examination of Congressman Pete Sessions, and again during its closing argument.

The "*tira flechas*" WhatsApp conversation should never have been admitted, as it clearly failed under Federal Rule of Evidence 403. On the one hand, such language almost certainly inflamed the passions of the jury. *See, e.g.*, *Joseph v. Publix Super Markets, Inc.*, 151 F. App'x 760, 769–70 (11th Cir. Sept. 16, 2005) (racial slur by not relevant and highly prejudicial; excluded under Rules 401, 402, and 403); *Jamar v. Jacobs Tech., Inc.*, No. 10-cv-03529, 2012 U.S. Dist. LEXIS 143655, at *2-4 (N.D. Ala. Oct. 4, 2012) (excluding coworker racial remarks as irrelevant and, alternatively, under Rule 403).

On the other hand, the "*tira flechas*" conversation had no probative value. The government argued that the conversation revealed that because Mr. Rivera was racist against Venezuelan-Americans, it therefore followed that he could not possibly have been acting to support the Venezuelan opposition. But one does not follow the other. After all, it is undisputed that Mr. Rivera was helping *somebody* in Venezuela. According to the government, Mr. Rivera was helping the Venezuelan government. According to Mr. Rivera, he was helping the Venezuelan opposition. If Mr. Rivera despised Venezuelans in Miami would it actually follow that he would want nothing to do with the Venezuelan Opposition? Indeed, how does the use of "*tira flechas*" as related to

---

[13] Mr. Rivera argued that this was an incorrect translation both as to "tira fleches" and "savages". *See* David Rivera's Motion for Corrected Translation [ECF No. 471]. The direct translation of "*tira flechas*" is "arrow throwers" not "savages." Similarly, the direct translation of "savages" is "salvajes", not "tira flechas".  This Court denied that Motion.

#111725254v2
#111790270v1
#111790270v2

*liberal, Democrat-leaning* Venezuelan-Americans make it more likely that Mr. Rivera was working to assist the *leftist, socialist* Venezuelan government as opposed to the more anti-socialist Venezuelan opposition? In context, to which the Court seemingly afforded no weight, the text was nothing more than a statement about the leftist political leanings of some Venezuelan ex pats, not about all Venezuelans being savages in any non-political sense, with the racist connotations that the government stamped into the jury's consciousness using an inaccurate translation. If anything, Rivera's supposed disdain for *leftist* Venezuelan-Americans undercuts the government's theory that Rivera was supporting the *leftist* Venezuelan government. In the court-licensed hands of the prosecutors, the text was a *savage* attack on Rivera personally, which denied him a fair trial.

> **VI.    This Court's commentary before the jury in response to multiple objections to Attorney Shohat's closing argument for Mr. Rivera improperly disparaged the merits of that argument.**

During the latter portion of Rivera's counsel's closing argument, he was reading from a portion of GX 15 in which, on October 5, 2017, Rivera explained to Raul Gorrin why Citgo's latest request that Rivera approve the assignment of the PDV USA consulting agreement to PDVSA could not happen. In pertinent part, Rivera stated "…[a][sic]nd secondly, a contract with PDVSA Caracas requires registering with FARA which my attorney has told me is currently illegal due to Trump's sanctions on PDVSA, and not to touch it with a 50 foot pole, but it would be a scandal of monumental proportions." The government objected on the ground that the defense had not noticed an Advice of Counsel defense. But this statement decidedly was *not* a good faith advice of counsel assertion as to not filing a FARA registration statement for the Consulting Agreement itself, which is what this case was about. Moreover, and just as important, it involved an exhibit *the government* had placed into evidence, not the defense. Nonetheless, after an exchange between the Court and counsel, the Court admonished counsel to move on and instructed the jury to disregard the argument, which was a central part of Rivera's overall good faith defense on which the jury had already been instructed.

This ruling was unfair and extremely prejudicial to Rivera, having the potential to be interpreted by the jury as a rebuke of Rivera's good faith defense *by the Court*, particularly coming when it did near the end of Rivera's closing argument. There were multiple times during trial when the Court was quickly ready to hold the defense responsible for allegedly opening the door to

19

various things even without government prompting. What was 'good for the goose', was definitely not 'good for the gander.'

This was extremely prejudicial to Rivera. At no time did the Court make it clear to the jury that it, and not the Court, was to determine the facts related to the Good Faith defense. Cf., *Quercia v. United States*, 289 U.S. 466, 469 (1933). See also, *United States v. Hope*, 714 F.2d 1084, 1088 (11th Cir. 1983) ([A] trial judge may comment on evidence "so long as he instructs the jury that it is the sole judge of the facts and that it is not bound by his comments. . . ." )  Of course, such discretion is not without limits; the judge may not distort or add to the evidence, and should make commentary only with great care. *Quercia*, 289 U.S. at 469. The district court must be sure that its remarks do not prejudice the jury against the defendant; "juries are extremely sensitive to every word and intimation given by the judge." *United States v. Cox*, 664 F.2d 257, 259 (11th Cir. 1981). *United States v. Jenkins*, 901 F.2d 1075, 1082-83 (11th Cir. 1990). No instruction of any kind was given to the jury after the Court's defense-deprecating remarks.

In this instance, the timing and substance of the Court's admonishment to counsel and instruction to the jury to disregard counsel's argument undercut the Good Faith defense,  unfairly prejudiced the jury and require a new trial.

WHEREFORE, David Rivera asks that this Court grant this Motion and grant a judgment of acquittal or, alternatively, order that a new trial be conducted.

Respectfully submitted on June 8th, 2026.

**EDWARD R. SHOHAT, PA**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (786) 525-3621
By:      */s/ Edward R. Shohat*
         **Edward R. Shohat**
         Florida Bar No. 152634
         ed@edwardrshohat.com
**JONES WALKER LLP**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (305) 679-5700
By:      */s/ David S. Weinstein*
         **David S. Weinstein**
         Florida Bar No. 749214
         dweinstein@joneswalker.com
*Counsel for David Rivera*

20

#111725254v2
#111790270v1
#111790270v2