**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20552-DAMIAN/TORRES**

UNITED STATES OF AMERICA,

vs.

ESTHER NUHFER, et al.,

Defendants.
_________________________________/

# ESTHER NUHFER'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

## INTRODUCTION

FARA carries a five-year statutory maximum. Congress has decided that the most serious FARA offender imaginable, a paid covert agent who actually negatively transformed American policy for a foreign power while evading registration with the Attorney General, deserves no more than five years for their actions. Instead of taking guidance from this congressionally-imposed statutory cap for even the worst of offenders, probation now proposes a Guidelines range for Esther Nuhfer that is over two times more than the statutory maximum. Unbelievably, the PSR claims that the appropriate guidelines for Esther equate to roughly **eleven to fourteen** years in prison. Congress capped the worst case at five. Probation, though, recommends more than double the maximum FARA sentence for the least serious FARA case imaginable. That should tell the Court that the guideline calculations are amiss. Those calculations bear no reasonable relationship to Esther's conduct, her role, the absence of harm, or the seriousness of the underlying offense.

Esther objects to the probation office's application of guideline enhancements because they are unsupported by the law and the facts and the refusal to credit her for being a minimal participant

in the criminal activity. Equally, she objects to the exaggerated version of the offense conduct within the PSR. Rather than a guideline level that likens Esther to a terrorist or child trafficker, the total offense level should be significantly lower. At worst, the guideline calculations yield a total offense level of 19, which results in a non-mandatory guideline recommendation of 30 to 37 months.

It is difficult to imagine a less culpable FARA defendant. Esther attended one meeting. She said nothing. She asked for nothing. She influenced no one. No policy changed. No official act occurred. No one was harmed. Nothing happened. Even setting aside Esther's limited role, the charged conduct sits at the bottom of the spectrum of conceivable FARA violations.

The Government nevertheless seeks to turn this registration offense into an **eleven**-year case because Esther later used her share of the contract proceeds to purchase property. The laundering count is being asked to do work the FARA count cannot: to overwhelm the underlying offense and produce a sentence far beyond what Congress authorized for the offense itself. The Supreme Court has long warned against a sentencing factor that becomes the "tail which wags the dog of the substantive offense." *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). And in *United States v. Santos*, every member of the Court recognized the danger posed by money-laundering charges that merely repackage the receipt or spending of proceeds from the underlying crime. The plurality refused to read the statute to "radically increase" punishment for "a transaction that is a normal part of a crime [Congress] had duly considered and appropriately punished elsewhere." 553 U.S. 507, 515–16 (2008) (plurality opinion). The dissenters answered that the merger problem "is fundamentally a sentencing problem, and the proper remedy is a sentencing remedy." *Id.* at 547 (Alito, J., dissenting). This is sentencing. The remedy is available here.

The Sentencing Commission saw the same problem years earlier. In 2001 it rewrote § 2S1.1 to tie money-laundering offense levels to the underlying offense, because the prior structure "did not reflect adequately the culpability of the defendant" and set laundering levels "without sufficient consideration of" the underlying offense. U.S.S.G. app. C, amend. 634 (effective Nov. 1, 2001). The Guidelines key laundering punishment to the crime that produced the money. The Government inverts that design here. It uses the laundering count, and a stack of enhancements layered on top of it, to dwarf the offense that produced the money in the first place.

Esther will file a separate sentencing memorandum explaining why probation is the appropriate sentence under 18 U.S.C. § 3553(a). This filing addresses a different problem: the Government's effort to manufacture an absurd Guidelines range through a series of unsupported and cumulative enhancements.

The sequence that produced Probation's recommendation also deserves attention. When defense counsel first spoke with Probation, the officer advised that the applicable range was 30 to 37 months. Then, the Government bent her ear. Now, the recommendation has extraordinarily shifted to **135 to 168** months. Whatever explains that shift, one principle is fixed: Probation is not an arm of the prosecution, and a Guidelines calculation should not harden into the Government's litigating position because the Government pressed for a harsher result after trial.

