UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, CASE NO. 22-cr-20552 -Damian/Valle

Plaintiff,
v.

DAVID RIVERA,

Defendants.
_______________________________________//

**DAVID RIVERA'S OBJECTIONS TO THE PSR**

Defendant, David Rivera, through counsel, objects to the Presentence Investigation Report ("PSR") as follows:

**PREFACE TO OBJECTIONS**

At its core, this is a FARA registration case—where Congress mandated a maximum sentence of five years for even the worst of the worst FARA violators, particularly those who, unlike Rivera, lack a long history of community service. Consequently, the use of monetary transaction guidelines which would wholly swallow the FARA case that the entire six-week trial was about, should not be adopted where it would unduly elevate the punishment for the core concern of the violations tried. The PSR cumulatively incorporates guideline enhancements (which largely will be shown herein to be unwarranted) that would drive the potential sentence up to a USSG level 39, 262-327 months, or between more than ***four and five times*** the maximum sentence for a FARA registration crime. Then, in paragraph 221, the PSR states that no reason presents itself for a below guideline sentence (a conclusion at odds with vast majority of even far-lower

guideline sentences for registration-based offenses).[1] These PSR guideline determinations arise in the case of a sixty year (60) old, non-violent first offender with prostate cancer and with no victims (PSR paragraph 150), and no success in the alleged normalizing of relations between the U.S. and Venezuela (PSR paragraph 123). Further, they arise where the monetary transactions inhered in only spending transactions inherent in the crime itself, such as using "proceeds" to buy real estate and deposit funds in an election account without "promotion" or "concealment," not anything within the core scope of the laundering statutes. (PSR paragraph 124) The extraordinary overrepresenting and disproportionate nature of the guideline calculation treatment will be the subject of both specific objections below and Rivera's separate Motion for Downward Variance.

**DETAILED OBJECTION TO FACTUAL PORTION OF THE PSR**

Because of the unique nature of this case factually, Rivera is compelled to take the unusual step of challenging the PSR's factual portion as a whole, paragraphs 35-123, much the same as he has done in his Motion for New Trial (DE 543) and in his Reply regarding that motion. (DE 575) In order to avoid turning the sentencing process into a lengthy re-litigation of the entire trial, Rivera will not set out his objections paragraph by paragraph.[2] However, Rivera is constrained to point out that factually, the PSR is seriously flawed. That is, while purporting to establish a FARA conspiracy and substantive offense, the PSR actually fails to establish that Rivera conspired not to file a FARA, or that such conspiracy included an agreement whereby Rivera would serve as an unregistered agent of the Maduro government in Venezuela during 2017-2018, the object of which

---

[1] *See* Rivera's Motion for 18 U.S.C. § 3553 Consideration or, in the Alternative, Motion for Downward Variance, filed simultaneously herewith, at paragraph 5(C) page 5 along with paragraphs 4(D)-(H) and 5 on pages 4-8. ("Sentencing Statistics")

[2] Rivera is, however, prepared to address, as necessary, each individual material factual paragraph of the PSR to demonstrate that they are seriously mistaken, misleading and incomplete.



#112222867v1
#112223709v3

agency was allegedly to “normalize relations” between the Maduro government and the United States. This is what the Superseding Indictment (“indictment”) charged. Neither the evidence at trial, nor the summary of that evidence provided to Probation by the prosecutors and plugged into the PSR, prove any FARA conspiracy, FARA violation or money laundering offense. In fact, aside from a few general references in the chat evidence to “normalizing relations” and Hugo Perera’s obviously biased repeated incantation of those magic words with zero substantive specifics, not a single piece of evidence at trial—whether witness testimony, document or contemporaneous communication—establishes even one actual effort to help the Maduro regime stay in power or to normalize its relations with the United States as charged in the Indictment. And, with regard to “normalizing relations,” the trial evidence showed that these references actually presumed the *removal* of Maduro (the opposite of normalizing relations) and the evidence showed such a removal of the dictatorial Maduro (following the dictatorial Chavez) was Rivera’s lifelong quest; certainly, such references were not with what Rivera was charged. This is the immutable truth about this case. In this regard, the PSR can be broken down as follows:

**A. Affirmative proof in the PSR that the charged FARA conspiracy did not exist**:

The following paragraphs of the PSR, constituting the overwhelming material evidence at trial either by their own terms or in combination with documents and witness testimony, establish that Rivera was engaged *only* in efforts to support the Venezuelan Opposition and U.S. government officials, such as then - U.S. Senator Marco Rubio and Texas Congressman Pete Sessions, to remove Maduro from power through an “electoral solution” or “negotiations”: **49, 51, 52, 54-55, 57-59, 66, 78-79, 81-94, 96-97, 102, 112 and 114-119.** Among these paragraphs of the PSR, the following *explicitly* reference efforts to support the opposition efforts to remove Maduro: **49, 51, 54, 57, 58, 66, 84, 86, 87-88, 89, 90, 96, 114, 116, 118, and 119**. These PSR “Offense



#112222867v1
#112223709v3

Conduct…the Conspiracy" section paragraphs, taken as a whole and in context, unequivocally establish that Rivera was only trying to get Maduro to agree to 'free and fair elections' which would result in his removal, to which the evidence at trial showed Maduro never agreed, and certainly was not the pro-Maduro FARA conspiracy with which Rivera was charged. This truth about the PSR must not be ignored or simply swept away.

**B. Proof of the real purpose of the consulting agreement:**

Many other paragraphs of the PSR establish that, as the defense contended at trial, the real purpose of the consulting agreement was a FARA-exempt commercial enterprise to convince **Exxon** to resume drilling in Venezuela. These are paragraphs **46, 56, 60-64, 69, 71-72, 77, 95 and 99**. Congressman Sessions testified, without contradiction, that the Exxon effort too was part of the overall Opposition plan to remove Maduro and improve everyday lives of Venezuelans in post-Maduro Venezuela. (*See eg.*, TT excerpt, Apr. 27, 2026 at 38:13-24).