The Court should reject these enhancements. They distort the Guidelines, vastly overstate Esther's conduct, and threaten to punish her for exercising her right to trial (the Government offered her a non-incarcerative sentence during the trial itself). Sentencing should be driven by the law and the evidence, not by an effort to convert the least serious FARA case imaginable into a national-security money-laundering prosecution carrying a sentence exceeding a decade.

**OBJECTION NO. 1: THE FACTS (¶¶ 9-124)**

The Court heard the evidence over a lengthy trial and is familiar with the facts. The probation officer did not. And yet the probation officer gives this Court an entirely skewed and exaggerated version of the facts in the background section of the presentence investigation report, paragraphs 9 to 124. Instead of objecting paragraph by paragraph and relitigating the trial, we simply object to these "facts" and ask the Court to rely on the trial evidence and not the probation officer's version, which is untethered to the testimony.

**OBJECTION NO. 2: ROLE CALCULATION (¶¶ 148, 162) AND UNDERLYING FACTS -- Esther's Sentencing Guidelines Should Be Reduced By 4 Points Because She Was A Minimal Participant.**

Esther is entitled to a four-level reduction as a minimal participant under U.S.S.G. § 3B1.2(a). The jury heard six weeks of evidence. Very little of it was about Esther Nuhfer. Only 4 out of 14 government witnesses even knew who she was. The Government's case had a center of gravity, and it was David Rivera: the former Congressman who sought, negotiated, signed, and controlled the contract; communicated with the relevant parties, including the foreign principal; expressly gave advice regarding the FARA and sanctions issues; controlled and disbursed funds; made decisions as to the amount of funds to distribute; and led the project. Esther did none of those things. She attended one substantive meeting with a United States official and said nothing. She asked for nothing and lobbied no one. She communicated with no Venezuelan official, directed no participant, arranged no political outreach, controlled no funds other than her own, and planned no transaction involving anyone else's money.

Whatever the jury found, it did not find that Esther ran anything, planned anything, or controlled anyone. If the criminal activity occurred as the Government alleged, Esther was plainly

the least culpable participant. The Court should reduce her offense level by four under U.S.S.G. § 3B1.2(a).

### A. The governing standard requires a fact-specific comparison of Esther's role with that of the other participants.

Section 3B1.2(a) provides a four-level reduction where the defendant was a "minimal participant" in the criminal activity, meaning a defendant "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n.4. The touchstone is whether the defendant is "substantially less culpable than the average participant in the criminal activity." *Id.* cmt. n.3(A). Esther bears the burden by a preponderance of the evidence. *United States v. De Varon*, 175 F.3d 930, 939 (11th Cir. 1999) (en banc). The trial record carries that burden with room to spare.

As to Esther's culpability in relation to others, two principles from *De Varon* frame the inquiry. The Court measures Esther's role against the relevant conduct for which she is held accountable at sentencing, and it compares her role to that of the other participants in that conduct. *Id.* at 940, 944-45. The question is comparative culpability across the whole record. Not whether the Government needed Esther's own actions to complete a particular count. This is particularly true since the Commission deliberately amended the commentary to 3B1.2 in 2015. It did so in response to a Commission study which found that the mitigating-role reduction was being "applied inconsistently and more sparingly than the Commission intended," particularly in economic-crime cases where courts denied it to defendants deemed "integral" to the offense. U.S.S.G. supp. app. C, amend. 794 (effective Nov. 1, 2015). Although, in this case, Esther was not "integral" to the offense and did not perform an essential or indispensable role, the Sentencing Commission's

comments about why it revised the guideline commentary are useful. Courts should consider and apply a mitigating role reduction more often, like here.

**B. Esther was substantially less culpable than Rivera and every other participant the Government identified.**

If the relevant conduct is the broad scheme the PSR describes, Esther must be compared with the people who conceived, controlled, and executed it, and she was plainly less culpable than all of them. The comparison is not close.

Rivera is the former Congressman with connections in Washington, D.C. He was the contracting principal and the person who purported to understand the legal framework. He communicated with the relevant parties, entered the contract, handled the contract-transfer question, received and controlled all funds, addressed FARA and sanctions, and occupied the center of the Government's narrative for six weeks.