**C. Trial evidence missing from the PSR**:

(1) references to the testimony of witnesses, such as Marco Rubio, Julio Borges, Pete Sessions and others who overwhelmingly and consistently established that Rivera never said or did one thing in support of Maduro and that every interaction with Rivera was about removing Maduro from power; (2) the telling complete absence of any conversations or statements in support of Maduro in the contemporaneous text and chat threads introduced into evidence at trial including, but not limited to, GX 15, GX 20, GX 23 and DRX 776, which together contained literally thousands of contemporaneous statements of the four 25% "partners" over the entire length and breadth of the alleged Count 1 FARA conspiracy; (3) the complete failure of the government to respond to defense challenges at trial and in his Motion for New Trial to identify a single thing Rivera said or did to normalize relations for Maduro. These challenges were leveled during the



#112222867v1
#112223709v3

cross-examination of government star witness Hugo Perera, when counsel placed the entirety of the chat and text message exhibits in front of him and asked Perera to identify even a single statement by Rivera in favor of Maduro (even on the encrypted WhatsApp MIA group chat), and he could not do so. On its redirect of Perera, the prosecutor did not touch this issue. The challenge was leveled again during closing argument, without response. Finally, it was leveled in Rivera's Motion for New Trial (DE 543) again, with no response. We renew this challenge here.

**D. Failure to include specific evidence of "normalizing relations":**

The PSR makes several references to "normalizing relations" but fails to include specific evidence, including in the testimony of Perera, as well as in the testimony of defense witness, Congressman Pete Sessions that, as used by the alleged conspirators, that term meant *removing* Maduro, *then* normalizing relations. *See*, *e.g.*, **(**TT excerpt, Apr. 13, 2026, at pp. 39-42) (DRX 776 pp. 10-11) (testimony of Hugo Perera).

**E. Mistaken and misleading paragraphs referencing the proposed assignment of and Rivera's refusal to assign the PDV USA/Interamerican Consulting Agreement:**

The PSR in paragraphs 76 and 106 references two Citgo efforts to get Rivera to agree to assign the March 21, 2017 PDV USA/Interamerican Consulting Agreement underlying this entire case to PDVSA in which, in the paragraph 76 communication with Nuhfer, Rivera stated "Call me, I don't think that there is any way we can do this." These paragraphs, which are the only place in the PSR referencing the proposed assignment and Rivera's refusal to assign, are mistaken and misleading because they fail to reference other evidence in the case, including the testimony of Arnaldo Arcay (TT, Mar. 27, 2026) and Gina Coon (TT, Mar. 23 and Mar. 24, 2026) which, taken together with the referenced communications, establish that Rivera left $35,000,000 on the table

by not agreeing to the assignment, evidence which directly undercuts the government's 'greed' theory of the case and the pro-Maduro conspiracy charged in the indictment.

**F. Failure to include facts showing evidence that Rivera agreed with anyone not to file a FARA:**

Not a single paragraph or statement in the PSR makes reference to evidence that Rivera agreed with anyone not to file a FARA or to so much as even discuss not doing so, or to launder the "proceeds" of not doing so.

As he faces sentencing, based upon a draconian PSR, which does nothing more than swallow whole the government's mistaken, misleading and very incomplete factual recitation, Rivera seeks only an honest assessment of the actual proof at trial. He has a right to this. *See* 2023 Federal Sentencing Guideline Manual, Ch. 1, Pt. A(1)(3), The Basic Approach (Policy Statement)[3]. While the Guidelines have undergone many revisions since 2023, "honesty in sentencing" has remained the top priority. To do that, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See, *Rita v. United States*, 551 U.S., at 347–348 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007).

The PSR, as it presently stands, is not an honest assessment of the evidence in this case and is strikingly objectionable. For its part, the government is and has consistently ignored the truth about the evidence choosing instead to throw out a blizzard of evidentiary points which serve only to mask the truth that Rivera *only* worked to remove Maduro and that every material event in the

[3] "The [Criminal Justice][sic] Act's basic objective was to enhance the ability of the criminal justice system to combat crime through an effective but fair sentencing system. To achieve this objective Congress first sought *honesty in sentencing*." (*Id*.) (emphasis added)

indictment was either precisely that or the commercial Exxon effort.[4] Specifically, and as set out herein, in light of the overwhelming evidence set out in the PSR, and admitted at trial, which shows that Rivera's real effort was *against* Maduro, the PSR is a mistaken, misleading, incomplete and inaccurate summary of the evidence in this case. As currently written, the PSR should not be relied upon to determine the sentence for Rivera in this case.

**OBJECTIONS TO GUIDELINE CALCULATIONS**

1. Rivera objects to paragraphs 149 and 164 of the PSR regarding Role in the Offense, inasmuch as the evidence throughout the trial shows that Rivera did not "organize supervise, manage or lead" Esther Nuhfer or anyone, but was an equal partner as testified to by Hugo Perera and argued by the government. (e.g., TT, Apr. 13, 2026, at 77:7-12). The PDV USA payments were split equally among the 4 participants. (TT, Apr. 10, 2026 at 63:18-20). As paragraph 149 actually lays out, each participant played his or her own role, some more than others, but no one supervised, managed or led the others. The evidence shows that Rivera regularly consulted with, but did not manage or supervise, the others.

From the government's own words in DE 589, their Response to Nuhfer's PSR objections regarding minimal role, at pages 7-8, the government refers to it being Nuhfer, not Rivera, "…who initially established the MIA chat group so that the four partners could communicate through encrypted messages…", that Nuhfer, not Rivera, sent the first invoice to Gorrin…", that Nuhfer posted the photos of herself with Rex Tillerson, that Nuhfer "accessed the Department of Justice's FARA website and sent emails to Rivera…to help Rivera draft the Scope of Services…, Nuhfer tells Rivera "Call Hugo now…no more mtgs until we get a slice…" The fact that Nuhfer could even

[4] This "blizzard of evidentiary points which only serve to mask the truth…" was certainly the government's strategy in its Response to Rivera's Motion for New Trial. (*see* DE 575, pp. 6-7).