Raul Gorrin is the Venezuelan billionaire. He is the one who personally knew Nicolas Maduro, Delcy Rodriguez, and Venezuelan opposition party leaders. He is the one who enabled Rivera to obtain the contract for Interamerican Consulting. He is the individual that played both Venezuelan political parties, obtained direction and instructions from Venezuelan leaders, and wanted to create financial opportunities from the Venezuelan crisis.

Hugo Perera is the Miami multi-millionaire with a home on Fisher Island that connected Rivera to Raul Gorrin. He had business ties in Venezuela beyond the Interamerican contract and had previously met with Nicolas Maduro. Unlike Esther, he traveled to Venezuela and met with Maduro again in April 2018.

Bertica Cabrera is the close, personal friend of Congressman Pete Sessions. Without her, Rivera's luring of Sessions into Venezuela dealings never could have happened. She is the one

that has decades of experience as a political consultant, acted as a close and frequent liaison between Rivera and Sessions, delivered talking points to Sessions, reviewed documents and letters for Rivera, actively worked on the Exxon dispute, and also personally met with Maduro in 2018.

This is not a borderline case between average and minor participation. Esther exercised no authority, directed no one, planned nothing, made no political presentation, communicated with no foreign official, and conducted no financial transaction for anyone else. The Government's own conduct confirms its assessment of her culpability: it offered her probation during the trial. The Government does not offer probation to average participants in what it calls a national-security case. It offers probation to the person at the bottom.

Even accepting the evidence in the light most favorable to the Government, Esther's conduct is minimal: She found possible language in FARA filings for the Scope of Services section in the Interamerican contract. She drafted invoices for payments from PDV USA to Interamerican Consulting. She did an initial draft of the Interamerican progress report. In other words, her actions largely revolved around the Interamerican contract. They was not focused on the so-called "political" activity allegedly performed for the government of Venezuela. Certainly, Esther commented a number of times in the MIA chat on things happening and inquired repeatedly about when Interamerican was going to get paid. She was also blind-copied on several communications to PDV USA officials, a PDVSA representative, and others. But she <u>did</u> very little – i.e., had minimal participation – in the activities for which Interamerican was paid $20 million.

According to the PSR and the government's arguments at trial, the efforts allegedly made for the Venezuelan government were directed to 3 primary purposes: 1) resolving a legal dispute between ExxonMobil and Venezuela; 2) lobbying U.S. politicians to resolve economic sanctions on Maduro and providing him an opportunity to leave power without any repercussions, and 3)

locating a U.S. attorney that could assist Erick Malpica to be removed from the OFAC list. The PSR devotes 23 paragraphs describing the work done for the legal dispute between PDVSA and Exxon. In those paragraphs, Esther did ***nothing***. It is undisputed by testimony and trial exhibits that the work on the Exxon conflict was performed by David Rivera, Raul Gorrin, Bertica Cabrera, and Congressman Pete Sessions. Next, the PSR attempts to describe the lobbying of "U.S. government officials, including Rubio and Conway." PSR, ¶ 77. Esther does not know Kellyanne Conway, and Kellyanne Conway does not know Esther Nuhfer. Esther did not lobby Conway. There was no evidence of communications between them by phone, email, text, WhatsApp, or meeting. Similarly, there was no evidence that Esther lobbied Marco Rubio. It was Rivera that went to Rubio's home on July 9, 2017. It was Rivera's text messages and WhatsApp messages with Rubio that were introduced at trial. And it was Rivera who spoke at the July 12, 2017 hotel meeting with Rubio. Secretary Rubio himself testified that Esther never lobbied him. In addition to never lobbying any U.S. official on behalf of Maduro, Esther also did not travel to Venezuela in 2018 to sit and meet with Maduro. Any lobbying to normalize relations was done by Rivera, Gorrin, or others. Lastly, Esther did not identify or connect Erick Malpica to legal counsel in the United States.