#112222867v1
#112223709v3

say things like this to Rivera (as she did on more than one occasion), and that neither Gorrin or Perera ever pushed back at all, is proof positive that no one saw Rivera as the "organizer, manager, leader or supervisor". The fact that, at various times, each of the partners directed or suggested things for the others to do, does not make one or the other a manager or leader. And the government goes on to repeatedly reference how the partners "discussed" who should be allowed to attend meetings and Nuhfer telling Rivera "you need to send this tomorrow". And on page 11 referring to the four as receiving "co-equal shares". Then on pages 12-13 arguing that "…different is not the same as substantially less culpable" an argument which surely goes both ways. This evidence in the government's own words refutes any suggestion that Rivera supervised or led the others and establishes their mutual consultations and discussions on virtually all relevant matters.

A Section 3B1.1 aggravating role adjustment is not for persons who are, perhaps more important to a conspiracy, but who do not "organize, lead, manage or supervise" others. (Application Note 2) (*See also* factors set out in Application Note 4: based on the evidence Rivera did not "exercise decision making authority" over Nuhfer or others, did not "recruit[ ] accomplices[5]", and did not "claim[ ] right to a larger share of the fruits of the crime". The contemporaneous communications in GX 15 (MIA Chat Group, GX 20 (La Luz trilateral chat), as well as the several bilateral chats, manifestly establish joint, equal partner discussions with no one, except arguably Raul Gorrin, who was communicating with Delcy Rodriguez, taking a larger decision making or leadership role than anyone else. And Gorrin was not an accomplice or coconspirator.

---

[5] The relevant trial testimony of Hugo Perera was that Nuhfer introduced Rivera to her friend Perera (TT, Apr. 14, 2026, p. 6:15-17) and Perera introduced Rivera and Nuhfer to Gorrin who needed assistance in the U.S. (TT, April 13, 2026, p. 56:17-19). And it was Gorrin who then brought in Delcy Rodriguez leading to the Consulting Agreement. (TT, Apr. 7, 2026, p. 36:8-13 and pp. 39-41).



#112222867v1
#112223709v3

2. Rivera objects to paragraphs 151-152 and 165 regarding Obstruction of Justice inasmuch as there is no evidence that Rivera's civil deposition testimony exhibits constituted a willful effort to obstruct justice in the criminal case as required by USSG Section 3C1.1(1)(a). There was no evidence in the case that Rivera had the slightest intention that his deposition testimony would impact the criminal case in any way.

Moreover, the three defense exhibits cited in the PSR at paragraph 152 to justify the obstruction enhancement, DRX 820T, DRX 821T and DRX 823T do not "contain materially false testimony which was refuted by the evidence presented at trial" as alleged. No contrary trial testimony has been referenced.[6] The PSR alleges that these defense exhibits contained Rivera's false deposition testimony in 4 ways:

1. Denying that he considered FARA in review of the draft PDV USA agreement;
2. denying that he conducted research regarding FARA in connection with the agreement's formation;
3. denying that he was compensated for working to arrange a meeting between Venezuelan Foreign Minister Delcy Rodriguez and other Venezuelan officials, and corporate leaders of ExxonMobile; and
4. denying that his efforts to set up meetings in April 2017 between Sessions, Rodriguez and Borges was related to the PDV USA agreement.

The PSR is wrong. First, what does "considered FARA" even mean? (#1 above). The question is far too vague to form the basis of an obstruction enhancement. The same is true with the phrase "research regarding FARA." (#2 above) What research regarding FARA? Entirely too vague.

[6] It is entirely insufficient to establish that testimony was false to simply say that it was "refuted by evidence presented at trial". This largely leaves Rivera shooting in the dark. Nonetheless, as we will show in the text, the cited allegedly false testimony was not false at all.



#112222867v1
#112223709v3

Only exhibit DRX 820T concerns the use of FARA with respect to the contract. And in that excerpt Rivera denied reviewing or researching FARA filings "[w]hen *you were reviewing* the draft agreement that was provided by Citgo". (DRX-820T-0001:13-14)(italics suppled) There was no evidence presented at trial that Rivera personally reviewed FARA filings at any time much less at the time he was presented "the draft agreement". In fact, in DE 589, as part of their effort to beat back Nuhfer's minimal role claim, the government goes out of its way to establish that it was Nuhfer, not Rivera, who accessed the FARA website and emailed Rivera with suggested language for the Scope of Services portion of the PDV USA Consulting Agreement.[7] And the evidence was that Rivera was provided multiple "draft agreements" initially with CITGO as the counter-party and eventually with PDV USA as the counter-party (GX 133, GX308B, GX310B). To which draft(s) does the question make reference? Nor was evidence presented at trial that Rivera personally did "research regarding FARA" at any time. (*Id.* 17-20). Finally, the transcript, when read in its entirety, shows that Rivera's recollection at the time of the deposition, over eight years after the March 2017 events, was that he saw boilerplate language from FARA filings which may have been provided for use in the appendix or scope of services in the contract. (*Id.*, 617- 622:21-11). This testimony is entirely consistent with the evidence at trial. There was no evidence that DRX 820T contained false testimony as alleged in points 1 and 2 above.