### C. The 3B1.2 Commentary factors also favor a role reduction for Esther.

These facts comparing Esther to the other participants in Section B above also support a role reduction based on the Commentary to 3B1.2. In determining whether to apply a mitigating role, Comment 3(C) provides that the Court must consider the totality of the circumstances, including various factors, such as, the degree to which Esther understood the scope and structure of the criminal activity, the degree to which she participated in planning or organizing it, the degree

to which she exercised decision-making authority or influenced the exercise of such authority, and the nature and extent of her participation, including the acts she performed and the responsibility and discretion she had in performing them. U.S.S.G. § 3B1.2 cmt. n.3(C).

First, Esther had, at most, a limited understanding of the scope and structure of the alleged criminal activity**.** Nothing at trial showed that Esther understood the broader structure the Government attributed to Rivera and the other actors. There was no evidence that she knew the full scope of Rivera's goals, his political strategy, or his interactions with U.S. officials and lawyers. Most of the trial concerned people, meetings, and political activity in which Esther played no part. She sat through six weeks of evidence about other people's conduct. As one example, there are 74 pages of constant texts between Bertica Cabrera and Congressman Sessions detailing Sessions' and Rivera's intent and acts in resolving the Exxon matter. EN10. Esther was not on this text thread and was never consulted about Exxon strategy. Another example -- there are numerous text messages between Rivera and then-Senator Rubio discussing what Rubio should say in his speech on Globovision to the Venezuelan people and who the U.S. government should include on the economic sanctions lists. Esther did not provide input and was not asked for her input on either. Esther is a fundraiser. She's not a strategist, political consultant, or national lobbyist. It makes sense that she was not involved in the game plan and details of how to accomplish the "normalizing of relations." That is not what she does.

Similarly, Esther did not plan or organize the alleged criminal activity. There was no evidence that Esther conceived the engagement, negotiated its terms, selected its objectives, developed a lobbying strategy, structured the payment chain,, communicated with Venezuelan officials, or directed what others should do. The PSR concedes as much. Instead, it is undeniable that Rivera was at the center of the project. He communicated the legal and operational directives

to Esther, Raul Gorrin, Bertica Cabrera, Congressman Pete Sessions, and Hugo Perera. And he told the group that the existing PDV USA contract did not require registration, and that transferring the contract to PDVSA in Caracas would create FARA and sanctions problems. Whether those statements were legally correct is beside the point for role purposes. Their importance lies in the fact that it shows who supplied direction, who exercised authority, and who purported to understand and control the arrangement. It was Rivera. It was never Esther.

Further, it is uncontested that Esther exercised no decision-making authority over anyone or anything**.** No witness testified that Esther supervised, instructed, recruited, paid, or controlled another participant. No document showed that anyone reported to her. She had no authority over Rivera, Perera, Gorrin, PDV USA, PDVSA, Citgo, or any foreign official. She did not decide whom Rivera, Sessions, or Gorrin would meet, what they would say, what political outcome would be pursued, how the contract would be administered, or how money would be distributed.

Finally, a role reduction is appropriate because the nature and extent of Esther's participation were extraordinarily limited. The Government's evidence against Esther can be stated briefly because there was so little of it. She performed work on a consulting engagement. She attended one meeting with Senator Rubio, where she said nothing. She received a portion of the contract payments. She later used her own funds to purchase property.[1] That was the case.

[1] The Government will focus on the amount Esther received and the property she bought. But financial benefit is but one non-controlling factor, and a court commits legal error by resting on it alone. *United States v. Presendieu*, 880 F.3d 1228, 1250 (11th Cir. 2018); *United States v. Valois*, 915 F.3d 717, 732 (11th Cir. 2019). The question is not whether Esther was paid under the contract. It is how her benefit compares to that of the other participants in the alleged criminal activity. There was no evidence that Esther received a premium for failing to register or was promised money for concealing a foreign principal. The Government's own theory was that she was paid under a consulting contract and separately failed to register. No one conditioned her compensation on nonregistration. No witness said she was paid to conceal anything.

To sum up, there was no evidence that Esther:

- communicated with Maduro or any Venezuelan government official;
- received instructions from a foreign principal;
- lobbied Senator Rubio or any other United States official;
- arranged Rivera's or Sessions's meetings;
- drafted political communications or talking points;
- controlled the contract or the payment structure;
- directed Rivera, Perera, or any other participant;
- created or controlled a laundering entity;
- moved money for anyone else;
- concealed another participant's funds; or
- agreed with anyone about her personal property purchase.