With respect to allegations 3 and 4 above, Rivera was not asked in any of the cited transcripts whether he was "compensated" for anything, much less "for working to arrange" the referenced meeting. DRX 821T is exclusively about the Exxon efforts. DRX 820T is about FARA and the language in the contract. And in the only other Rivera exhibit cited by Probation, DRX

[7] "Nuhfer accessed the Department of Justice's FARA website and sent emails to Rivera…to help Rivera draft the Scope of Services…" (DE 589 at p. 7)

823T, Rivera is questioned in detail and explains in detail the genesis of the Sessions, Rodriguez and Borges NYC meetings in April 2017 and why those meetings had zero to do with the PDV USA Consulting Agreement. The meetings had nothing to do with political activity in the U.S. as required by FARA. They were intended to be entirely related to efforts by Sessions to mediate between the Venezuelan government (Rodriguez) and the Opposition (Borges) about the political situation *in Venezuela*. (DRX 823T:675-681: 9-5). Borges confirmed this during his testimony. (TT Mar. 25, 2026, at 33:1-17) We also know from trial testimony by Congressman Sessions that Rodriguez wanted nothing to do with the opposition and co-opted (changed the subject of) her NY meeting with Sessions to enlist his assistance on Exxon. (TT Excerpt, Apr. 27, 2026, at 25-27). No trial evidence has been shown to establish that there was false testimony by Rivera in this or any of the three referenced defense exhibits and, as we have said, that any such civil deposition testimony was a willful effort to obstruct the criminal case.

3. Substantially incorporating and adopting, but also adding to, the PSR objections filed by Esther Nuhfer (DE 577), Rivera objects to paragraphs 124 and 156-160 of the PSR which result in the establishment of the Base Offense Level under Sentencing Guidelines' Section 2S1.1, the guideline for Money Laundering. At no point has this been a case about money laundering. A single summary witness, Michael Petron, at the very end of the government's six week case-in-chief, out of a total of 14 government witnesses, testified for about an hour about the alleged money laundering. The FARA statute carries a five-year statutory maximum for even the worst imaginable FARA offender. The entire trial was about FARA. Yet, the PSR says the guidelines should be driven by Section 1957 transactional money laundering, even using enhancements under the money laundering guidelines, such as a 6 level increase "for an offense involving national security" in paragraph 161, that appear nowhere related to FARA violations for which there is no guideline.

The result is objectionable as it seriously distorts and overrepresents the actual alleged criminal conduct in the case, even as set out in the PSR, a victimless crime (PSR paragraph 150) in which nothing happened (PSR paragraph 123) and in which even the money laundering was of the least culpable kind without "promotion" or "disguise" and consisted merely of spending money (PSR paragraph 124). This is a case about not filing a government registration form which, had it been filed, everything Rivera did would have been perfectly legal. Therefore, no "honest" or "fair" sentencing guideline determination could support anything remotely like that set out in the PSR which, at 22-27 years, more than four to five times the statutory five year maximum for FARA violations. And the PSR ignores Rivera's lack of prior criminal history, age, medical condition and national and community service which render the recommended sentence, or anything like it, literally a life sentence.[8]

The Supreme Court has long warned against a sentencing factor that becomes the "tail which wags the dog of the substantive offense." *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). And in *United States v. Santos*, 553 U.S. 507 (2008) every member of the Court recognized the danger posed by money-laundering charges that merely repackage the receipt or spending of proceeds from the underlying crime. The plurality refused to read the statute to "radically increase" punishment for "a transaction that is a normal part of a crime [Congress] had duly considered and appropriately punished elsewhere." *Id.* at 515–16 (2008) (plurality opinion). The dissenters answered that the merger problem "is fundamentally a sentencing problem, and the proper remedy is a sentencing remedy." *Id.* at 547 (Alito, J., dissenting). This is sentencing. The remedy is available here.

---

[8] Again, see Rivera's Motion to 18 U.S.C. § 3553 Consideration or, in the Alternative, Motion for Downward Variance, filed simultaneously herewith.

The Sentencing Commission saw the same problem years earlier. In 2001 it rewrote § 2S1.1 to tie money-laundering offense levels to the underlying offense, because the prior structure "did not reflect adequately the culpability of the defendant" and set laundering levels "without sufficient consideration of" the underlying offense. USSG. app. C, amend. 634 (effective Nov. 1, 2001). The Guidelines connect laundering punishment to the crime that produced the money. The Government inverts that design here. It uses the laundering count, and a stack of enhancements layered on top of it, to dwarf the offense that produced the money in the first place. This is improper and must be rejected.

4. More specifically, Rivera objects to the PSR's calculation of the value of the laundered funds at paragraphs 124 and 160, at $15m (or $20m if the Gazprom Bank payment is included which the PSR does not). On April 16, 2026, the Sentencing Commission voted unanimously to adopt amendments adjusting the § 2B1.1(b)(1) monetary table for inflation, the first such adjustment since 2015. The amendments were submitted to Congress on April 30, 2026, and, absent congressional action, take effect on November 1, 2026. U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines (Preliminary) 2 (Apr. 16, 2026).[9] The applicable portion of the new guidelines is here:

(I) More than $2,000,000 add 16
(J) More than $5,000,000 add 18
(K) More than $15,000,000 add 20

The Court should use the amended 2B1.1 loss numbers in calculating David's advisory guidelines. As Nuhfer represents in her pleadings, the Government apparently has no objection to

[9] It is surprising that Probation fails to mention the unanimous amendments to the guidelines taking effect in November and the change in the 2B1.1 table. It could at least have been mentioned in paragraph 226, Factors that may warrant a sentencing outside of the advisory guideline system. Instead, the PSR says nothing about them.



#112222867v1
#112223709v3

the application of the November 2026 guidelines. In the alternative, we ask the Court to continue Rivera's sentencing until after their effective date.