**D. The reduction should be four levels, not two.**

A two-level minor-participant reduction applies to a defendant who is less culpable than most participants but whose role cannot be described as minimal. U.S.S.G. § 3B1.2 cmt. n.5. Esther's role can be described as minimal, and it should be.

She was not a subordinate manager, an important facilitator, or a knowledgeable operator with limited authority. She was a silent attendee at one meeting who received no foreign direction, exercised no control, organized nothing, and played no role in anyone else's finances. Her lack of knowledge of the scheme's scope and structure, combined with the extraordinarily limited nature of her participation, places her squarely within Application Note 4's description of defendants "plainly among the least culpable."

---

When the foreign principal sought to transfer the contract from PDV USA to PDVSA, Rivera told Esther and Perera that the transfer would create FARA and sanctions problems, and the group did not proceed, even though the transfer could have generated an additional $35 million. People running a profit-driven criminal enterprise do not walk away from $35 million. People following the direction of the person who appeared to understand and control the engagement do.

After conducting a comparative analysis of the players and examining the commentary factor of 3B1.2, the Court should sustain Esther's objection and reduce her offense level by four levels under § 3B1.2(a). If the Court concludes that her role falls between minimal and minor, it should apply a three-level reduction.

**OBJECTION NO. 3: THE VALUE OF LAUNDERED FUNDS (¶¶ 158, 164, 167, 217) AND UNDERLYING FACTS -- The PSR Incorrectly Includes a 20-Level Increase For The Amount of Laundered Funds**

**A. The Court should calculate the value of the laundered funds pursuant to the amended guidelines effective November 2026 (which the government does not object to) or, in the alternative, should continue Esther Nuhfer's sentencing hearing until after November 1.**

On April 16, 2026, the Sentencing Commission voted unanimously to adopt amendments adjusting the § 2B1.1(b)(1) monetary table for inflation, the first such adjustment since 2015. The amendments were submitted to Congress on April 30, 2026, and, absent congressional action, take effect on November 1, 2026. U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines (Preliminary) 2 (Apr. 16, 2026).[2] The applicable portion of the new guidelines is here:

| | | |
|---|---|---|
| (I) | More than $2,000,000 | add 16 |
| (J) | More than $5,000,000 | add 18 |
| (K) | More than $15,000,000 | add 20 |

The Court should use the amended 2B1.1 loss numbers in calculating Esther's advisory guidelines. The Government has no objection to the application of the November 2026 guidelines. In the alternative, we ask the Court to continue Esther's sentencing until after their effective date.

[2] It is surprising that Probation fails to mention the unanimous amendments to the guidelines taking effect in November and the change in the 2B1.1 table. It could at least have been mentioned in paragraph 226, Factors that may warrant a sentencing outside of the advisory guideline system. Instead, the PSR says nothing about them.

**B. The correct value of the laundered funds is $3,500,000 resulting in a 16-level increase.**

The PSR concludes that the value of the laundered funds involved in the case is $15,000,000. Accordingly, it increases the offense level by 20 points under § 2S1.1(a)(2) and § 2B1.1(b)(1)(K). ¶ 158. Esther objects to this twenty-level increase. That figure charges Esther with the entire amount the Government says PDV USA paid Interamerican Consulting: money Rivera kept, money paid to Gorrin, money paid to Perera, money paid to Cabrera Morris, and money paid to Esther. Namely, the $15 million amount includes funds that were never sent to, distributed by, controlled, used, or even touched by Esther. It also includes "innocent," non-laundered funds. The correct value should be $3,500,000, the net amount Esther received from the $15,000,000 the PSR identifies as the laundered funds.[3] The correct increase is sixteen levels.