**A. The correct value of the allegedly laundered funds is $1.1m resulting in a 14-level increase.**

The PSR erroneously concludes that the value of the laundered funds involved in the case is $15,000,000. (Paragraph 160) Accordingly, it increases the offense level by 20 points under §2S1.1(a)(2) and § 2B1.1(b)(1)(K). (Paragraph 160) Rivera objects to this twenty-level increase. As the following analysis proves, the correct USSG Sections 2S1.1, 2B1.1 level increase is only 14 because the amount allegedly laundered in post FARA offense Section 1957 "transactions" was only $1.1 million, not $15 million. That figure charges Rivera with the entire amount the Government says PDV USA paid Interamerican Consulting: money Rivera partially kept, but also money paid to Gorrin, Perera, Cabrera Morris and to Nuhfer. While under 18 U.S.C. § 1956(9) this might represent the "gross receipts" of a money launderer, it is not the correct value of the amount actually laundered. This was what the plurality opinion in *United States v. Santos,* 553 U.S. 507, 515-516 (2008) pointed out, "every member of the Court recognized the danger posed by money-laundering charges that merely repackage the receipt or spending of proceeds from the underlying crime." For sentencing purposes under USSG section 2S1.1, "'Laundered funds' means the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. [§] 1956 or 1957... which require the district court to determine the amount of funds actually laundered." *See United States v. Pratt,* 728 F.3d 463, 481 (5th Cir. 2013).

The distribution by Rivera of PDV USA's gross payments, whether $15m or $20m, to Interamerican Consulting, Inc., to his equal partners is part of the crime and, under the "merger



#112222867v1
#112223709v3

doctrine," is not money laundering under Section 1957.[10] *Santos, supra*. *Santos* is the pivotal Supreme Court case addressing the "merger problem." The Court held that paying criminal expenses—such as paying illegal lottery employees and winners—does not constitute money laundering. *See also, United States v. Puig-Infante*, 19 F.3d 929 (5th Cir. 1994) **(**explicitly ruling that a drug deal or distribution transaction itself is not money laundering. The money exchanged or handed over to a co-conspirator during the execution of the drug offense does not constitute "proceeds" at the exact moment the transfer occurs); *United States v. Cloud***,** 680 F.3d 396 (4th Cir. 2012)(Although a fraud case, the Fourth Circuit held that a § 1957 money laundering conviction must be vacated under the merger doctrine because the transaction relied upon by the government was simply the payment of co-conspirators and essential expenses required to pull off the scheme).

We can find no indication that the government ever made the argument before or during trial that Rivera's partnership payments violated the laundering laws. The indictment did not charge, and the government never proposed a jury instruction relying on partner payments as money laundering. And partner payments were clearly no part of their only money laundering argument to the jury. (TT excerpt, Apr. 28, 2026, at 64-65:20-9) Nor can they make this argument, inasmuch as the *United States Attorney's Manual* at Section 9-105.200 (C) explicitly forbids, without DOJ approval, federal prosecutors from charging money laundering when a transaction "merges" with the crime. The manual clarifies that § 1956 and § 1957 should not be charged if the financial transaction is part of the crime producing the funds. *And as we have said but hasten to*

[10] Just as a drug dealer paying the courier who delivered the drugs or a bank robber paying accomplices, Rivera's payments to his partners in crime, whether knowing participants or not, is not a "transaction" under Section 1957 which probably explains why such distributions were not part of the indictment. *See* cases cited in the text.

*repeat, no such money laundering was charged in this case.* However, incredibly, the government has resorted to precisely this legally unsupportable argument in what apparently is a desperate effort to fend off Nuhfer's PSR objections. (DE 589, pp. 15-16) ("[r]ather the money laundering conspiracy was based on Rivera's and Nuhfer's agreement to divide the funds Interamerican Consulting received from PDV USA and PDVSA in roughly equal parts between the primary participants (Rivera, Nuhfer, Raul Gorrin and Hugo Perera)… ." Unfortunately. this argument is of a piece with the government's failure to reveal that its statute of limitations position was directly contrary to the DOJ's longstanding position which supports Rivera's jury instruction request.[11] These experienced prosecutors know the "merger doctrine" and they are charged with knowing the requirements of the *U.S. Attorney's Manual.*

Critically, the $15 million amount includes funds that were never charged or involved in 18 U.S.C. § 1957 money laundering transactions. According to Counts 4-8 of the indictment, that amount is only $1.1 million (PSR paragraph 124) (Counts 7 and 8 involve the same funds and should not be double counted)[12] described there as money laundering when Rivera "…used [his][sic] portions of these funds to pay for various personal and business expenses." Using the $1.1m in money laundering transactions number, the increase should only be 14 under 2B1.1(b)(1)(H).

---

[11] DE 543 at pp. 6-13; DE 575 at pp. 3-8.

[12] The Sentencing Guidelines define "laundered funds" as "the property, funds, or monetary instrument involved in the transaction . . . in violation of 18 U.S.C. § 1956 or § 1957." USSG § 2S1.1, cmt. n.1. "[T]he inclusion of the modifier 'laundered' before 'funds' indicates that the funds which should be considered for sentencing purposes are those that were actually laundered." *United States v. Paley*, 442 F.3d 1273, 1278 (11th Cir. 2006); *see also United States v. Gross*, 661 F. App'x 1007, 1026 (11th Cir. 2016) (relying on the total amount laundered to determine the loss amount for sentencing purposes).

The $15m also includes "innocent," non-laundered funds. Throughout the trial, starting in its opening statement and again in its closing argument, the government distinguished Perera, Gorrin and Bertica Morris as having no knowledge of FARA and, therefore, lacking the required willfulness. They legally cannot even be considered "participants" in the FARA conspiracy. *United States v. Costales*, 5 F.3d 480, 484-85 (11th Cir. 1993) (holding that a "participant" must be an individual "with criminal liability and intent" who was "an actual member of the plan or conspiracy" and not an "innocent enabler" of the unlawful conduct). Consequently, they were not charged, and their money was not "dirty" and could not be the subject of money laundering charges. In other words, there was no "specified unlawful activity" regarding the funds shared by Rivera with Perera, Gorrin or Cabrera Morris.[13] By the government's own account, these were lawful payments.