The amount of $3,500,000 is the appropriate amount for guideline purposes because of the meaning of "laundered funds." The guideline keys the offense level to "the value of the laundered funds," § 2S1.1(a)(2), and the commentary defines that term as the funds involved in a transaction "in violation of 18 U.S.C. § 1956 or § 1957." U.S.S.G. § 2S1.1 cmt. n.1. Money is not "laundered" just because it moved. The transaction must violate the statute, and every element must be present, including proceeds of a specified unlawful activity. The specified unlawful activity here is a felony violation of FARA, 18 U.S.C. § 1956(c)(7)(D), and a FARA felony requires willfulness. 22 U.S.C. § 618(a)(1). For a defendant convicted of conspiracy, the Court may count only her own conduct and the conduct of others that was within the scope of the criminal activity she jointly undertook, in furtherance of it, and reasonably foreseeable to her. § 1B1.3(a)(1)(B). The scope of her

[3] The PSR includes three of the payments received by Communication Solutions in paragraphs 47, 64, and 67. Although probation omitted 2 payments, we've included them here for purposes of these Objections.

agreement is not the scope of the conspiracy, and the Court must make individualized findings before charging her with anyone else's transactions. § 1B1.3 cmt. n.3(B); *United States v. Hunter*, 323 F.3d 1314, 1319–20 (11th Cir. 2003); *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993). The $15,000,000 figure fails both requirements.

**C. Money the Government told the jury was clean cannot be counted as dirty.**

In its opening statement and again in closing, the Government told the jury that Gorrin, Perera, and Cabrera Morris could not be charged because they did not act willfully. We take the Government at its word. No willfulness means no FARA felony. No FARA felony means no specified unlawful activity. And a payment to a person who, on the Government's own account, committed no crime is not a laundering transaction. It is a lawful payment.

The Government's own summary chart, titled "Net Flow of Funds," traces $3,750,000 to Interglobal Yacht for Gorrin; $5,291,833 to Perera's companies; and $250,000 to Cabrera Morris. GX 1. That is $9,291,833 paid to people the Government told the jury it could not charge because they had not committed a crime. After all, there is a reason the Government has not asked for this money back from these individuals and did not have cooperation or non-prosecution agreements with them. The Government cannot call that money clean, innocent proceeds at trial and probation call it dirty at sentencing.

**D. Rivera's share was Rivera's.**

Rivera "retained the remaining funds" (¶ 148) and spent them as he chose. He controlled the contract, the invoices, and the accounts; he decided who got paid and how much. *Id.* He put his share into his own home-equity line, his own PAC, and his own campaign account, transactions the Government charged against him alone (Counts Four, Five, Seven, and Eight). No evidence showed that Esther held any interest in those funds, played any role in those transactions, or made

any agreement covering what Rivera would do with his own money. Under § 1B1.3(a)(1)(B), Rivera's personal spending sits outside the scope of anything Esther jointly undertook, and the PSR makes no finding to the contrary.

**E. What remains is Esther's money.**

The PSR fixes the laundered funds at $15,000,000 based upon the PDV USA payments of March and April 2017. Probation correctly excludes the $5,000,000 wired to Interamerican from PDVSA's account at Gazprom Bank on October 27, 2017. ¶¶ 123, 158. Esther's net receipts from that $15,000,000 total exactly $3,500,000: the five transfers of March and April 2017 ($750,000, $750,000, $750,000, $625,000, and $625,000). GX 9C. A total of $3,500,000 equates to an increase of sixteen levels. § 2B1.1(b)(1)(I).

Even if the Court includes the Gazprom payment, the amount calculated by the Government as the "Net Flow of Funds" attributed to Esther through July 2018 is $4,691,333. *See* GX 9C. This still yields an increase of sixteen levels to the base offense level pursuant to the 2026 guidelines, not twenty. § 2B1.1(b)(1)(I). On either view, ¶ 158 is wrong, and ¶¶ 164, 167, and 217 must be corrected with it.

**OBJECTION NO. 4: THE SIX-LEVEL NATIONAL SECURITY ENHANCEMENT (¶ 159) AND UNDERLYING FACTS**

Esther objects to the six-level increase under § 2S1.1(b)(1)(B)(iii), which applies only if she "knew or believed" that the laundered funds were the proceeds of, or were intended to promote, "an offense involving … national security." The enhancement fails twice over. A FARA registration offense is not an offense involving national security within the meaning of the guideline. And no evidence shows that Esther knew or believed any such thing.