The guidelines connect the offense level to "the value of the laundered funds". USSG §2S1.1(a)(2), and the commentary defines that term as the funds involved in a transaction "in violation of 18 U.S.C. § 1956 or § 1957." USSG § 2S1.1 cmt. n.1. Money is not "laundered" just because it moved. The transaction must violate the statute, and every element must be present, including proceeds of a specified unlawful activity. The specified unlawful activity here is a felony violation of FARA, 18 U.S.C. § 1956(c)(7)(D), and a FARA felony requires willfulness. 22 U.S.C. § 618(a)(1). For a defendant convicted of conspiracy, the Court may count only his own conduct and the conduct of others that was within the scope of the criminal activity he jointly undertook,

---

[13] The Government's own summary chart, titled "Net Flow of Funds," traces $3,750,000 to Interglobal Yacht for Gorrin; $5,291,833 to Perera's companies; and $250,000 to Cabrera Morris. (GX 1) That is $9,291,833 paid to people the Government told the jury it could not charge because they had not committed a crime. After all, there is a reason the Government has not asked for this money back from these individuals and did not have cooperation or non-prosecution agreements with them. The Government cannot call that money clean, innocent proceeds at trial and probation call it dirty at sentencing.



#112222867v1
#112223709v3

in furtherance of it, and reasonably foreseeable.[14] Section 1B1.3(a)(1)(B). Since neither Perera or Gorrin, or for that matter Cabrera Morris engaged in conspiratorial conduct, their money was not part of any money laundering transaction. *See*, USSG § 1B1.3 cmt. n.3(B); *United States v. Hunter*, 323 F.3d 1314, 1319–20 (11th Cir. 2003); *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993). The $15,000,000 figure fails both requirements. This is yet another reason that the $15m figure used in paragraph 160 is not appropriate.

For all these reasons, Rivera objects to paragraph 160. His position is that the increase under USSG § 2B1.1 is only the value of the funds he, according to the indictment and verdict, laundered in the transactions set out in Counts 4-8, or $1.1m, for a 14-level increase.

5. Again, substantially adopting, but also adding to, the Nuhfer objection, Rivera objects to paragraph 161 of the PSR which applies a 6-level increase for "an offense involving national security" under 2S1.1(b)(1)(A),(B)(iii). First, this is an enhancement only *if* the Court applies the money laundering guidelines to determine the offense level to which Rivera has objected in paragraph 3 of these objections. Second, this enhancement only applies if Rivera "knew or believed" that the laundered funds were the proceeds of, or were intended to promote, "an offense involving … national security." The enhancement fails twice over. A FARA registration offense is not an offense involving national security within the meaning of the guideline. And no evidence shows that Rivera knew or believed any such thing. On the contrary, the evidence at trial, including the testimony of Secretary Rubio, Congressman Sessions, Julio Borges and others established that U.S. foreign policy during 2017-2018 was to support the Venezuelan Opposition in its efforts to secure the negotiated removal of Maduro through 'free and fair elections'. And

[14] There was no evidence at trial that Rivera "jointly undertook" or could "reasonably foresee" Nuhfer's transactions with her share of the PDV USA payments.



#112222867v1
#112223709v3

these same witnesses established that this was entirely the goal of Rivera as well. Therefore, even if the absurd, unsupported government idea that Maduro and the PDVSA Board agreed to pay Rivera's company $50m over a three month period starting in March 2017 to arrange for his removal and soft landing, an idea only peddled by the prosecutors at the very end of their case after they realized that the overwhelming weight of the evidence contradicted their pro-Maduro normalizing relations theory- even accepting the eleventh hour uncharged amended theory - Rivera did absolutely nothing against U.S. policy or national security.[15] Quite to the contrary, the trial evidence consistently showed Rivera's efforts to be entirely aligned with U.S. foreign policy and national security: to remove Maduro.

Other, more serious, FARA cases have not applied this enhancement. For example, Paul Manafort ran the most notorious FARA scheme in the statute's history: tens of millions of dollars in unregistered lobbying income for the Government of Ukraine, moved through offshore accounts and concealed for a decade. When the Special Counsel's Office calculated Manafort's Guidelines for the money-laundering conspiracy, it used the value-of-funds framework Probation uses here, and it never sought this enhancement. *United States v. Manafort*, No. 17-cr-201 (D.D.C.), Plea Agreement, ECF No. 422 (Sept. 14, 2018). That was not an oversight. It was the Government's own judgment of the correct range in one of the most scrutinized prosecutions in modern memory.

---

[15] And this theory was not charged in the indictment and is an ***unconstitutional amendment*** of it. "Ever since *Ex parte Bain*, 121 U.S. 1, was decided in 1887 it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself…The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. *See also United States v. Norris*, 281 U.S. 619, 622. *Cf. Clyatt v. United States*, 197 U.S. 207, 219, 220." *Stirone v. United States*, 361 U.S. 212, 215-17, 80 S. Ct. 270, 272 (1960). While not a conviction on the specific charge of a crime affecting national security, using uncharged conduct to enhance the advisory sentencing guidelines range has the same effect.

There is a reason for that. This enhancement was written for money that funds bombs and spies. It was not written for every missing FARA Form[16]

**A. "National security" does not mean a missed disclosure filing.**

The six-level enhancement covers funds tied to drug trafficking, crimes of violence, firearms, explosives, national security, and the sexual exploitation of minors. § 2S1.1(b)(1)(B). The Commission reserved its heaviest laundering enhancement for money that finances the most dangerous categories of crime. FARA is not in that family. It is "a registration and disclosure statute" in the PSR's own words. (¶ 12) whose "specific purpose" is "to prevent covert influence" through transparency. (*Id.*). The cure FARA prescribes is a form, filed with the Department of Justice and posted on a public website. ( *Id.*). An offense whose remedy is paperwork and where, had the paperwork been filed, everything Rivera did would have been perfectly legal, does not belong on a list with explosives and the exploitation of children. Words draw meaning from their neighbors. *Yates v. United States*, 574 U.S. 528, 543 (2015).