Other, more serious FARA cases have not applied this enhancement. For example, Paul Manafort ran the most notorious FARA scheme in the statute's history: tens of millions of dollars in unregistered lobbying income for the Government of Ukraine, moved through offshore accounts and concealed for a decade. When the Special Counsel's Office calculated Manafort's Guidelines for the money-laundering conspiracy, it used the value-of-funds framework Probation uses here, and it never sought this enhancement. *United States v. Manafort*, No. 17-cr-201 (D.D.C.), Plea Agreement, ECF No. 422 (Sept. 14, 2018). That was not an oversight. It was the Government's own judgment of the correct range in the most scrutinized prosecution in modern memory. There is a reason for that. This enhancement was written for money that funds bombs and spies. It was not written for every missing form.[4]

**A. "National security" does not mean a missed disclosure filing.**

The six-level enhancement covers funds tied to drug trafficking, crimes of violence, firearms, explosives, national security, and the sexual exploitation of minors. § 2S1.1(b)(1)(B). The Commission reserved its heaviest laundering enhancement for money that finances the most dangerous categories of crime. FARA is not in that family. It is "a registration and disclosure statute" (the PSR's own words, ¶ 11) whose "specific purpose" is "to prevent covert influence" through transparency. ¶ 12. The cure FARA prescribes is a form, filed with the Department of Justice and posted on a public website. ¶ 11. An offense whose remedy is paperwork does not

[4] There are lots of real world examples of a FARA registration (or lack thereof) that do not affect "national security." President Trump's ex-campaign manager, Bradley Parscale, recently filed a FARA form to lobby on behalf of Israel to combat anti-semitism. Imagine if he had not filed the form. Would the Government take the position that his offense and seeking to eliminate anti-semitism in the United States involved national security?

belong on a list with explosives and the exploitation of children. Words draw meaning from their neighbors. *Yates v. United States*, 574 U.S. 528, 543 (2015).

Attorney General Bondi's own FARA directive confirms that a FARA violation is not categorically an "offense involving … national security" within the meaning of § 2S1.1(b)(1)(B)(iii). In the Attorney General's Memorandum directed to all Department employees, the section titled "Shifting Resources in the National Security Division" orders that "the Foreign Influence Task Force shall be disbanded" and that "[r]ecourse to criminal charges under [FARA] … shall be limited to instances of alleged conduct similar to more traditional espionage by foreign government actors." For other FARA matters, the Attorney General directed the Counterintelligence and Export Control Section, including the FARA Unit, to "focus on civil enforcement, regulatory initiatives, and public guidance." Memorandum from the Att'y Gen. to All Dep't Emps., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* 4 (Feb. 5, 2025). That deliberate line-drawing demonstrates DOJ's own recognition that not every FARA violation necessarily involves national security. It recognizes the critical distinction between ordinary registration-and-disclosure violations and the narrower subset of espionage-like conduct that actually implicates national security.

The cases reinforce why the FARA label alone cannot carry the enhancement. FARA "neither prohibits nor censors the dissemination of advocacy materials by agents of foreign principals"; rather, Congress "simply required the disseminators of such material to make additional disclosures." *Meese v. Keene*, 481 U.S. 465, 478, 480 (1987). Its "[p]enal sanctions attach . . . for willful failure to file a statement when required," or for willfully omitting a required material fact. *Viereck v. United States*, 318 U.S. 236, 242 (1943). Likewise, FARA does "not penalize speech, but rather the lack of registration," and "the key actus reus is not 'engaging in

political activities' but rather the omission of failing to register." *United States v. Michel*, No. 19-cr-148-1 (CKK), 2022 WL 4182342, at *5 (D.D.C. Sept. 13, 2022). FARA's focus has "gradually shifted" from "the political propagandist or subversive" to "the now familiar situation of lobbyists, lawyers, and public relations consultants." *United States v. McGoff*, 831 F.2d 1071, 1073–74 (D.C. Cir. 1987). It creates "a comprehensive regulatory scheme for foreign agent registration" and "criminalizes the willful failure to comply with the information production requirements." *Id.* at 1075. It is, "at bottom, a disclosure statute," and "Congress' fundamental purpose . . . was not to punish foreign agents for the activities described in the statute; rather, it was to compel disclosure to permit evaluation of these activities." *Id.* at 1093–94. As the court put it, "[p]remeditated murder is one thing; failure to disclose, even in an open, highly regulated society, is quite another." *Id.* at 1093.