Former Attorney General Bondi's own FARA directive confirms that a FARA violation is not categorically an "offense involving … national security" within the meaning of § 2S1.1(b)(1)(B)(iii). In the Attorney General's Memorandum directed to all Department employees, the section titled "Shifting Resources in the National Security Division" orders that "the Foreign Influence Task Force shall be disbanded" and that "[r]ecourse to criminal charges under [FARA] … shall be limited to instances of alleged conduct similar to more traditional espionage by foreign government actors." For other FARA matters, the Attorney General directed

[16] There are lots of real-world examples of a FARA registration (or lack thereof) that do not affect "national security." President Trump's ex-campaign manager, Bradley Parscale, recently filed a FARA form to lobby on behalf of Israel to combat antisemitism. Imagine if he had not filed the form. Would the Government take the position that his offense and seeking to eliminate antisemitism in the United States involved national security?



#112222867v1
#112223709v3

the Counterintelligence and Export Control Section, including the FARA Unit, to "focus on civil enforcement, regulatory initiatives, and public guidance." Memorandum from the Att'y Gen. to All Dep't Emps., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* 4 (Feb. 5, 2025). That deliberate line-drawing demonstrates DOJ's own recognition that not every FARA violation necessarily involves national security. It recognizes the critical distinction between ordinary registration-and-disclosure violations and the narrower subset of espionage-like conduct that actually implicates national security.

The cases reinforce why the FARA label alone cannot carry the enhancement. FARA "neither prohibits nor censors the dissemination of advocacy materials by agents of foreign principals"; rather, Congress "simply required the disseminators of such material to make additional disclosures." *Meese v. Keene*, 481 U.S. 465, 478, 480 (1987). Its "[p]enal sanctions attach . . . for willful failure to file a statement when required," or for willfully omitting a required material fact. *Viereck v. United States,* 318 U.S. 236, 242 (1943). Likewise, FARA does "not penalize speech, but rather the lack of registration," and "the key actus reus is not 'engaging in political activities' but rather the omission of failing to register." *United States v. Michel*, No. 19-cr-148-1 (CKK), 2022 WL 4182342, at *5 (D.D.C. Sept. 13, 2022). FARA's focus has "gradually shifted" from "the political propagandist or subversive" to "the now familiar situation of lobbyists, lawyers, and public relations consultants." *United States v. McGoff*, 831 F.2d 1071, 1073–74 (D.C. Cir. 1987). It creates "a comprehensive regulatory scheme for foreign agent registration" and "criminalizes the willful failure to comply with the information production requirements." *Id.* at 1075. It is, "at bottom, a disclosure statute," and "Congress' fundamental purpose . . . was not to punish foreign agents for the activities described in the statute; rather, it was to compel disclosure to permit evaluation of these activities." *Id.* at 1093–94. As the court put it, "[p]remeditated murder



#112222867v1
#112223709v3

is one thing; failure to disclose, even in an open, highly regulated society, is quite another." *Id.* at 1093.

The six-level enhancement therefore cannot rest on the FARA label alone. The Government must prove through sufficient and reliable evidence that the requirements of § 2S1.1(b)(1) are satisfied, including that the particular underlying offense actually involved national security and that the defendant possessed the knowledge or belief required by subsection (B). *See United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013). The facts here do not establish any of that. In fact, as set out in the Preface to these objections, an honest assessment of the facts in this case points in exactly the opposite direction.

**B. A FARA Offense Does Not Automatically Involve National Security.**

The Guidelines have a home for offenses involving national security: Chapter Two, Part M, "Offenses Involving National Defense and Weapons of Mass Destruction," which covers treason, espionage, evasion of national-security export controls, and material support. The contrast is built into the Manual: when a money-laundering defendant also committed the underlying export-control or sanctions offense, § 2S1.1(a)(1) directs the court to use the offense level for that underlying offense, including § 2M5.1 where applicable. USSG §§ 2S1.1(a)(1), 2M5.1.

If a FARA violation were an offense involving national security, some guideline in that Part would be "sufficiently analogous" to it. The PSR concludes the opposite: no guideline anywhere in the Manual is sufficiently analogous to the FARA counts, so 18 U.S.C. § 3553 controls them. (PSR paragraph 158). Probation cannot hold both positions. Either FARA implicates national security and has a national security guideline, or it is what paragraph 158 says it is: an offense the Guidelines do not reach at all. The report cannot classify FARA as nothing for the offense level and as a national security threat for a six-level enhancement.

**C. There is no evidence that Rivera believed the money promoted an offense involving national security**

Subsection (b)(1)(B) is a *mens rea* provision. The Government must prove that Rivera, not Nuhfer or anyone else and not the conspiracy in the abstract, knew or believed the funds were the proceeds of, or were meant to promote, a national security offense. The verdict does not supply that finding; it established only what was charged, a willful non-registration, nothing more. The promotion prong does not rescue the enhancement either. It requires the same two things the Government lacks: an offense involving national security, and Rivera's knowledge of it. And the Government's own witnesses foreclose it. Its cooperator, Perera, did not believe the work was unlawful, and the Government told the jury he could not be charged for exactly that reason. (TT Apr. 28, 2026 at 10-11 and 33). Its witness Cabrera Morris never registered for her own Venezuela work with Rivera, said registration never crossed her mind, and she explained why: she represented an American company. (TT, Mar. 30, 2026, at p. 9:8-10, p. 161:25, p. 162:1, p. 169-170). Perera testified that this is what Rivera constantly and repeatedly said that this is what he believed. (TT, Mar. 8, 2026, at pp. 13-18). No witness testified that Rivera believed he was financing a threat to the national security of the United States. No document says it. Six levels roughly doubles the guideline range. The Government must earn those levels with proof of Rivera's state of mind, not with speculation.