The six-level enhancement therefore cannot rest on the FARA label alone. The Government must prove through sufficient and reliable evidence that the requirements of § 2S1.1(b)(1) are satisfied, including that the particular underlying offense actually involved national security and that the defendant possessed the knowledge or belief required by subsection (B). *See United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013). The facts here do not establish that.

**B. A FARA Offense Does Not Automatically Involve National Security.**

The Guidelines have a home for offenses involving national security: Chapter Two, Part M, "Offenses Involving National Defense and Weapons of Mass Destruction," which covers treason, espionage, evasion of national-security export controls, and material support. The contrast is built into the Manual: when a money-laundering defendant also committed the underlying

export-control or sanctions offense, § 2S1.1(a)(1) directs the court to use the offense level for that underlying offense, including § 2M5.1 where applicable. U.S.S.G. §§ 2S1.1(a)(1), 2M5.1.

If a FARA violation were an offense involving national security, some guideline in that Part would be "sufficiently analogous" to it. The PSR concludes the opposite: no guideline anywhere in the Manual is sufficiently analogous to Esther's FARA counts, so 18 U.S.C. § 3553 controls them. ¶ 156. Probation cannot hold both positions. Either FARA implicates national security and has a national security guideline, or it is what ¶ 156 says it is: an offense the Guidelines do not reach at all. The report cannot classify FARA as nothing for the offense level and as a national security threat for a six-level enhancement.

**C. There is no evidence that Esther believed the money promoted an offense involving national security.**

Subsection (b)(1)(B) is a *mens rea* provision. The Government must prove that Esther, not Rivera and not the conspiracy in the abstract, knew or believed the funds were the proceeds of, or were meant to promote, a national security offense. The verdict does not supply that finding; it established willful non-registration, nothing more. The promotion prong does not rescue the enhancement either. It requires the same two things the Government lacks: an offense involving national security, and Esther's knowledge of it. And the Government's own witnesses foreclose it. Its cooperator, Perera, did not believe the work was unlawful, and the Government told the jury he could not be charged for exactly that reason. Its witness Cabrera Morris never registered for her own Venezuela work, said registration never crossed her mind, and explained why: she represented an American company. No witness testified that Esther believed she was financing a threat to the national security of the United States. No document says it. Six levels roughly doubles a guideline

range. The Government must earn those levels with proof of Esther's state of mind, not with geography.

**THE CORRECTED CALCULATION**

If the Court sustains these objections, the calculation is:

| | |
|---|---|
| Base offense level (§ 2S1.1(a)(2)) | 8 |
| Value of laundered funds: $3,500,000 (§ 2B1.1(b)(1)(I)) | +16 |
| Conviction under 18 U.S.C. § 1957 (§ 2S1.1(b)(2)(A)) | +1 |
| Minimal participant (§ 3B1.2(a)) | −4 |
| Zero-point offender (§ 4C1.1) | −2 |
| Total offense level | 19 |

At criminal history category I, level 19 yields 30 to 37 months. If the Court instead adopts the Government's full net figure of $4,691,333, the value increase is the same, and the range remains 30 to 37 months under the table that takes effect November 1. Level 19 also lands exactly where Probation itself started: the 30-to-37-month range it quoted defense counsel before the Government weighed in. Either way, the PSR's range of 135 to 168 months cannot stand. It rests on twenty levels for other people's money and six levels for a threat no witness described.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street, PH 1
Miami, FL 33128
Telephone: (305) 379-6667
Facsimile: (305) 379-6668

By: /s/ David Oscar Markus
David Oscar Markus
dmarkus@markuslaw.com

/s/ A. Margot Moss
A. Margot Moss
mmoss@markuslaw.com