The government's arguments at DE 589 in their response to Nuhfer's objection to the national security enhancement, do not directly address these arguments and amount to little more than pure sophistry-lawyer's arguments- without reference to any actual evidence that, for his part, Rivera actually *knew or believed* as required by the guideline that his conduct implicated U.S. national security. Particularly offensive are two government arguments at pages 20-22 of their response regarding U.S. sanctions on Venezuela and so-called efforts "to exploit longstanding



#112222867v1
#112223709v3

personal ties to senior U.S, political leaders". Every piece of relevant evidence in the case was that Rivera promoted U.S. sanctions against Venezuelan officials and that, through his staff, he *assisted* Rubio in having additional sanctions imposed.

Yes, Rivera did try for a short time to find a U.S. lawyer for Eric Malpica, an opposition supported member of the extended Maduro family, but that brief effort (which did not succeed) would have resulted in *perfectly legal and above-board efforts* by legal counsel within the established system for requesting and securing approval for removal from the OFAC list. The hiring of a lawyer for an OFAC delisting matter is both routine and legal. Nothing to see here about U.S. national security. And recommending a lawyer for this purpose is not FARA political activity in the United States. Nor was there even a scintilla of proof at trial that the Malpica effort was part of the (long cancelled) Consulting Agreement or of an effort to normalize relations for a Maduro led Venezuela with the U.S. which, after all, were the charges in the case.[17]

And to accuse Rivera of somehow coopting U.S. government officials like Rubio, Sessions and Conway, not only contradicts the trial testimony of Rubio and Sessions- who exclusively identified Rivera's anti-Maduro and Exxon efforts and said zero about any attempt to get them to help Maduro or a Maduro led Venezuela, including the April 2018 Venezuela Maduro/Allup meetings, is as absurd now as it was at the very end of the trial. More importantly, this sophistry by the government wholly fails the *U.S. v. Washington*, supra. test: real evidence, not lawyer's arguments., is required to prove a guideline enhancement.

---

[17] In fact, all of the relevant evidence was about how the partners tried to get paid separately or under an expanded agreement for the Malpica effort. (GX 15) (MIA chat Malpica references) proving that the effort had nothing to do with any existing agreement with Maduro, nor could it have been since Malpica was part of the opposition.



#112222867v1
#112223709v3

6. Based on the foregoing, Rivera contends that the use of the money laundering guidelines as the driver of the appropriate advisory guideline calculation in the case is wrong. Therefore, as paragraph 158 of the PSR correctly points out, there is no guideline or "analogous" guideline for the FARA registration counts which drive this case and, as such, USSG Section 2X5.1 *requires* that "the provisions of 18 U.S.C. § 3553 *shall control.*" (Italics added) Where the PSR goes completely off the rails is allowing the money laundering guideline to become the driver of the advisory sentencing guideline determination in a case where money laundering was, at most, an afterthought, the proverbial *"tail that wags the dog"* as the Supreme Court warned in *McMillan*, supra., as just a "normal part of the crime." Congress considered and, in the situation with no guideline, deemed FARA to be punishable under the provisions of Section 3553. (*Id.*, 553 U.S. 507).

With this in mind, Rivera will address the 3553 factors in both his separate downward variance motion and in his Sentencing Memorandum. However, as for the money laundering guidelines based on the above objections, the advisory guideline level should be as follows:

**2S1.1, 2B1.1 Base Offense Level = 8**
**2B1.1(H) Increase based on $1.1m in 1957 transactions = +14**
**Adjustment for Conviction under Section 1957 = +1**
**Total 2S1.1 Offense Level = 23**
**Adjustment for "offense involving national security" = 0**
**Adjustment for Role in the Offense = 0**
**Adjustment for Obstruction of Justice = 0**
**Reduction for Zero Point Offender = -2**
**Total Adjusted Money Laundering Offense Level= 21 (37-46 months)**

**<u>OBJECTION TO FAILURE TO RECOMMEND NON-GUIDELINE SENTENCE</u>**

7. Rivera objects to Part E, paragraph 221 of the PSR which states "the probation officer has not identified any factors that may warrant a sentence outside of the advisory guideline system." Seriously, what has become of our sentencing system when a probation officer can say



#112222867v1
#112223709v3

this about what would be a life sentence for a 60 year old first time, non-violent, offender with prostate cancer, for a registration crime that has no victims, no actual financial "loss" to anyone and accomplished nothing?[18] Neither Probation, nor apparently the Government, even acknowledge, much less apply, the requirement of 18 U.S.C. § 3553(a), that Rivera's sentence be ***"sufficient but not greater than necessary"*** to accomplish the statutory factors. This fact alone, along with the numerous paragraphs which are mistaken and misleading based on the actual evidence in the case, unmasks the entire PSR process for what it is: an overly aggressive expression of the prosecution- not of a neutral arm of the Court. See, *Agudelo v. U.S.*, 724 F. Supp. 1110 (E.D. NY 1989) (a federal probation officer is an arm of the court and not an agent of the prosecutor)

Rivera therefore requests that the Court sustain the objections raised herein and direct that the PSR include the mitigating factors set out in his Motion for 18 U.S.C. § 3553 Consideration or, in the Alternative, Motion for Downward Variance, being filed simultaneously herewith.

Respectfully submitted on August 14th, 2026.

**EDWARD R. SHOHAT, PA**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (786) 525-3621
By: */s/ Edward R. Shohat*
**Edward R. Shohat**
Florida Bar No. 152634

[18] In 2025, the Commission amended the Guidelines Manual to remove departures and policy statements relating to specific personal characteristics. (*See* USSG App. C, amend. 836 (effective Nov. 1, 2025). The Commission sought to make these changes to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures provided for within the Guidelines Manual in the wake of *United States v. Booker*, 543 U.S. 220 (2005), and subsequent decisions. The Commission envisioned and framed this 2025 amendment to be outcome neutral. As such, the removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence. The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a).

ed@edwardrshohat.com

**JONES WALKER LLP**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (305) 679-5700
By: *_/s/ David S. Weinstein_*
**David S. Weinstein**
Florida Bar No. 749214
dweinstein@joneswalker.com
*Counsel for David Rivera*



#112222867v1
#112223709v3